**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAYSUKH RUDANI, Individually And On Behalf Of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>        v.<br><br>IDEANOMICS, INC. f/k/a SEVEN STARS CLOUD GROUP, INC. f/k/a WECAST NETWORK, INC., ZHENG WU a/k/a BRUNO WU, BING YANG, and ROBERT BENYA, and FEDERICO TOVAR,<br><br>                        Defendants. | No: 1:19-cv-06741-GBD<br><br>**AMENDED SECURITIES CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

TABLE OF DEFINED TERMS AND ABREVIATIONS ............................................................. iii

TABLE OF PERSONS AND ENTITIES ................................................................................. v

CHRONOLOGY ................................................................................................................. vi

I.      NATURE AND SUMMARY OF THE ACTION ......................................................... 1

II.     JURISDICTION AND VENUE ................................................................................. 6

III.    THE PARTIES ...................................................................................................... 7

        A.      Lead Plaintiff ......................................................................................... 7

        B.      Defendants ............................................................................................ 7

        C.      Relevant Non-Party ............................................................................... 8

IV.     SUBSTANTIVE ALLEGATIONS ........................................................................... 8

        A.      The Company ........................................................................................ 8

        B.      Blockchain ............................................................................................ 9

        C.      Ideanomics Acquires SVG And WAG From BT Capital With A $250 Million
                Revenue And $15 Million Profit Guarantee, While Concealing SVG And WAG's
                Previous Revenues And Gross Losses ................................................... 11

        D.      Defendants Make False And/Or Misleading Statements Regarding Revenues And
                Profitability Of SVG/WAG And 2017 Company-Wide Guidance...................... 14

        E.      Ideanomics Announces A Crude Oil Business And Defendants Continue To Make
                False And/Or Misleading Statements About WSG ........................................ 18

        F.      Defendants Make A False And/Or Misleading Statement Touting $170 Million In
                Q4 2017 Crude Oil Revenue ................................................................... 20

        G.      Ideanomics Dismisses Its Auditor And Reveals 2017 Revenues ...................... 20

        H.      Defendants Make False And/Or Misleading Statements About Incorporating
                Blockchain And Artificial Intelligence Technology Into Ideanomics' Crude Oil
                Supply Chain Business .......................................................................... 22

        I.      Ideanomics Reveals That Crude Oil Revenue For The Fourth Quarter Of 2017
                Consisted Of $18.9 Million From Related Parties And Issues Shares To BT
                Capital Pursuant To SVG Purchase Agreement ................................................ 26

i

J.  Ideanomics Reveals That It Will Divest Its Consumer Electronics And Crude Oil Trading Businesses For Lack Of Profitability And That It Never Integrated Blockchain Into The Businesses .................................................................. 26

K.  Relevant Post-Class Period Events ...................................................... 27

V.  ADDITIONAL SCIENTER ALLEGATIONS .................................................. 29

A.  *Respondeat Superior* and Agency Principles Apply.............................. 29

B.  Defendants' Conscious Misbehavior And Recklessness Regarding SVG And WAG's Fourth Quarter 2016 Revenues And Unprofitability And Company-Wide 2017 Guidance ..................................................................................... 30

C.  Defendants' Conscious Misbehavior And Recklessness Regarding Actual Crude Oil Revenues In Q4 2017 ...................................................................... 33

D.  Defendants' Conscious Misbehavior And Recklessness Regarding The Integration Of Blockchain Into Crude Oil And Consumer Electronics ................................. 34

E.  The Defendants' Blockchain And Financial Experience ...................................... 36

F.  Defendants' Financial Motive................................................................... 37

G.  Terminations And Resignations.................................................................. 40

H.  Importance Of The Consumer Electronics And Crude Oil Businesses And The Integration Of Blockchain To The Company ......................................... 42

VI.  LOSS CAUSATION................................................................................... 43

VII.  CLASS ACTION ALLEGATIONS ............................................................. 46

VIII.  CONTROL PERSON LIABILITY................................................................ 49

IX.  THE FRAUD ON THE MARKET PRESUMPTION ...................................... 50

X.  NO STATUTORY SAFE HARBOR.............................................................. 51

XI.  CAUSES OF ACTION .............................................................................. 52

XII.  PRAYER FOR RELIEF ............................................................................. 56

XIII.  JURY TRIAL DEMAND ........................................................................... 56

**TABLE OF DEFINED TERMS AND ABBREVIATIONS**

| Term | Definition |
|---|---|
| **2Q 2018 10-Q** | Ideanomics, Quarterly Report (on Form 10-Q) (Aug. 13, 2018) |
| **3Q 2018 10-Q** | Ideanomics, Quarterly Report (on Form 10-Q) (Nov. 14, 2018) |
| **2016 Annual Report** | Ideanomics, 2016 Annual Report (on Form 10-K) (Mar. 31, 2017) |
| **2018 Annual Report** | Ideanomics, 2018 Annual Report (on Form 10-K) (Apr. 1, 2019) |
| **ASC** | Accounting Standards Codification |
| **Benya** | Defendant Robert Benya |
| **BF Borgers** | Ideanomics' auditor, BF Borgers CPA PC |
| **Bruno Wu** | Defendant Zheng Wu a/k/a Bruno Wu |
| **BT Capital** | Bruno Wu's BT Capital Global Limited |
| **BT Capital Guarantee** | § 2.3 of the SVG Purchase Agreement, which guaranteed the following: (i) audited Revenue of two fifty million U.S. dollars ($250,000,000) (the "Revenue Performance Guarantee"), and (ii) fifteen million U.S. Dollars ($15,000,000) of audited Gross Profit (the "Profit Performance Guarantee")  within twelve (12) months of the Closing |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **Chairman** | Chairman of the Board of Directors |
| **Class Period** | February 1, 2017 through November 13, 2018, both dates inclusive |
| **Company** | Defendant Ideanomics |
| **Complaint** | Amended Securities Class Action Complaint |
| **CRO** | Chief Revenue Officer |
| **Defendants** | Ideanomics, Bruno Wu, Yang, Tovar, and Benya |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **FASB** | Financial Accounting Standards Board |
| **First 2017 10-K** | Ideanomics, 2017 Annual Report (on Form 10-K) (Mar. 30, 2018) |
| **GAAP** | U.S. Generally Accepted Accounting Principles |
| **Grant Thornton** | Ideanomics' former auditor, Grant Thornton International |

## TABLE OF DEFINED TERMS AND ABBREVIATIONS

| Term | Definition |
|---|---|
| **Ideanomics** | Defendant Ideanomics, Inc. f/k/a Seven Stars Cloud Group, Inc. f/k/a Wecast Network Inc. |
| **MYP** | M.Y. Products, LLC |
| **NextGen** | NextGen Exchange Group, Inc. |
| **Ocasia** | Ideanomics' crude oil joint venture partner, Ocasia Group Holdings |
| **PCAOB** | Public Company Accounting Oversight Board |
| **Plaintiff** | Lead Plaintiff Jaysukh Rudani |
| **SEC** | U.S. Securities and Exchange Commission |
| **Second 2017 10-K** | Ideanomics, 2017 Annual Report (on Form 10-K/A) (Aug. 28, 2018) |
| **SOX** | Sarbanes-Oxley Act of 2002 |
| **SVG** | Sun Video Group HK Limited |
| **SVG Purchase Agreement** | Sun Video Securities Purchase Agreement |
| **Third 2017 10-K** | Ideanomics, 2017 Annual Report (on Form 10-K/A) (Dec. 14, 2018) |
| **TPaaS** | Transaction Platform as a Service |
| **Tovar** | Defendant Federico Tovar |
| **WAG** | Wide Angle Group Limited |
| **WSG** | Ideanomics' subsidiary, Wecast Services Group |
| **Wang** | CFO Simon Wang |
| **Yang** | Defendant Bing Yang |

**TABLE OF PERSONS AND ENTITIES**

| Name | Description |
|---|---|
| **Benya, Robert** | Defendant, President, CRO, and Director Robert Benya |
| **BF Borgers CPA PC** | Ideanomics' auditor, hired after Grant Thornton's dismissal |
| **BT Capital Global Limited** | Private equity fund controlled by Defendant Bruno Wu, which sold various entities to Defendant Ideanomics, including Sun Video Group HK Limited and Wide Angle Group Limited |
| **Tovar, Federico** | Defendant and CFO Federico Tovar |
| **Grant Thornton International** | Ideanomics' former auditor, dismissed in February 2018 |
| **Ideanomics, Inc. f/k/a Seven Stars Cloud Group, Inc. f/k/a Wecast Network Inc.** | Defendant corporation which claims to engage in several businesses, but primarily derived revenue from consumer electronics and crude oil supply chain businesses during the Class Period |
| **M.Y. Products, LLC** | A smart supply chain management operator, of which a 51% stake was acquired as a result of Ideanomics acquiring SVG |
| **NextGen Exchange Group, Inc.** | A blockchain and big data-enabled exchange acquired from Bruno Wu's affiliate, Redrock Capital Group, Limited, and which was added to the Wecast Services Group business |
| **Ocasia Group Holdings** | Ideanomics' crude oil joint venture partner, which engaged in trading of crude oil and guaranteed $500 million in net sales to Ideanomics from December 1, 2017 through December 30, 2018 |
| **Public Company Accounting Oversight Board** | A nonprofit corporation established by Congress to oversee the audits of public companies |
| **Wang, Simon** | Former CFO who resigned right after Ideanomics filed its First 2017 10-K |
| **Sun Video Group HK Limited** | A supply chain company controlled by Bruno Wu's BT Capital, which Ideanomics acquired on January 30, 2017 and rebranded as Wecast Services Group |
| **Wecast Services Group** | Ideanomics' subsidiary and rebranded SVG, which engaged in consumer electronics and crude oil businesses during the Class Period |
| **Wide Angle Group Limited** | An industrial/trade media and commerce company controlled by Bruno Wu's BT Capital, which Ideanomics acquired on January 31, 2017 and added to the Wecast Services Group |
| **Wu, Bruno** | Defendant, CEO, and Chairman Zheng Wu a/k/a Bruno Wu |
| **Yang, Bing** | Defendant and former CEO who was terminated by the Company in October 2017 |

## CHRONOLOGY

| Date | Event |
|---|---|
| Nov. 10, 2016 | Ideanomics, Sun Video Group HK Limited ("SVG"), and Wide Angle Group Limited ("WAG") are under the common control of Bruno Wu as defined by ASC Subtopic 805-50.  ¶39. |
| Feb. 1, 2017 | Class Period begins as Ideanomics, Bruno Wu, and Yang make misleading statements regarding acquisition of SVG from Bruno Wu-controlled BT Capital Global Limited ("BT Capital"), revenue and profit guarantee of $250 million and $15 million, respectively ("BT Capital Guarantee"), and $280 million 2017 revenue guidance, while omitting, *inter alia*, SVG and WAG's lack of historical revenues and unprofitability in the fourth quarter of 2016.  ¶¶36, 41. |
| Feb. 2, 2017 | Ideanomics announces acquisition of WAG from Bruno Wu-controlled BT Capital Global Limited ("BT Capital"), including WAG's revenues and profits in BT Capital's Guarantee; Company reiterates $280 million 2017 guidance.  ¶¶38, 45.

Ideanomics and Yang make misleading statement about acquisition of SVG and WAG, while omitting, *inter alia*, SVG and WAG's lack of historical revenues and unprofitability in the fourth quarter of 2016.  ¶45. |
| Mar. 31, 2017 | Ideanomics and Bruno Wu make misleading statements regarding 2017 revenue guidance while omitting, *inter alia*, SVG and WAG's lack of historical revenues and unprofitability in the fourth quarter of 2016.  ¶47. |
| Apr. 2017 | Ideanomics retains Grant Thornton International ("Grant Thornton") as its independent auditor.  ¶59. |
| May 15, 2017 | Ideanomics and Bruno Wu make misleading statement regarding 2017 revenue guidance while omitting, *inter alia*, SVG and WAG's lack of historical revenues and unprofitability in the fourth quarter of 2016.  ¶49. |
| June 9, 2017 | Ideanomics enters into Securities Purchase Agreement with Bruno Wu affiliate to acquire NextGen, for sole consideration of adding NextGen to BT Capital Guarantee.  ¶51. |
| Aug. 14, 2017 | Ideanomics enters into joint venture partnership deal with Ocasia Group Holding ("Ocasia"), a crude oil trading business.  ¶52. |
| Oct. 2017 | Company begins crude oil trading under Ocasia joint venture.  ¶53. |
| Oct. 9, 2017 | Company terminates CEO Yang.  ¶107. |
| Nov. 13, 2017 | Ideanomics and Bruno Wu make false and/or misleading statements 2017 revenue guidance, including that Ideanomics was on track to meet that guidance, while omitting, *inter alia*, SVG and WAG's lack of historical revenues and unprofitability in the fourth quarter of 2016 and Company's intent to operate consumer electronic and crude oil businesses for research purposes only.  ¶47.

Ideanomics touts $500 million net sales guarantee from Dec. 1, 2017 until Dec. 31, 2018 with Ocasia crude oil partnership.  ¶56. |

## CHRONOLOGY

| Date | Event |
|---|---|
| **Dec. 22, 2017** | Ideanomics issues press release announcing "Brief Update on Company Vision," which hyped Company as "next-generation Artificial Intelligence and Block-chain Powered[.]"  ¶66. |
| **Jan. 16, 2018** | Ideanomics issues press release falsely stating that crude oil revenues for the fourth quarter of 2017 alone totaled $170 million.  ¶57. |
| **Feb. 22, 2018** | After market close, Ideanomics files Form 8-K announcing dismissal of Grant Thornton less than a year after they were retained.  ¶59. |
| **Feb. 23, 2018** | Pre-market open, Ideanomics issued press release announcing retention of BFA Borgers CPA PC to replace Grant Thornton as its auditor.  ¶¶60-61.

Also, pre-market open, Ideanomics announces massive revenue miss, stating that revenue for 2017 would total only $125-$144 million despite $300 million guidance and purported $170 million crude oil revenues.  ¶62.

On this news, Ideanomics' stock price dropped from a closing price of $2.80 per share on February 22, 2018 to close at $1.70 per share on February 23, 2018—a $1.10 or a 39.3% drop.  ¶63. |
| **Apr. 6, 2018** | CFO Wang resigns.  ¶108. |
| **May 15, 2018** | Bruno Wu makes false statements during earnings call regarding integration of blockchain into crude oil.  ¶67. |
| **Aug. 3, 2018** | Ideanomics' board of directors approves of the issuance of 16.5 million shares (at $1.50 per share) to BT Capital per SVG Purchase Agreement, or $24.75 million out of the $50 million BT Capital would have gotten if BT Capital Guarantee was met.  ¶74. |
| **Aug. 13, 2018** | Ideanomics, Tovar, and Benya make false and/or misleading statements regarding integration of blockchain into crude oil and consumer electronics businesses in Quarterly Report on Form 10-Q for 2nd quarter 2018, and earnings call.  ¶¶68, 70. |
| **Aug. 28, 2018** | Ideanomics files amended 2017 Annual Report on Form 10-K/A with the SEC ("Second 2017 10-K"), revealing that it made only $18.9 million in crude oil revenue from related parties in 2017.  ¶72.

On this news, Ideanomics' stock price dropped from a closing price of $4.95 per share on August 27, 2018, to close at $4.05 per share on August 28, 2018—a $0.90 or 18.2% drop.  ¶73. |
| **Nov. 13, 2018** | Last day of the Class Period.  ¶1. |
| **Nov. 14, 2018** | Pre-market open, the Company announces that it is divesting its crude oil and consumer electronics businesses due to "low margins."  ¶75.

On this news, Ideanomics stock price dropped from a closing price of $3.26 per share on November 13, 2018 to close at $1.67 per share on November 14, 2018—a |

## CHRONOLOGY

| Date | Event |
|---|---|
| | $1.59 or 48.8% drop.  ¶76.<br><br>Post-market close, the Company files quarterly report on Form 10-Q for the third quarter of 2018, admitting that the Company did not integrate blockchain into its consumer electronics or crude oil businesses, and omitting mention of the "Venus" blockchain platform previously touted.  ¶77. |
| **Dec. 2018** | Ideanomics sells WAG to Hooxi, a Bruno Wu company, for a "nominal amount," losing $1.2 million.  ¶78. |
| **Dec. 14, 2018** | Ideanomics filed second amended 2017 Annual Report on Form 10-K/A with the SEC revealing that the Company never intended to maintain its consumer electronics or crude oil businesses, and only intended to operate these businness for "research purposes," and deleting mentions of "Venue Blockchain."  ¶79. |
| **Apr. 1, 2019** | Company files 2018 Annual Report that reveals full crude oil revenue for fourth quarter of 2017 was only $19 million (including $18.9 million from related party previously disclosed) and that gross profit in 2018 fell by more than half ($7.1 million in 2017 to $3.1 million in 2018).  ¶80. |
| **Present** | Company has abandoned consumer electronics and crude oil altogether and now claims to focus on electric vehicles.  ¶81. |

The allegations in this Amended Securities Class Action Complaint ("Complaint") are based on the personal knowledge of Lead Plaintiff Jaysukh Rudani ("Plaintiff"), as to Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Plaintiff's information and belief is based upon the substantial investigation by Plaintiff's counsel into the facts and circumstances alleged herein, based on the following: (i) a review and analysis of those public filings referenced herein that Ideanomics, Inc.—f/k/a Seven Stars Cloud Group, Inc.—f/k/a Wecast Network Inc. ("Ideanomics" or the "Company") made with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of those press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Ideanomics and/or the other defendants named herein; (iii) a review and analysis of those Company conference calls, press conferences, and related statements and materials referenced herein; and (iv) review and analysis of those other documents referenced herein.  The mere reference to a document herein does not automatically incorporate it by reference.[1]  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  Many additional facts supporting the allegations are known only to the Defendants and/or are within their exclusive custody or control.  Plaintiff believes that additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## I.  NATURE AND SUMMARY OF THE ACTION

1.  Subject to certain exclusions, this is a federal securities class action brought on behalf of a class consisting of all persons or entities who purchased or otherwise acquired publicly traded Ideanomics stock at artificially inflated prices between February 1, 2017 and November 13, 2018, both dates inclusive (the "Class Period"), and were damaged thereby,

---

[1]   All internal citations and quotations are omitted and all emphases are added unless otherwise noted.

seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      Ideanomics is a company in search of a business.  Over a period of just three years, it changed its name three times and went from providing video-on-demand services to becoming involved in consumer electronics, smart supply chain management, and crude oil trading businesses, all while purportedly in pursuit of its goal of becoming a "next generation Artificial-Intelligence and Blockchain-Powered Financial Technology Company."  Indeed, when Ideanomics obtained its current name, its Chairman and founder, Bruno Wu, emphasized the value of ideas—not execution—in a press release replete with corporate buzzwords:  "The combination of the 'idea' and the 'field of economics,' yields Ideanomics—a new paradigm and model for solving problems, creating efficiencies, and more equitably distributing wealth and knowledge.  Ideas create value.  With ideas, there is a future.  Ideanomics, we are digitizing tomorrow!"

3.      During the Class Period, Defendants made three broad categories of misrepresentations concerning Ideanomics' businesses.  First, Defendants touted Ideanomics' acquisition of Sun Video Group HK Limited ("SVG") and Wide Angle Group Limited ("WAG") from a private equity fund controlled by defendant Bruno Wu which came with a $250 million revenue and $15 million gross profit *guarantee* and which guarantees Ideanomics used to support its 2017 Company-wide revenue guidance of $280 million (later raised to $300 million).  Defendants omitted, however, that in the fourth quarter of 2016—immediately prior to Ideanomics' acquisition of SVG and WAG—***SVG and WAG generated only $30 million in revenue and incurred a $0.4 million loss***.  Second, on January 16, 2018, Ideanomics misrepresented that the Company had already generated crude oil revenues for the fourth quarter

2

of 2017 of $170 million, when, in fact, revenues were at most $19 million.  Third, after

disappointing investors in 2017, Ideanomics began touting the integration of blockchain and

artificial intelligence technology into its consumer electronics and crude oil businesses, when in

fact no such integration had occurred.

4.      With respect to the first category of Defendants' fraudulent statements, on

February 1, 2017, Ideanomics announced the acquisition of Bruno Wu-controlled SVG.  In

exchange, Bruno Wu's BT Capital Global Limited ("BT Capital") obtained $800,000 in cash and

a $50 million promissory note convertible into 33,333,333 Ideanomics shares at $1.50 per share.

As part of the acquisition, BT Capital guaranteed that SVG would earn at least ***$250 million***

***revenue*** and ***$15 million in gross profit*** within a year of the agreement's closing.[2]  Ideanomics

then announced the acquisition of WAG, whose revenues/profits would count towards the

guarantee.  Based on these acquisitions, Ideanomics issued a revenue guidance of $280 million

for 2017, which it promptly raised to $300 million.[3]

5.      Unbeknownst to investors, from November 10, 2016 to December 31, 2016

alone—the quarter immediately preceding the acquisitions, SVG and WAG, combined, ***obtained***

***$30 million in revenue while incurring*** a ***net <u>loss</u> of $0.4 million***, meaning that it was doubtful

if not highly unlikely that SVG and WAG would be able to meet the revenue and gross profit

guarantees that were a highly touted part of the deal, meaning that the guidance the Company

issued as a result of these acquisitions was likewise doubtful if not highly unlikely to occur.

---

[2]      As explained in more detail below, if SVG failed to meet the guarantee, it would have to
return shares on a *pro rata* basis based on the lowest percentage performance metric, *i.e.*, if
SVG's actual profits constituted a lower percentage of the guarantee than revenues, then the
shares returned would be based on profits.

[3]      Ideanomics' fiscal year tracks the calendar year.

Indeed, the Company would go on to acquire additional companies and businesses to add new revenue/profit streams to the guarantee in an attempt to make up for SVG and WAG's lack of revenues and unprofitability throughout the Class Period.  As well, the SVG and WAG acquisitions marked the beginning of a Company shopping spree where it acquired several other companies from Bruno Wu-controlled or-affiliated companies during the Class Period.

6.      With respect to the second category of Defendants' fraudulent statements, in October 2017, the Company began a crude oil trading joint venture with Ocasia Group Holdings ("Ocasia").  Shortly thereafter, on January 16, 2018 after the conclusion of the fourth quarter, Defendants boasted that the crude oil business *alone generated Ideanomics $170 million in revenues for the fourth quarter of 2017* and *touted a $500 million net sales "guarantee" from Ocasia for December 1, 2017 through December 31, 2018*.

7.      Investors were subsequently—and justifiably—shocked when, on February 23, 2018, the Company announced that it was firing its auditor and that its revenues for all of 2017 would *not exceed $144 million,* far below the $300 million guidance Ideanomics claimed it was on track to meet in November 2017 and likewise well below the $170 million in crude oil-related revenues that it touted just a month before.  Ideanomics also claimed that firing then-CEO Yang back in October 2017—which Ideanomics had previously claimed was a resignation—was a step it had taken to remedy issues that had led to this massive miss.

8.      On this news, Ideanomics' stock price dropped from a closing price of $2.80 per share on February 22, 2018 to close at $1.70 per share on February 23, 2018—a $1.10 or a 39.3% drop.

9.      A few months later, on August 28, 2018, in response to SEC comments, the Company amended its Annual Report on Form 10-K/A for 2017, revealing, in part, that *crude oil*

*revenues consisted of $18.9 million from related parties*.  This was approximately $151 million or 89% less than the $170 million in revenues Ideanomics previously claimed the crude oil business had already generated in the fourth quarter of 2017 as of January 16, 2018.

10.     On this news, Ideanomics' stock price dropped from a closing price of $4.95 per share on August 27, 2018, to close at $4.05 per share on August 28, 2018—a $0.90 or 18.2% drop.

11.     With respect to the third category of Defendants' fraudulent statements, not long after the Company's disappointing 2017 revenues were made public in February 2018, Defendants began making misrepresentations to investors about the role of blockchain in its consumer electronics and crude oil businesses.  By way of background, while blockchain is perhaps best known for its association with cryptocurrencies like Bitcoin, blockchain can be used in any process involving transactions and exchanging data.  Blockchain is an immutable ledger which is shared and updated by multiple computers simultaneously.  It creates a system where parties can connect directly with each other, without the need for intermediaries like banks or brokers.  Because it is not centralized, blockchain can provide greater transparency, increased efficiency, better security, and increased traceability of products.

12.     Starting in May 2018, the Company began to represent that its crude oil business was *already utilizing* blockchain technology and artificial intelligence, allowing the Company to access higher margins (*i.e.*, profits), with the intent to apply blockchain in the consumer electronics business.  Unbeknownst to investors, the Company was merely seizing on the blockchain craze around this time to give its share price an artificial boost.  As the Company would later reveal, no such integration actually occurred.  In fact, Ideanomics had no intention of

even remaining in the consumer electronics and crude oil businesses, as it later disclosed that it was *only operating them during this time for "research," not "competitive returns*."

13.     Subsequently, on November 14, 2018, the Company announced that it was divesting from its consumer electronics business, SVG and WAG—the same business that incurred losses before being sold to Ideanomics by Bruno Wu—and its crude oil business to pursue "higher margins," *i.e.*, profits.  That same day, capping a spate of suspicious resignations and terminations throughout the Class Period, the Company announced Bruno Wu's temporary resignation, presumably to lay low as the market digested all of this negative information.  As well, in a quarterly report on Form 10-Q filed that day, the Company finally admitted that its crude oil and consumer electronics business *had never integrated blockchain technology*.

14.     On this news, Ideanomics stock price dropped from a closing price of $3.26 per share on November 13, 2018 to close at $1.67 per share on November 14, 2018—a $1.59 or 48.8% drop.

15.     Defendants' fraudulent acts and omissions, which led to the artificial inflation and precipitous decline in the market value of the Company's stock when the truth was revealed, caused Plaintiff and other Class members to suffer significant damages, which this action seeks to recover.

## II.     JURISDICTION AND VENUE

16.     This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Ideanomics is headquartered in this District, and certain of the acts and conduct complained of herein, including the dissemination and/or omission of materially false and/or misleading information to the investing public, occurred in this District.

19.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## III.    THE PARTIES

### A.    Lead Plaintiff

20.     Plaintiff purchased Ideanomics stock at artificially inflated prices during the Class Period and was damaged thereby when the truth was revealed, as set forth in the certification submitted to the Court.  ECF No. 21-2.

### B.    Defendants

21.     Defendant Ideanomics is incorporated in Nevada with principal executive offices located at 55 Broadway, 19th Floor, New York, New York 10006.  The Company's common stock trades on the NASDAQ under the ticker symbol "IDEX" and previously traded under the ticker symbols "SSC" and "WCST."

22.     Defendant Zheng Wu a/k/a Bruno Wu ("Bruno Wu") was at all relevant times Ideanomics' founder, Chairman of the Board of Directors ("Chairman"), and also served as Chief Executive Officer ("CEO") beginning on October 9, 2017.

23.     Defendant Bing Yang ("Yang") served as CEO and director of Ideanomics from December 2016 until he was dismissed from the Company on or around October 9, 2017.

24.     Defendant Federico Tovar ("Tovar") served as Chief Financial Officer ("CFO") of Ideanomics beginning on June 1, 2018 until his resignation on or around April 30, 2019.

25.     Defendant Robert Benya ("Benya") served as the President, Chief Revenue Officer ("CRO"), and director of Ideanomics beginning on or around October 2017 until he resigned on November 12, 2018.

26.     Defendants Bruno Wu, Yang, Tovar, and Benya are collectively referred to herein as the "Individual Defendants."

**C.     Relevant Non-Party**

27.     BT Capital Global Limited, or BT Capital, is a private equity fund controlled by Bruno Wu.  During the Class Period, Bruno Wu's BT Capital sold several businesses to Ideanomics.

## IV.     SUBSTANTIVE ALLEGATIONS

**A.     The Company**

28.     The Company's primary business activity from 2010 until 2017 was providing premium content video on demand services under the brand name "You-on-Demand," with primary operations in the People's Republic of China ("PRC").  Ideanomics, 2017 Annual Report (on Form 10-K), at 4 (Mar. 30, 2018).  In late 2016, the Company changed its name from "You-on-Demand Holdings, Inc." to Wecast Network, Inc." ("Wecast").  Press Release, *YOU On Demand. . . Announces corporate Name Change . . . to WeCast Network, Inc.* (Sept. 19, 2016).

29.     Then, Wecast acquired two companies in early 2017 that were controlled by Wecast's Chairman Bruno Wu:  Sun Video Group HK Limited—or SVG—and Wide Angle Group Limited—or WAG.  Press Release, *Wecast Network Completes Acquisition of Sun Video Group and Issues 2017 Company-Wide Guidance of $280 Million Revenue* (Feb. 1, 2017); Press Release, *Wecast Network Acquires 55% of Wide Angle Group Limited* (Feb. 2, 2017).  As a

result of these acquisitions, during the Class Period, Wecast became involved in "consumer electronics" and "smart supply chain management operations."  Ideanomics, 2017 Annual Report (on Form 10-K), at 4 (Mar. 30, 2018).  A few months later, Wecast changed its name to Seven Stars Cloud Group, Inc. ("Seven Stars Cloud").  Press Release, *Wecast Announces Corporate Name Change to Seven Stars Cloud Group* (June 5, 2017).

30.     Then, in August 2017, the Company announced that it entered into a joint venture partnership deal with Ocasia Group Holdings, or Ocasia, a company which was engaged in a broad range of activities including the trading of physical crude oil, fuel oil, and refined oil products as well as oil storage facilities.  Press Release, *Seven Stars Cloud Announces 2 New Separate JV Partnerships* (Aug. 14, 2017).

31.     Subsequently, in December 2017, Seven Stars Cloud announced that it was "applying Blockchain and Artificial Intelligence to create a hybrid solution for supply chain finance."  *See* Press Release, *Seven Stars Cloud Chairman & CEO Bruno Wu Provides Brief Update on Company Vision* (Dec. 22, 2017).  Seven Stars Cloud would get yet another name change the following year, when the Company adopted its present name, Ideanomics.[4]  *See* Press Release, *Seven Stars Cloud Announces Business Name Change to Ideanomics* (Aug. 27, 2018).

**B.     Blockchain**

32.     Blockchain is "a time-stamped series of immutable record of data that is managed by a cluster of computers not owned by any single entity.  Each of these blocks of data (*i.e.*, block) are secured and bound to each other using cryptographic principles (*i.e.*, chain)."  Ameer Rosic, *What is Blockchain Technology? A Step-by-Step Guide For Beginners*,

---

[4]     Plaintiff refers to the Company by its three names—Ideanomics, Seven Stars Cloud, and Wecast—interchangeably throughout the Complaint.

https://blockgeeks.com/guides/what-is-blockchain-technology/ (last updated Mar. 1, 2019).  The

following analogy is apt:

> Picture a spreadsheet that is duplicated thousands of times across a network of
> computers.  Then imagine that this network is designed to regularly update this
> spreadsheet and you have a basic understanding of the blockchain.  Information
> held on a blockchain exists as a shared—and continually reconciled—database.
> This is a way of using the network that has obvious benefits.  The blockchain
> database isn't stored in any single location, meaning the records it keeps are truly
> public and easily verifiable.  No centralized version of this information exists for
> a hacker to corrupt.  Hosted by millions of computers simultaneously, its data is
> accessible to anyone on the internet.

*Id.*

33.     Blockchain's decentralized nature provides certain benefits, including the

following: (1) greater transparency; (2) increased efficiency as a result of the removal of

middlemen in processes and facilitating faster peer-to-peer transactions; (3) better security as a

result of its immutable and decentralized nature; and (4) increased traceability of products.  *See*

*Ilker Koksal*, Forbes, *The Benefits of Applying Blockchain Technology In Any Industry* (Oct. 23,

2019).

34.     Seizing on the blockchain hype, several publicly traded companies incorporated

blockchain into their names or business practices.  Indeed, as Reuters noted, "If you want a quick

boost to your company's share price, adding 'blockchain' to your name will work—at least for

awhile."  Alasdair Pal, Reuters, Fintech, *Blockchain name-grabbing has echoes of dotcom*

*bubble*, https://www.reuters.com/article/us-blockchain-companies/blockchain-name-grabbing-

has-echoes-of-dotcom-bubble-idUSKBN1FS1F3 (Feb. 8, 2018).  The average share price of

companies capitalizing on the blockchain craze rose "more than threefold since" those name

changes.  *Id.*

35.     Indeed, the SEC took notice.  "***The SEC is looking closely at the disclosures of***

***public companies that shift their business models to capitalize on the perceived promise of***

***distributed ledger technology and whether the disclosures comply with the securities laws***,

particularly in the case of an offering."  International Business Times, *SEC Looking Into*

*Companies With Vapid Blockchain Hype*, https://www.ibtimes.com/sec-looking-companies-

vapid-blockchain-hype-2644217 (Jan. 23, 2018) (quoting Chairman of the SEC, Jay Clayton).

Indeed, Jay Clayton, the SEC's Chairman, posed the following hypothetical in opening remarks

at the Securities Regulation Institute:

> I doubt anyone in this audience thinks it would be acceptable for a public
> company with no meaningful track record in pursuing the commercialization of
> distributed ledger or blockchain technology to (1) start to dabble in blockchain
> activities, (2) change its name to something like 'Blockchain-R-Us,' and (3)
> immediately offer securities, without providing adequate disclosure to Main Street
> investors about those changes and the risks involved.  ***The SEC is looking closely***
> ***at the <u>disclosures</u> of public companies that shift their business models to***
> ***capitalize on the perceived promise of distributed ledger technology and***
> ***whether the disclosures comply with the securities laws***, particularly in the case
> of an offering.

SEC, Chairman Jay Clayton, *Opening Remarks at the Securities Regulation Institute*,

https://www.sec.gov/news/speech/speech-clayton-012218 (Jan. 22, 2018).

### C.     Ideanomics Acquires SVG And WAG From BT Capital With A $250 Million Revenue And $15 Million Profit Guarantee, While Concealing SVG And WAG's Previous Revenues And Gross Losses

36.     On February 1, 2017, Ideanomics (then Wecast) announced the completion of its

acquisition of supply chain company SVG along with SVG's 51% ownership stake in smart

supply chain management operator M.Y. Products, LLC ("MYP") from Bruno Wu-controlled

BT Capital.  *See* Press Release, *Wecast Network Completes Acquisition of Sun Video Group and*

*Issues 2017 Company-Wide Guidance of $280 Million Revenue* (Feb. 1, 2017).  Ideanomics

acquired SVG in exchange for an $800,000 cash payment to BT Capital and a promissory note of

$50 million with principal and interest automatically[5] convertible into Ideanomics shares at $1.50 per share (33,333,333 shares).  *Id.*  The Company announced that SVG would be rebranded as the "Wecast Services Group" ("WSG").  *Id.*  The WSG subsidiary would primarily engage in consumer electronics and smart supply chain management operations, and later on crude oil trading.  *See* Ideanomics, 2017 Annual Report (on Form 10-K), at *31-32 (Mar. 30, 2018) ("First 2017 10-K"); *see also* Ideanomics, 2018 Annual Report (on Form 10-K), at 45 (Apr. 1, 2019).

37.   Under § 2.3 of Ideanomics and BT Capital's Sun Video Securities Purchase Agreement ("SVG Purchase Agreement"), BT Capital *guaranteed* that SVG would achieve $250 million in audited revenue and $15 million in audited gross profits ("BT Capital Guarantee") within a year.  SVG Purchase Agreement § 2.3.  The revenues counting towards the BT Capital Guarantee would be based on the consolidated revenue and gross profit of SVG, its subsidiaries, *any new businesses started by SVG or its subsidiaries,* and "*any companies acquired by [SVG] or its subsidiaries . . . , provided that [Ideanomics'] Board of Directors approves of such future acquisitions*."  *Id.*  If SVG—along with its subsidiaries/new businesses—failed to meet the BT Capital Guarantee, then BT Capital *must forfeit back* the Ideanomics shares BT Capital received from the convertible $50 million promissory note on a *pro rata* basis depending on whichever guarantee achieves the lowest percentage.  *Id.*  That is, if SVG achieved only half of the revenue guarantee but achieved two-thirds of the profit guarantee, then the shares forfeited would be based on revenue.  *Id.*

---

[5]    The promissory note contained an "Automatic Conversion," meaning that once stockholders approved of the conversion, the principal and accrued but unpaid interest "*shall be automatically converted into shares*" at $1.50 per share.  *See* Ideanomics, 2017 Annual Report (on Form 10-K), Ex. 10.55, Convertible Promissory Note, at §§ 2.2, 2.3 (dated Jan. 30, 2017).

38.     The next day, on February 2, 2017, Ideanomics (then Wecast) announced that it acquired 55% of industrial/trade media and commerce company WAG from Bruno Wu's BT Capital.  Press Release, *Wecast Network Acquires 55% of Wide Angle Group Limited* (Feb. 2, 2017).  According to the Company, the sole consideration for acquiring WAG was that Ideanomics must add WAG to the SVG business (*i.e.*, WSG), thereby causing the revenue and gross profit from WAG to be included in the calculation of the BT Capital Guarantees.  *Id.*

39.     Unbeknownst to investors, was that in the quarter directly preceding their acquisition, SVG and WAG, collectively, were unprofitable businesses with revenues well below the BT Capital Guarantee.  As would later be revealed in a Form 10-K filed on March 30, 2018, SVG and WAG collectively obtained ***only $30 million in revenue while incurring a loss of $475,046 in the fourth quarter of 2016 alone***.  Ideanomics, 2017 Annual Report (on Form 10-K), 31-32 (Mar. 30, 2018).[6]  These facts were revealed to investors because, as the Company admitted, Ideanomics, SVG, and WAG were under common control by Bruno Wu when SVG and WAG were acquired, with such common control beginning in November 10, 2016.  *See* Ideanomics, 2017 Annual Report (on Form 10-K), 31 (Mar. 30, 2018).  Thus, under Accounting Standards Codification ("ASC")[7] Subtopic 805-50, which is a part of GAAP, the Company acknowledged that "financials for the year 2016 [must] be adjusted respectively as if [SVG and WAG] had been owned by the Company since November 10, 2016 when common control

---

[6]     The Form 10-K filed on March 30, 2018 only reports the combined revenues and losses for SVG and WAG.

[7]     The ASC provides the source for Generally Accepted Accounting Principles ("GAAP") and is maintained by the Financial Accounting Standards Board ("FASB").  *See* Deloitte, *FASB Accounting Standards Codification*, https://www.iasplus.com/en-us/standards/fasb (last visited Dec. 2, 2019).

existed in accordance with US GAAP[.]"  *Id.*; *see also* Deloitte, *A Roadmap to Common-Control Transactions*, at 15 (Oct. 2016) ("Financial statements and financial information presented for prior years also shall be retrospectively adjusted to furnish comparative information.  All adjusted financial statements and financial summaries shall indicate clearly that financial data of previously separate entities are combined.").

40.     Notwithstanding SVG and WAG's previous low revenues and unprofitability, Defendants continued to tout SVG and WAG (which were under the newly formed WSG) and Ideanomics' initial $280 million and revised $300 million revenue guidance for 2017 while omitting or misrepresenting SVG/WAG's profitability and limited historical revenue in their public statements.

**D.     Defendants Make False And/Or Misleading Statements Regarding Revenues And Profitability Of SVG/WAG And 2017 Company-Wide Guidance[8]**

41.     The Class Period begins on February 1, 2017, pre-market open, when Ideanomics issued a press release titled "Wecast Network Completes Acquisition of Sun Video Group and Issues 2017 Company-Wide Guidance of $280 Million Revenue," announcing the SVG acquisition.  The press release stated, in relevant part:

> ***As previously mentioned and as part of the original deal, SVG <u>guaranteed</u> it would achieve certain revenue and profitability milestones within 12 months of closing the transaction.***  If SVG fails to meet the guarantee, then SVG would forfeit back to the Company the WCST promissory note / common stock it received, on a prorate[d] basis.  ***As part of the negotiation process, that revenue milestone has been increased to $250 million (up from $200 million) and the gross profit milestone has been established at $15 million***.

---

[8]     With respect to statements flagged as false and/or misleading in this Complaint, the statements being challenged as false and/or misleading are those statements that are ***bolded, italicized, <u>underlined</u>, or otherwise highlighted*** for emphasis.  All false and/or misleading statements identified in this Complaint were knowingly and/or recklessly made by the identified speakers.

42.     The statements by Ideanomics in ¶41 were misleading when made, in the context of the BT Capital Guarantee, because the following fact was omitted or misrepresented: *in the fourth quarter of 2016 alone*, SVG and WAG were unprofitable businesses that incurred a collective loss of $475,046 and generated only $30 million in revenues, ¶39, which made it doubtful and in any event materially less likely that Ideanomics would meet the BT Capital Guarantee and 2017 revenue guidance.

43.     The February 1, 2017 press release also quotes Yang as stating, "*Based on all of this, today [Ideanomics] is confident in issuing Company-wide 2017 guidance of $280 million top-line revenue*."

44.     The statement by Yang and Ideanomics in ¶43 was misleading when made, in the context of the BT Capital Guarantee and the $280 million guidance, because the following facts were omitted or misrepresented:

a)     that in the fourth quarter of 2016, SVG and WAG generated only $30 million in revenue and were unprofitable businesses that incurred a collective loss of $475,046, which made it doubtful and in any event materially less likely that Ideanomics would meet its 2017 revenue guidance, ¶39;

b)     the Company was only operating its consumer electronics business for "research purposes" and "not primarily with a view to competitive returns," ¶77; and

c)     and as a result, the guidance had no reasonable basis.

45.     In a February 2, 2017 press release, Ideanomics announced the acquisition of WAG, and Yang was quoted as stating the following about the acquisition of WAG: "*Not only will it directly and significantly bolster the financial performance of the Wecast Services*

**Group**, **_but the accretive nature_** extends even further as Wecast Network is acquiring 55% of WAG for no additional stock or monetary consideration."

46.     The statement by Ideanomics and Yang in ¶45 was misleading when made, in the context of the BT Capital Guarantee and the $280 million full year 2017 guidance, because the following facts were omitted or misrepresented:

    a)    that in the fourth quarter of 2016, SVG and WAG generated only $30 million in revenue and were unprofitable businesses that incurred a collective loss of $475,046, which made it doubtful and in any event materially less likely that Ideanomics would meet its 2017 revenue guidance, ¶39; and

    b)    the Company was only operating its consumer electronics business for "research purposes" and "not primarily with a view to competitive returns," ¶77;

    c)    as a result, the guidance had no reasonable basis.

47.     On March 31, 2017, during the earnings call, Bruno Wu and Yang stated:

[Bruno Wu]: Before I turn the call over to Bing [Yang]**, _I'm pleased to note the company today is raising its full-year revenue guidance from $280 million to $300 million based on recent visibility of and internal projections for 2017. This projection is based currently on the Wecast Service Group, which, as a reminder, is a new operational and branding for the recently purchased Sun Video Group_**.

\* \* \*

[Yang]: **_But for now, as Bruno previously mentioned, we are raising our full-year, top-line revenue guidance to $300 million for the full-year 2017._**

Ideanomics, Q4 2016 Earnings Call, at 2 (Mar. 31, 2017) (Bloomberg LP Tr.).

48.     The statements by Ideanomics, Bruno Wu, and Yang in ¶47 were misleading when made, in the context of the BT Capital Guarantee and the $300 million full year 2017 guidance, because the following facts were omitted or misrepresented:

a)      that in the fourth quarter of 2016, SVG and WAG generated only $30 million in revenue and were unprofitable businesses that incurred a collective loss of $475,046, which made it doubtful and in any event materially less likely that Ideanomics would meet its 2017 revenue guidance, ¶39;

b)      the Company was only operating its consumer electronics business for "research purposes" and "not primarily with a view to competitive returns," ¶77;

c)      as a result, the guidance had no reasonable basis.

49.      On May 15, 2017, during the Company's Q1 2017 Earnings Call with investors, Bruno Wu stated, in relevant part, "Secondly, while we will not be providing any guidance into Q2 revenue today, ***based on the progression we have seen thus far and the ramp-up that we anticipate***, *we are reiterating our full-year top-line revenue guidance of $300 million*."

50.      The statement by Ideanomics and Bruno Wu in ¶49 was misleading when made, in the context of the BT Capital Guarantee and the $300 million full year 2017 guidance, because the following facts were omitted or misrepresented:

a)      that in the fourth quarter of 2016, SVG and WAG generated only $30 million in revenue and were unprofitable businesses that incurred a collective loss of $475,046, which made it doubtful and in any event materially less likely that Ideanomics would meet its 2017 revenue guidance, ¶39; and

b)      the Company was only operating its consumer electronics business for "research purposes" and "not primarily with a view to competitive returns," ¶77

c)      as a result, the guidance had no reasonable basis.

51.      On June 9, 2017, Ideanomics entered into a Securities Purchase Agreement with Redrock Capital Group, Limited, a Bruno Wu affiliate, acquiring 51% of NextGen Exchange

17

Group, Inc. ("NextGen") for the sole consideration of the Company adding NextGen to the Sun

Video Business acquired by the Company under the Sun Video SPA, and including the revenue

and gross profit from NexGen in the calculation of the BT Capital Guarantee.  *See* Ideanomics,

Current Report (on Form 8-K), Item 1.01 (June 12, 2017).  Ideanomics touted NextGen's

blockchain credentials as "the first Blockchain and Big Data-enabled index exchange, which will

reside and operate under" WSG.  *Id.*

### E.    Ideanomics Announces A Crude Oil Business And Defendants Continue To Make False And/Or Misleading Statements About WSG

52.    On August 14, 2017, Ideanomics announced that it entered into a joint venture

partnership deal with Ocasia, a company engaged in the trading of physical crude oil, fuel oil,

and refined oil products.  Press Release, *Seven Stars Cloud Announces 2 New Separate JV*

*Partnerships* (Aug. 14, 2017).  As would later be revealed, this crude oil business would operate

under Ideanomics' subsidiary WSG, and, presumably, the crude oil revenues would be included

in the BT Capital Guarantee.  *See* Ideanomics, 2017 Annual Report (on Form 10-K), at 31 (Mar.

30, 2018); SVG Purchase Agreement § 2.3.

53.    In or around October 2017, the Company began conducting its crude oil trading

business from its Ocasia joint venture.  *See* Ideanomics, 2017 Annual Report (on Form 10-K), at

4 (Mar. 30, 2018).

54.    The following month, on November 13, 2017, Ideanomics (then Seven Stars

Cloud) issued a press release titled, "Seven Stars Cloud Reports 3Q 2017 Results."  The press

release quotes Bruno Wu as stating:

> With that in mind, YTD revenue for Seven Stars Cloud, a company aiming to
> become a global leader in providing next-generation Artificial-Intelligent &
> Fintech Powered, Supply Chain and Digital Finance Solutions, was approximately
> $107 million USD.  That is up 23x over the same period YTD period in 2016.
> Additionally, revenues for the year thus far only reflect our supply chain
> management business line and do not yet reflect the other parts of our growing

ecosystem such as supply chain finance, our digital financial derivatives trading platform (BBD Finance Group JV) and asset-backed securitization and tokenization (ABST).  ***With all that being said, I am pleased to say we are still <u>on track</u> to reach our top line revenue guidance of $300 million USD as projected by the Company in early 2017***.

55.     Bruno Wu's and Ideanomics' statement in ¶54 was false and misleading when made, in the context of the BT Capital Guarantee and the fact that the Company only accrued $107 million of its $300 million full year 2017 guidance at that point, because the following facts were omitted or misrepresented:

a)     that in the fourth quarter of 2016, SVG and WAG generated only $30 million in revenue and were unprofitable businesses that incurred a collective loss of $475,046, which made it doubtful and in any event materially less likely that Ideanomics would meet its 2017 revenue guidance, ¶39;

b)     as a result, the guidance had no reasonable basis; and

c)     the Company was not on track to meet its 2017 guidance because it had only earned approximately 64% of this guidance at that time, meaning that the Company would have to earn $193 million in the less than two months remaining in 2017, which was particularly unlikely given that: (i) the Company generated only approximately $4.5 million in revenues for 2016, which were from its legacy video-on-demand business that it transitioned away from during the Class Period (*see* Press Release, *Wecast Network Announces Q4 and Full Year 2016 Results* (Mar. 31, 2017)); (ii) SVG and WAG generated only $30 million in revenues in the fourth quarter of 2016, ¶39; and (iii) the Company was only operating its crude oil and consumer electronics business for "research purposes" and "not primarily with a view to competitive returns[,]" ¶77.

19

56.     Separately, the press release also contained the following guarantee with respect to the Company's new crude oil business, "Ocasia is guaranteeing a minimum of $500 million USD worth of sales volume to the JV Partnership from December 1, 2017 until December 31, 2018."

**F.     Defendants Make A False And/Or Misleading Statement Touting $170 Million In Q4 2017 Crude Oil Revenue**

57.     On January 16, 2018, Ideanomics (then Seven Stars Cloud) issued a press release titled "Seven Stars Cloud Announces Several Crude Oil Based Trading Products" claiming to "provide[] preliminary and unaudited update on Q4 2017 revenues."  In the press release, the Company stated, "In addition to the above, it is worth noting that ***[the Company's] crude oil supply chain finance and management business alone*** (specifically from its JV with Ocasia: ttps://www.prnewswire.com/news-releases/seven-starscloud-announces-2-new-separate-jv-partnerships-300503626.html), ***did a preliminarily reviewed, but still unaudited, $170 million USD in revenue in Q4 2017***."

58.     The statement by Ideanomics in ¶57 was false when made because the Company's revenue from crude oil for the fourth quarter of 2017 was only $19,028,003—roughly 11% of the ***$170 million*** indicated.  *See* Ideanomics, 2018 Annual Report (on Form 10-K), at 48 (Apr. 1, 2019).

**G.     Ideanomics Dismisses Its Auditor And Reveals 2017 Revenues**

59.     After market close on February 22, 2018, Ideanomics filed a Form 8-K with the SEC revealing that it dismissed Grant Thornton International ("Grant Thornton") as its auditor less than a year after Grant Thornton was engaged on April 27, 2017.  Ideanomics, Current Report (on Form 8-K), Item 4.01 (Feb. 22, 2018); Ideanomics, Current Report (on Form 8-K), Item 4.01 (May 3, 2017).  Grant Thornton is one of the world's largest audit companies with

over 53,000 people in over 135 countries. *See* Grant Thornton, https://www.grantthornton.global (last visited Dec. 2, 2019).

60.     Then, on February 23, 2018, pre-market open, Ideanomics issued two press releases. The first press release, titled "Seven Stars Cloud Announces BF Borgers CPA PC as New Independent Auditor," revealed that Ideanomics hired BF Borgers CPA PC ("BF Borgers") as its independent public accounting firm who would review the Company's financial statements for the quarter and year ending December 31, 2017.

61.     In contrast with Grant Thornton, BF Borgers appears to be a relatively small accounting firm with only 16 professional staff with offices in Colorado. *See* Public Company Accounting Oversight Board ("PCAOB"), *Report on 2017 Inspection of BF Borgers CPA PC*, at 2 (Nov. 19, 2018). According to the PCAOB in a 2017 inspection of BF Borgers,[9] BF Borgers issued ***at least 7 audit opinions that "should not have been issued" due to BF Borgers' "failure to obtain reasonable assurance that [it] was required to obtain[.]"*** *Id.* at 4-6.

62.     The second press release issued that day, titled "Seven Stars Cloud Anticipated to Achieve Record Revenues in 2017 and Provides 2018 Fiscal Year Revenue and EBITDA Guidance," revealed that Ideanomics ***would only achieve $125-$144 million in revenue for the year 2017***. This is $156 million less than the $300 million in full year 2017 revenue Defendants repeatedly boasted Ideanomics would—and was on track to—achieve and $26 million less than the $170 million Ideanomics claimed in January 2018 to have ***already*** achieved in crude oil

---

[9]     The PCAOB "is a nonprofit corporation established by Congress to oversee the audits of public companies in order to protect investors and the public interest by promoting informative, accurate, and independent audit reports. The PCAOB also oversees the audits of brokers and dealers, including compliance reports filed pursuant to federal securities laws, to promote investor protection." PCAOB, *About the PCAOB*, https://pcaobus.org/About (last visited Dec. 2, 2019).

revenue alone.  Ideanomics' press release, in a quote attributed to Bruno Wu, explained that dismissing Yang back in October was a step the Company took to remediate "communication" deficiencies and that it was going to execute its plan to partner with firms focused on artificial intelligence and blockchain:

> ***Unanticipated personnel issues that led to internal communication and internal administrative oversights that materialized during the Company's 2017 fiscal year, resulted in what is anticipated to be 2017 revenue that is below prior and recent guidance expectations***.  However, the Company and management specifically, believes that ***it has taken strong and immediate actions to cure the causes of these deficiencies***.  Because of the foundation built and steps taken during 2017, the Company believes it is well positioned for continued growth in 2018.  Specifically: . . . ***The Company executed the first phase of its strategic and integration plan by acquiring, investing in, or partnering with firms focused on Artificial Intelligence, Blockchain and Alternative Trading System platforms***; [and] . . . ***The Company <u>relieved</u> its former Chief Executive Officer [Yang] of his responsibilities and Mr. Robert G. Benya joined the Company as President, Chief Revenue Officer & Board Director***.

63.     On this news, Ideanomics' stock price dropped from a closing price of $2.80 per share on February 22, 2018 to close at $1.70 per share on February 23, 2018—a $1.10 or a 39.3% drop.

### H.     Defendants Make False And/Or Misleading Statements About Incorporating Blockchain And Artificial Intelligence Technology Into Ideanomics' Crude Oil Supply Chain Business

64.     While the Company was touting its consumer electronics business, it also announced that it was "aiming to become a next generation and global Artificial Intelligence & Blockchain-powered disruptive financial services company offering a hybrid and value-add solution of digital asset risk management, securitization, tokenization and trading, all within its ecosystem."  Press Release, *Seven Stars Cloud Provides Update on its 2018 Business Ecosystem and Organizational Plan* (Jan. 2, 2018).  Indeed, the Company hyped up this directional shift earlier on December 22, 2017, when it issued a press release titled "Seven Stars Cloud Chairman & CEO Bruno Wu Provides Brief Update on Company Vision," quoting Bruno Wu as stating:

[Ideanomics] is a next-generation Artificial Intelligence and Blockchain-Powered Financial Technology Company that offers supply chain and digital finance solutions aiming to disrupt and consolidate supply chain finance, risk management and asset-backed digital securitization. Focusing on Blockchain for a moment I want to be very clear and concise on how Blockchain is powering Seven Stars Cloud business models. . . . In this case of [Ideanomics], we are <u>applying</u> Blockchain and Artificial Intelligence to create a hybrid solution for supply chain finance, risk management and asset-backed digital securitization. And these are only the first massive opportunities and markets we are targeting, with more plug and play opportunities to be announced in 2018.

65.     Seeking to capitalize on the perceived benefits of blockchain to Ideanomics' stock price, Defendants began to misrepresent to investors that the Company had integrated blockchain into its crude oil business, with a view to incorporate it into the consumer electronics business. In fact, as would be later revealed by the Company after scrutiny from the SEC, blockchain was not integrated into Ideanomics' crude oil business, and the crude oil and consumer electronics businesses were operated for "research" purposes, not "competitive returns." *See infra* ¶¶77, 79.

66.     On May 15, 2018, the Company held a conference call with investors.  During the call, Bruno Wu discussed applying "four layers" of blockchain based technology onto the consumer electronics and crude oil trading businesses and told investors that Ideanomics had applied these four layers to crude oil and was going to apply it to consumer electronics, and that applying these "four layers" would "greatly increase the margin" of the crude oil business with Ocasia.  Specifically, Bruno Wu, stated, in relevant part:

The second revenue driver would be the legacy to what we put in, because we— for the entire year of 2017, our model—I mean we really took over the management in May, but the entire year's model has been Phase 1, which is blockchain, which is a supply chain.  We were trying to blockchainize supply chain.  But however, since October to now, we have migrated that model into what we call vertical industry asset digitization.  Taking electronic supply chain, (inaudible) Global, for example, are taking the crude oil with Ocasia, for example. ***If we just do supply chain, then the gross margin is very low***.  ***But however, the supply chain business provides a foundation for us to add four layers of pyramid on top of that, which is the digital settlement based on blockchain which is the digital wallets that based blockchain for buyers and sellers which is***

*the digital asset trading place whereas we can capture a transaction fee over all the blockchain-based transactional activities in that particular industry.  And on top of that pyramid is the indexing and future derivative computation using super artificial Intelligence and dynamic ontology technology.  So we are now in the middle of transforming—we did with the crude oil.  What we did with the crude oil is going to greatly increase the margin of Ocasia subsidiary and we are about ready to in the next couple of quarters do the same thing with electronic vertical.*

Ideanomics, Q1 2018 Earnings Call, at 3-4 (May 15, 2018) (Bloomberg LP Tr.).

67.    The statement by Ideanomics and Bruno Wu in ¶66 was false when made, in the context of the SEC's scrutiny of companies touting blockchain and the Company's stated focus on becoming a blockchain and artificial intelligence-driven business, because it omitted or misrepresented the fact that blockchain and artificial intelligence *were not integrated* into the crude oil business.  ¶¶65, 77, 79.

68.    On August 13, 2018, Ideanomics filed its Form 10-Q for the second quarter of 2018 ("2Q 2018 10-Q").  The 2Q 2018 10-Q was signed by Tovar.  The 2Q 2018 10-Q stated, in relevant part, "*As part of our blockchain and AI focused strategy*, *we are currently focused on consumer electronics and the crude oil trading business in supply chain management with the intent to migrate this on to the blockchain with AI capabilities*."  2Q 2018 10-Q at 33.

69.    The statement by Ideanomics and Tovar in ¶68 was false when made, in the context of the SEC's scrutiny of companies touting blockchain and the Company's stated focus on becoming a blockchain and artificial intelligence-driven business, because the following facts were omitted or misrepresented:

    a)    blockchain and artificial intelligence *were not integrated* into the crude oil or
        consumer electronics businesses, ¶¶65, 77, 79;

b)      The Company never intended to migrate the consumer electronics and crude oil businesses onto blockchain as it only intended to operate these businesses for research purposes.  ¶¶77, 79.

70.      On that same day, Ideanomics held an earnings call with investors, further touting the integration of blockchain into its consumer electronics and crude oil supply chain businesses. Benya stated, in relevant part, "***Product four is TradeTech which involves the use of blockchain, active ledger and index products to ramp up margins significantly in our supplier chain finance services business, which is a key driver of our <u>current</u> and <u>rapid topline revenue growth</u>***."  By "current and rapid topline revenue growth," Benya was referencing Ideanomics' consumer electronics and crude oil businesses operated through WSG, which comprised all of Ideanomics' revenues for the second quarter of 2018.  *See* 2Q 2018 10-Q at 35 (Company-wide revenues of $132.9 million), 36 (WSG revenues of $132.9 million).  Thus, Benya was stating that TradeTech—which purportedly uses blockchain—was responsible for Ideanomics' revenue growth in WSG, which was primarily engaged in the consumer electronics and crude oil businesses.  *See id.* at 35 (stating that WSG's business consisted primarily of "consumer electronics and smart supply chain management operations," along with "oil trading").

71.      The statement by Ideanomics and Benya in ¶70 was false when made, in the context of the SEC's scrutiny of companies touting blockchain and the Company's stated focus on becoming a blockchain and artificial intelligence-driven business, because the following facts were omitted or misrepresented:

a)      blockchain ***was not integrated*** into the crude oil or consumer electronics businesses, ¶¶65, 77, 79; and

b)      as a result, blockchain was not driving Ideanomics' revenues, ¶¶77, 79.

**I.     Ideanomics Reveals That Crude Oil Revenue For The Fourth Quarter Of 2017 Consisted Of $18.9 Million From Related Parties And Issues Shares To BT Capital Pursuant To SVG Purchase Agreement**

72.     On August 28, 2018, pre-market open, Ideanomics filed an amended Annual Report for the year 2017 on Form 10-K/A with the SEC ("Second 2017 10-K") in response to SEC comments, which was signed by Bruno Wu and Tovar.  The Second 2017 10-K revealed that Ideanomics' crude oil revenue, specifically, consisted of $18,973,054 from related parties, Second 2017 10-K at F-6—a far cry from the $170 million in crude oil revenues the Company purported to have achieved in the fourth quarter of 2017, ¶57.

73.     On this news, Ideanomics' stock price dropped from a closing price of $4.95 per share on August 27, 2018, to close at $4.05 per share on August 28, 2018—a $0.90 or 18.2% drop.

74.     On August 31, 2018, Ideanomics filed a Schedule 14C with the SEC informing shareholders that on August 3, 2018, Ideanomics' board of directors—of which Bruno Wu is Chairman—approved of the issuance of 16.5 million shares (at $1.50 per share) to BT Capital, or $24.75 million out of the $50 million, approximately 49.5%, BT Capital would have gotten if Ideanomics were to meet the BT Capital Guarantee under the SVG Purchase Agreement.  On August 31, 2018, shares of Ideanomics traded at a high of $4.02 per share.

**J.     Ideanomics Reveals That It Will Divest Its Consumer Electronics And Crude Oil Trading Businesses For Lack Of Profitability And That It Never Integrated Blockchain Into The Businesses**

75.     On November 14, 2018, pre-market open and after the end of the Class Period, Ideanomics issued a press release titled "Ideanomics Reports Third Quarter Financial Results." The press release stated, in relevant part:

> Although to date, aside from our legacy video-on-demand business, ***only our commodities trading business has generated revenues, given that our oil trading and consumer electronics businesses have realized low margins in relation to***

***top line sales***, we decided to focus our efforts on the higher margins we believe may be achievable in our digital securitized asset business.  As a result, ***we intend to phase out our oil trading and consumer electronics businesses***, ***with the intention to fully divest these assets in the near future.***

76.      On this news, Ideanomics stock price dropped from a closing price of $3.26 per share on November 13, 2018 to close at $1.67 per share on November 14, 2018—a $1.59 or 48.8% drop.

77.      Additionally, on that day after market close, the Company filed its Form 10-Q for the third quarter of 2018 ("3Q 2018 10-Q").  In that 3Q 2018 10-Q, the Company admitted for the first time that its "***commodities trading business does not currently integrate blockchain or AI based logistics solutions***" and did not mention the supposed "Venus blockchain" platform previously touted by Ideanomics in the First 2017 10-K.  3Q 2018 10-Q at 35; *see also* First 2017 10-K at 4, 10 ("Other than the trading business that Company already operated in 2017, the Company also intends to run the engine upon its Venus blockchain based platform, which includes TPaaS & VPaaS system.  As of fourth quarter of 2017, TPaaS system went into trial operation.").

**K.      Relevant Post-Class Period Events**

78.      After the Class Period, on or around December 2018, the Company sold WAG to Hooxi—a Bruno Wu affiliated company, *see* W-Foundation, *W-Foundation Established, Hooxi Network and Hooxi Foundation in Hong Kong*, https://www.gcrfund.org/en/w-foundation-established-hooxi-network-and-hooxi-foundation-in-hong-kong/?ckattempt=2 (last visited Dec. 2, 2019)—for a "***nominal amount***."  Ideanomics, 2018 Annual Report (on Form 10-K), at 81, F-20 (Apr. 4, 2019).  Although the Company has refused to state the dollar figure for this amount or file the sale agreement with the SEC, Ideanomics has said that it incurred ***a loss of***

*approximately $1.2 million selling WAG*, which earned **only $347,000 in annual sales** and had net assets of only $46,000.  *See id.*

79.    On December 14, 2018, Ideanomics amended—for a second time[10]—its 2017 Annual Report in response to SEC comments ("Third 2017 10-K").  The Company added the following sentence which was not present in the First or Second 2017 10-K, "***Our crude oil trading business does not currently integrate blockchain- or AI-based logistics solutions***." Ideanomics, 2017 Annual Report (on Form 10-K/A), at 3 (Dec. 14, 2018).  As well, the second amended form 10-K for the year 2017 conceded that Ideanomics never intended to maintain its consumer electronics and crude oil businesses, stating, "***While we generate revenues from our crude oil and consumer electronics business, we engage in this business largely for research purposes to support our development of fintech solutions for this space, and not primarily with a view to competitive returns***."  *Id.* at 12.  In fact, the second amended Form 10-K does not even mention the "Venus" blockchain platform touted by Defendants in the First 2017 10-K. *Compare* First 2017 10-K at 4, 10 ("Other than the trading business that Company already operated in 2017, the Company also intends to run the engine upon its Venus blockchain based platform, which includes TPaaS & VPaaS system.  As of fourth quarter of 2017, TPaaS system went into trial operation."), *with* Third 2017 10-K (omitting mention of "Venus" blockchain platform).

80.    On April 1, 2019, the Company also filed its 2018 Annual Report on Form 10-K ("2018 Annual Report").  For the first time, the 2018 Annual Report broke down the Company's revenues and gross profits on a segment-by-segment basis, revealing that the crude oil segment only made $19 million (including the $18.9 million from a related party, *see* Second 2017 10-K

---

[10]    The Company previously amended the 2017 Annual Report on August 28, 2018.

at F-6) in revenue for the year 2017—***not $170 million***—and $260 million in revenue for the

year 2018, a ***far cry from the $500 million Ocasia*** guarantee.  2018 Annual Report at 48, F-4.  It

also revealed that ***gross profit for 2018 fell by more than half***, from $7.1 million in 2017 to $3.1

million in 2018.

81.     Currently, the Company has shifted its business yet ***again***, choosing to "change

[its] business focus from logistics management to Electric Vehicles and Fintech businesses."  *See*

Press Release, *Ideanomics Reports Q3 2019 Financial Results* (Nov. 14, 2019).

## V.     ADDITIONAL SCIENTER ALLEGATIONS

82.     As alleged herein, Defendants acted with scienter because at the time they made

their public statements, they knew or recklessly disregarded the fact that such statements were

materially false and/or misleading because they omitted material facts concerning SVG/WAG's

fourth quarter of 2016 revenues and unprofitability and 2017 Company-wide guidance, the

Company's intent to operate the consumer electronics and crude oil businesses for research

purposes only, the true fourth quarter of 2017 crude oil revenues, the non-integration of

blockchain into the consumer electronics and crude oil businesses.  Defendants knew that such

documents and statements would be issued or disseminated to the investing public, knew that

persons were likely to rely upon those misrepresentations and omissions, and knowingly and/or

recklessly participated in the issuance and/or dissemination of such statements and/or documents

nonetheless.

### A.     ***Respondeat Superior*** **and Agency Principles Apply**

83.     Ideanomics is liable for the acts of the Defendants and other Company officers,

directors, employees, and agents under the doctrine of *respondeat superior* and common law

principles of agency, as all of the wrongful acts complained of herein were carried out within the

scope of their employment or agency with the authority or apparent authority to do so.  The

scienter of the Defendants and other Company officers, directors, employees, and agents is similarly imputed to Ideanomics under *respondeat superior* and agency principles.

> **B.    Defendants' Conscious Misbehavior And Recklessness Regarding SVG And WAG's Fourth Quarter 2016 Revenues And Unprofitability And Company-Wide 2017 Guidance**

84.    All Defendants had possession of or access to information concerning SVG and WAG's revenues and unprofitability in the fourth quarter of 2016 and the 2017 guidance.

85.    Defendants Bruno Wu, Yang, Wang, and Ideanomics were aware of SVG and WAG's revenues and unprofitability in the fourth quarter of 2016.  Indeed, the ***SVG*** transaction ***could not have been completed*** without the following: (1) "***completion of due diligence satisfactory to each party***;" and (2) ***board approval***.  *See* Press Release, *YOU On Demand Signs Non-Binding Term Sheet with Sun Video Group to Purchase 51% of M.Y. Products, LLC and Announces Corporate Name Change from YOU On Demand to WeCast Network, Inc.* (Sept. 19, 2016).  In that vein, negotiation over the SVG transaction took several months, *see* Press Release, *Wecast Network Completes Acquisition of Sun Video Group and Issues 2017 Company-Wide Guidance of $280 Million Revenue* (Feb. 1, 2017): Defendants announced that Ideanomics entered into a non-binding term sheet in September 2016 which provided for a $200 million revenue guarantee,[11] and ultimately signed the binding SVG Purchase Agreement four months later on January 30, 2017.  *See* Press Release, *YOU On Demand Signs Non-Binding Term Sheet with Sun Video Group to Purchase 51% of M.Y. Products, LLC and Announces Corporate Name Change from YOU On Demand to WeCast Network, Inc.* (Sept. 19, 2016); SVG Purchase Agreement.  Thus, considering the due diligence requirement, and the length of negotiation over the SVG Purchase Agreement, Defendants had possession of or access to data showing SVG and

---

[11]    This was eventually increased to a $250 million revenue guarantee and a $15 million profit guarantee was added.  ¶37.

WAG's collective revenues and unprofitability for the period beginning November 10, 2016 through the end of 2016, and prior to Ideanomics' acquisition of those companies and the issuance of its 2017 revenue guidance.

86.     As well, Bruno Wu—as Chairman of Ideanomics' Board—approved the SVG acquisition.  *See* Ideanomics, Current Report (on Form 8-K), Item 1.01 (Feb. 1, 2017).  Moreover, given that Bruno Wu—through his control of BT Capital—controlled SVG and WAG, *see* First 2017 10-K at F-21, he had access to SVG's and WAG's financial records for 2016.  As well, Yang, as Ideanomics' then-CEO, signed the SVG Purchase Agreement on January 30, 2017, which could not have been completed without due diligence.  Bruno Wu and Yang signed the WAG Purchase Agreement on January 31, 2017.  Accordingly, SVG's and WAG's financial records were reviewed by Ideanomics' officers, including Bruno Wu and Yang, or at a minimum, Ideanomics, Bruno Wu, and Yang were deliberately reckless in not reviewing the financial records.  Review of these records would have revealed that SVG and WAG obtained only $30 million in revenues while sustaining a gross loss of $475,046 in the fourth quarter of 2016.

87.     Moreover, Bruno Wu, Yang, and Ideanomics were aware that in light of SVG's lack of profitability and limited historical revenues, further businesses would need to be added to WSG in order to meet the BT Capital Guarantee and meet the Company's $300 million guidance for the year 2017.  First, Ideanomics added WAG to WSG and paid nothing for it, except that Bruno Wu would get the benefit of adding WAG's revenues/profits to WSG for the BT Capital Guarantee.  *See* 2017 Annual Report at 53.  Then, Ideanomics added NextGen, again paying nothing except for adding NextGen's revenues/profits to the BT Capital Guarantee.  *Id.*  Last, Ideanomics added the Ocasia crude oil business to WSG.  The addition of WAG's, NextGen's,

and the crude oil business' revenues/profits to the BT Capital Guarantee is evidence that Bruno

Wu, Yang, and Ideanomics were aware that it was doubtful and in any event materially less

likely that Ideanomics would meet its Company-wide 2017 guidance of $280 million, which was

revised to $300 million.  Thus, the addition of these businesses to the WSG business and the BT

Capital Guarantee is evidence that Bruno Wu, Yang, and Ideanomics were aware of SVG and

WAG's revenues and gross loss in the fourth quarter of 2016 and that Ideanomics' 2017 revenue

guidance lacked a reasonable basis when it was issued by the Company.

88.     Ideanomics, Bruno Wu, and Yang were also under a duty to monitor SVG and

WAG's financial records under ASC Subtopic 805-50 and Generally Accepted Accounting

Principles ("GAAP"), and 17 C.F.R. § 210.4-01(a)(1), which presumes that financial reports

which do not comply with GAAP "to be misleading or inaccurate."  As Defendants admitted in

several SEC filings filed throughout the Class Period, Ideanomics, SVG, and WAG a "were

controlled by [] Chairman Bruno Wu since November 10, 2016" and Ideanomics was therefore

required to retrospectively adjust Ideanomics' financial statements to reflect SVG and WAG's

gross loss under ASC Subtopic 805-50 and GAAP.  Ideanomics, Quarterly Report (on Form 10-

Q), at 17 (May 15, 2017) (signed by CFO Wang); Ideanomics, Quarterly Report (on Form 10-Q),

at 17 (Aug. 14, 2017) (same); Ideanomics, Quarterly Report (on Form 10-Q), at 17 (Nov. 13,

2017) (same).  It is also beyond dispute that Bruno Wu was aware of his duty to monitor, as he

controlled Ideanomics, SVG, and WAG beginning in November 10, 2016, and signed the

certification accompanying the Form 10-Q for the third quarter of 2017 filed on November 13,

2017—the same day he touted the Company's guidance—attesting that he reviewed the quarterly

report which discussed the Company's duties under ASC Subtopic 805-50 and GAAP.

Ideanomics, Quarterly Report (on Form 10-Q), Ex. 31.1 (Nov. 13, 2017).  Accordingly, had

Defendants complied with their duty to monitor under the relevant SEC regulations and GAAP, they would have discovered that SVG and WAG obtained only $30 million in revenues and were unprofitable in the fourth quarter of 2016 and that their statements regarding the 2017 guidance were misleading when made.

89.     As well, the Company's abrupt dismissal of Grant Thornton adds to the inference that Defendants were aware that their statements regarding the Company-wide 2017 guidance and omission of SVG and WAG's 2016 revenues and unprofitability were false and/or misleading.  Grant Thornton was terminated when the Company disclosed that it was not going to meet its $300 million guidance, thus revealing that its previous statements regarding SVG and WAG's revenues and profitability, 2017 guidance, and the fourth quarter crude oil revenues were belied by the fact that the Company was only achieving $144 million in revenue for 2017.  ¶¶59-63.  The Company further chose to replace Grant Thornton with a much smaller auditor, BFA Borgers, which itself has a history of issuing *at least 7 audit opinions that "should not have been issued" due to BF Borgers' "failure to obtain reasonable assurance that [it] was required to obtain[.]"* *Report on 2017 Inspection of B F Borgers CPA PC*, at 4-6 (Nov. 19, 2018).

**C.      Defendants' Conscious Misbehavior And Recklessness Regarding Actual Crude Oil Revenues In Q4 2017**

90.     Ideanomics had possession of or access to information showing that its statement regarding the crude oil revenues for the fourth quarter of 2017 was false when made.

91.     When Ideanomics touted its false $170 million figure, ¶57, it claimed to have *reviewed* data before asserting this figure.  *See* Press Release, *Seven Stars Cloud Announces Several Crude Oil Based Trading Products* (Jan. 16, 2018).  Since the crude oil revenues were later revealed to be *$19 million, not $170 million*, a review of the relevant data would have

shown that the $170 million figure was incorrect.  A deviation of this magnitude itself is evidence that Ideanomics was aware of, or recklessly disregarded, this fact in its review.

92.    Additionally, Ideanomics' crude oil revenues for the fourth quarter of 2017 consisted almost entirely of revenue from *a related party*.  That is, of the $19 million Ideanomics made in crude oil revenues for that quarter, $18.9 million came from "an entity that is partially owned by the same individual who is also a minority shareholder" in Ideanomics' subsidiary. *See* Ideanomics, 2017 Annual Report (on Form 10-K/A), at 49, 78 (Dec. 14, 2018) (describing $18.9 million transaction as a "Related Party Transaction"); Ideanomics, 2018 Annual Report (on Form 10-K), at 48 (Apr. 1, 2019).  Thus, Ideanomics had possession of or access to data from its subsidiary that crude oil revenue for the fourth quarter of 2017 was only $19 million and that the Company did virtually no crude oil business with third parties.

93.    As well, during the Company's earnings call with investors on November 13, 2017, Bruno Wu stated that the Company would "have a very good picture" regarding 2018 guidance in December.  Ideanomics, Q3 2017 Earnings Call, at 6 (Nov. 13, 2017) (Bloomberg LP Tr.).  Thus, in obtaining this "good picture" regarding 2018 guidance, Ideanomics and Bruno Wu would have evaluated the growth trajectory of, *inter alia*, crude oil revenues in December, which would have revealed only $19 million in revenue, or at the very least, an amount far below the $170 million touted by the Company.

### D.    Defendants' Conscious Misbehavior And Recklessness Regarding The Integration Of Blockchain Into Crude Oil And Consumer Electronics

94.    All Defendants had possession of or access to information showing that their statements regarding the integration of blockchain into the Company's crude oil and consumer electronics businesses were false and/or misleading when made.

95.     Given the nature of blockchain, Ideanomics, Bruno Wu, Benya, and Tovar had

possession of or access to information showing that blockchain was not, in fact, integrated into

the crude oil and consumer electronics businesses.  Specifically, because blockchain is

essentially a system of immutable ledgers held on various computers, the existence of such a

system would have meant that transactions in Ideanomics' consumer electronics and crude oil

businesses were recorded on multiple computers, including computers that Ideanomics possessed

or had access to.  *See* ¶¶32-33.  Indeed, Bruno Wu touted the accessibility aspect of blockchain,

stating that "[b]lockchain ***democratizes the selling process*** . . . making it ***more accessible to***

***people*** on the global basis."  Ideanomics, Q1 2018 Earnings Call, at 6 (May 15, 2018)

(Bloomberg LP Tr.); *see also* Press Release, *Seven Stars Cloud Chairman & CEO Bruno Wu*

*Provides Brief Update on Company Vision* (Dec. 22, 2017) (quoting Bruno Wu as explaining

that blockchain is "unique" because it "does not require an intermediary to overlook transactions,

the digital database is itself dispersed and decentralized, it can run on numerous computers and it

can be updated in real-time.").  Thus, a review of transactions in the consumer electronics and

crude oil businesses would have easily revealed that a blockchain system was not integrated into

those businesses, as the Company would later admit.  ¶¶77, 79.

96.     Additionally, Ideanomics, Bruno Wu, Benya, and Tovar were aware of the fact

that the Company was not integrating blockchain and artificial intelligence into its crude oil

businesses in light of the SEC's scrutiny of the Company's filings, or had access to that fact.

When Ideanomics first filed its March 30, 2018 Form 10-K, the Company touted that it was

rolling out blockchain via its Venus Blockchain platform in its crude oil and consumer

electronics "engine."  First 2017 10-K at 4, 10.  During that time period, the SEC was

scrutinizing companies who were touting blockchain in order to artificially inflate their stock.

¶¶34-35.  When *again* confronted by the SEC, after already announcing that it was divesting from its crude oil and consumer electronics business, the Company finally deleted this statement from its annual report for the year 2017.  Third 2017 10-K.  In responding to the SEC inquiry, which undoubtedly related to the Company's statements regarding the integration of blockchain in light of what Defendants edited, Defendants must have reviewed data showing that blockchain technology was not in fact integrated into the crude oil business or were deliberately reckless in not doing so.

### E.    The Defendants' Blockchain And Financial Experience

97.    Each of the Defendants are highly educated, trained, and experienced in financial technology, marketing, and/or financing and were therefore well-aware that their statements concerning the BT Capital Guarantee and 2017 guidance, crude oil revenues for the fourth quarter of 2017, and the integration of blockchain into the consumer electronics and crude oil supply chain businesses were false and/or misleading when made and omitted material information.

98.    Defendant, Chairman, and CEO Bruno Wu is a billionaire, *see* Forbes, *#371 Bruno Wu & Family* (last visited Dec. 2. 2019), and is an "experienced investor, [and] technology and media entrepreneur[.]"  Ideanomics, Annual Report (on Form 10-K/A), at 46 (Aug. 28, 2018).  Bruno Wu possesses a Ph.D. from the School of International Relations and Public Affairs at Fudan University, Shanghai, China in 2001, an M.A. in in International Relations from Washington University, a B.A. in Business Management from Culver-Stockton College of Missouri and a diploma in Superior Studies in French Literature from the School of French Language and Literature at the University of Savoie in Chambery, France.  *Id.* at 42.

99.    Defendant and former CEO Yang possesses a "wide range of experience in research [and] development, product development and sales and marketing."  2016 Annual

Report at 36.  Yang previously served as CEO of On-Ramp Service between May 2015 and

March 2016, CEO of KJT.com from October 2014 through May 2015, and held various

executive positions throughout his 30-year career at, *inter alia*, Cisco and Convergent Networks.

*Id.*  Yang possesses a Bachelor of Science in Electrical Engineering from the University of Texas

at Austin, and a Master of Science in Electrical Engineering from the University of New

Hampshire.  *Id.*

100.    Defendant and CFO Tovar "is a seasoned operational and financial executive, ***and***

***subject matter expert in Cyber, Fintech, Blockchain, AI, and IoT***."  Press Release, *Seven Stars*

*Cloud Announces Federico Tovar as New Chief Financial Officer* (June 1, 2018).  Tovar served

as Chief Financial and Strategy Officer of Global Sentinal Inc., an AI technology company,

before joining Ideanomics.  2018 Annual Report at 61.

101.    Defendant, President, CRO, and director Benya is an experienced executive "with

over 35 years of experience" who purportedly "pioneered numerous businesses and product

innovations in the U.S. and Scandinavian cable television industries."  First 2017 10-K at 40.

Benya served as CRO for Time Warner Cable and helped create, *inter alia*, "Road Runner High

Speed Internet, Broadband Portals, Online Video Stores, Advertising Sales Interconnect Joint

Ventures, Pay Per View, Video on Demand, Interactive TV and Cloud DVR services."  *Id.*

F.    **Defendants' Financial Motive**

102.    Bruno Wu was motivated to artificially inflate Ideanomics' stock price because

doing so allowed Ideanomics to acquire more Bruno Wu companies, further enriching him:

- By acquiring SVG and WAG from Bruno Wu's BT Capital, Bruno Wu was able
  to offload an unprofitable business in exchange for $800,000 in cash and a
  promissory note that eventually ended up reaping his BT Capital $24.75 million
  in Company shares at $1.50 per share.  *See* Ideanomics, Schedule 14C, at 1 (Aug.

37

31, 2018).  Indeed, when Ideanomics filed its Schedule 14C with the SEC

disclosing the issuance on August 31, 2018, Ideanomics' shares traded at a high

price of $4.02 per share—a $2.52 per share or 168% premium over the $1.50

share price in the promissory note.  *Id.*

- On or around April 24, 2018, Ideanomics acquired Shanghai GuangMing

  Investment Management from, *inter alia*, a Bruno Wu affiliate for $0.36 million.

  *See* 2018 Annual Report at F-19.

- On or around July 18, 2018, Ideanomics acquired Grapevine Logic Corp., of

  which a Bruno Wu affiliate owns 34.5%, for $2.4 million.  *See* Ideanomics,

  Current Report (on Form 8-K) (July 24, 2018).

- On or around September 13, 2018, Ideanomics acquired $15.5 million of Liberty

  Biopharma stock from Bruno Wu's Sun Seven Stars group in exchange for

  Ideanomics stock.  *See* Ideanomics, Current Report (on Form 8-K), at 3 (Sept. 13,

  2018).

103.     As well, Defendants were motivated to artificially inflate the Company's stock

price to acquire the following companies using Ideanomics stock:

- On or around December 4, 2017, the Company announced a purchase of 20% of

  BBD Digital Capital Group Ltd.'s stock for $2 million in cash and ***$7.8 million in***

  ***Ideanomics stock***.

- On or around December 20, 2017, Ideanomics acquired a 27% stake in the

  Delaware Board of Trade Holdings, Inc. for ***1,627,869 shares of Ideanomics***

  ***stock***.

104.    Defendants were also motivated to artificially inflate Ideanomics' stock price to raise capital to avoid insolvency, as acknowledged by Ideanomics' independent registered public accounting firm in a report raising "substantial doubt about the Company's ability to continue as a going concern."  Ideanomics, 2017 Annual Report (on Form  10-K/A), at F-14 (Aug. 28, 2018). Through these artificially inflated shares, Ideanomics reaped over $60 million through the following private placements and share/convertible notes issuances during the Class Period:

- On May 25, 2017, Ideanomics announced that it entered into a subscription agreement for the sale of 727,273 common shares for $2.75 a share, netting the Company approximately ***$2 million***.  Press Release, *Wecast Raises $2 million USD in Private Placement* (May 25, 2017).

- On October 27, 2017, Ideanomics entered into a Securities Purchase Agreement with Hong Kong Guo Yuan Group Capital Holdings Limited to sell and issue 5,494,505 shares of the Ideanomics' common stock for $1.82 per share resulting in net proceeds of ***$10.0 million***.  Press Release, *Seven Stars Cloud Closes on $10 Million USD Private Placement* (Oct. 27, 2017).

- On March 22, 2018, Ideanomics initially entered into a Purchase Agreement with GT Dollar Pte. LTD for $40 million in exchange for Ideanomics stock and two convertible promissory notes.  Press Release, *Seven Stars Cloud to Raise an Aggregate of $40 Million USD in Strategic Private Placement from GT Dollar* (Mar. 22, 2018).  Then, on August 10, 2018, this deal was subsequently "restructured" from $40 million to ***$10 million in exchange for Ideanomics stock***.  Press Release, *Seven Stars Cloud Raises $12 Million USD from Advantech*

*Capital II Investment Limited and Restructures GT Dollar Private Placement* (Aug. 10, 2018).

- On July 30, 2018, Ideanomics raised **$26 million** from subscriptions to purchase Ideanomics shares.  Press Release, *Seven Stars Cloud Raises $26 Million USD from Various Strategic Investors* (July 30, 2018).

- On August 10, 2018, Ideanomics raised **$12 million** via a convertible note with Advantech Capital II Investment Limited.  Press Release, *Seven Stars Cloud Raises $12 Million USD from Advantech Capital II Investment Limited and Restructures GT Dollar Private Placement* (Aug. 10, 2018).

### G.    Terminations And Resignations

105.    Save for Tovar, all of the Individual Defendants and some other high level executives of the Company were either terminated or resigned at suspicious times, suggesting that their resignations/terminations were in relation to the undisclosed facts concerning SVG and WAG's revenues and unprofitability in the fourth quarter of 2016 and the Company-wide 2017 guidance, the Company's intent to operate the consumer electronics and crude oil businesses for research purposes only, the actual fourth quarter 2017 crude oil revenues, and the non-integration of block chain into the consumer electronics and crude oil business.

106.    On January 30, 2017, the day that Ideanomics entered into the SVG Purchase Agreement, Ideanomics' then-CFO Mei Chen notified the board of her resignation.  *See* Ideanomics, Current Report (on Form 8-K), Item 5.02 (Feb. 2, 2017).  This resignation was suspicious because it occurred on the day that Ideanomics purchased SVG, which would supposedly secure the Company substantial revenue and profits.

107.     On October 9, 2017, Yang was dismissed as CEO of Ideanomics one month before Ideanomics repeated its third quarter 2017 results, where it would reiterate that it was "on track" to achieve its $300 million revenue guidance despite having accumulated only $107 million by the third quarter's end.  Yang's termination was suspicious due to its timing and because the Company first described Yang's departure as a "resignation," *see* Ideanomics, Current Report (on Form 8-K), Item 5.02 (Oct. 9, 2017), but then later admitted that it "relieved" (*i.e.*, fired) Yang as a step to cure "internal communication" deficiencies that led to Ideanomics touting its 2017 revenue guidance and misrepresenting its fourth quarter 2017 crude oil revenues. *See* Press Release, *Seven Stars Cloud Anticipated to Achieve Record Revenues in 2017 and Provides 2018 Fiscal Year Revenue and EBITDA Guidance* (Feb. 23, 2018).

108.     On April 6, 2018, Wang resigned from the CFO position.  *See* Ideanomics, Current Report (on Form 8-K), Item 5.02 (Apr. 12, 2018).  Wang's resignation is suspicious because it happened mere days after Ideanomics filed its Form 10-K detailing poor revenues and profits for 2017 and approximately a month after Ideanomics dismissed Grant Thornton as its auditor.

109.     On November 12, 2018, just ***two days*** before Ideanomics announced it was ditching its consumer electronics and crude oil businesses, Benya resigned from the Company. *See* Ideanomics, Annual Report (on Form 10-K), at 72 (Apr. 1, 2019).  Given the resignation's timing right before Ideanomics' damning announcement that it was going to ditch its consumer electronics and crude oil businesses, and a month before Ideanomics admitted that it was operating these businesses for "research" purposes, Benya's resignation is suspicious.

110.     On November 14, 2018, the day that Ideanomics announced it was ditching the consumer electronics and crude oil businesses, Ideanomics also announced that then-CEO and

Chairman Bruno Wu would step down from those positions at Ideanomics to "lead [the] National Committee for China-US Relations[.]"  Press Release, *Ideanomics Appoints New Officers and Directors* (Nov. 14, 2018).  Despite touting this as a "prestigious and highly visible role," *id.*, Bruno Wu returned to Ideanomics as Chairman a mere three months later on February 21, 2019.  Press Release, *Ideanomics Announces Bruno Wu To Return As Chairman* (February 21, 2019).  Bruno Wu's resignation is suspicious because it coincided with the Company's November 14, 2018 disclosure that it was ditching businesses that the Company ***essentially bought from him***.

### H.   Importance Of The Consumer Electronics And Crude Oil Businesses And The Integration Of Blockchain To The Company

111.   Because the fraud alleged herein relates to the primary business of Ideanomics, knowledge of the facts underlying the fraud may be imputed to the Defendants.  Indeed, during the Class Period, WSG's consumer electronics and crude oil businesses were Ideanomics' primary sources of revenue.  *See* Ideanomics, Annual Report (on Form 10-K/A), at 29 (Aug. 28, 2018).  As such, Ideanomics admitted in its SEC filings that it was "focused on consumer electronics and the crude oil business" as "part of [its] blockchain and AI-driven strategy."  *Id.* at 33.  Indeed, a "significant portion of [Ideanomics'] operations [] consist[ed]" of the businesses the Company acquired from BT Capital, *i.e.*, SVG and WAG, as well as its crude oil joint venture with Ocasia.  *Id.* at 3.  Moreover, with respect to the importance of the integration of blockchain, defendant Bruno Wu has himself stated, "Blockchain is the future."  Ideanomics, Q4 2017 Earnings Call, at 6 (Apr. 2, 2018) (Bloomberg LP Tr.).  Therefore, the Defendants, as senior level executives and/or board members, were in such positions at the Company to access all material, non-public information concerning those businesses, including, *inter alia*, SVG and WAG's revenues and unprofitability in the fourth quarter of 2016 and the 2017 guidance, the Company's actual crude oil revenues for the fourth quarter of 2017, and the non-integration of

blockchain into the crude oil and consumer electronics businesses, and undoubtedly did so given their fiduciary duties.

112.    Given the importance of the Company's consumer electronics and crude oil businesses, and the integration of blockchain into those businesses, it is reasonable to infer from the detailed allegations herein that Defendants were aware of the facts that were omitted and misrepresented by them as alleged herein.

## VI.    LOSS CAUSATION

113.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial damages.

114.    During the Class Period, Plaintiff and other Class members purchased Ideanomics stock at artificially inflated prices, and suffered substantial losses and damages when the true facts concealed by the Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Ideanomics stock declined significantly causing Plaintiff and other Class members to suffer losses and damages when the Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by the Defendants materialized.

115.    Defendants made false and misleading statements and material omissions regarding the SVG and WAG's fourth quarter 2016 revenues and unprofitability, the Company's intent to operate the consumer electronics and crude oil businesses for research purposes only, and Ideanomics' 2017 guidance (¶¶41-50, 54-55), the fourth quarter 2017's crude oil revenues (¶¶57-58), and the integration of blockchain and artificial intelligence technology into its crude oil and consumer electronics businesses (¶¶66-71).  On the strength of these false and misleading statements and material omissions, the Company's stock price was artificially inflated to a Class

Period high of $7.00 per share on December 20, 2017.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Ideanomics' business, operations, performance, and prospects. When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Ideanomics' common stock declined.

116.    As detailed below, the true facts and risks regarding SVG's and WAG's fourth quarter 2016 revenues and unprofitability prior to Ideanomics' acquisition and the Company's intent to operate the consumer electronics and crude oil businesses for research purposes only which were omitted and/or misrepresented by the Defendants eventually caused the price of Ideanomics stock to decline on two occasions—February 23, 2018 and November 14, 2018— thereby causing harm to investors.

117.    Additionally, the true facts and risks regarding the fourth quarter 2017's crude oil revenues which were omitted and/or misrepresented by the Defendants eventually caused the price of Ideanomics stock to decline on two occasions—February 23, 2018 and August 28, 2018—thereby causing harm to investors.

118.    As well, the true facts and risks regarding Ideanomics' incorporation of blockchain technology into its consumer electronics and crude oil business which were omitted and/or misrepresented by the Defendants eventually caused the price of Ideanomics stock to decline on one occasion, November 14, 2018, thereby causing harm to investors.

119.    First, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding SVG and WAG's fourth quarter 2016 revenues and unprofitability, the Company's intent to operate the consumer electronics and crude oil

businesses for research purposes only, the Company-wide 2017 guidance, and the actual crude

oil revenue for the fourth quarter of 2017 materialized when, after market close on February 22,

2018, and pre-market open on February 23, 2018, the Company announced that it was dismissing

its auditor and that revenue for 2017 was less than half Ideanomics' stated guidance and far

below the $170 million crude oil revenues it touted earlier, causing investors to suffer losses as

Ideanomics' share price fell $1.10 per share, or approximately 39.3% from the previous trading

day's closing price of $2.80 per share, to close at $1.70 per share on February 23, 2018. *See*

¶¶59-63.

120.    Second, Defendants' statements were partially corrected, and the risks concealed

by the undisclosed actual crude oil revenue for the fourth quarter of 2017 materialized when, on

August 28, 2018, the Company filed an amended Form 10-K revealing only approximately $18.9

million in crude oil revenue from a related party, causing investors to suffer losses as

Ideanomics' share price fell $0.90 per share, or approximately 18.2% from the previous day's

closing price of $4.95 per share, to close at $4.05 per share on August 28, 2018. *See* ¶¶72-73.

121.    Third, Defendants' statements were further partially corrected, and the risks

concealed by the undisclosed facts regarding SVG and WAG's fourth quarter 2016 revenues and

unprofitability in the fourth quarter of 2016, the Company's intent to operate the consumer

electronics and crude oil businesses for research purposes only, and the non-integration of

blockchain and artificial intelligence technology into Ideanomics' crude oil and consumer

electronics businesses further materialized when, on November 14, 2018, the Company

announced that it was going to phase out its consumer electronics and crude oil businesses due to

low margins, causing investors to suffer losses as Ideanomics' share price fell $1.59 per share, or

approximately 48.8% from the previous trading day's closing price of $3.26 per share, to close at $1.67 per share on November 14, 2018.  *See* ¶¶75-76.

122.    For convenience, the following chart summarizes the foregoing loss causation events and applicable undisclosed/misrepresented facts:

| Event | Applicable Misrepresentation And Omissions |
|---|---|
| February 22-February 23, 2018 disclosure and stock drop | • SVG/WAG's fourth quarter 2016 revenues and unprofitability and Company-wide 2017 guidance;<br>• The Company's intent to operate the consumer electronics and crude oil businesses for research purposes only;<br>• the crude oil revenue for the fourth quarter of 2017 |
| August 28, 2018 disclosure and stock drop | • The crude oil revenue for the fourth quarter of 2017 |
| November 14, 2018 disclosure and stock drop | • SVG/WAG's fourth quarter 2016 revenues and unprofitability;<br>• the Company's intent to operate the consumer electronics and crude oil businesses for research purposes only;<br>• the integration of blockchain and artificial intelligence into Ideanomics' crude oil and consumer electronics business |

123.    Accordingly, as a result of their purchases of Ideanomics' publicly traded stock during the Class Period, Plaintiff and other members of the Class suffered economic loss and damages.

## VII.   CLASS ACTION ALLEGATIONS

124.    Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities who purchased Ideanomics stock listed on the NASDAQ or domestically in the United States at artificially inflated prices during the Class Period, and were damaged thereby, seeking to pursue remedies under the Exchange Act (the "Class").

125.    Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

126.    Also excluded from the Class are those who purchased or otherwise acquired Ideanomics stock on foreign exchanges or purchased or otherwise acquired Ideanomics stock outside of the United States, in accordance with the United States Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010) ("[I]t is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.").

127.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Ideanomics common stock was actively traded on the NASDAQ, which is an efficient market.  While the exact number of Class members cannot be determined at this early stage, Plaintiff believes that thousands of people held Ideanomics stock during the Class Period.  Record owners and other members of the Class may be identified from records maintained by Ideanomics or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

128.    Plaintiff's claims are typical of the claims of the Class because Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct as complained herein.

129.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class.

130.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

        a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b)    Whether Defendants' publicly disseminated statements made during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

        c)    Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Ideanomics' stock to be artificially inflated during the Class Period;

        d)    Whether Defendants acted with the requisite level of scienter in omitting and/or misrepresenting material facts;

        e)    Whether the Defendants were controlling persons of Ideanomics;

        f)    Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

        g)    Whether Class members have sustained damages, and if so, the proper measure of damages.

131.     Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

132.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## VIII.   CONTROL PERSON LIABILITY

133.     The Defendants, because of their positions with Ideanomics, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, advertisements, promotional materials, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Defendants possessed the power to direct or cause the direction of the management and policies of Ideanomics.  Each of the Defendants had a duty to promptly disseminate complete, accurate, and truthful information with respect to SVG and WAG's fourth quarter 2016 revenues and unprofitability and Ideanomics' 2017 guidance, Ideanomics' crude oil revenue in the fourth quarter of 2017, and non-integration of blockchain and artificial intelligence technology into Ideanomics' crude oil and consumer electronics businesses.  Each of the Defendants was provided with copies of the Company's SEC filings, reports, promotional materials, and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Defendants knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the

public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## IX.    THE FRAUD ON THE MARKET PRESUMPTION

134.    The false and/or misleading statements alleged herein were material and public and, at all relevant times, the market for Ideanomics' stock was an efficient market for the following reasons, among others:

a.    Ideanomics' common stock was listed on the NASDAQ Stock Market, a highly efficient market;

b.    As a registered and regulated issuer of securities, Ideanomics filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c.    Ideanomics regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services; and

d.    The market reacted to public information disseminated by Ideanomics.

135.    As a result of the above, the market for Ideanomics' securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical daily trading prices and volumes of Ideanomics securities are incorporated herein by reference.

136.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Ideanomics' securities.  Without knowledge of the misrepresented or omitted facts, Plaintiff and other members of the Class purchased Ideanomics securities between the time that the Defendants made the material misrepresentations and

omissions and the time that the truth or concealed risk was revealed, during which time the price of Ideanomics' securities was artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## X.    NO STATUTORY SAFE HARBOR

137.    The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

138.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

139.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

140.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements, such as, *inter alia*, SVG and WAG's fourth quarter of 2016 revenues and unprofitability and 2017 Company-wide guidance, the Company's intent to operate the consumer electronics and crude oil businesses for research purposes only, Ideanomics' crude oil revenue in the fourth quarter of 2017, and non-integration of blockchain and artificial intelligence technology into Ideanomics' crude oil and consumer electronics businesses.  Such statements were also not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press releases, SEC filings, earnings calls, or other public statements described herein were general,

"boilerplate" statements of risk that would affect any company engaged in the same types of businesses and operations as Ideanomics, and misleadingly contained no factual disclosure of any of the specific details concerning SVG and WAG's fourth quarter 2016 revenues and unprofitability and 2017 Company-wide guidance, Ideanomics' crude oil revenue in the fourth quarter of 2017, and non-integration of blockchain and artificial intelligence technology into Ideanomics' crude oil and consumer electronics businesses, or similar important factors that would give investors adequate notice of such risks.

141.    Fourth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Ideanomics who actually knew that each such statement was false or misleading when made.

## XI.    CAUSES OF ACTION

### COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

142.    Plaintiff re-alleges each allegation above as if fully set forth herein.

143.    This Count is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

144.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings, presentations, press releases, and

conference calls concerning SVG and WAG's revenues and unprofitability in the fourth quarter of 2016 and 2017 Company-wide guidance, Ideanomics' crude oil revenue in the fourth quarter of 2017, and non-integration of blockchain and artificial intelligence technology into Ideanomics' crude oil and consumer electronics business, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false or misleading.

145.   The acts and scienter of the Individual Defendants and other Company employees are imputed to the Company under the principles of agency and *respondeat superior.*

146.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about SVG and WAG's revenues and unprofitability in the fourth quarter of 2016 and 2017 Company-wide guidance, the Company's intent to operate the consumer electronics and crude oil businesses for research purposes only, Ideanomics' crude oil revenue in the fourth quarter of 2017, and non-integration of blockchain and artificial intelligence technology into Ideanomics' crude oil and consumer electronics businesses, and the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

147.   Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

148.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

149.    Plaintiff and other Class members purchased Ideanomics stock, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In doing so, Plaintiff and other Class members relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.

150.    Plaintiff and other Class members were damaged as a result of their reliance on the Defendants' false and/or misleading statements and misrepresentations and omissions of material facts.  Plaintiff and other Class members would not have purchased Ideanomics stock at the prevailing prices had they known the truth about the matters discussed above.

151.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members have suffered damages in connection with their purchases or acquisitions of Ideanomics stock.

152.    Plaintiff is filing this action within two years after the discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claims, and within five years after the violations with respect to Plaintiff's investments.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against All The Individual Defendants**

153.    Plaintiff re-alleges each allegation above as if fully set forth herein.

154.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

155.    As alleged herein, the Individual Defendants caused Ideanomics to violate Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

156.    Each of the Individual Defendants, by reason of their status as senior executive officers and/or directors of Ideanomics, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and other Class members, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases, and other statements related to Plaintiff's and other Class members' investments in Ideanomics stock within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

157.    The Individual Defendants controlled and had the authority to control the content of the Company's SEC filings, press releases, and other statements.  Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

158.    The Individual Defendants knew or recklessly disregarded the fact that Ideanomics' representations were materially false and misleading and/or omitted material facts when made, and are therefore culpable participants in the fraud.  In so doing, the Individual Defendants did not act in good faith.  By virtue of their high-level positions and their participation in and awareness of Ideanomics' operations and public statements, the Individual Defendants were able to and did influence and control Ideanomics' decision making, including

controlling the content and dissemination of the documents that Plaintiff and other Class members contend contained materially false and misleading information and on which Plaintiff and other Class members relied.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff on his own behalf, and on behalf of the Class, demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class representative;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and statements alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorney's fees, expert and consultant fees, and other costs;

D.    Awarding rescissory damages in favor of Lead Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law; and

E.    Awarding such other and further relief as this Court may deem just and proper.

## XIII.  JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  December 2, 2019                              Respectfully submitted,

                                                     By: /s/ *Richard W. Gonnello*
                                                          Richard W. Gonnello

                                                     Richard W. Gonnello
                                                     Katherine M. Lenahan

Sherief Morsy
**FARUQI & FARUQI, LLP**
685 Thirds Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: rgonnello@faruqilaw.com
          klenahan@faruqilaw.com
          smorsy@faruqilaw.com

*Attorneys for Plaintiff*