**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JAYSUKH RUDANI, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

        v.

IDEANOMICS, INC. f/k/a SEVEN STARS
CLOUD GROUP, INC. f/k/a WECAST
NETWORK, INC., *et al.*,

                  Defendants.

No. 1:19-cv-06741-GBD

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT FEDERICO TOVAR'S MOTION TO DISMISS**
**AMENDED SECURITIES CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL ALLEGATIONS ............................................................................................... 1

I.      The Sole Allegation Against Mr. Tovar ................................................................. 1

II.     Plaintiff's Allegations of Falsity Are Unfounded. ................................................. 6

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

I.      The Sole Alleged Statement Made by Mr. Tovar is Not Actionable Under the
        PSLRA Safe Harbor and the Bespeaks Caution Doctrine. .................................. 10

        A.      The 2Q 2018 10-Q Statement is Forward-Looking and Contains Adequate
                Cautionary Language. ............................................................................... 11

        B.      The August 13th Earnings Call Statement is Forward-Looking and Preceded
                by Adequate Cautionary Language. ......................................................... 13

        C.      The Amended Complaint Fails to Allege Actual Knowledge of Falsity. ............. 14

II.     Plaintiff Fails to State a 10b-5 Claim Against Mr. Tovar. ................................... 15

        A.      The 2Q 2018 10-Q Statement Does Not Support a Claim Against Mr. Tovar. ..... 16

        B.      The August 13th Earnings Call Statement Cannot Form the Basis of a Claim
                Against Mr. Tovar. .................................................................................... 19

        C.      Plaintiff Fails to Allege Facts Giving Rise to a Cogent or Compelling
                Inference of Scienter as to Mr. Tovar. ..................................................... 20

                1.      The Amended Complaint Fails to Allege Specific Facts to Show
                        Motive and Opportunity. ............................................................... 21

                2.      The Amended Complaint Alleges the Opposite of Misbehavior and
                        Recklessness as to Mr. Tovar. ....................................................... 22

III.    The Amended Complaint Fails to State a Section 20(a) Control Person Claim. .............. 24

CONCLUSION .................................................................................................................. 25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................10, 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................9

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998)..................................................................................24

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02 CIV.6478 NRB, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd*
    *sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) ..............................11

*ECA Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..................................................................................20, 22

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)..................................................................................9, 10, 21

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................................................................22

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)..................................................................................14

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)..................................11

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)..................................................................................9, 15

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................22

*Kleinman v. Elan Corp., PLC*,
    706 F.3d 145 (2d Cir. 2013)..................................................................................10

*Lopez v. Ctpartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016)..................................................................................11

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
No. 3:09-CV-01740 VLB, 2013 WL 1188050 (D. Conn. Mar. 23, 2013) ..............................11

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...........................................................................................21

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps.*
*Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ........................................13

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
153 F. Supp. 3d 628 (S.D.N.Y. 2015).................................................................10, 18, 23, 24

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................................................21

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)...............................................................................................22

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)..........................................................................................17, 19

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010).........................................................................................12, 14

*In re SunEdison, Inc. Sec. Litig.*,
300 F. Supp. 3d 444 (S.D.N.Y. 2018).................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*,
551 U.S. 3084 (2007)...............................................................................................15, 20

*Xerion Partners, I LLC v. Resurgence Asset Mgmt.*,
LLC, 474 F. Supp. 2d 505 (S.D.N.Y. 2007), *aff'd sub nom. Bay Harbour*
*Mgmt. LLC v. Carothers*, 282 F. App'x 71 (2d Cir. 2008).......................................18

**Statutes**

15 U.S.C. § 78j(b) ...................................................................................................1, 15, 24

15 U.S.C. § 78u–4...........................................................................................................9, 20

15 U.S.C. § 78u–5.....................................................................................................11, 12, 14

**Other Authorities**

17 C.F.R. § 240.10b-5(b) ........................................................................................1, 15, 24

Fed. R. Civ. P. 9(b) ................................................................................................................9

iii

Fed. R. Civ. P. 12(b)(6)..........................................................................................................1, 9

Press Release, Ideanomics, Seven Stars Cloud Announces Business Name Change
    to Ideanomics (Aug. 27, 2018), https://investors.ideanomics.com/2018-08-27-
    Seven-Stars-Cloud-Announces-Business-Name-Change-to-Ideanomics.................................7

## INTRODUCTION

Defendant Federico Tovar, the former CFO of Defendant Ideanomics, Inc. f/k/a Seven Stars Cloud Group, Inc. f/k/a Wecast Network, Inc. (the "Company"), should not be a defendant in this lawsuit. Mr. Tovar joined the Company as CFO in June 2018, after the majority of the alleged misconduct occurred. The 158-paragraph Amended Complaint alleges only *one* statement attributable to Mr. Tovar that is allegedly false. That statement, however, is a "forward-looking statement" that cannot support a violation of Section 10(b), Rule 10b-5, or Section 20(a) of the Exchange Act under the "PSLRA safe harbor." Furthermore, the statement is not false, as demonstrated by Plaintiff's own allegations, which in any event do not establish the requisite *scienter*. Therefore, the claims as to Mr. Tovar must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because they fail to state a claim on which relief can be granted.

## FACTUAL ALLEGATIONS

### I.      The Sole Allegation Against Mr. Tovar

Mr. Tovar was employed with the Company for fewer than six months of the Class Period. Plaintiff alleges a Class Period beginning on February 1, 2017, Am. Compl. ¶ 36, through November 13, 2018, when the Company announced it would be divesting the consumer electronics and crude oil lines of business. *Id.* ¶¶ 1, 75. Mr. Tovar joined the Company as Chief Financial Officer ("CFO") on June 1, 2018 and served as CFO until April 30, 2019. *Id.* ¶ 24.

Before joining the Company, Mr. Tovar served as the Chief Financial and Strategy Officer of Global Sentinal Inc., a privately held cybersecurity and AI technology company. *Id.* ¶ 100; Declaration of Hunter T. Carter ("Carter Decl.") Ex. 1, 2Q 2018 10-Q at 32. Prior to that, Mr. Tovar worked as a strategy and management consultant at Booz Allen Hamilton, an advisor at Ernst & Young, and a Director at Grant Thornton LLP. *Id.* Mr. Tovar is a "seasoned business professional and subject matter expert in *AI, FinTech, Blockchain, IoT and cybersecurity*." Carter

Decl. Ex. 1, 2Q 2018 10-Q at 32 (emphasis added).  He was recruited to the Company as part of the Company's efforts to secure a management team with expertise in blockchain, AI and the financial services industry.  *Id.*  Indeed, prior to Mr. Tovar's arrival, the Company for almost two years had pursued the crude oil and consumer electronics business in order to develop its blockchain and AI capabilities, and those businesses generated substantial revenue growth in the second quarter of 2018.  *See* Am. Compl. ¶ 70.

Plaintiff attributes only *one* alleged misrepresentation to Mr. Tovar throughout the entire Class Period, and that statement is a Company statement on SEC Form 10-Q, reporting results for the second quarter (ending June 30) of 2018 (the "2Q 2018 10-Q").  Mr. Tovar signed the document in his capacity as the Chief Financial Officer,[1] a position for which he was hired on June 1, 2018, thirty days before the end of the second quarter, which ended only six weeks before he signed the 2Q 2018 10-Q.[2]  Allegedly, the 2Q 2018 10-Q contains one misstatement (the "2Q 2018 10-Q Statement"):

> As part of our blockchain and AI focused strategy, we are currently focused on consumer electronics and the crude oil trading business in supply chain

---

[1]       Mr. Tovar's signature to the 2Q 2018 10-Q reads as follows:

In accordance with the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized on August 13, 2018.

Seven Stars Cloud Group, Inc.

By: /s/ Federico Tovar
Name: Federico Tovar
Title: Chief Financial Officer
(Principal Financial Officer and an Authorized Officer).

Carter Decl. Ex. 1, 2Q 2018 10-Q at 48.

[2]       "On April 6, 2018, Mr. Simon Wang resigned from his position as Chief Financial Officer ("CFO") of the Company. On April 11, 2018, the Board unanimously appointed its previous Finance Director, Mr. Jason Wu, as the interim CFO and principal accounting officer of the Company, effective immediately. On June 1, 2018, the Board appointed Mr. Federico Tovar as CFO of the Company."  Carter Decl. Ex. 1, 2Q 2018 10-Q at 43.

2

management *with the intent to* migrate this on to the blockchain with AI capabilities.

Am. Compl. ¶ 68 (emphasis added). That's it. In the entire, more than 50-page document containing financial statements, analysis, and other disclosures, Plaintiff identifies only this one forward-looking sentence about the intent to migrate businesses onto the blockchain as the basis for a securities fraud claim against Mr. Tovar.

The Amended Complaint references five different SEC filings signed by Mr. Tovar — the 2Q 2018 10-Q; the August 28, 2018 First Amendment to 2017 10-K (the "Second 2017 10-K"); the November 14, 2018 3Q 2018 10-Q (the "3Q 2018 10-Q"); the December 14, 2018 Second Amendment to 2017 10-K (the "Third 2017 10-K"); and the April 1, 2019 10-K — yet in all the *hundreds* of pages of these five SEC filings, Plaintiff alleges only this *one* misstatement by Mr. Tovar.

The 2Q 2018 10-Q Statement is on its face forward-looking, and the subsequent sentences provide additional context:

> As such, the company *is co-developing* the underlying technology platform with its technology partner *with an aim* to become a smart supply chain management platform with one token as means of settlement and digital wallet function. *In the near future*, *once the technology platform is fully functional*, the company *will bring* customers of traditional 3C consumer electronics business and crude oil trading business *onto the platform*, which *will greatly improve* the efficiency of capital utilization and inventory turnover for both consumer electronics and crude oil business by cutting middle-man cost.

Carter Decl. Ex. 1, 2Q 2018 10-Q at 33 (emphasis added). These two sentences elaborate on the Company's future strategy for integrating blockchain, again using language like "aim," "in the near future," and "will bring."

The forward-looking statements in the 2Q 2018 10-Q are accompanied by cautionary language. The "Cautionary Note Regarding Forward Looking Statements" (the "Cautionary

3

Note") emphasizes that statements using forward looking language "involve risks and uncertainties":

> You should read statements that contain these words carefully because they discuss our future expectations, contain projections of our future results of operations or financial condition or state other "forward-looking" information. We believe that it is important to communicate our future expectations to our investors. However, *these forward-looking statements are not guarantees of future performance and actual results may differ materially from the expectations that are expressed, implied or forecasted* in any such forward-looking statements.

Carter Decl. Ex. 1, 2Q 2018 10-Q at 30 (emphasis added). The 2Q 2018 10-Q also identifies risks and challenges specific to the Company's ability to migrate blockchain and AI capabilities to the consumer electronics and crude oil businesses:

> Our current electronic and crude oil products and services compete in highly competitive global markets characterized by aggressive price competition and resulting downward pressure on gross margins, frequent introduction of new products, short product life cycles, evolving industry standards, continual improvement in product price/performance characteristics, rapid adoption of technological and product advancements by competitors and price sensitivity on the part of consumers.

*Id.* at 33. Importantly, this cautionary language is found in the sentence that *immediately precedes* the 2Q 2018 10-Q Statement. Additionally, in the "Risk Factors" section of the 2Q 2018 10-Q, the Company emphasizes that it is "in the process of transforming its business model [to a next-generation AI- and blockchain- powered company] and this transformation may not be successful," and that "[a]ny failure to implement this plan . . . could have a material adverse effect on our financial results." *Id.* at 44.

The Amended Complaint references only one other alleged misrepresentation that occurred during Mr. Tovar's tenure as CFO — but, importantly, Plaintiff does *not* allege Mr. Tovar made that statement; rather, the statement is attributed to Defendant Robert Benya, the President, Chief Revenue Officer ("CRO"), and Director of the Company. Am. Compl. ¶ 25. Plaintiff claims that on August 13, 2018, during an earnings call with investors to discuss the 2Q 2018 10-Q filed

4

the same day, Mr. Benya stated as follows (the "August 13[th] Earnings Call Statement," together with the 2Q 2018 10-Q Statement, the "Blockchain Intent Statements"):

> Product four is TradeTech which involves the use of blockchain, active ledger and index products to ramp up margins significantly in our supplier chain finance services business, which is a key driver of our current and rapid topline revenue growth.

Am. Compl. ¶ 70.  The statement was made by Mr. Benya in the context of providing an overview of the TradeTech product and discussing the Company's "4+2+1 Strategy," which he explained "*will drive growth* across our core products which are (1) digital financial assets; (2) consumer digital assets; (3) commodities and energy; and (4) TradeTech."  Carter Decl. Ex. 2, Aug. 13, 2018 Earnings Call Tr. at 3 (emphasis added).   Mr. Tovar, later during the call, added further clarification:

> The gross margin for the three months ended June 30, 2018 was 1.1% . . . This increase in margin is primarily due to our expanding supply chain management business, which *we intend to transition* into our higher margin and blockchain-driving TradeTech business.

*Id*. at 4 (emphasis added).

It is important to recall that "blockchain" still is, and was in the first half of 2018, a novel technology under exploration and development in many different business sectors, a fact that reinforces the correctness of construing these statements of intent to migrate to this novel technology as being forward looking statements about future business plans. *See generally*, Carter Decl. Ex. 2, Aug. 13, 2018 Earnings Call Tr.  Thus, in the August 13th Earnings Call Statement, Mr. Tovar emphasized that TradeTech, which involves the use of blockchain, would *be transitioned* (*i.e.* in the future) into the supply chain management business (*i.e.* the consumer electronics and crude oil trade businesses). Mr. Tovar's forward-looking statement during the August 13th Earnings Call about transitioning to the blockchain is not, however, one of the statements the Amended Complaint relies upon for a securities fraud claim.

5

At the beginning of the Earnings Call, Chad Arroyo read a "Safe Harbor Statement" which noted that statements made during the call may be "forward-looking and involve a number of risks and uncertainties that could cause actual results to differ materially." Carter Decl. Ex. 2, Aug. 13, 2018 Earnings Call Tr. at 2. He also directed investors on the call to see the 2Q 2018 10-Q for details regarding the risks, stating that "we are subject to a number of risks that may significantly impact our business and financial results. These results and uncertainties are detailed from time-to-time in the Management's Discussion and Analysis section of our corporate filings." *Id.* The 2Q 2018 10-Q, the subject of the call, expressly warned of the specific risks and challenges facing the consumer electronics and crude oil business. The 2Q 2018 10-Q also warned that, "since these are new business lines, customer demand is in the process of being validated, and the global regulatory environment is constantly adapting to these new fintech products and technologies so it is not reasonable to make a definitive prediction at this time." Carter Decl. Ex. 1, 2Q 2018 10-Q at 35. In other words, the Company warned that the supplier chain finance services business may not continue to generate the kind of growth seen in the second quarter of 2018.

The Amended Complaint makes no individualized allegation that Mr. Tovar had the motive or purpose to deceive. The Amended Complaint alleges that defendants were collectively motivated to raise corporate funds, but the two instances cited where the Company allegedly raised capital as a result of alleged artificially inflated stock prices — $26 million on July 30, 2018 and $12 million on August 10, 2018, Am. Compl. ¶ 104, — both occurred *before* the 2Q 2018 10-Q Statement, the only alleged misrepresentation attributable to Mr. Tovar.

## II.     Plaintiff's Allegations of Falsity Are Unfounded.

Viewed in the light most favorable to the Plaintiff, the gravamen of the claim against Mr. Tovar (and the other defendants) is that, in an attempt to capitalize on the blockchain trend, the Company "touted" that it had integrated blockchain into the consumer electronics and crude oil

6

businesses, when in actuality it had not, and never had any intention of doing so. The facts alleged in no way support this theory.

First, the Amended Complaint acknowledges that the Company's overarching goal was to become a "next generation Artificial-Intelligence and Blockchain-Powered Financial Technology Company," Am. Compl. ¶ 2, and the Company actually pursued that goal with the consumer electronics and crude oil trading products. Starting in February 2017, the Company's subsidiary, Wecast Services Group, engaged in the consumer electronics business, *id.* ¶¶ 29, 36, and in October 2017, the Company began crude oil trading in a joint venture with Ocasia Group Holdings, *id.* ¶ 53. The 2Q 2018 10-Q, filed on August 13, 2018 and reporting results of the second quarter, shows that the consumer electronics and crude oil trading businesses generated $132.9 million in revenue. *Id.* ¶ 70. These facts establish that, as of August 13, 2018, the Company was indeed focused on consumer electronics and crude oil trading and was seeing significant growth in those product lines.[3]

Second, the Amended Complaint contends that the Company stated for the first time in the 3Q 2018 10-Q and the Third 2017 10-K (dated December 14, 2008) that the consumer electronics and crude oil trading businesses did not currently integrate blockchain or AI-based logistics solutions, *id.* ¶ 77, 79, demonstrating that statements in the prior quarter about intent to migrate to blockchain technology (the Blockchain Intent Statements) were false. However, neither alleged misrepresentation stated that blockchain had *already* been integrated; rather, they express the Company's "*intent*" to integrate blockchain *in the future*.

---

[3]    Also in August 2018, the Company adopted "Ideanomics" as its new name because the name "aligned with the Company's vision and mission for transforming traditional assets and their associated industries into the asset digitization era." Am. Compl. ¶ 31; Press Release, Ideanomics, Seven Stars Cloud Announces Business Name Change to Ideanomics (Aug. 27, 2018), https://investors.ideanomics.com/2018-08-27-Seven-Stars-Cloud-Announces-Business-Name-Change-to-Ideanomics.

Third, Plaintiff faults the Company for changing its intent (*i.e.*, future business plans). The Amended Complaint alleges that the Blockchain Intent Statements are false because (1) the 3Q 2018 10-Q and the Third 2017 10-K omitted reference to the "Venus platform" — a blockchain platform disclosed in prior SEC filings, Am. Compl. ¶¶ 77, 79; (2) the Third 2017 10-K stated that the Company engaged in the consumer electronics and crude oil businesses "largely for research purposes," *id.* ¶ 79; and (3) the Company eventually divested the crude oil and consumer electronics businesses, *id.* ¶ 75. It is unchallenged that although the second quarter of 2018 saw significant revenue growth in the consumer electronic and crude oil businesses, and the third quarter revenues for the Company were generated primarily by the consumer electronics business, the Company experienced significant losses, resulting in low margins for the commodities trading business. *Id.* ¶ 75. As a result, the Company disclosed that it was forced to switch gears and adopt a different business strategy. *Id.* The mere fact that the Company chose to change strategies in no way suggests that the Company did not intend to integrate blockchain into these business lines at the time Mr. Tovar signed the 2Q 2018 10-Q Statement (and when the August 13th Earnings Call Statement occurred).

The Amended Complaint cites a speech given by SEC Chairman Jay Clayton stating that the SEC was "looking closely at the disclosures of public companies that shift their business models to capitalize on the perceived promise of distributed ledger technology and whether the disclosures comply with the securities laws, particularly in the case of an offering." *Id.* ¶ 35. The Amended Complaint, however, makes no connection between this allegation and the alleged conduct underlying the claims made here. That there was increased scrutiny of blockchain related claims of other companies is irrelevant unless tied to the Company. The Amended Complaint is devoid of any allegation that the SEC took any action against the Company or Mr. Tovar relating

8

to blockchain.  Plaintiff contends that the deletions and additions in the Third 2017 10-K were in response to an SEC inquiry, "which undoubtedly related to the Company's statements regarding the integration of blockchain." *Id*. ¶ 96.  This is both conclusory and irrelevant; that changes were made in response to an SEC inquiry, without more, has no significance with regard to the truth or falsity, or forward-looking nature, of the Blockchain Intent Statements.

### LEGAL STANDARD

Ordinarily, a complaint is subject to dismissal for failure to state a claim on which relief may be granted. Fed. R. Civ. P. 12(b)(6). To avoid dismissal, the allegations must be "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

A complaint that purports to allege securities fraud must satisfy heightened pleading requirements under the Private Securities Litigation Reform Act (the "PSLRA") and Fed. R. Civ. P. 9(b).  *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 92 (2d Cir. 2016).  "[T]he PSLRA specifically requires a complaint to demonstrate that the defendant made '[m]isleading statements and omissions . . . of a material fact,' 15 U.S.C. § 78u–4(b)(1), and acted with the '[r]equired state of mind' (the 'scienter requirement'), *id*. § 78u–4(b)(2)." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).

Similarly, Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  "To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

9

when the statements were made, and (4) explain why the statements were fraudulent.'" *Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 305 (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

In determining whether a securities class action complaint is well-pleaded, a court should consider the complaint in its entirety, including "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *ATSI Comms.*, 493 F.3d at 99. "To be considered incorporated into the complaint by reference 'the [c]omplaint must make a clear, definite and substantial reference to the documents.'" *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 642 (S.D.N.Y. 2015) (quoting *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011)). In addition, courts may also properly consider documents that "bear on the adequacy of SEC disclosures." *Pehlivanian*, 153 F. Supp. 3d at 643 (holding that transcripts of earnings calls referenced in complaint could be considered on motion to dismiss and that court could take judicial notice of conference call transcripts not referenced in complaint).

## ARGUMENT

### I. The Sole Alleged Statement Made by Mr. Tovar is Not Actionable Under the PSLRA Safe Harbor and the Bespeaks Caution Doctrine.

The only alleged misstatement attributable to Mr. Tovar is protected by the PSLRA safe harbor for "forward-looking statements." Under the PSLRA, Mr. Tovar is not liable if the

10

allegedly false or misleading statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i).  Likewise, the "bespeaks caution" doctrine generally protects "[a] company's statements of hope, opinion, or belief about its future performance or general market conditions." *In re Duane Reade Inc. Sec. Litig.*, No. 02 CIV.6478 NRB, 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *see also Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016).  The Blockchain Intent Statements satisfy both elements of the safe harbor and the bespeaks caution doctrine.  Additionally, Plaintiff has not alleged facts supporting a strong inference that Mr. Tovar actually knew that the statements were misleading.  For these reasons, the claims against Mr. Tovar should be dismissed.

### A.    The 2Q 2018 10-Q Statement is Forward-Looking and Contains Adequate Cautionary Language.

The statutory language of the PSLRA definition of "forward-looking statement" includes "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," 15 U.S.C. § 78u-5(i)(1)(B).  The 2Q 2018 10-Q Statement indicates a future "*intent* to migrate . . . to [] blockchain," Am. Compl. ¶ 68 (emphasis added), and thus falls squarely within this definition.  *See Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 410 (S.D.N.Y.) (statements that company "intended" to expand commercial market was forward-looking), *aff'd*, 757 F. App'x 35 (2d Cir. 2018); *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 3:09-CV-01740 VLB, 2013 WL 1188050, at *11 (D. Conn. Mar. 23, 2013) ("Words such as . . . '*intend*,' and similar expressions may identify such forward-looking statements." (emphasis added)).  Particularly when viewed in the

11

context of the two sentences following the 2Q 2018 10-Q Statement, which emphasize that the Company was in the process of "co-developing" a technology platform "with *an aim to become* a smart supply chain management platform" "*[i]n the near future*," there is no dispute that the 2Q 2018 10-Q Statement is forward-looking.  Carter Decl. Ex. 1, 2Q 2018 10-Q at 33 (emphasis added).  The "use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's *intention* to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 769 (2d Cir. 2010) (emphasis added).  Like "expect" or "expectation," the use of the word "intent" conveys a future act.

Moreover, the statement is contained in the Management Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the 2Q 2018 10-Q and is *expressly identified as forward-looking*:  "In addition to historical information, the following discussion contains certain *forward-looking information*."  Carter Decl. Ex. 1, 2Q 2018 10-Q at 30 (emphasis added).[4]  The very first statement of the section containing the 2Q 2018 10-Q statement leaves no ambiguity — if not historical, the statements are forward-looking.

The 2Q 2018 10-Q also contains express cautionary language that there were certain challenges and risks to migrating blockchain and AI capabilities to the consumer electronics and crude oil businesses.  Carter Decl. Ex. 1, 2Q 2018 10-Q at 30, 33, 44.  The caution is far from "boilerplate" and is sufficient as a matter of law to warn investors of the risk that the Company's ability to remain competitive in the consumer electronic and crude oil business may be limited.

---

[4]      The placement of the statement in the MD&A section is independently significant.  "[The purpose of the MD&A is to present the company's business 'as seen through the eyes of those who manage [it].'" *Slayton*, 604 F.3d at 767 (quoting Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75,056, 75,056 (Dec. 29, 2003)). "Congress explicitly included 'a statement of future economic performance ... contained in a discussion and analysis of financial condition by the management' in its definition of a forward-looking statement, 15 U.S.C. § 78u–5(i)(1)(C) . . . ." *Id.* at 767.

*See Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 567 (S.D.N.Y. 2018) ("To qualify as 'meaningful,' cautionary language 'must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.'" (quoting *Slayton*, 604 F.3d at 771)), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019).

It is abundantly clear that the Amended Complaint as to Mr. Tovar rests entirely on the 2Q 2018 10-Q Statement, a forward-looking statement accompanied by adequate cautionary language. Accordingly, it cannot form the basis of Plaintiff's claims against Mr. Tovar.

**B.     The August 13th Earnings Call Statement is Forward-Looking and Preceded by Adequate Cautionary Language.**

The August 13th Earnings Call Statement is not attributed to Mr. Tovar, but is likewise a forward-looking statement about the Company's intent to migrate the consumer electronics and crude oil trading business onto the blockchain.  Mr. Benya's statement, *see* Am. Compl. ¶ 70, is forward-looking in that it describes the Company's plan to use TradeTech, which involves the use of blockchain, to "ramp up" future margins in the supplier chain finance services business. *See Xerox*, 300 F. Supp. 3d at 574 (statements describing Xerox's expectations as to how implementation of platform would benefit the company in the future were forward-looking).  Mr. Benya explains the TradeTech product as part of the 4+2+1 Strategy, which "*will drive* growth across our core products."  Carter Decl. Ex. 2, Aug. 13, 2018 Earnings Call Tr. at 3 (emphasis added).  Later during the call, Mr. Tovar further explains the Company's future strategy, stating that the Company "*intend[s] to transition* [supplier chain finance services business] into our higher margin and blockchain-driven TradeTech business."  *Id.* at 4 (emphasis added).[5]  The August 13th

---

[5]     The "supplier chain finance services business" is the consumer electronics and crude oil business.  Am. Compl. ¶ 70.

Earnings Call Statement is nearly identical to the 2Q 2018 10-Q Statement — both statements indicate the Company's future goal to integrate blockchain (TradeTech) with the consumer electronic and crude oil businesses.  Thus, the August 13th Earnings Call Statement is forward-looking.

And, as required by the safe harbor, Mr. Arroyo cautioned at the opening of the call that actual results may differ materially from those projected and identified a readily available written document — SEC filings — setting out risk factors that could cause the actual results to materially differ.  Carter Decl. Ex. 2, Aug. 13, 2018 Earnings Call Tr. at 2 (beginning call with cautionary statement and directing investors to SEC filings); *see* 15 U.S.C. § 78u-5(c)(2); *Gissin v. Endres*, 739 F. Supp. 2d 488, 510 (S.D.N.Y. 2010) (holding that risks were adequately disclosed in SEC disclosures which formed the basis of earnings call).  Accordingly, the August 13th Earnings Call Statement is protected by the PSLRA safe harbor.

### C.      The Amended Complaint Fails to Allege Actual Knowledge of Falsity.

The PSLRA safe harbor applies for the additional, independent reason that Plaintiff fails to allege that the forward-looking Blockchain Intent Statements were made with actual knowledge that they were false or misleading, as required by the statute.  *See* 15 U.S.C. § 78u–5(c)(1)(B) (safe harbor requires dismissal if plaintiff does not "prove that the forward-looking statement . . . was . . . made or approved by [an executive officer] with *actual knowledge* by that officer that the statement was false or misleading" (emphasis added)).  "Moreover, because the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, the scienter requirement for forward-looking statements is stricter than for statements of current fact. . . . [L]iability . . . attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 773 (internal quotations omitted).

14

Based on the facts alleged in the Amended Complaint, a reasonable person could not infer that Mr. Tovar actually knew in August 2018 that the Company would divest the crude oil and consumer electronics businesses before integrating blockchain.  With a background in blockchain and AI, Mr. Tovar had recently joined the Company, which for almost two years had pursued the crude oil and consumer electronics business (in order to develop its blockchain and AI capabilities) and generated substantial revenue growth in the second quarter of 2018.  *See* Am. Compl. ¶ 70.  The Amended Complaint lacks any facts to suggest that Mr. Tovar did not genuinely believe the Blockchain Intent Statements.  Nor does the Amended Complaint set forth any undisclosed facts that would seriously undermine the accuracy of either statement, "cogent and at least as compelling as any opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 323–24 (2007).  Accordingly, the PSLRA safe harbor bars Plaintiff's claims against Mr. Tovar.

## II.        Plaintiff Fails to State a 10b-5 Claim Against Mr. Tovar.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  SEC Rule 10b-5 states that it "shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  To state a claim under section 10(b) and Rule 10b-5, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Indiana Pub. Ret. Sys.*, 818 F.3d at 93 (quoting *ATSI*, 493 F.3d at 105).  Plaintiff fails to allege a statement attributable to Mr. Tovar that was false at the time it was made or made with the requisite scienter.  The claims against Mr. Tovar should be dismissed.

15

### A.      The 2Q 2018 10-Q Statement Does Not Support a Claim Against Mr. Tovar.

The 2Q 2018 10-Q Statement contains two parts:  (1) the representation that the Company was "currently focused on consumer electronics and the crude oil trading business in supply chain management" and (2) the representation that the Company intended to "migrate this [consumer electronics and the crude oil trading business] on to the blockchain with AI capabilities."  Am. Compl. ¶ 68.  Neither is false.

The allegations in the Amended Complaint confirm that the first part of the statement is entirely true.  Plaintiff alleges that the Company shifted its focus from providing on demand video services to consumer electronics in February 2017, *id.* ¶¶ 29, 36, and began crude oil trading in or around October 2017, *id.* ¶ 53.  As of the close of the second quarter of 2018, the Company was "currently focused" on those products, so much so that consumer electronics and crude oil were the primary revenue generating business for the Company in that quarter.  Am. Compl. ¶ 70; Carter Decl. Ex. 1, 2Q 2018 10-Q at 35, 36.  Therefore, the first part of the 2Q 2018 10-Q Statement is not false.

Plaintiff alleges that the second part of the 2Q 2018 10-Q Statement is false because in the 3Q 2018 10-Q and the Second Amended 2017 10-K, the Company stated that the consumer electronics and crude oil business "does not currently integrate blockchain or AI-based logistics solutions."  Am. Compl. ¶¶ 69, 77, 79.  The 2Q 2018 10-Q Statement does not assert that the Company had *already* integrated blockchain into consumer electronics and crude oil trading, only that the Company *intended* to do so in the future.  Nothing about the 2Q 2018 10-Q Statement suggests that the integration of blockchain and AI had already occurred.  The 3Q 2018 10-Q and Second Amended 2017 10-K are perfectly consistent with and confirm the truth of the 2Q 2018 10-Q Statement.  And, the Second Circuit has acknowledged that statements that "simply reflect[] company policy at the time" are "not promises to maintain that policy in the future, and thus [are]

16

not rendered misleading by the company's subsequent consideration of an alternative plan." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996).

Plaintiff also claims that because the Third 2017 10-K states that the consumer electronics and crude oil businesses were "largely for research purposes to support our development of fintech solutions for this space, and not primarily with a view to competitive returns," the Company never intended to maintain those business lines or migrate them to blockchain. Am. Compl. ¶ 79. Plaintiff also alleges that reference to the Venus blockchain platform[6] found in the First 2017 10-K filed on March 30, 2018 was omitted from the 3Q 2018 10-Q and the Third 2017 10-K,[7] further suggesting that the Company was merely "touting" blockchain and deleted the reference in response to SEC scrutiny. Am. Compl. ¶¶ 77, 79, 96. Plaintiff's reasoning is unsupported.

First, the allegations in the Amended Complaint align with the Company's stated focus on blockchain and AI technologies. Starting in early 2017, the Company "aim[ed] to become a next generation Artificial-Intelligent (AI) & Blockchain-Powered, Fintech company," and the consumer electronics and crude oil businesses provided a critical opportunity for achieving that goal. Carter Decl. Ex. 1, 2Q 2018 10-Q at 30.[8] The 2Q 2018 10-Q Statement states — consistent with this goal — that, "*[a]s part of our blockchain and AI focused strategy*, we are currently

---

[6]   The "Venus blockchain based platform" includes "TPaaS & VPaaS system." Carter Decl. Ex. 1, 2Q 2018 10-Q at 35.

[7]   Notably, Plaintiff's contention that reference to the Venus blockchain platform is omitted from Third 2017 10-K is wrong. Page 3 of the filing stated, "[f]or our consumer electronics trading business, we developed a TPaaS (Transactional Platform as a Service) system, which we began testing through Amer in the fourth quarter of 2017." Carter Decl. Ex. 3, Third 2017 10-K at 3.

[8]   The Company's 10-Qs as far back as the first quarter of 2017 confirm that the Company's overall purpose was to become a blockchain and AI-powered business. 1Q 2017 10-Q at 10 (Wecast Network's focus was "BASE" or Blockchain, Artificial Intelligence, Supply Chain & Exchanges), http://bit.ly/1Q201710-Q; 2Q 2017 10-Q at 10 (same), http://bit.ly/2Q201710-Q; 3Q 2017 10-Q at 10 ("SSC is aiming to become a global leader in providing next-generation Artificial-Intelligent (AI) & Fintech Powered, Supply Chain + Digital Finance Solutions"), http://bit.ly/3Q201710-Q; 1Q 2018 10-Q at 11 (same), http://bit.ly/1Q201810-Q.

17

focused on consumer electronics and the crude oil trading business." Am. Compl. ¶ 68 (emphasis added). The Third 2017 10-K likewise states:

> *To support the development of blockchain- and AI-based technologies* for the logistics management and financing industries, we entered the commodities trading business, with the primary goal of learning about the needs of buyers and sellers in industries that rely heavily on the shipment of goods to inform our understanding of the features a blockchain platform would need in order to serve this industry vertical.

Carter Decl. Ex. 3, Third 2017 10-K at 3 (emphasis added). Having acquired those businesses, and given that the businesses had generated significant revenue in the second quarter of 2018 ($132.9 million), Am. Compl. ¶ 70, the next logical step was to integrate blockchain and AI capabilities into those product lines. Thus, the crude oil and consumer electronic businesses were critical to the Company's overall business plan, particularly *at the time* that the 2Q 2018 10-Q Statement was made.

Second, the fact that the Company ultimately changed strategies and divested the consumer electronic and crude oil trading lines in no way undermines the Company's intent, at the time, to integrate blockchain. The statements referenced in Paragraphs 77 and 79 do not support the inference that the Company's business strategy as of August 13, 2018 was anything other than to migrate the consumer electronics and crude oil businesses to blockchain. *Pehlivanian*, 153 F. Supp. 3d at 646 (emphasizing that "the fact that [defendant] decided to pursue another strategy does not make its earlier statements false"); *Xerion Partners, I LLC v. Resurgence Asset Mgmt.*, LLC, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007), *aff'd sub nom. Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71 (2d Cir. 2008) (dismissal appropriate where no allegations to support that business strategy was contemporaneously false). Even if the Company had already made the decision to divest the consumer electronics and crude oil businesses as of August 13, 2018, the Second Circuit rejected the argument that a company's statement discussing one business strategy

18

was "false because the company had already made the decision, or was actively considering adopting a plan" to pursue a different strategy. *Philip Morris*, 75 F.3d at 812.

Third, the 2Q 2018 10-Q Statement cannot reasonably be construed as misleading merely because the disclosures were made at a time that the SEC was scrutinizing companies "touting" blockchain. Am. Compl. ¶¶ 65, 69, 71, 96. This is both conclusory and irrelevant, in that whether changes were made in response to an SEC inquiry, without more, has no significance with regard to the truth or falsity, or forward-looking nature, of the Blockchain Intent Statements. Accordingly, the 2Q 2018 10-Q statement is not false or misleading.

### B. The August 13th Earnings Call Statement Cannot Form the Basis of a Claim Against Mr. Tovar.

Plaintiff claims that the August 13th Earnings Call Statement is false because blockchain was not integrated into the crude oil or consumer electronics businesses and blockchain was not driving the Company's revenue. *Id.* ¶ 71. Plaintiff's theory is groundless.

As an initial matter, the August 13th Earnings Call Statement is attributed to Mr. Benya, not to Mr. Tovar. For that reason alone, the statement cannot support a claim against Mr. Tovar. Moreover, the statement is not false. The statement contains three parts: (1) Product four, TradeTech, involves the use of blockchain, active ledger and index products; (2) TradeTech will ramp up margins in the supplier chain finance services business; and (3) the supplier chain finance services business was at the time a key driver of the Company's topline revenue growth. The first part of the statement defines what TradeTech is — it is a product that uses blockchain, active ledger and index products. Plaintiff does not allege that this portion of the statement is false.

The second part of the statement predicts that TradeTech will "ramp up" margins in the supplier chain finance services business. Nothing in this portion of the statement suggests that blockchain was already integrated into the consumer electronics and crude oil businesses. Rather,

19

it is a forward-looking statement, indicating a future plan to integrate blockchain.  Indeed, a statement made by Mr. Tovar later in the earnings call provides additional clarity:  "This increase in margin is primarily due to our expanding supply chain management business, *which we intend to transition into our higher margin and blockchain-driving TradeTech business*."  Carter Decl. Ex. 2, Aug. 13, 2018 Earnings Call Tr. at 4 (emphasis added).

The third part of the statement indicates that the supplier chain finance services business — not blockchain — was "a key driver of our current and rapid topline revenue growth."  *Id.* at 2. Thus, contrary to Plaintiff's allegation, no one during the earnings call claimed that blockchain had already been integrated, or that blockchain drove the increase in revenue.

Furthermore, the subsequent statements by the Company (as alleged in Paragraphs 77 and 79) do not render the August 13th Earnings Call Statement false.  *See supra*, pp. 16–19.

### C.       Plaintiff Fails to Allege Facts Giving Rise to a Cogent or Compelling Inference of Scienter as to Mr. Tovar.

Under the PSLRA, where proof of scienter is a required element, as it is in the actual knowledge prong of the statutory safe harbor, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2); *ECA Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  The Supreme Court has established that to qualify as a "strong inference," the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.*, 551 U.S. at 314.  The requisite scienter may be established by pleading facts to show that defendants had the motive and opportunity to commit fraud, or strong circumstantial evidence of conscious misbehavior or recklessness.  *ECA*, 553 F.3d at 198–99.

20

Importantly, the Class Period spans February 2017 through November 2018, and Mr. Tovar only became CFO in June 2018. The Amended Complaint lacks any specific allegations as to Mr. Tovar's motive and opportunity or misbehavior and recklessness. As such, Plaintiff fails to allege that Mr. Tovar possessed the requisite scienter to sustain a 10b-5 claim.

        1.       The Amended Complaint Fails to Allege Specific Facts to Show Motive and Opportunity.

"[M]otive for scienter can 'be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity could be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged.'" *Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 309 (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009)). Rather than asserting allegations specific to Mr. Tovar's motive or opportunity, Plaintiff uses group pleading to collectively allege the motive and opportunity of all the defendants. This approach fails with respect to Mr. Tovar for two reasons.

First, as a matter of law, collective allegations relating to motive and opportunity are insufficient to satisfy the heightened pleading requirement. "To establish an adequate motive to commit securities fraud, plaintiffs must allege a motive that is *concrete and personal to the defendant charged* with making the misstatement or omission." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007) (emphasis added); *see also Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000) (plaintiff must allege that defendant "benefitted in some concrete and personal way from the purported fraud"). Here, the Amended Complaint does not contain a single allegation identifying *Mr. Tovar's* motive or opportunity. With the exception of one allegation directed at Defendant Wu's motivation, the Amended Complaint contains only collective allegations that all the defendants were motivated to artificially inflate the Company's stock prices.

21

Am. Compl. ¶¶ 103–04. "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198. Particularly here, where Mr. Tovar became CFO in June 2018, after the majority of the alleged fraud occurred, Plaintiff must allege specific facts demonstrating the personal benefit to Mr. Tovar as opposed to generalized motive attributable to any corporate officer.

Second, for the timeframe during which Mr. Tovar was CFO, the Amended Complaint cites only two instances where the Company allegedly raised capital as a result of the alleged artificially inflated stock prices, Am. Compl. ¶ 104, and both occurred *before* the 2Q 2018 10-Q Statement. Thus, Mr. Tovar could not possibly have benefitted directly from the alleged fraud attributed to him. *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (affirming dismissal where "plaintiffs [had] not pointed to any specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders"). Accordingly, Plaintiff has failed to plead motive or opportunity.

2.     The Amended Complaint Alleges the Opposite of Misbehavior and Recklessness as to Mr. Tovar.

To support an inference of recklessness, Plaintiff must allege facts to show that Mr. Tovar's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (internal quotations omitted). Recklessness is adequately alleged when, *inter alia*, a plaintiff "specifically alleges defendants' knowledge of facts or access to information contradicting their public statements." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 282 (S.D.N.Y. 2006). "To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must

22

specifically identify the reports or statements containing this information." *Pehlivanian*, 153 F. Supp. 3d at 653 (internal quotations omitted).  Moreover, "the recklessness inquiry as to forward-looking projections focuses on whether the defendants knew at the time they made these projections that they were unrealistic or unlikely to come true." *Id.* at 653–54.

Plaintiff has not offered any particularized allegations to suggest that Mr. Tovar did not believe that the Company intended to continue its focus on the consumer electronics and crude oil businesses, which earned over $130 million in one quarter, or that the Company intended to integrate blockchain and AI-capabilities to its most lucrative business lines.  Plaintiff alleges that based on Mr. Tovar's experience with blockchain, he had access to information showing that blockchain was not integrated into the crude oil and consumer electronics businesses.  Am. Compl. ¶ 95.  However, neither of the Blockchain Intent Statements represented that the Company *had already* integrated blockchain in these areas.

Plaintiff also suggests that Mr. Tovar and the other defendants knew that the Company would not integrate blockchain into the consumer electronics or crude oil businesses "in light of the SEC's scrutiny of the Company's filings."  Am. Compl. ¶ 96.  In particular, Plaintiff suggests that the SEC scrutinized companies "touting blockchain," and as a result, the Company allegedly deleted a statement in the Third 2017 10-K mentioning the Venus blockchain platform.  *Id.* However, the Third 2017 10-K expressly mentions the testing of TPaaS, which is part of the Venus blockchain system.  Carter Decl. Ex. 3, Third 2017 10-K at 3.  Thus, Plaintiff's conclusion that Mr. Tovar was aware that the Company had no intention to integrate blockchain is entirely speculative and conclusory, and thus cannot support Plaintiff's claims.

Therefore, Plaintiff fails to adequately allege scienter with respect to Mr. Tovar.  As a result, the claims against Mr. Tovar should be dismissed.

### III.    The Amended Complaint Fails to State a Section 20(a) Control Person Claim.

Plaintiff also attempts to allege claims against Mr. Tovar pursuant to section 20(a) of the Exchange Act, "which imposes liability on individuals who control any person or entity that violates § 10." *Pehlivanian*, 153 F. Supp. 3d at 656.  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.  "[A] determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

As discussed in detail above, Plaintiff has failed to allege any primary violation by Mr. Tovar.  The 2Q 2018 10-Q Statement is the only alleged misrepresentation attributable to Mr. Tovar, and it is both protected by the safe harbor and not false.  Nor has Plaintiff alleged the requisite scienter to support the claim.  The August 13th Earnings Call Statement is not attributable to Mr. Tovar as it was made by Mr. Benya.  Nevertheless, it likewise does not support Plaintiff's claim as it also falls within the scope of the safe harbor, is not false, and is unsupported by the necessary scienter allegations.  Plaintiff's failure to allege a primary violation under section 10(b) and rule 10b-5 is grounds for dismissal of the section 20(a) claim.  *See Pehlivanian*, 153 F. Supp. 3d at 656 ("Given that a control person liability claim under § 20(a) is predicated on a primary violation of the securities laws, the control person liability claims must be dismissed because Plaintiff has failed to allege a primary violation under § 10(b).").

Even if Mr. Benya's August 13th Earnings Call Statement was actionable, there is no allegation in the Amended Complaint to support an inference that Mr. Tovar, the CFO of the Company, exercised control over Mr. Benya, the President, CRO, and Director of the Company

24

from October 2017 until November 2018.  Am. Compl. ¶ 25.  *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 497 (S.D.N.Y. 2018) (control person claims dismissed where no allegation that defendant controlled the primary violator).  The Amended Complaint has it exactly backward as to the control locus in that relationship.

Finally, with respect to the alleged misrepresentations that occurred prior to Mr. Tovar joining the Company, he cannot be held liable under Section 20(a).  Mr. Tovar did not join the Company until June 2018.  The majority of the alleged misconduct took place prior to June 2018. The Amended Complaint is devoid of any facts to support that Mr. Tovar was a "meaningful participant" in the conduct that occurred prior to his arrival.

## CONCLUSION

For the reasons set forth above, Plaintiff fails to state a claim against Mr. Tovar.  The only alleged misstatement attributed to Mr. Tovar is a non-actionable, forward-looking statement. Additionally, Plaintiff's claims cannot survive a motion to dismiss because the alleged misstatement is not false and lacks the requisite scienter.  Accordingly, Mr. Tovar respectfully requests that the Court grant his motion and dismiss all claims against him with prejudice.

Respectfully submitted,

Dated:   January 17, 2020              ARENT FOX LLP

By: */s/ Hunter T. Carter*
Hunter T. Carter
1301 Avenue of the Americas
Floor 42
New York, NY 10019
Telephone:  (212) 484-3900
Facsimile:  (212) 484-3990
Email: hunter.carter@arentfox.com

*Counsel for Defendant Federico Tovar*

25

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of Defendant Federico Tovar's Memorandum of Law in Support of Motion to Dismiss Amended Complaint was served on this date on counsel of record via the Court's CM/ECF system.

Dated: January 17, 2020                                  */s/ Hunter T. Carter*

Hunter T. Carter