# EXHIBIT 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-Q**

☒   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended **June 30, 2018**

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: **001-35561**

# SEVEN STARS CLOUD GROUP, INC.

(Exact name of registrant as specified in its charter)

| **Nevada** | **20-1778374** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**55 Broadway, 19th Floor**
**New York, NY 10006**
(Address of principal executive offices)
**212-206-1216**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "larger accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer  ☐ | Smaller reporting company ☒ |
| Emerging growth company  ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐    No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date: 73,142,299 shares as of August 10, 2018.

**QUARTERLY REPORT ON FORM 10-Q**
**OF SEVEN STARS CLOUD GROUP, INC.**
**FOR THE PERIOD ENDED JUNE 30, 2018**

**TABLE OF CONTENTS**

**PART I**        **-FINANCIAL INFORMATION**

| Item 1. | Financial Statements | 3 |
|---|---|---|
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 3 | Quantitative and Qualitative Disclosures About Market Risk | 43 |
| Item 4. | Controls and Procedures | 43 |

**PART II**        **-OTHER INFORMATION**

| Item 1. | Legal Proceedings | 44 |
|---|---|---|
| Item 1A. | Risk Factors | 44 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 46 |
| Item 3. | Defaults Upon Senior Securities | 46 |
| Item 4. | Mine Safety Disclosures | 46 |
| Item 5. | Other Information | 46 |
| Item 6. | Exhibits | 47 |
| Signatures | | 48 |

**References**

*Except as otherwise indicated by the context, references in this report to (i) the "Company," "Seven Stars Cloud,", "SSC", "we," "us," and "our" are to Seven Stars Cloud Group, Inc. (formerly known as Wecast Network, Inc.), a Nevada corporation, and its consolidated subsidiaries and variable interest entities; (ii) "CB Cayman" refers to our wholly-owned subsidiary China Broadband, Ltd., a Cayman Islands company; (iii) "YOD Hong Kong" refers to YOU On Demand (Asia) Limited (formerly known as Sinotop Group Limited), a Hong Kong company wholly-owned by CB Cayman; (iv) "YOD WOFE" refers to YOU On Demand (Beijing) Technology Co., Ltd., a PRC company wholly-owned by YOD Hong Kong; (v) "Sinotop Beijing" or "Sinotop" refers to Beijing Sino Top Scope Technology Co., Ltd, a PRC company controlled by YOD Hong Kong through contractual arrangements; (vi) "Zhong Hai Media" refers to Zhong Hai Shi Xun Media Co., Ltd., a PRC company 80% owned by Sinotop Beijing until June 30, 2017; (vii) "SSF" refers to Tianjin Sevenstarflix Network Technology Limited, a PRC company controlled by YOD Hong Kong through contractual arrangements; (viii) "Hua Cheng" refers to Hua Cheng Hu Dong (Beijing) Film and Television Communication Co., Ltd., a PRC company 39% owned by Sinotop Beijing and 20% owner of Zhong Hai Media; (ix) "Wecast Services" refers to our wholly-owned subsidiary Wecast Services Group Limited (formerly known as Sun Video Group Hong Kong Limited) a Hong Kong company; (x) "Wide Angle" refers to Wide Angle Group Limited, a Hong Kong company 55% owned by the Company; (xi) "Wecast SH" refers to Shanghai Wecast Supply Chain Management Limited, a PRC company 51% owned by the Company; (xii)"SEC" refers to the United States Securities and Exchange Commission; (xiii) "Securities Act" refers to Securities Act of 1933, as amended; (xiv) "Exchange Act" refers to the Securities Exchange Act of 1934, as amended; (xv) "PRC" and "China" refer to People's Republic of China; (xvi) "Renminbi" and "RMB" refer to the legal currency of China; (xvii) "U.S. dollar," "$" and "US$" refer to United States dollars; and (xviii) "VIEs" refers to our current variable interest entities, Sinotop Beijing, and Tianjin Sevenstarflix Network Technology Limited.*

**PART I — FINANCIAL INFORMATION**

**Item 1. Financial Statements.**

**SEVEN STARS CLOUD GROUP, INC., ITS SUBSIDIARIES AND VARIABLE INTEREST ENTITIES**
**INDEX TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE PERIOD ENDED JUNE 30, 2018**

| | Page |
|---|---|
| Unaudited Consolidated Balance Sheets | 4 |
| Unaudited Consolidated Statements of Operations | 5 |
| Unaudited Consolidated Statements of Comprehensive Income (Loss) | 6 |
| Unaudited Consolidated Statements of Cash Flows | 7 |
| Unaudited Consolidated Statements of Equity | 8 |
| Notes to Unaudited Consolidated Financial Statements | 10 |

3

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**UNAUDITED CONSOLIDATED BALANCE SHEETS**

| | | June 30, 2018 | | December 31, 2017 (As adjusted*) |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash | $ | 1,775,374 | $ | 7,208,037 |
| Restricted cash | | 362,418 | | 369,280 |
| Accounts receivable, net | | 112,785,737 | | 26,962,085 |
| Licensed content | | 16,958,149 | | 16,958,149 |
| Inventory | | 216,453 | | 216,453 |
| Prepaid expenses | | 919,340 | | 2,202,728 |
| Other current assets | | 3,302,234 | | 2,276,096 |
| **Total current assets** | | **136,319,705** | | **56,192,828** |
| Property and equipment, net | | 172,558 | | 127,275 |
| Intangible assets, net | | 143,568 | | 148,874 |
| Long term investments | | 16,745,320 | | 6,975,511 |
| Other non-current assets | | 189,224 | | - |
| **Total assets** | **$** | **153,570,375** | **$** | **63,444,488** |
| **LIABILITIES, CONVERTIBLE REDEEMABLE PREFERRED STOCK AND EQUITY** | | | | |
| **Current liabilities:** (including amounts of the consolidated VIEs without recourse to Seven Stars Cloud Group, Inc. See note 3) | | | | |
| Accounts payable | $ | 30,454,900 | $ | 26,829,593 |
| Deferred revenue | | 105,507 | | 222,350 |
| Accrued interest due to a related party | | 79,562 | | 20,055 |
| Accrued other expenses | | 286,858 | | 175,618 |
| Accrued salaries | | 712,500 | | 737,072 |
| Amount due to related parties | | 81,918,686 | | 434,030 |
| Other current liabilities | | 974,787 | | 625,942 |
| Convertible promissory note due to a related party | | 3,000,000 | | 3,000,000 |
| **Total current liabilities** | | **117,532,800** | | **32,044,660** |
| Other non-current liabilities | | - | | 384,243 |
| **Total liabilities** | **$** | **117,532,800** | **$** | **32,428,903** |
| **Commitments and contingencies (Note 15)** | | | | |
| **Convertible redeemable preferred stock:** | | | | |
| Series A - 7,000,000 shares issued and outstanding, liquidation and deemed liquidation preference of $3,500,000 as of June 30, 2018 and December 31, 2017, respectively | **$** | **1,261,995** | **$** | **1,261,995** |
| **Equity:** | | | | |
| Common stock - $0.001 par value; 1,500,000,000 shares authorized, 73,092,299 and 68,509,090 shares issued and outstanding as of June 30, 2018 and December 31, 2017, respectively | | 73,092 | | 68,509 |
| Additional paid-in capital | | 176,033,510 | | 158,449,544 |
| Accumulated deficit | | (138,734,415) | | (126,693,022) |
| Accumulated other comprehensive loss | | (936,020) | | (782,074) |
| **Total Seven Stars Cloud shareholders' equity** | | **36,436,167** | | **31,042,957** |
| Non-controlling interest | | (1,660,587) | | (1,289,367) |
| **Total equity** | | **34,775,580** | | **29,753,590** |
| **Total liabilities, convertible redeemable preferred stock and equity** | **$** | **153,570,375** | **$** | **63,444,488** |

*The above consolidated balance sheets present the Shanghai Guang Ming Investment Management Limited ("Guang Ming") acquired from Tianjin Sun Seven Stars Culture Development Co. Ltd. ("Tianjin") and Beijing Nanbei Huijin Investment Co. Ltd on April 4 2018 as if they had been owned by the Company since November 10, 2016 in accordance with ASC Subtopic 805-50 (See Note 4 "Acquisition")

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**UNAUDITED CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2018 | June 30, 2017 | June 30, 2018 | June 30, 2017 |
| | | (As adjusted*) | | (As adjusted*) |
| Revenue | $ 132,986,538 | $ 43,327,868 | $ 318,920,359 | $ 76,495,611 |
| Cost of revenue from third parties | 49,603,626 | 43,272,723 | 72,884,557 | 72,615,141 |
| Cost of revenue from related parties | 81,850,378 | - | 244,110,132 | - |
| **Gross profit** | **1,532,534** | **55,145** | **1,925,670** | **3,880,470** |
| | | | | |
| Operating expenses: | | | | |
| Selling, general and administrative expense | 8,790,167 | 2,992,230 | 12,528,166 | 4,337,076 |
| Research and development expense | 679,587 | - | 725,609 | - |
| Professional fees | 640,365 | 777,583 | 1,353,298 | 1,048,525 |
| Depreciation and amortization | 13,020 | 61,100 | 23,225 | 257,320 |
| Impairment of other intangible assets | - | 63,621 | - | 63,621 |
| **Total operating expense** | **10,123,139** | **3,894,534** | **14,630,298** | **5,706,542** |
| | | | | |
| **Loss from operations** | **(8,590,605)** | **(3,839,389)** | **(12,704,628)** | **(1,826,072)** |
| | | | | |
| Interest and other income (expense) | | | | |
| Interest expense, net | (28,137) | (3,448) | (56,172) | (44,750) |
| Change in fair value of warrant liabilities | - | 26,117 | - | (243,999) |
| Equity in loss of equity method investees | (10,691) | (33,090) | (30,434) | (76,836) |
| Other | 18,512 | (11,030) | 367,500 | (110,600) |
| **Loss before income taxes** | **(8,610,921)** | **(3,860,840)** | **(12,423,734)** | **(2,302,257)** |
| | | | | |
| Income tax benefit | - | - | - | - |
| | | | | |
| **Net loss** | **(8,610,921)** | **(3,860,840)** | **(12,423,734)** | **(2,302,257)** |
| | | | | |
| Net loss attributable to non-controlling interest | 290,897 | 57,221 | 382,341 | 631,633 |
| | | | | |
| **Net loss attributable to Seven Stars Cloud shareholders** | **$ (8,320,024)** | **$ (3,803,619)** | **$ (12,041,393)** | **$ (1,670,624)** |
| | | | | |
| **Basic loss per share** | **$ (0.12)** | **$ (0.06)** | **$ (0.17)** | **$ (0.03)** |
| **Diluted loss per share** | **$ (0.12)** | **$ (0.06)** | **$ (0.17)** | **$ (0.03)** |
| | | | | |
| Weighted average shares outstanding: | | | | |
| **Basic** | **71,785,448** | **61,180,365** | **70,309,078** | **58,297,202** |
| **Diluted** | **71,785,448** | **61,180,365** | **70,309,078** | **58,297,202** |

*The above consolidated balance sheets present the Shanghai Guang Ming Investment Management Limited ("Guang Ming") acquired from Tianjin Sun Seven Stars Culture Development Co. Ltd. ("Tianjin") and Beijing Nanbei Huijin Investment Co. Ltd on April 4 2018 as if they had been owned by the Company since November 10, 2016 in accordance with ASC Subtopic 805-50 (See Note 4 "Acquisition")

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**UNAUDITED CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2018 | June 30, 2017 | June 30, 2018 | June 30, 2017 |
| | | (As adjusted*) | | (As adjusted*) |
| Net loss | $ (8,610,921) | $ (3,860,840) | $ (12,423,734) | $ (2,302,257) |
| | | | | |
| Other comprehensive income (loss), net of nil tax Foreign currency translation adjustments | (117,927) | (815,853) | (142,825) | 702,989 |
| Comprehensive loss | (8,728,848) | (4,676,693) | (12,566,559) | (1,599,268) |
| | | | | |
| Comprehensive loss attributable to non-controlling interest | 270,628 | 259,001 | 371,220 | 664,591 |
| Comprehensive loss attributable to Seven Stars Cloud shareholders | $ (8,458,220) | $ (4,417,692) | $ (12,195,339) | $ (934,677) |

*The above consolidated balance sheets present the Shanghai Guang Ming Investment Management Limited ("Guang Ming") acquired from Tianjin Sun Seven Stars Culture Development Co. Ltd. ("Tianjin") and Beijing Nanbei Huijin Investment Co. Ltd on April 4 2018 as if they had been owned by the Company since November 10, 2016 in accordance with ASC Subtopic 805-50 (See Note 4 "Acquisition")

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

6

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**UNAUDITED CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Six Months Ended | |
| --- | --- | --- |
| | June 30, 2018 | June 30, 2017 (As adjusted*) |
| Cash flows from operating activities: | | |
| Net loss | $ (12,423,734) | $ (2,302,257) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Share-based compensation expense | 3,360,917 | 147,652 |
| Provision for doubtful accounts | - | 103,043 |
| Depreciation and amortization | 23,225 | 257,320 |
| Equity in loss of equity method investees | 30,434 | 76,836 |
| Loss on disposal of assets | - | 679,091 |
| Change in fair value of warrant liabilities | - | 243,999 |
| Impairment of intangible assets | - | 63,621 |
| | | |
| Change in assets and liabilities: | | |
| Accounts receivable | (85,823,652) | (33,765,572) |
| Licensed content | - | 759,698 |
| Prepaid expenses and other assets | (1,931,974) | 3,699,840 |
| Accounts payable | 3,625,307 | 29,200,687 |
| Amount due to related parties | 81,850,378 | - |
| Accrued expenses, salary and other current liabilities | (17,769) | (264,918) |
| Deferred revenue | (116,843) | (626,396) |
| **Net cash used in operating activities** | **(11,423,711)** | **(1,727,356)** |
| | | |
| Cash flows from investing activities: | | |
| Acquisition of property and equipment | (64,828) | (53,031) |
| Proceeds from disposal of property and equipment | - | 743 |
| Disposal of Zhong Hai Shi Xun, net of cash disposed | - | (115,060) |
| Cash paid for the acquisition of subsidiaries | (391,610) | (693,187) |
| **Net cash used in investing activities** | **(456,438)** | **(860,535)** |
| | | |
| Cash flows from financing activities | | |
| Proceeds from issuance of warrant and shares | 6,427,632 | 1,866,301 |
| Borrowings from related parties | 25,888 | 90,979 |
| **Net cash provided by financing activities** | **6,453,520** | **1,957,280** |
| Effect of exchange rate changes on cash | (12,896) | 40,130 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | **(5,439,525)** | **(590,481)** |
| | | |
| **Cash, cash equivalents and restricted cash at beginning of period** | **7,577,317** | **4,079,769** |
| | | |
| **Cash, cash equivalents and restricted cash at end of period** | $ **2,137,792** | $ **3,489,288** |
| | | |
| Supplemental Cash Flow Information: | | |
| | | |
| Exchange of Series E Preferred Stock for common stock | $ - | $ 7,155 |

*The above consolidated balance sheets present the Shanghai Guang Ming Investment Management Limited ("Guang Ming") acquired from Tianjin Sun Seven Stars Culture Development Co. Ltd. ("Tianjin") and Beijing Nanbei Huijin Investment Co. Ltd on April 4 2018 as if they had been owned by the Company since November 10, 2016 in accordance with ASC Subtopic 805-50 (See Note 4 "Acquisition")

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**UNAUDITED CONSOLIDATED STATEMENTS OF EQUITY**
**For the Six Months Ended June 30, 2017**

| | Series E Preferred Stock | Series E Par Value | Common Stock | Par Value | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Seven Stars Cloud Shareholders' Equity | Non-controlling Interest | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance, January 1, 2017 (As adjusted*)** | **7,154,997** | **$ 7,155** | **53,918,523** | **$ 53,918** | **$152,792,855** | **$(115,829,451)** | **$ (1,371,498)** | **$ 35,652,979** | **$(5,325,481)** | **$30,327,498** |
| Share-based compensation | - | - | - | - | 147,652 | - | - | **147,652** | - | **147,652** |
| Common stock issuance | - | - | 538,182 | 538 | 1,479,463 | - | - | **1,480,001** | - | **1,480,001** |
| Common stock issuance for RSU vested | - | - | 105,215 | 105 | (105) | - | - | **-** | - | **-** |
| Common stock issuance for option exercised | - | - | 11,035 | 11 | (11) | - | - | **-** | - | **-** |
| Common stock issued for warrant exercised | - | - | 236,105 | 236 | 563,261 | - | - | **563,497** | - | **563,497** |
| Common stock issued from conversion of series E preferred stock | (7,154,997) | (7,155) | 7,154,997 | 7,155 | - | - | - | **-** | - | **-** |
| Disposal of Zhong Hai Shi Xun | - | - | - | - | (9,993,734) | (360,518) | (220,717) | **(10,574,969)** | 3,947,477 | **(6,627,492)** |
| Acquisition of Guang Ming | | | | | 78,630 | | | **78,630** | | **78,630** |
| Net loss | - | - | - | - | - | (1,670,624) | - | **(1,670,624)** | (631,633) | **(2,302,257)** |
| Foreign currency translation adjustments, net of nil tax | - | - | - | - | - | - | 735,947 | **735,947** | (32,958) | **702,989** |
| **Balance, June 30, 2017 (As adjusted*)** | **-** | **$ -** | **61,964,057** | **$ 61,963** | **$145,068,011** | **$(117,860,593)** | **$ (856,268)** | **$ 26,413,113** | **$(2,042,595)** | **$24,370,518** |

*The above consolidated balance sheets present the Shanghai Guang Ming Investment Management Limited ("Guang Ming") acquired from Tianjin Sun Seven Stars Culture Development Co. Ltd. ("Tianjin") and Beijing Nanbei Huijin Investment Co. Ltd on April 4 2018 as if they had been owned by the Company since November 10, 2016 in accordance with ASC Subtopic 805-50 (See Note 4 "Acquisition")

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**UNAUDITED CONSOLIDATED STATEMENTS OF EQUITY**
**For the Six Months Ended June 30, 2018**

| | Common Stock | Par Value | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Seven Stars Cloud Shareholders' Equity | Non-controlling Interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| **Balance, January 1, 2018 (As adjusted*)** | **68,509,090** | **$ 68,509** | **$ 158,449,544** | **$ (126,693,022)** | **$ (782,074)** | **$ 31,042,957** | **$ (1,289,367)** | **$ 29,753,590** |
| Share-based compensation | | | 3,360,917 | | | 3,360,917 | | 3,360,917 |
| Investment from GTD and SSS | | | 5,900,000 | | | 5,900,000 | | 5,900,000 |
| Common stock issuance for RSU vested | 1,240,707 | 1,241 | (1,241) | | | - | | - |
| Common stock issuance for option exercised | 42,502 | 42 | 2,590 | | | 2,632 | | 2,632 |
| Common stock issued for warrant exercised | 300,000 | 300 | 524,700 | | | 525,000 | | 525,000 |
| Common stock issuance for acquisition of BDCG | 3,000,000 | 3,000 | 7,797,000 | | | 7,800,000 | - | 7,800,000 |
| Net loss | | | | (12,041,393) | | (12,041,393) | (382,341) | (12,423,734) |
| Foreign currency translation adjustments, net of nil tax | | | | | (153,946) | (153,946) | 11,121 | (142,825) |
| **Balance, June 30, 2018** | **73,092,299** | **$ 73,092** | **$ 176,033,510** | **$ (138,734,415)** | **$ (936,020)** | **$ 36,436,167** | **$ (1,660,587)** | **$ 34,775,580** |

*The above consolidated balance sheets present the Shanghai Guang Ming Investment Management Limited ("Guang Ming") acquired from Tianjin Sun Seven Stars Culture Development Co. Ltd. ("Tianjin") and Beijing Nanbei Huijin Investment Co. Ltd on April 4 2018 as if they had been owned by the Company since November 10, 2016 in accordance with ASC Subtopic 805-50 (See Note 4 "Acquisition")

*The accompanying notes are an integral part of these unaudited consolidated financial statements.*

9

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**1.  Organization and Principal Activities**

Seven Stars Cloud Group, Inc. (the "Company"), formerly known as Wecast Network, Inc., is a Nevada corporation that primarily operates in China ("PRC") through its subsidiaries and consolidated variable interest entities ("VIEs"). The Company, its subsidiaries and consolidated VIEs are collectively referred to as Seven Stars Cloud ("SSC", "we", "us", or "the Company").

Starting in early 2017, SSC has been aiming to become a next generation Artificial-Intelligent (AI) & blockchain-powered, fintech company. By providing and managing an infrastructure and ecosystem that facilitates the transformation of traditional financial markets such as commodities, currency and credit into the asset digitalization era, SSC hopes to provide asset owners and holders a seamless method and platform for digital asset securitization, tokenization and trading. Separately, SSC is aiming to offer a closed supply chain trading ecosystem for corporate buyers and sellers designed to eliminate standard transactional intermediaries and create a more direct and margin-expanding path for principals.

Through acquisitions made in 2017 and the establishment of joint ventures with business partners, SSC's supply chain finance and management for vertical products is fully operational.

On January 30, 2017, the Company entered into a Securities Purchase Agreement (the "Sun Video SPA") with BT Capital Global Limited, a British Virgin Islands company ("BT") and affiliate of the Company's Chairman Bruno Wu, for the purchase by the Company of all of the outstanding capital stock of Sun Video Group Hong Kong Limited ("Wecast Services"). On January 31, 2017, the Company entered into another Securities Purchase Agreement (the "Wide Angle SPA") with BT and Sun Seven Stars Media Group Limited, one of the Company's largest shareholders, controlled by Mr. Wu, as guarantor, for the purchase by us of 55% of the outstanding capital stock of Wide Angle Group Limited ("Wide Angle"). Details of these two acquisitions are in Note 4. After acquiring these two entities, other than Company's legacy You On Demand ("YOD") business, the Company became engaged in consumer electronics and smart supply chain management operations.

In 2017, the Company entered into another Securities Purchase Agreement (the "BT SPA") with BT, pursuant to which the issued and outstanding stock that SSC holds in one loss-generating non-core asset, was sold to BT for zero. The detail of this transaction have been disclosed in Note 11.

In the opinion of management, all adjustments (which include normal recurring adjustments) necessary to present a fair statement of the financial position as of June 30, 2018, results of operations for the three and six months ended June 30, 2018 and 2017, and cash flows for the six months ended June 30, 2018 and 2017, have been made. All significant intercompany transactions and balances are eliminated on consolidation.

Certain information and footnote disclosures normally included in the annual consolidated financial statements prepared in accordance with U.S. GAAP have been condensed or omitted. These unaudited consolidated financial statements should be read in conjunction with the Company's audited consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2017 filed with the Securities and Exchange Commission on March 30, 2018("2017 Annual Report").

In the first quarter of 2018, we adopted the following Accounting Standards Updates (ASU): ASU 2014-09, Revenue from Contracts with Customers (Topic 606); ASU 2016-01, Financial Instruments — Overall (Subtopic 825-10) and ASU 2016-18 Statement of Cash Flows (Topic 230): Restricted Cash ASU 2018-02. ASU 2014-09 has no financial impact to our unaudited financial statement, and impact by ASU 2016-01 and ASU 2016-18 has been reflected in our unaudited consolidated statements of cash flow and note 8 to this unaudited consolidated financial statements.

**2.  Going Concern and Management's Plans**

For the six months ended June 30, 2018 and 2017, the Company incurred loss from operations of approximately $12.7 million and $1.8 million, respectively, and incurred net loss of $12.4 million and $2.3 million, respectively, and cash used in operations was approximately $11.4 million and $1.7 million, respectively. Further, the Company had accumulated deficit of approximately $138.7 million and $126.7 million as of June 30, 2018 and December 31, 2017, respectively, due to recurring losses since the inception of its business.

The Company must continue to rely on proceeds from debt and equity issuances to pay for ongoing operating expenses in order to execute its business plan. On May 19, 2017, the Company completed a common stock financing for $2.0 million with certain investors, officers & directors and affiliates in a private placement. On October 23, 2017, the Company completed a common stock financing with Hong Kong Guo Yuan Group Capital Holdings Limited for $10 million. In March 2018, the Company entered into a common stock financing with GT Dollar Pte. Ltd., for a private placement totaling $40.0 million, which agreement was subsequently amended and restated on June 28, 2018 to reduce such investment to $10.0 million (See Note 9). The Company has received $5.3 million and expects to receive the remaining $4.7 million in the third quarter. The Company entered into a Convertible Note Purchase Agreement with Advantech Capital Investment II Limited on June 28, 2018 for $12.0 million. The funds were delivered on July 5, 2018.

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

Although the Company may attempt to raise funds by issuing debt or equity instruments, additional financing may not be available to the Company on terms acceptable to the Company or at all or such resources may not be received in a timely manner.

These conditions raise substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements have been prepared assuming that the Company will continue as a going concern and, accordingly, do not include any adjustments that might result from the outcome of this uncertainty. If we are in fact unable to continue as a going concern, our shareholders may lose their entire investment in our Company.

3.  **VIE Structure and Arrangements**

    a)  **Sinotop VIE structure and arrangement**

To comply with PRC laws and regulations that prohibit or restrict foreign ownership of companies that provides value-added telecommunication services, the Company provides its services through Sinotop Beijing. The Company has the ability to control Sinotop Beijing through a series of contractual agreements entered into among YOD WOFE, YOD Hong Kong, Sinotop Beijing and the legal shareholders of Sinotop Beijing.

Prior to January 2016, the Company entered into a series of contractual agreements to give it the ability to control Sinotop Beijing with Zhang Yan, the former legal shareholder of Sinotop Beijing (the spouse of its then-CEO). In January 2016, in connection with the appointment of a new CEO and in accordance with its rights under the contractual agreements, (1) the legal ownership of Sinotop Beijing was transferred from Zhang Yan to Bing Wu, the brother of its current Chairman and Yun Zhu, the former Vice President of Beijing Sun Seven Stars Culture Development Limited ("SSS"), (2) the Company terminated the series of contractual arrangements with Zhang Yan, and (3) the Company entered into new contractual agreements with Bing Wu and Yun Zhu (collectively, the "Former Sinotop VIE Agreements"). In October 2016, in accordance with its rights under contractual agreements, (1) the legal ownership of Sinotop Beijing was transferred from Bing Wu to Mei Chen, the former CFO of the Company, (2) the Company terminated the series of contractual arrangements with Bing Wu, and (3) the Company entered into new contractual agreements with Mei Chen (collectively, the "New Sinotop VIE Agreements"). Although the Former Sinotop VIE Agreements and New Sinotop VIE Agreements resulted in changes to the legal shareholders of Sinotop Beijing, there was no change in the Company's ability to control Sinotop Beijing or the Company's rights to 100% of the economic benefits of Sinotop Beijing. The Company was the primary beneficiary of Sinotop Beijing prior to the signing of the Former Sinotop VIE Agreements and New Sinotop VIE Agreements and the Company remained the primary beneficiary of Sinotop Beijing after the signing of the former Sinotop VIE Agreements and the New Sinotop VIE Agreements. Accordingly, the change in legal ownership of Sinotop Beijing did not have any impact to the Company's consolidation of Sinotop Beijing. The key terms of the New Sinotop VIE Agreements are summarized as follows:

*Equity Pledge Agreement*

Pursuant to the Equity Pledge Agreement among YOD WOFE, Sinotop Beijing, Mei Chen and Yun Zhu (collectively, the "Nominee Shareholders"), the Nominee Shareholders pledged all of their equity interests in Sinotop Beijing (the "Collateral") to YOD WOFE as security for the performance of the obligations of Sinotop Beijing to make all the required technical service fee payments pursuant to the Technical Services Agreement and for performance of the Nominee Shareholders' obligation under the Call Option Agreement. The terms of the Equity Pledge Agreement expire upon satisfaction of all obligations under the Technical Services Agreement and Call Option Agreement.

*Call Option Agreement*

Pursuant to the Call Option Agreement among YOD WOFE, Sinotop Beijing and the Nominee Shareholders, the Nominee Shareholders granted an exclusive option to YOD WOFE, or its designee, to purchase, at any time and from time to time, to the extent permitted under PRC law, all or any portion of the Nominee Shareholders' equity in Sinotop Beijing. The exercise price of the option shall be determined by YOD WOFE at its sole discretion, subject to any restrictions imposed by PRC law. The term of the agreement is until all of the equity interest in Sinotop Beijing held by the Nominee Shareholders are transferred to YOD WOFE, or its designee and may not be terminated by any part to the agreement without consent of the other parties.

11

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

*Power of Attorney*

Pursuant to the Power of Attorney agreements among YOD WOFE, Sinotop Beijing and each of the respective Nominee Shareholders, each of the Nominee Shareholders granted YOD WOFE the irrevocable right, for the maximum period permitted by law, all of its voting rights as shareholders of Sinotop Beijing. The Nominee Shareholders may not transfer any of its equity interest in Sinotop Beijing to any party other than YOD WOFE. The Power of Attorney agreements may not be terminated except until all of the equity in Sinotop Beijing has been transferred to YOD WOFE or its designee.

*Technical Service Agreement*

Pursuant to the Technical Service Agreement between YOD WOFE and Sinotop Beijing, YOD WOFE has the exclusive right to provide technical service, marketing and management consulting service, financial support service and human resource support services to Sinotop Beijing, and Sinotop Beijing is required to take all commercially reasonable efforts to permit and facilitate the provision of the services by YOD WOFE. As compensation for providing the services, YOD WOFE is entitled to receive service fees from Sinotop Beijing equivalent to YOD WOFE's cost plus 30% of such costs as calculated on accounting policies generally accepted in the PRC. YOD WOFE and Sinotop Beijing agree to periodically review the service fee and make adjustments as deemed appropriate. The term of the Technical Services Agreement is perpetual, and may only be terminated upon written consent of both parties.

*Spousal Consent*

Pursuant to the Spousal Consent, undersigned by the respective spouse of Nominee Shareholders (collectively, the "Spouses"), the Spouses unconditionally and irrevocably agreed to the execution of the Equity Pledge Agreement, Call Option Agreement and Power of Attorney agreement. The Spouses agreed to not make any assertions in connection with the equity interest of Sinotop Beijing and to waived consent on further amendment or termination of the Equity Pledge Agreement, Call Option Agreement and Power of Attorney agreement. The Spouses further pledge to execute all necessary documents and take all necessary actions to ensure appropriate performance under these agreements upon YOD WOFE's request. In the event the Spouses obtain any equity interests of Sinotop Beijing which are held by the Nominee Shareholders, the Spouses agreed to be bound by the New Sinotop VIE Agreements, including the Technical Services Agreement, and comply with the obligations thereunder, including sign a series of written documents in substantially the same format and content as the New Sinotop VIE Agreements.

*Letter of Indemnification*

Pursuant to the Letter of Indemnification among YOD WOFE and Mei Chen and YOD WOFE and Yun Zhu, YOD WOFE agreed to indemnify Nominee Shareholders against any personal, tax or other liabilities incurred in connection with their role in equity transfer to the greatest extent permitted under PRC law. YOD WOFE further waived and released Nominee Shareholders from any claims arising from, or related to, their role as the legal shareholder of Sinotop Beijing, provided that their actions as a nominee shareholder are taken in good faith and are not opposed to YOD WOFE's best interests. Conversely, the Nominee Shareholders will not be entitled to dividends or other benefits generated therefrom, or receive any compensation in connection with this arrangement. The Letter of Indemnification will remain valid until either Nominee Shareholders or YOD WOFE terminates the agreement by giving the other party hereto 60 days' prior written notice.

In addition to the New Sinotop VIE Agreements, the Management Service Agreement between Sinotop Beijing and YOD Hong Kong continued to remain in effect, the key terms of which are as follows:

*Management Services Agreement*

Pursuant to a Management Services Agreement, as of March 9, 2010, YOD Hong Kong has the exclusive right to provide to Sinotop Beijing management, financial and other services related to the operation of Sinotop Beijing's business, and Sinotop Beijing is required to take all commercially reasonable efforts to permit and facilitate the provision of the services by YOD Hong Kong. As compensation for providing the services, YOD Hong Kong is entitled to receive a fee from Sinotop Beijing, upon demand, equal to 100% of the annual net profits as calculated on accounting policies generally accepted in the PRC of Sinotop Beijing during the term of the Management Services Agreement. YOD Hong Kong may also request ad hoc quarterly payments of the aggregate fee, which payments will be credited against Sinotop Beijing's future payment obligations.

The Management Services Agreement also provides YOD Hong Kong, or its designee, with a right of first refusal to acquire all or any portion of the equity of Sinotop Beijing upon any proposal by the sole shareholder of Sinotop Beijing to transfer such equity. In addition, at the sole discretion of YOD Hong Kong, Sinotop Beijing is obligated to transfer to YOD Hong Kong, or its designee, any part or all of the business, personnel, assets and operations of Sinotop Beijing which may be lawfully conducted, employed, owned or operated by YOD Hong Kong, including:

12

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

(a)      business opportunities presented to, or available to Sinotop Beijing may be pursued and contracted for in the name of YOD Hong Kong rather than Sinotop Beijing, and at its discretion, YOD Hong Kong may employ the resources of Sinotop Beijing to secure such opportunities;

(b)      any tangible or intangible property of Sinotop Beijing, any contractual rights, any personnel, and any other items or things of value held by Sinotop Beijing may be transferred to YOD Hong Kong at book value;

(c)      real property, personal or intangible property, personnel, services, equipment, supplies and any other items useful for the conduct of the business may be obtained by YOD Hong Kong by acquisition, lease, license or otherwise, and made available to Sinotop Beijing on terms to be determined by agreement between YOD Hong Kong and Sinotop Beijing;

(d)      contracts entered into in the name of Sinotop Beijing may be transferred to YOD Hong Kong, or the work under such contracts may be subcontracted, in whole or in part, to YOD Hong Kong, on terms to be determined by agreement between YOD Hong Kong and Sinotop Beijing; and

(e)      any changes to, or any expansion or contraction of, the business may be carried out at the sole discretion of YOD Hong Kong, and in the name of and at the expense of, YOD Hong Kong; provided, however, that none of the foregoing may cause or have the effect of terminating (without being substantially replaced under the name of YOD Hong Kong) or adversely affecting any license, permit or regulatory status of Sinotop Beijing.

The term of the Management Services Agreement is 20 years, and may not be terminated by Sinotop Beijing, except with the consent of, or a material breach by, YOD Hong Kong.

Pursuant to the above contractual agreements, YOD WOFE can have the assets transferred freely out of Sinotop Beijing without any restrictions. Therefore, YOD WOFE considers that there is no asset of Sinotop Beijing that can be used only to settle obligations of Sinotop Beijing, except for the registered capital of the entity amounting to RMB10.6 million (approximately $1.6 million) as of June 30, 2018. As Sinotop Beijing is incorporated as limited liability company under PRC Company Law, creditors of this entity do not have recourse to the general credit of other entities of the Company.

**b)   Tianjin Sevenstarflix Network Technology Limited ("SSF") VIE structure and arrangements**

To comply with PRC laws and regulations that prohibit or restrict foreign ownership of companies that provides value-added telecommunication services, the Company plans to also provide its services through SSF, which is applying to hold the licenses and approvals to provide digital distribution and Internet content services in the PRC. The Company has the ability to control SSF through a series of contractual agreements, as described below, entered into among YOD WOFE, YOD Hong Kong, SSF and the legal shareholders of SSF.

On April 5, 2016, YOD WOFE entered into variable interest entity agreements with SSF and its nominee shareholders pursuant to the Amended Tianjin Agreement dated December 21, 2015 (see Note 12(c)) (the "SSF VIE Agreements"). Lan Yang, holder of 99% equity ownership in SSF and a party to certain of the SSF VIE Agreements, is the spouse of Bruno Zheng Wu, the Company's Chairman. Yun Zhu, holder of 1% equity ownership in SSF and a party to certain of the SSF VIE Agreements, is the Vice President of SSS.

The terms of the SSF VIE Agreements are as follows:

*Equity Pledge Agreement*

Pursuant to the Equity Pledge Agreement among YOD WOFE, Lan Yang and Yun Zhu (the "Nominee Shareholders"), dated April 5, 2016, the Nominee Shareholders pledged all of their capital contribution rights in SSF to YOD WOFE as security for the performance of the obligations of SSF to make all the required technical service fee payments pursuant to the Technical Services Agreement and for performance of the Nominee Shareholders' obligation under the Call Option Agreement. The terms of the Equity Pledge Agreement expire upon satisfaction of all obligations under the Technical Services Agreement and Call Option Agreement.

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

*Call Option Agreement*

Pursuant to the Call Option Agreement among YOD WOFE, SSF and the Nominee Shareholders, dated April 5, 2016, the Nominee Shareholders granted an exclusive option to YOD WOFE, or its designee, to purchase, at any time and from time to time, to the extent permitted under PRC law, all or any portion of the Nominee Shareholders' equity in SSF. The exercise price of the option shall be determined by YOD WOFE at its sole discretion, subject to any restrictions imposed by PRC law. The term of the agreement is until all of the equity interest in SSF held by the Nominee Shareholders is transferred to YOD WOFE, or its designee and may not be terminated by any party to the agreement without consent of the other parties.

*Power of Attorney*

Pursuant to the Power of Attorney agreements among YOD WOFE, SSF and each of the respective Nominee Shareholders, dated April 5, 2016, each of the Nominee Shareholders granted YOD WOFE the irrevocable right, for the maximum period permitted by law, to all of its voting rights as shareholders of SSF. The Nominee Shareholders may not transfer any of their equity interest in SSF to any party other than YOD WOFE. The Power of Attorney agreements may not be terminated except until all of the equity in SSF has been transferred to YOD WOFE or its designee.

*Technical Service Agreement*

Pursuant to the Technical Service Agreement, dated April 5, 2016, between YOD WOFE and SSF, YOD WOFE has the exclusive right to provide technical service, marketing and management consulting service, financial support service and human resource support services to SSF, and SSF is required to take all commercially reasonable efforts to permit and facilitate the provision of the services by YOD WOFE. As compensation for providing the services, YOD WOFE is entitled to receive service fees from SSF equivalent to YOD WOFE's cost plus 20-30% of such costs as calculated on accounting policies generally accepted in the PRC. YOD WOFE and SSF agree to periodically review the service fee and make adjustments as deemed appropriate. The term of the Technical Services Agreement is perpetual, and may only be terminated upon written consent of both parties.

*Spousal Consent*

Pursuant to the Spousal Consent, dated April 5, 2016, undersigned by the respective spouse of the Nominee Shareholders (collectively, the "Spouses"), the Spouses unconditionally and irrevocably agreed to the execution of the Equity Pledge Agreement, Call Option Agreement and Power of Attorney agreement. The Spouses agreed to not make any assertions in connection with the equity interest of SSF and to waive consent on further amendment or termination of the Equity Pledge Agreement, Call Option Agreement and Power of Attorney agreement. The Spouses further pledge to execute all necessary documents and take all necessary actions to ensure appropriate performance under these agreements upon YOD WOFE's request. In the event the Spouses obtain any equity interests of SSF which are held by the Nominee Shareholders, the Spouses agreed to be bound by the SSF VIE Agreements, including the Technical Services Agreement, and comply with the obligations thereunder, including sign a series of written documents in substantially the same format and content as the SSF VIE Agreements.

*Letter of Indemnification*

Pursuant to the Letter of Indemnification among YOD WOFE and Lan Yang and YOD WOFE and Yun Zhu, both dated as of April 5, 2016, YOD WOFE agreed to indemnify Nominee Shareholders against any personal, tax or other liabilities incurred in connection with their role in equity transfer to the greatest extent permitted under PRC law. YOD WOFE further waived and released the Nominee Shareholders from any claims arising from, or related to, their role as the legal shareholder of SSF, provided that their actions as a nominee shareholder are taken in good faith and are not opposed to YOD WOFE's best interests. The Nominee Shareholders will not be entitled to dividends or other benefits generated therefrom, or receive any compensation in connection with this arrangement. The Letter of Indemnification will remain valid until either the Nominee Shareholders or YOD WOFE terminates the agreement by giving the other party hereto 60 days' prior written notice.

*Loan Agreement*

Pursuant to the Loan Agreement among YOD WOFE and the Nominee Shareholders, dated April 5, 2016, YOD WOFE agrees to lend RMB 19.8 million and RMB 0.2 million, respectively, to the Nominee Shareholders for the purpose of establishing SSF and for development of its business. As of June 30, 2018, RMB 27.6 million (US $4.2 million) and RMB nil have been lent to Lan Yang and Yun Zhu, respectively. Lan Yang has contributed all of the RMB 27.6 million (US $4.2 million) in the form of capital contribution. The loan can only be repaid by a transfer by the Nominee Shareholders of their equity interests in SSF to YOD WOFE or YOD WOFE's designated persons, through (i) YOD WOFE having the right, but not the obligation to at any time purchase, or authorize a designated person to purchase, all or part of the Nominee Shareholders' equity interests in SSF at such price as YOD WOFE shall determine (the "Transfer Price"), (ii) all monies received by the Nominee Shareholders through the payment of the Transfer Price being used solely to repay YOD WOFE for the loans, and (iii) if the Transfer Price exceeds the principal amount of the loans, the amount in excess of the principal amount of the loans being deemed as interest payable on the loans, and to be payable to YOD WOFE in cash. Otherwise, the loans shall be deemed to be interest-free. The term of the Loan Agreement is perpetual, and may only be terminated upon the Nominee Shareholders receiving repayment notice, or upon the occurrence of an event of default under the terms of the agreement. The loan extended to the Nominee Shareholders and the capital of SSF are fully eliminated in the consolidated financial statements.

14

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

*Management Services Agreement*

In addition to the SSF VIE Agreements, the Company's subsidiary and the parent company of YOD WOFE, YOU On Demand (Asia) Limited, a company incorporated under the laws of Hong Kong ("YOD Hong Kong") entered into a Management Services Agreement with SSF, dated as of April 6, 2016 (the "Management Services Agreement"). Pursuant to a Management Services Agreement, YOD Hong Kong has the exclusive right to provide to SSF management, financial and other services related to the operation of SSF's business, and SSF is required to take all commercially reasonable efforts to permit and facilitate the provision of the services by YOD Hong Kong. As compensation for providing the services, YOD Hong Kong is entitled to receive a fee from SSF, upon demand, equal to 100% of the annual net profits as calculated on accounting policies generally accepted in the PRC of SSF during the term of the Management Services Agreement. YOD Hong Kong may also request ad hoc quarterly payments of the aggregate fee, which payments will be credited against SSF's future payment obligations.

In addition, at the sole discretion of YOD Hong Kong, SSF is obligated to transfer to YOD Hong Kong, or its designee, any part or all of the business, personnel, assets and operations of SSF which may be lawfully conducted, employed, owned or operated by YOD Hong Kong, including:

(a)    business opportunities presented to, or available to SSF may be pursued and contracted for in the name of YOD Hong Kong rather than SSF, and at its discretion, YOD Hong Kong may employ the resources of SSF to secure such opportunities;

(b)    any tangible or intangible property of SSF, any contractual rights, any personnel, and any other items or things of value held by SSF may be transferred to YOD Hong Kong at book value;

(c)    real property, personal or intangible property, personnel, services, equipment, supplies and any other items useful for the conduct of the business may be obtained by YOD Hong Kong by acquisition, lease, license or otherwise, and made available to SSF on terms to be determined by agreement between YOD Hong Kong and SSF;

(d)    contracts entered into in the name of SSF may be transferred to YOD Hong Kong, or the work under such contracts may be subcontracted, in whole or in part, to YOD Hong Kong, on terms to be determined by agreement between YOD Hong Kong and SSF; and

(e)    any changes to, or any expansion or contraction of, the business may be carried out in the exercise of the sole discretion of YOD Hong Kong, and in the name of and at the expense of, YOD Hong Kong;

provided, however, that none of the foregoing may cause or have the effect of terminating (without being substantially replaced under the name of YOD Hong Kong) or adversely affecting any license, permit or regulatory status of SSF.

The term of the Management Services Agreement is 20 years, and may not be terminated by SSF, except with the consent of, or a material breach by, YOD Hong Kong.

Pursuant to the above contractual agreements, YOD WOFE can have the assets transferred freely out of SSF without any restrictions. Therefore, YOD WOFE considers that there is no asset of SSF that can be used only to settle obligation of YOD WOFE, except for the registered capital of SSF amounting to RMB 50.0 million (approximately $7.5 million), among which RMB 27.6 million (approximately $4.2 million) has been injected as of June 30, 2018. As SSF is incorporated as limited liability company under PRC Company Law, creditors of this entity do not have recourse to the general credit of other entities of the Company.

*Financial Information*

The following financial information of our VIEs, as applicable for the periods presented, affected the Company's consolidated financial statements.

15

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

| | | June 30, 2018 | | December 31, 2017 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash | $ | 2,737 | $ | 3,898 |
| Prepaid expenses | | 869 | | 3,604 |
| Other current assets | | 1,511 | | 1,537 |
| Intercompany receivables due from the Company's subsidiaries[(i)] | | 2,452,736 | | 2,494,505 |
| **Total current assets** | | **2,457,853** | | **2,503,544** |
| Long term investments | | 3,690,884 | | 3,719,467 |
| **Total assets** | $ | **6,148,737** | | **6,223,011** |
| | | | | |
| **LIABILITIES** | | | | |
| Current liabilities: | | | | |
| Other current liabilities | $ | 41 | | 41 |
| Intercompany payables due to the Company's subsidiaries[(i)] | | 3,541,150 | | 3,601,454 |
| **Total current liabilities** | | **3,541,191** | | **3,601,495** |
| **Total liabilities** | $ | **3,541,191** | | **3,601,495** |

| | | Six Months Ended | | |
|---|---|---:|---|---:|
| | | June 30, 2018 | | June 30, 2017 |
| **Revenue** | $ | - | | 794,273 |
| **Net income (loss)** | $ | (32,590) | | 132,231 |

| | | Six Months Ended | | |
|---|---|---:|---|---:|
| | | June 30, 2018 | | June 30, 2017 |
| **Net cash used in operating activities** | $ | (1,161) | | (1,558,586) |
| **Net cash used in investing activities** | $ | - | | (141,639) |
| **Net cash provided by financing activities**[(i)] | $ | - | | 189,515 |

(i)   Intercompany receivables and payables are eliminated upon consolidation. The intercompany financing activities include the capital injection of $0.2 million to Sinotop Beijing in the six months period ended June 30, 2017.

The decrease in revenue, net income and net cash used in operating activities was mainly due to disposal of Zhong Hai Shi Xun Media in 2017.

4.   **Acquisition**

(i)   **Acquisition of SVG and Wide Angle**

On January 30, 2017, the Company entered into a Securities Purchase Agreement (the "Sun Video SPA") with BT Capital Global Limited, a British Virgin Islands company ("BT") which is controlled by Company's Chairman Bruno Wu, for the purchase by SSC of all of the outstanding capital stock of Sun Video Group Hong Kong Limited, a Hong Kong corporation ("SVG"), for an aggregate purchase price of $800,000 and a $50 million Promissory Note (the "SVG Note") with the principal and interest thereon convertible into shares of the Company's common stock at a conversion rate of $1.50 per share. BT has guaranteed that SVG will achieve certain financial goals within 12 months of the closing. Until receipt of necessary shareholder approvals, the SVG Note is not convertible into shares of our common stock, but once the necessary shareholder approval is received, the unpaid principal and interest thereon will automatically convert. Under the terms of the Sun Video SPA, BT has guaranteed that the business of SVG and its subsidiaries (the "Sun Video Business") shall achieve revenue of $250 million and $15 million of gross profit (collectively the "Performance Guarantees") within 12 months of the closing. If the Sun Video Business fails to meet either of the Performance Guarantees within such time, BT shall forfeit back to the Company the shares of the Company's common stock or the SVG Note, on a pro rata basis based on the Performance Guarantee for which the Sun Video Business achieves the lowest percentage of the respective amount guaranteed.

In addition, if the Sun Video Business achieves more than $50 million in cumulative net income within 3 years of closing, (the "Net Income Threshold"), the Company shall pay BT 50% of the amount of any cumulative net income above the Net Income Threshold. Profit share payments shall be made on an annual basis, in either cash or stock at the discretion of our Board of Directors. If the Board decides to make the payment in stock, the number of our shares of common stock to be awarded shall be calculated based on the market price of such shares.

16

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

After the acquisition SVG, the Company changed its name to Wecast Services Group Limited, and is therefore also referred to herein as Wecast Services.

On January 31, 2017, the Company entered into a Securities Purchase Agreement (the "Wide Angle SPA") with BT and Sun Seven Stars Media Group Limited, a Hong Kong company ("SSS"), one of the Company's largest shareholders, controlled by our Chairman Bruno Wu, as guarantor, for the purchase by the Company of 55% of the outstanding capital stock of Wide Angle for the sole consideration of the Company adding Wide Angle to the Sun Video Business acquired by the Company under the Sun Video SPA and thereby including 100% of the revenue and gross profit from Wide Angle in the calculation of the SVG Performance Guarantees set forth in the Sun Video SPA considering the Company has consolidated Wide Angle.

As of June 30, 2018, the Company recorded the $24.3 million SVG Note as additional paid in capital, as the Company believes that the Performance Guarantees can be met within 12 months of the closing. Considering the proceeds transferred were larger than carrying amounts of the net assets received, such $24.3 million was then recognized as a reduction to the Company's additional paid in capital. The Company has not begun accruing any reserves relating to potential Net Income Threshold earnout payments, since the Sun Video Business is currently not close to exceeding this threshold.

**(ii) Acquisition of BBD Digital Capital Group Ltd.**

On December 7, 2017, the Company entered into a Securities Purchase Agreement (the "BDCG Purchase Agreement") with Tiger Sports Media Limited, a Hong Kong limited liability company ("Tiger") pursuant to which the Company agreed to purchase Tiger's 20% equity ownership in BBD Digital Capital Group Ltd. ("BDCG"), a New York corporation. SSC will purchase the 20% equity from Tiger for a total purchase price of $9.8 million (the "Transaction") which consists of $2 million in cash and $7.8 million to be paid in the form of the Company's capital stock (valued at $2.60 per share and equal to 3 million shares of the Company's common stock). The valuation report was received post-signing of the BDCG Purchase Agreement with both parties agreeing that there is no obligation to close the Transaction until a satisfactory valuation report has been received, evaluated and approved by the Company's Audit Committee. On April 24, 2018, the Audit Committee approved the satisfactory valuation report provided by an independent third party and closed this transaction. The Company paid the $2 million in cash upon the execution of the BDCG Purchase Agreement and issued the 3 million shares of Company common stock upon the closing of the Transaction which is contingent upon the receipt of a valuation report satisfactory to the Audit Committee. According to the BDCG Joint Venture Agreement, Board actions shall only be valid with more than 2/3 of the directors' approval. As the Company is only able to assign 3 directors of the 5 in the Board, it is concluded that the Company does not have control in BDCG and should use an equity method to record the investment in BDCG. After such acquisition, the Company owns 60% of BDCG. It will be consolidated once the Company changes BDCG's article of incorporation (or that joint venture agreement) according to GAAP.

**(iii) Acquisition of Shanghai GuangMing**

On December 7, 2017, the Company entered into a Securities Purchase Agreement (the "GuangMing Purchase Agreement") with Tianjin Sun Seven Stars Culture Development Co. Ltd, a PRC limited liability company ("Tianjin SSCD") and Beijing Nanbei Huijin Investment Co., Ltd., a PRC limited liability company ("Beijing Nanbei"), pursuant to which the Company agreed to purchase Tianjin SSCD's 80% equity ownership in Shanghai GuangMing Investment Management ("Shanghai GuangMing"), a PRC limited liability company, and Beijing Nanbei's 20% equity ownership in Shanghai GuangMing. SSC will purchase the 100% equity for a total purchase price of $0.36 million (the "Transaction"). The fairness opinion report, which is delivered by Deloitte & Touche Financial Advisory Services Limited, has been received, evaluated and approved by the Company's Audit Committee in April, 2018.

5.  **Accounts Receivable, Net**

Accounts receivable consists of the following:

|  | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Accounts receivable, gross: | $ 112,789,368 | 26,965,731 |
| Less: allowance for doubtful accounts | (3,631) | (3,646) |
| **Accounts receivable, net** | **$ 112,785,737** | **26,962,085** |

The movement of the allowance for doubtful accounts is as follows:

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

|  | June 30, 2018 | December 31, 2017 |
|---|---|---|
| **Balance at the beginning of the period** | $ (3,646) | (2,828,796) |
| Additions charged to bad debt expense | - | (145,512) |
| Write-off of bad debt allowance | 15 | 89,851 |
| Disposal of Zhong Hai Shi Xun | - | 2,880,811 |
| **Balance at the end of the period** | $ (3,631) | (3,646) |

6. **Property and Equipment, Net**

The following is a breakdown of the Company's property and equipment:

|  | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Furniture and office equipment | $ 318,596 | 308,383 |
| Vehicle | 146,458 | 147,922 |
| Leasehold improvements | 60,075 | 8,058 |
| **Total property and equipment** | **525,129** | **464,363** |
| Less: accumulated depreciation | (352,571) | (337,088) |
| **Property and Equipment, net** | $ **172,558** | **127,275** |

The Company recorded depreciation expense of approximately $10,537 and $18,121 for the three and six months ended June 30, 2018 and $32,707 and $200,798 for the three and six months ended June 30, 2017 respectively.

7. **Intangible Assets**

As of June 30, 2018 and December 31, 2017, the Company's amortizing and indefinite lived intangible assets consisted of the following:

| Amortizing Intangible Assets | June 30, 2018 | | | | December 31, 2017 | | | |
|---|---|---|---|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Impairment Loss | Net Balance | Gross Carrying Amount | Accumulated Amortization | Impairment Loss | Net Balance |
| Software and licenses | 213,857 | (204,579) | - | 9,278 | 214,210 | (199,626) | - | 14,584 |
| Patent and trademark (i) | 92,965 | (39,943) | (53,022) | - | 92,965 | (39,943) | (53,022) | - |
| **Total amortizing intangible assets** | $ 306,822 | (244,522) | (53,022) | 9,278 | $ 307,175 | $ (239,569) | $ (53,022) | $ 14,584 |
|  |  |  |  |  |  |  |  |  |
| Indefinite lived intangible assets |  |  |  |  |  |  |  |  |
| Website name | 134,290 | - | - | 134,290 | 134,290 | - | - | 134,290 |
| Patent (i) | 10,599 | - | (10,599) | - | 10,599 | - | (10,599) | - |
| **Total intangible assets** | $ 451,711 | (244,522) | (63,621) | 143,568 | $ 452,064 | $ (239,569) | $ (63,621) | $ 148,874 |

(i) During the second quarter of 2017, the Company determined that one of its subsidiaries in the US would not serve the core business or generate future cash flow. As no future cash flows will be generated from using the patents owned by this subsidiary, the Company estimated the fair value of those patents to be nil as of June 30, 2017. Fair value was determined using unobservable (Level 3) inputs. Impairment loss from patents of $63,621 was recognized in 2017 to write off the entire book value of the patents.

The following table outlines the amortization expense for the following years:

| Years ending December 31, | Amortization to be Recognized |
|---|---|
| 2018 (6 months) | $ 5,061 |
| 2019 | 4,217 |
| **Total amortization to be recognized** | $ **9,278** |

8. **Long Term Investments**

*Equity investments without readily determinable fair values*

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

Equity investments without readily determinable fair values as of the period ended June 30, 2018 and December 31, 2017 are as follow:

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| Topsgame (i) | $ 3,365,969 | 3,365,969 |
| Frequency (ii) | 3,000,000 | 3,000,000 |
| DBOT (iii) | 250,000 | 250,000 |
| **Total** | **$ 6,615,969** | **6,615,969** |

In the first quarter of 2018, we adopted the ASU 2016-01, Financial Instruments — Overall (Subtopic 825-10). Under the new ASC, entities no longer use the cost method of accounting as it was applied before, but it can elect a measurement alternative for equity investments that do not have readily determinable fair values and do not qualify for the practical expedient in ASC 820 to estimate fair value using the NAV per share. After management's assessment of each of these three equity investments, management concluded that these three investments should be accounted for using measurement alternative. Under the alternative, the Company measures these investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for an identical or similar investment of the same issuer, and the Company has to make a separate election to use the alternative for each eligible investment and has to apply the alternative consistently from period to period until the investment's fair value becomes readily determinable. ASU further requires that the Company should use prospective method for all equity investments without readily determinable fair values.

*(i)* *Investment in Topsgame*

On April 13, 2016, SSF entered into a Game Right Assignment Agreement with SSS for the acquisition of certain game IP rights ("Game IP Rights") for approximately $2.7 million (RMB18 million) in cash. On April 15, 2016, SSF entered into a Capital Increase Agreement with Nanjing Tops Game Co., Ltd. ("Topsgame") and its shareholders whereby SSF transferred the Game IP Rights acquired from SSS to Topsgame in exchange for 13% of Topsgame's equity ownership. Topsgame is a PRC company that specializes in the independent development and operation of online, stand-alone and other games as well as the distribution of domestic and overseas games. The Company's 13% ownership interest does not provide the Company with the right to nor does the Company have representation on the board of directors of Topsgame.

The Company has recognized the cost of the investment in Topsgame, which is a private company with no readily determinable fair value, based on the acquisition cost of Game IP Rights of approximately $2.7 million and accounts for the investment by the cost method.

On September 14, 2016, SSF increased its investment in Topsgame by RMB3,900,000 (approximately $584,000) and maintained its 13% equity ownership of Topsgame. The investment continued to be accounted for as equity investments without readily determinable fair values.

The Company expects to sell its investment interest in Topgain and other owned IP and its investment interest in Frequency (discussed in Note 8 (ii)) to an independent third party with consideration greater than its net book value in 2018. The Company has signed a letter of intent with this third party and management believes it will close this transaction in 2018 on the basis of a valuation report provided by a qualified independent valuation firm. Accordingly, the Company did not make any impairment to either of these long-lived assets as of June 30, 2018.

*(ii)* *Investment in Frequency*

In April 2016, the Company and Frequency Networks Inc. ("Frequency") entered into a Series A Preferred Stock Purchase Agreement (the "SPA") for the purchase of 8,566,271 shares of Series A Preferred Stock, Frequency (the "Frequency Preferred Stock") for a total purchase price of $3 million. The 8,566,271 Series A Preferred Stock represent 9% ownership and voting interest on an as converted basis and does not provide the Company with the right to nor does the Company have representation on the board of directors of Frequency.

19

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

The Frequency Preferred Stock is entitled to non-cumulative dividends at the rate of $0.02548 per share per annum, declared at the discretion of Frequency's board of directors. The Frequency Preferred Stock is also convertible into shares of Frequency common stock at the Company's election any time after issuance on a 1:1 basis, subject to certain adjustment. Each share of Frequency Preferred Stock also has a liquidation preference of $0.42467 per share, plus any declared but unpaid dividends.

The Company has recognized the cost of the investment in Frequency, which is a private company with no readily determinable fair value, at its cost of $3 million and accounts for the investment by the cost method.

There were no identified events or changes in circumstances that may have had a significant adverse effect on the fair value of this investment.

#### (iii) Investment in DBOT

In August, 2017, the Company subscribed for a strategic investment of US$250,000 in the Delaware Board of Trade Holdings, Inc. ("DBOT") to acquire 187,970 common shares. DBOT is an approved and licensed FINRA- and SEC-regulated electronic trading platform with operations in Delaware. One of our subsidiaries is powered by DBOT's platform, trading system and technology. The Company accounts for this investment as equity investments without readily determinable fair values, as the Company owns less than 4% of the common shares and the Company has no significant influence over DBOT.

On December 18, 2017, January 12, 2018 and February 28, 2018, the Company entered into three stock purchase agreements with certain existing DBOT shareholders to acquire their owned shares of common stock of DBOT in an aggregate amount of 3,543,546 shares. To acquire those shares, the Company agreed to issue in the aggregate amount of 2,267,869 SSC common stock. The closing of these transactions with DBOT are still pending as it is necessary to obtain approval from FINRA, and the Company has not issued the shares and recorded such as additional investments as of June 30, 2018. Therefore the Company did not change the fair value of this investment.

**Equity method investments**

Equity method investment movement for the six months ended on June 30, 2018 is as follow:

| | | December 31, 2017 | Addition | Loss on investment | Foreign currency translation adjustments | June 30, 2018 |
|---|---|---|---|---|---|---|
| | | | | | **June 30, 2018** | |
| Wecast Internet | (i) | 6,044 | | (1,608) | - | 4,436 |
| Hua Cheng | (ii) | 353,498 | | (28,826) | 243 | 324,915 |
| Shandong Media | (iii) | - | | - | - | - |
| BDCG | (iv) | - | 9,800,000 | - | - | 9,800,000 |
| **Total** | | $  359,542 | 9,800,000 | (30,434) | 243 | 10,129,351 |

#### (i) Investment in Wecast Internet

In October 2016, the Company's subsidiary, YOU On Demand (Asia) Ltd., invested RMB1,000,000 (approximately $149,750) in Wecast Internet Limited ("Wecast Internet") and held its 50% equity ownership. In 2017, Wecast Internet closed its 100% owned subsidiary and the Company received $35,612 from its previous capital investment, and expects to receive the remaining investment from Wecast Internet in 2018.

#### (ii) Investment in Hua Cheng

As of the period ended June 30, 2018 and December 31, 2017, the Company held 39% equity ownership in Hua Cheng, and accounted for the investment by the equity method.

20

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

*(iii) Investment in Shandong Media*

As of the period ended June 30, 2018 and December 31, 2017, the Company held 30% equity ownership in Shandong Media, and accounts for the investment by the equity method. The investment was fully impaired as of June 30, 2018 and December 31, 2017.

*(iv) Investment in BDCG*

As of the period ended June 30, 2018 and December 31, 2017, the Company held 60% and 20% equity ownership in BDCG respectively, and accounts for the investment by the equity method, as indicated in Note 4.

9.  **Stockholders' Equity**

On May 19, 2017, the Company entered into a subscription agreement with certain investors, including officers, directors and other affiliates of the Company, pursuant to which the Company issued and sold to such investors, in a private placement, an aggregate of 727,273 shares of the common stock of the Company, for $2.75 per share, or a total purchase price of $2.0 million. Investors in the private placement included Lan Yang, the wife of the Company's Chairman Bruno Wu, and China Telenet Ventures Limited, an entity owned and controlled by Sean Wang, a member of the Company's Board of Directors. As of July 18, 2017, all subscription amounts have been received by the Company.

On October 23, 2017, the Company entered into a Securities Purchase Agreement with Hong Kong Guo Yuan Group Capital Holdings Limited. Pursuant to the terms of the agreement, the Company has agreed to sell and issue 5,494,505 shares of the Company's common stock to the Hong Kong Guo Yuan Group Capital Holdings Limited for $1.82 per share, or a total purchase price of $10.0 million.

On March 17, 2018, the Company entered into a subscription agreement (the "Subscription Agreement") with GT Dollar Ptd. Ltd. ("GTD") for a private placement ("GT Financing") in the total amount of $40.0 million, which consists of issuance of new shares in the amount of US$25,066,878.20 and issuance of two promissory notes in the amount of US$10,000,000 and US$4,933,121.80, respectively. The Subscription Agreement was subsequently amended and restated (the "Amended Agreement") on June 28, 2018 to reduce the amount of such investment to $10.0 million and to terminate the two promissory notes. Pursuant to the terms of the Amended Agreement, the Company will issue and sell to GTD, an aggregate of 5,494,506 shares of the common stock of the Company, par value $0.001 per share (the "Common Stock"), for $1.82 per share, or a total purchase price of $10,000,000.92. The Company has received $5.3 million and expects to receive the remaining $4.7M in the third quarter. The Company has not yet issued any shares with respect to this financing.

10. **Fair Value Measurements**

Accounting standards require the categorization of financial assets and liabilities, based on the inputs to the valuation technique, into a three-level fair value hierarchy. The various levels of the fair value hierarchy are described as follows:

- Level 1 — Financial assets and liabilities whose values are based on unadjusted quoted market prices for identical assets and liabilities in an active market that we have the ability to access.

- Level 2 — Financial assets and liabilities whose values are based on quoted prices in markets that are not active or model inputs that are observable for substantially the full term of the asset or liability.

- Level 3 — Financial assets and liabilities whose values are based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement.

Accounting standards require the use of observable market data, when available, in making fair value measurements. When inputs used to measure fair value fall within different levels of the hierarchy, the level within which the fair value measurement is categorized is based on the lowest level input that is significant to the fair value measurement.

The Company reviews the valuation techniques used to determine if the fair value measurements are still appropriate on an annual basis, and evaluate and adjust the unobservable inputs used in the fair value measurements based on current market conditions and third party information.

Common stock is valued at closing price reported on the active market on which the individual securities are traded.

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

The carrying amount of cash, accounts receivable, notes receivable, accounts payable, accrued other expenses, other current liabilities and convertible promissory note as of June 30, 2018 and December 31, 2017, approximate fair value because of the short maturity of these instruments.

**11. Related Party Transactions**

*(a) $3.0 Million Convertible Note*

On May 10, 2012, the Executive Chairman and Principal Executive Officer, Mr. Shane McMahon, made a loan to the Company in the amount of $3,000,000. In consideration for the loan, the Company issued a convertible note to Mr. McMahon in the aggregate principal amount of $3,000,000 (the "Note") at a 4% interest rate computed on the basis of a 365 day year. Upon issuance, the conversion price of the Note was equal to the price per share paid for securities by investors in the most recent financing (as of the date of conversion) of equity or equity-linked securities of the Company.

On November 9, 2017, the Board of Directors approved Amendment No. 7 to $3.0 million Note, pursuant to which the maturity date of the Note was extended to December 31, 2019. The Note remains payable on demand or convertible on demand into Common Stock at a conversion price of $1.50.

For the three and six months ended June 30, 2018, the Company recorded interest expense of $30,000 and $59,507, respectively, related to the Note; For the three and six months ended June 30, 2017, the Company recorded interest expense of $29,507 and $59,507, respectively, related to the Note.

*(b) Assets Disposal to BT*

On November 28, 2017, due to strategic reasons, the Company and BT have agreed to amend the BT SPA, in which the Company will neither sell to BT the equity of Nanjing Tops Game Co., Ltd, and the equity of the Pantaflix joint venture nor receive the previously agreed upon consideration for such sales. But the Company will still sell to BT 80% of the outstanding capital stock of Zhong Hai Shi Xun Media to streamline the operations of the Company and to eliminate the Company's exposure to any liabilities and obligations of Zhong Hai Shi Xun Media.

*(c) Acquisition of GuangMing*

On December 7, 2017, the Company entered into a Securities Purchase Agreement with Shanghai Guang Ming Investment Management Limited, a PRC limited liability entity ("Guang Ming"), Tianjin Sun Seven Stars Culture Development Co. Ltd. ("Tianjin") and Beijing Nanbei Huijin Investment Co. Ltd. SSC will purchase 100% of Guang Ming's issued and outstanding shares for a total purchase price of RMB 2.4 million (approximately $363,436). Guang Ming holds a special fund management license and SSC's purpose for making the acquisition is to develop a fund management platform. The closing of the acquisition is conditioned upon, among other things, the sellers, including Guang Ming, obtaining all of the necessary approvals from the Asset Management Association of China ("AMAC"), a self-regulatory organization which oversees and regulates fund management companies in China. In the event that AMAC does not accept the sellers' submission for change of ownership, this agreement shall be rescinded, and the sellers shall continue their ownership of Guang Ming and shall refund any portion of the purchase price previously paid within 15 days of notice from the Company. This agreement was approved by the Company's Audit Committee and the closing of the Acquisition is also subject to the receipt of a fairness opinion and valuation report satisfactory to the Company and which concludes that the purchase price of the acquisition is fair from a financial point of view to the Company. The acquisition is deemed to be a related party transaction because Tianjin is an affiliate of Bruno Wu, the Company's Chairman and Chief Executive Officer. In April 2018, the fairness opinion was approved by Audit Committee, and the Company paid the consideration and closed this acquisition.

*(d) Crude Oil Trading*

During the first six months of 2018, ten of our crude oil transactions were purchased from three entities of which our minority shareholder has significant influence upon and because this minority shareholder has significant influence on both our Singapore joint venture and these three entities/suppliers, the Company reported these ten purchases as related party transaction from accounting perspective and hence recorded this as separate related party costs in its financial statement. Associated amounts payable represents almost 69.6% of total liabilities.

22

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**12. Share-Based Payments**

As of June 30, 2018, the Company had 1,773,392 options, 130,586 restricted shares and 403,714 warrants outstanding.

The Company awards common stock and stock options to employees and directors as compensation for their services, and accounts for its stock option awards to employees and directors pursuant to the provisions of ASC 718, *Stock Compensation*. The fair value of each option award is estimated on the date of grant using the Black-Scholes Merton valuation model. The Company recognizes the fair value of each option as compensation expense ratably using the straight-line attribution method over the service period, which is generally the vesting period.

Total share-based payments expense recorded by the Company during the three and six months ended June 30, 2018 and 2017 is as follows:

|  | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2018 | June 30, 2017 | June 30, 2018 | June 30, 2017 |
| Employees and directors share-based payments | $ 3,239,727 | $ 76,224 | $ 3,360,917 | $ 147,652 |

Effective as of December 3, 2010, our Board of Directors approved the Wecast Network, Inc. 2010 Stock Incentive Plan ("the 2010 Plan") pursuant to which options or other similar securities may be granted. The maximum aggregate number of shares of our common stock that may be issued under the Plan is 4,000,000 shares. As of June 30, 2018, options available for issuance are 92,499 shares.

*(a) Stock Options*

Stock option activity for the six months ended June 30, 2018 is summarized as follows:

|  | Options Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (Years) | Aggregated Intrinsic Value |
| --- | --- | --- | --- | --- |
| Outstanding at January 1, 2018 | 1,853,391 | $ 3.20 | 2.99 | 0.02 |
| Granted | - | - | | |
| Exercised | (70,000) | 1.99 | | |
| Expired | (9,999) | 1.58 | | |
| Forfeited | - | - | | |
| Outstanding at June 30, 2018 | 1,773,392 | 3.26 | 4.55 | 0.02 |
| Vested and expected to vest as of June 30, 2018 | 1,773,392 | 3.26 | 4.55 | 0.02 |
| Options exercisable at June 30, 2018 (vested) | 1,682,559 | 3.34 | 4.30 | 0.02 |

As of June 30, 2018, approximately $110,584 of total unrecognized compensation expense related to non-vested share options is expected to be recognized over a weighted average period of approximately 1.93 years. The total fair value of shares vested during the six months ended June 30, 2018 and 2017 was approximately $319,001 and $19,357, respectively.

*(b) Warrants*

In connection with the Company's financings, the Warner Brother Agreement and the service agreements, the Company issued warrants to service providers to purchase common stock of the Company. The warrants that were issued to SSS has been expired on March 28, 2018.

As of June 30, 2018, the weighted average exercise price of the warrants was $1.75 and the weighted average remaining life was 0.59 years. The following table outlines the warrants outstanding and exercisable as of June 30, 2018 and December 31, 2017:

| Warrants Outstanding | June 30, 2018 Number of Warrants Outstanding and Exercisable | December 31, 2017 Number of Warrants Outstanding and Exercisable | Exercise Price | Expiration Date |
| --- | --- | --- | --- | --- |
| 2014 Broker Warrants (Series E Financing) | 403,714 | 703,714 | $ 1.75 | 01/31/19 |
| 2016 Warrants to SSS | - | 1,818,182 | $ 2.75 | 03/28/18 |
|  | **403,714** | **2,521,896** | | |

23

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

*(c) Restricted Shares*

In January, 2017, the Company granted 35,000 restricted shares to one employee under the "2010 Plan". The restricted shares have a vesting period of four years with the first one-fourth vesting on the first anniversary from grant date and the remaining three-fourth vesting ratably over twelve quarters. The grant date fair value of the restricted shares was $43,750. As this employee left the Company in February, no expense was recorded.

In March and April, 2017, the Company granted 365,000 restricted shares to certain employees under the "2010 Plan". The restricted shares have a vesting period of four years with the first one-fourth vesting on the first anniversary from grant date and the remaining three-fourth vesting ratably over twelve quarters. The grant date fair value of the restricted shares was $778,200.

In November, 2017, the Board of Directors approved 2017 independent board compensation plan, which approved to grant 4,488 restricted shares to each of four then independent directors under the "2010 Plan." The restricted shares were all vested immediately since commencement date. The aggregated grant date fair value of all those restricted shares was $100,000.

In April and June, 2018, the Company granted 1,342,743 restricted shares to certain employees under the "2010 Plan". 1,239,743 of the restricted shares were all vested immediately since commencement date. Rest of the shares have a vesting period of two years with the first half vesting on the first anniversary from grant date and the other half vesting on the second anniversary. The grant date fair value of the restricted shares was $3,469,532.

A summary of the restricted shares is as follows:

|  | Shares | Weighted-average fair value |
|---|---|---|
| Restricted shares outstanding at January 1, 2018 | 109,586 | 1.92 |
| Granted | 1,342,743 | 2.58 |
| Forfeited | (57,000) | 2.02 |
| Vested | (1,264,743) | 2.57 |
| **Restricted shares outstanding at June 30, 2018** | **130,586** | **2.39** |

13. **Earnings (Loss) Per Common Share**

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 30, 2018 | June 30, 2017 | June 30, 2018 | June 30, 2017 |
| **Net loss attributable to common stockholders** | $ (8,320,024) | $ (3,803,619) | $ (12,041,393) | $ (1,670,624) |
| **Basic** |  |  |  |  |
| Basic weighted average shares outstanding | 71,785,448 | 61,180,365 | 70,309,078 | 58,297,202 |
|  |  |  |  |  |
| **Diluted** |  |  |  |  |
| Diluted weighted average common shares outstanding | 71,785,448 | 61,180,365 | 70,309,078 | 58,297,202 |
|  |  |  |  |  |
| **Net loss per share:** |  |  |  |  |
| **Basic** | $ (0.12) | $ (0.06) | $ (0.17) | $ (0.03) |
| **Diluted** | $ (0.12) | $ (0.06) | $ (0.17) | $ (0.03) |

Basic earnings (loss) per common share attributable to Seven Stars Cloud shareholders is calculated by dividing the net earnings (loss) attributable to Seven Stars Cloud shareholders by the weighted average number of outstanding common shares during the applicable period.

Diluted earnings (loss) per share is calculated by taking net earnings (loss), divided by the diluted weighted average common shares outstanding. Diluted earnings (loss) per share for the three and six months ended June 30, 2018 and 2017 both equal to basic loss per share for respective periods because the effect of securities convertible into common shares is anti-dilutive.

24

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

The following table includes the number of shares that may be dilutive potential common shares in the future. These shares were not included in the computation of diluted earnings (loss) per share because the effect was either antidilutive or the performance condition was not met.

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2018 | June 30, 2017 | June 30, 2018 | June 30, 2017 |
| Warrants | 403,714 | 3,546,897 | 403,714 | 3,546,897 |
| Options | 1,903,978 | 2,462,863 | 1,903,978 | 2,462,863 |
| Series A Preferred Stock | 933,333 | 933,333 | 933,333 | 933,333 |
| Convertible promissory note and interest | 18,265,908 | 35,745,070 | 18,265,908 | 35,745,070 |
| Total | 21,506,933 | 42,688,163 | 21,506,933 | 42,688,163 |

**14. Income Taxes**

As of June 30, 2018, the Company had approximately $35.7 million of the U.S domestic cumulative tax loss carryforwards and approximately $31.3 million of the foreign cumulative tax loss carryforwards, which may be available to reduce future income tax liabilities in certain jurisdictions. No U.S. tax loss would be expired based on new Tax Law. These PRC tax loss carryforwards will expire beginning year 2019 to year 2023.

The income tax expense for the six months ended June 30, 2018 is nil because of net operating loss and deferred tax assets related to the net operating loss carryovers utilized had been offset by a valuations allowance. Company had established a 100% valuation allowance against its net deferred tax assets due to its history of pre-tax losses and the likelihood that the deferred tax assets will not be realized. The valuation allowance was increased approximately $2.8 million during the six months ended June 30, 2018.

As of June 30, 2018, there are no unrecorded tax benefits which would impact our financial position or our results of operations.

**15. Contingencies and Commitments**

**(a) Operating Lease Commitment**

The Company is committed to paying leased property costs related to our offices as follows:

| Years ending December 31, | Leased Property Costs |
| --- | --- |
| 2018(6 months) | 602,230 |
| 2019 | 715,164 |
| 2020 | 360,394 |
| Thereafter | 93,376 |
| Total | $ 1,771,164 |

**(b) Lawsuits and Legal Proceedings**

From time to time, we may become involved in various lawsuits and legal proceedings which arise in the ordinary course of business. However, litigation is subject to inherent uncertainties, and an adverse result in these or other matters may arise from time to time that may harm our business. As of June 30, 2018, there are no such legal proceedings or claims that we believe will have a material adverse effect on our business, financial condition or operating results.

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**16. Concentration, Credit and Other Risks**

*(a)  PRC Regulations*

The PRC market in which the Company operates poses certain macro-economic and regulatory risks and uncertainties. These uncertainties extend to the ability of the Company to conduct wireless telecommunication services through contractual arrangements in the PRC since the industry remains highly regulated. The Company conducts legacy YOD business in China through Zhong Hai Media, which the Company controls as a result of a series of contractual arrangements entered among YOD WOFE, Sinotop Beijing as the parent company of Zhong Hai Media, SSF and the respective legal shareholders of Sinotop Beijing and SSF. The Company believes that these contractual arrangements are in compliance with PRC law and are legally enforceable. If Sinotop Beijing, SSF or their respective legal shareholders fail to perform the obligations under the contractual arrangements or any dispute relating to these contracts remains unresolved, YOD WOFE or YOD HK can enforce its rights under the VIE contracts through PRC law and courts. However, uncertainties in the PRC legal system could limit the Company's ability to enforce these contractual arrangements. In particular, the interpretation and enforcement of these laws, rules and regulations involve uncertainties. If YOD WOFE had direct ownership of Sinotop Beijing and SSF, it would be able to exercise its rights as a shareholder to effect changes in the board of directors of Sinotop Beijing or SSF, which in turn could effect changes at the management level, subject to any applicable fiduciary obligations. However, under the current contractual arrangements, the Company relies on Sinotop Beijing, SSF and their respective legal shareholders to perform their contractual obligations to exercise effective control. The Company also gives no assurance that PRC government authorities will not take a view in the future that is contrary to the opinion of the Company. If the current ownership structure of the Company and its contractual arrangements with the VIEs and their equity holders were found to be in violation of any existing or future PRC laws or regulations, the Company's ability to conduct its business could be affected and the Company may be required to restructure its ownership structure and operations in the PRC to comply with the changes in the PRC laws which may result in deconsolidation of the VIEs.

In addition, the telecommunications, information and media industries remain highly regulated. Restrictions are currently in place and are unclear with respect to which segments of these industries foreign owned entities, like YOD WOFE, may operate. The PRC government may issue from time to time new laws or new interpretations on existing laws to regulate areas such as telecommunications, information and media, some of which are not published on a timely basis or may have retroactive effect. For example, there is substantial uncertainty regarding the Draft Foreign Investment Law, including, among others, what the actual content of the law will be as well as the adoption and effective date of the final form of the law. Administrative and court proceedings in China may also be protracted, resulting in substantial costs and diversion of resources and management attention. While such uncertainty exists, the Company cannot assure that the new laws, when it is adopted and becomes effective, and potential related administrative proceedings will not have a material and adverse effect on the Company's ability to control the affiliated entities through the contractual arrangements. Regulatory risk also encompasses the interpretation by the tax authorities of current tax laws, and the Company's legal structure and scope of operations in the PRC, which could be subject to further restrictions resulting in limitations on the Company's ability to conduct business in the PRC.

*(b)  Major Customers*

<u>**Legacy YOD business**</u>

The Company has agreements with distribution partners, including digital cable operators, IPTV operators, OTT streaming operators and mobile smartphone manufacturers and operator. A distribution partner that individually generates more than 10% of the Company's revenue is considered a major customer.

On October 8, 2016, the Company signed an agreement to form a partnership with Zhejiang Yanhua ("Yanhua Agreement"), where Yanhua will act as the exclusive distribution operator (within the territory of the People's Republic of China) of WCST's licensed library of major studio films. According to the Yanhua Agreement, the existing legacy Hollywood studio paid contents as well as other IP contents specified in the agreement, along with the corresponding authorized rights letter that WCST is entitled to, will be turned over to Yanhua as a whole package, which was agreed to be priced at RMB13,000,000. In addition to the above-mentioned minimal guarantee fee of RMB13,000,000 specified, there is a provision in the Yanhua Agreement which states that once the revenue recognized from the existing contents transferred from WCST to Yanhua reaches the amount of RMB13,000,000, the revenue above RMB13,000,000 will be shared with WCST from the date when this revenue threshold is reached based on certain revenue-sharing mechanism stipulated in the Yanhua Agreement.

According to the Yanhua Agreement, the total price of the Existing Contents to be transferred is RMB13,000,000. The payment is agreed to be paid in two installments, the first half of RMB6,500,000 was received on December 30, 2016. The remaining RMB6,500,000 will be paid under the scenario that the license content fees due to Studios for the existing legacy Hollywood paid contents will be settled. Due to the fact that the second installment will depend upon some future events and is contingent in nature, we deem this portion of the fee is not fixed or determinable and therefore, this portion of the revenue did not meet the revenue recognition criteria to be recognized accordingly.

26

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

In terms of the additional revenue-sharing fee over the above-mentioned RMB13,000,000 fee specified, considering that this part of arrangement fee is not fixed or determinable at the time point as of June 30, 2018, it has not met the criteria for revenue recognition, management will recognize it once it becomes determinable and meet the other revenue recognition criteria in the future.

Pursuant to the Yanhua Agreement, RMB6,500,000 was recognized as revenue in 2017 based on the relative fair value of licensed content delivered to Yanhua.

**_Wecast Services_**

The holdings and businesses from Company's two acquisitions in January 2017(Note 4) now reside under "Wecast Services", our wholly-owned subsidiary Wecast Services Group Limited. Wecast Services is currently primarily engaged with consumer electronics e-commerce and crude oil supply chain management operations. The Company has been engaged in the crude oil supply chain business since October 2017.

For the six months ended June 30, 2017, one customer individually accounted for more than 10% of the Company's revenue. Two customers individually accounted for more than 10% of the Company's net accounts receivables as of June 30, 2017, respectively.

For the six months ended June 30, 2018, one customer individually accounted for more than 10% of the Company's revenue. One customers individually accounted for more than 10% of the Company's net accounts receivables as of June 30, 2018.

**(c)   Major Suppliers**

**_Legacy YOD business_**

The Company relies on agreements with studio content partners to acquire video contents. A content partner that accounts for more than 10% of the Company's cost of revenues is considered a major supplier. Since January 1, 2017, only the content that was acquired from SSS in the amount of $17.7 million were still recorded as licensed content assets and amortized into cost of sales based on revenue and gross profit margin estimates. For the six months ended June 30, 2017, $0.8 million was recorded in cost of sales and $0.8 million was recorded as revenue. No further revenue nor cost of sales was recorded since March 31, 2017.

**_Wecast Services_**

The Company relies on agreements with consumer electronics manufacturers and crude oil suppliers.

For the six months ended June 30, 2017, three suppliers individually accounted for more than 10% of the Company's cost of revenues. Three suppliers individually accounted for more than 10% of the Company's accounts payable as of June 30, 2017.

For the six months ended June 30, 2018, two supplier individually accounted for more than 10% of the Company's cost of revenues. Two supplier individually accounted for more than 10% of the Company's accounts payable and amount due to related parties as of June 30, 2018.

**(d)   Concentration of Credit Risks**

Financial instruments that potentially subject the Company to significant concentration of credit risk primarily consist of cash and accounts receivable. As of June 30, 2018 and December 31, 2017, the Company's cash was held by financial institutions (located in the PRC, Hong Kong , the United States and Singapore) that management believes have acceptable credit. Accounts receivable are typically unsecured and are mainly derived from revenues from Wecast Services. The risk with respect to accounts receivable is mitigated by regular credit evaluations that the Company performs on its distribution partners and its ongoing monitoring of outstanding balances.

**(e)   Foreign Currency Risks**

A majority of the Company's operating transactions are denominated in RMB and a significant portion of the Company's assets and liabilities is denominated in RMB. RMB is not freely convertible into foreign currencies. The value of the RMB is subject to changes in the central government policies and to international economic and political developments. In the PRC, certain foreign exchange transactions are required by laws to be transacted only by authorized financial institutions at exchange rates set by the People's Bank of China ("PBOC"). Remittances in currencies other than RMB by the Company in China must be processed through PBOC or other China foreign exchange regulatory bodies which require certain supporting documentation in order to complete the remittance.

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

Cash consist of cash on hand and demand deposits at banks, which are unrestricted as to withdrawal.

Time deposits, which mature within one year as of the balance sheet date, represent interest-bearing certificates of deposit with an initial term of greater than three months when purchased. Time deposits which mature over one year as of the balance sheet date are included in non-current assets.

Cash and time deposits maintained at banks consist of the following:

| | | June 30, 2018 | December 31, 2017 |
|---|---|---|---|
| RMB denominated bank deposits with financial institutions in the PRC | $ | 739,986 | 684,115 |
| US dollar denominated bank deposits with financial institutions in the PRC | $ | 629,437 | 628,481 |
| HKD denominated bank deposits with financial institutions in Hong Kong Special Administrative Region ("HK SAR") | $ | 29,083 | 17,508 |
| US dollar denominated bank deposits with financial institutions in Hong Kong Special Administrative Region ("HK SAR") | $ | 165,171 | 1,505,271 |
| US dollar denominated bank deposits with financial institutions in Singapore ("Singapore") | | - | 1,033,769 |
| US dollar denominated bank deposits with financial institutions in The United States of America ("USA") | $ | 561,697 | 3,698,704 |

As of June 30, 2018 and December 31, 2017 deposits of $426,399 and $398,243 were insured, respectively. To limit exposure to credit risk relating to bank deposits, the Company primarily places bank deposits only with large financial institutions in the PRC, HK SAR, USA, Singapore and Cayman with acceptable credit rating.

**17. Defined Contribution Plan**

For our U.S. employees, during 2011, the Company began sponsoring a 401(k) defined contribution plan ("401(k) Plan") that provides for a 100% employer matching contribution of the first 3% and a 50% employer matching contribution of each additional percent contributed by an employee up to 5% of each employee's pay. Employees become fully vested in employer matching contributions after six months of employment. Company 401(k) matching contributions were approximately $1,442 and $2,755 for the three and six months ended June 30, 2018 respectively and $904 and $2,100 for the three and six months ended June 30, 2017 respectively.

Full time employees in the PRC participate in a government-mandated defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. PRC labor regulations require the Company to make contributions based on certain percentages of the employees' basic salaries. Other than such contributions, there is no further obligation under these plans. The total contribution for such PRC employee benefits was $372,061 and $255,408 for the six months ended June 30, 2018 and 2017, respectively.

**18. Segment Reporting**

The Company's chief operating decision maker has been identified as the chief executive officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of the Company. In fiscal year 2016, the Company operated and reported its performance in one segment. However, starting from fiscal year 2017, since Company has acquired Wecast Services Limited and Wide Angle Group Limited in January 2017 (see note 4), the Company has operated two segments including Legacy YOD segment and Wecast Service segment. Therefore, there are two reportable segments for the six months ended June 30, 2018. The two reportable segments are:

*Legacy YOD* - Provides premium content and integrated value-added service solutions for the delivery of VOD and paid video programming to digital cable providers, Internet Protocol Television ("IPTV") providers. The core revenues are being generated from both minimum guarantee payments and revenue sharing arrangements with distribution partners as well as subscription or transactional fees from subscribers.

*Wecast Service* - Wecast Services (which resides under engine 7: supply chain management) is currently primarily engaged with consumer electronics and oil crude supply chain management operations..

Segment disclosures are on a performance basis consistent with internal management reporting. The Company does not allocate expenses below segment gross profit since these segments share the same executive team, office space, occupancy expenses, information technology infrastructures, human resources and finance department. The following tables summarized the Company's revenue and cost generated from different revenue streams.

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

| | Six Months Ended | |
|---|---|---|
| | June 30, 2018 | June 30, 2017 |
| NET SALES TO EXTERNAL CUSTOMERS | | |
| -Legacy YOD | $              - | $        794,273 |
| -Wecast Service | 318,920,359 | 75,701,338 |
| **Net sales** | **318,920,359** | **76,495,611** |
| GROSS PROFIT | | |
| -Legacy YOD | - | 31,659 |
| -Wecast Service | 1,925,670 | 3,848,811 |
| **Gross profit** | **1,925,670** | **3,880,470** |

| | June 30, 2018 | December 31, 2017 |
|---|---|---|
| TOTAL ASSETS | | |
| -Legacy YOD | $     27,538,697 | $      27,141,163 |
| -Wecast Service | 128,844,435 | 30,084,607 |
| -Unallocated assets | 2,618,053 | 11,270,378 |
| -Intersegment elimination | (5,430,810) | (5,051,660) |
| **Total** | **153,570,375** | **63,444,488** |

## 19. Subsequent Events

As at August 13, 2018, material subsequent events are as below.

**Global Headquarters for Technology and Innovation in Connecticut**

On July 3, 2018, Seven Stars Cloud announced that it will be establishing its global headquarters for technology and innovation called Chain Valley, in Connecticut, transforming UConn's former campus in West Hartford into a thriving center for research, training, and business development. The $283 million project is expected to create 330 jobs over the next five years.

Seven Stars Cloud entered into a Purchase and Sale Agreement, effective July 11, 2018 (the "P&S Agreement"), with the State of Connecticut acting by and through the University of Connecticut pursuant to which the Company is purchasing the parcel of land formerly known as the University of Connecticut Greater Hartford campus, including buildings and improvements (the "Acquisition") for purposes of creating the Company's global headquarters for technology and innovation. The Company delivered a deposit of $520,000 and the balance of the $5,200,000 purchase price is deliverable when the purchase contemplated by the P&S Agreement is closed. Such closing will be subject to typical closing conditions and shall occur within 30 days after the satisfaction of all closing conditions.

In connection with the Acquisition, the Company also entered into an Assistance Agreement by and between the State of Connecticut, acting by the Department of Economic and Community Development (the "Assistance Agreement"), pursuant to which the State of Connecticut may provide up to $10,000,000 of financial assistance (the "Funding") which in such case shall be evidenced by a promissory note, provided, however, that the aggregate principal of the funding shall not exceed 50% of the cost of the project. The Company will provide security for its obligation to repay the Funding to the State of Connecticut in the form of a first position mortgage. The Company agrees that in exchange for the Funding it will provide a minimum number of jobs at a minimum annual amount of compensation by December 31, 2021. Failure of the Company to do so will subject it to certain cash penalties for each employee below the minimum employment threshold. If the Company meets the employment obligations it is eligible for forgiveness of up to $10,000,000 of the Funding. The Company will agree to certain covenants with respect to the Funding and such Funding may become immediately due and payable upon the occurrence of certain standard events of default.

**Entry into a Material Definitive Agreement with C4 Holdco, Ltd.**

Effective July 18, 2018, Seven Stars Cloud entered into an Interim Agreement with C4 Holdco, Ltd., an England and Wales Private Limited Company ("C4") (the "Interim Agreement"), pursuant to which the Company and C4 set forth their interim agreement with respect to the joint venture which the parties desire to establish and operate and for which the parties are in good faith discussions to form and operate under the name GenXPlus (the "Joint Venture"). It is expected that pursuant to the Joint Venture SSC will contribute up to $700,000 and certain intellectual property and C4 will contribute services and intellectual property. It is expected that the Company will own 75% of the proposed joint venture and C4 will own 25% subject to a potential adjustment to 65% and 35%, respectively.

29

**Seven Stars Cloud Group, Inc., Its Subsidiaries and Variable Interest Entities**
**NOTES TO UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS**

Pursuant to the Interim Agreement, the Company shall form a private limited company, named Genxplus Global Ltd. ("Genx Global") under the laws of England and Wales. Genx Global will be a wholly owned subsidiary of the Company until such time as C4 becomes a shareholder of Genx Global. The Company has agreed to fund $350,000 to GenxGlobal as soon as practicable and to fund an additional $350,000 to GenxGlobal if a definitive agreement is reached with respect to the Joint Venture; provided, however, that the Company may choose to fund the remaining $350,000 in the event that a definitive agreement has not been reached. The Company and C4 acknowledge that the $700,000 represents initial capital to meet the priority objectives and the management team will create the business plan and requirements for the business, to be funded by the Company in a manner to be determined. During the term of the Interim Agreement C4 has agreed to provide certain services. The Interim Agreement is terminable on 15 days prior written notice by either party if the definitive Joint Venture agreement is not reached on or prior to 30 days following July 17, 2018.

**Merger of Grapevine Logic, Inc.**

On July 18, 2018, Seven Stars Cloud Group, Inc. (the "Company"), entered into an Agreement and Plan of Merger with GLI Acquisition Corp. (the "Merger"), a Delaware corporation and wholly owned subsidiary of the Company (the "Merger Sub"), and Grapevine Logic, Inc., a Delaware corporation ("GLI"), and Mr. Grant Deken, as the representative of the holders of capital stock of GLI, pursuant to which the Company agreed to acquire GLI for an aggregate cash payment of $2,400,000 to the holders of capital stock of GLI. On or prior to July 22, 2018, the Company was required to make aggregate payments of $2,400,000 (the "Purchase Price") in separate payments of $240,000 and $2,160,000, each to separate entities to be held in escrow pending the closing. The GLI selling stockholders are entitled to $240,000 as liquidated damages if the Merger does not close due to a Company breach. The Merger is to be closed as soon as possible following the satisfaction of the closing conditions to the Merger. The Purchase Price is subject to a closing adjustment. An aggregate of $530,000 will be held in escrow following the closing with respect to potential indemnifications claims.

An affiliate of Bruno Wu, the CEO of the Company, is a 34.5% equity holder of non-voting stock in GLI. Mr. Wu will not receive any part of the Purchase Price, however, Mr. Wu, or an affiliate, is expected to remain a rights holder in GLI after the Merger is closed. While Mr. Wu will relinquish his common stock in GLI for no consideration pursuant to this transaction, he is expected to receive stock rights pursuant to an agreement to be finalized prior to closing pursuant to which Mr. Wu, or an affiliate, will have a right to acquire 34.5% of GLI Class A Common Stock for zero consideration.

**Cautionary Note Regarding Forward Looking Statements**

This Form 10-Q contains "forward-looking" statements that involve risks and uncertainties. You can identify these statements by the use of forward-looking words such as "may", "will", "expect", "anticipate", "estimate", "believe", "continue", or other similar words. You should read statements that contain these words carefully because they discuss our future expectations, contain projections of our future results of operations or financial condition or state other "forward-looking" information. We believe that it is important to communicate our future expectations to our investors. However, these forward-looking statements are not guarantees of future performance and actual results may differ materially from the expectations that are expressed, implied or forecasted in any such forward-looking statements. There may be events in the future that we are unable to accurately predict or control, including weather conditions and other natural disasters which may affect demand for our products, and the product–development and marketing efforts of our competitors. Examples of these events are more fully described in the Company's 2017 Annual Report under Part I. Item 1A. Risk Factors.

Unless required by law, the Company undertakes no obligation to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise. However, readers should carefully review the reports and documents the Company files from time to time with the SEC, particularly its Quarterly Reports on Form 10-Q, Annual Report on Form 10-K , Current Reports on Form 8-K and all amendments to those reports.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The following management's discussion and analysis should be read in conjunction with our financial statements and the notes thereto and the other financial information appearing elsewhere in this report. In addition to historical information, the following discussion contains certain forward-looking information. See "Cautionary Note Regarding Forward Looking Statements" above for certain information concerning those forward-looking statements.

**Overview**

Seven Stars Cloud is aiming to become a next generation Artificial-Intelligent (AI) & Blockchain-Powered, Fintech company. By providing and managing an infrastructure and ecosystem that facilitates the transformation of traditional financial markets such as commodities, currency and credit into the asset digitalization era, SSC provides asset owners and holders a seamless method and platform for digital asset securitization, tokenization and trading. Separately, SSC offers a closed supply chain trading ecosystem for corporate buyers and sellers designed to eliminate standard transactional intermediaries and create a more direct and margin-expanding path for principals.

2017 was a year of transition from the Company's legacy business to the Company's new business.

Pertaining to the Company's efforts to become a next generation Artificial-Intelligent (AI) & Blockchain-Powered, Fintech company, in early Q1 2017, the Company completed the acquisition of Sun Video Group HK Limited ("SVG"), which had a 51% ownership stake in M.Y. Products, LLC ("MYP"), a global, smart supply chain management operator. Functioning as a global smart supply chain management company, the acquisition was consummated in an effort to support the Company's brand licensing and video commerce business with B2B services. With the aforementioned service offerings under one roof, the Company could now provide Chinese manufacturers the opportunity to improve profitability within the distribution chain and allowing manufacturers to capture more robust margins as well as reapportioning cost savings to marketing and branding, thereby improving revenue volume.

Also in early February 2017, the Company announced it had acquired 55% of Wide Angle Group Limited ("WAG"). Coupling WAG's capabilities and offerings with those already existing under the SVG/MYP deal, including Supply Chain Management, Manufacturer Sourcing, Supply Chain Financing, VR (virtual reality)-Enabled Commerce Technology and AI-driven Big Data Technology Management, the Company was seeking to creating a diversified and robust business division, separate from the VOD business.

For 2017, through the acquisition and operation of the SVG and WAG the two current revenue sources were initiated. They are supply chain management & structured finance and alternative finance & carry trade businesses. The Company is currently primarily engaged with consumer electronics and smart supply chain management operations. Our end customers include about 15 to 20 corporations across the world. Starting from October 2017, through partnership with another business partner, our newly controlled Singapore joint venture has been conducting oil trading business in Singapore. Other than the trading business that Company already operated in 2017, the Company also intends to run the engine upon its Venus blockchain based platform, which includes TPaaS & VPaaS system. As of fourth quarter of 2017, TPaaS system went into trial operation. A significant portion of our operations will consist of these new lines of business, however since these are new business lines, customer demand is in the process of being validated, and the global regulatory environment is constantly adapting to these new fintech products and technologies. As a result, it is not possible to make a definitive prediction on the rate of growth and profitability of these operations at this time. These services will be offered globally from our New York and China offices.

As part of our overall strategy, the Company is focused on trying to establish 4 digital asset product categories which are expected to trade on 4 digital asset global trading platforms and exchanges and are expected to be distributed and monetized through 4 digital asset global partner sales and monetization networks.

The 4 digital asset product categories are expected to be (i) financial, (ii) vertical industry, (iii) consumer and (iv) media. The products within these groups are in development and are expected to represent new digital financial assets that can be used for store of value, application platform-based transactions, supply chain transactions, transaction incentivization, and general payments. By nature, their storage and transactability in the various use cases that they are created and are expected to produce new value and fungibility with other digital assets and in some cases, fiat currency.

The 4 digital asset global trading platforms and exchanges are expected to be:

i. Global Financial Digital Asset Exchange Groups
ii. Global Vertical Industry Digital Asset Exchange Groups
iii. Global Consumer Digital Asset Exchange Groups
iv. Global Media Digital Asset Exchange Groups

Our digital asset trading platforms are expected to represent owned and partner exchanges that will support our digital asset products. The 4 digital asset global partner sales and monetization networks are expected to be:

i.GenXPlus (rebranded from NextGen X)
ii. Redrock Global Capital
iii. Partnerships with highly scalable, transparent and decentralized digital asset exchange platforms
iv. Launch of scalable, transparent and decentralized financial exchange platforms

The Company's global partner sales and monetization networks are expected to enable the unlocking of value through fractionalization, tokenization and securitization of assets in digital form.

Our dgital asset trading platforms are expected to represent owned and partner exchanges that will support our digital asset products.

In support of the Company's overall strategy, in August, 2017, the Company subscribed to a strategic investment of US$250,000 in the Delaware Board of Trade Holdings, Inc. ("DBOT") to acquire 187,970 common shares. DBOT is an SEC recognized Alternative Trading System, which SSC believes can be developed into a distributed network. On December 18, 2017, the Company subscribed for another 27% purchase of DBOT, which would make the Company the largest shareholder of DBOT, and as part of this purchase, the Company's President, Robert G. Benya, is expected to become a DBOT Board Director. DBOT (http://dbottrading.com/) operates three business lines: (i) DBOT ATS LLC, a FINRA Member Firm, a member of the Securities Investor Protection Corporation ("SIPC") and an SEC recognized fully automated, auto-execution Alternative Trading System ("ATS"); (ii) DBOT Issuer Services LLC, focused on setting and maintaining issuer standards, as well as the provision of issuer services to DBOT designated issuers; and (iii) DBOT Technology Services LLC, focused on the provision of market data and marketplace connectivity. These transactions are still pending and have not yet closed. These transactions will not close until DBOT gets FINRA's approval. We will not be able to consolidate the results of DBOT.

Also, in support of the Company's overall strategy, on October 19, 2017 the Company announced an agreement to establish a Joint Venture, BBD Digital Capital Group Ltd ("BDCG"), with management partners Tiger Sports Media Limited and Seasail Ventures Limited, ("Seasail") an affiliate of parent company BBD (https://en.bbdservice.com/introduction). The BDCG will focus on artificial intelligence-driven financial data services as well as transactional platforms for index, futures and derivative trading, for both global commodity and energy clients. By leveraging Seasail's technology, BDCG will look to capitalize on commodity and energy provider's needs for more precise risk management services, more informed operational planning and more strategic decision-making, specifically as they all relate to the trading of index, futures and commodities. In December 2017, the Company acquired 20% equity interest of BDCG from Tiger Sports Media Limited, which gave the Company 60% total equity interest, and BDCG would become one subsidiary of the Company. The valuation report of BDCG was received post-signing of the BDCG Purchase Agreement with both parties agreeing that there is no obligation to close the Transaction until a satisfactory valuation report has been received, evaluated and approved by the Company's Audit Committee. On April 24, 2018, the Audit Committee approved the satisfactory valuation report provided by an independent third party and closed this transaction.

**Recent Developments**

The Company has strategically secured a management team with diversified expertise in operations, technology, fintech, blockchain, AI, capital markets and the financial services industry.

The Company's Chairman and Chief Executive Officer, Dr. Bruno Wu is an experienced investor, technology and media entrepreneur, and philanthropist. Dr. Wu has been actively involved with blockchain based and big data technologies since October 2011. After four years of investment and research, in 2015, Dr. Wu and his companies proceeded to execute the strategy of becoming a leader in fintech and asset digitization services by aggregating AI, blockchain and other big data and Cloud based technologies, carefully sourced and selected on a global basis through joint ventures and partnerships. These partnerships focus on customizing and enabling actual business use case applications. Dr. Wu actively participated in the build out of the worlds leading big data hub in Guiyang, China, particularly by endorsing the integration with AI and blockchain. Currently Dr. Wu has committed to transforming the Company into a flagship for fintech and asset digitization services, with multiple use case technology engines to be rolled out.

The Company's Chief Financial Officer, Mr. Federico Tovar, is a seasoned business professional and subject matter expert in AI, FinTech, Blockchain, IoT and cybersecurity. He was previously the Chief Financial and Strategy Officer of Global Data Sentinel Inc, a privately held and high growth cybersecurity and AI technology company that supports data security across domains, including network, Cloud, mobile and IoT, with AI capabilities and next-generation applications in Blockchain, FinTech, energy, insurance, healthcare, and media industries, amongst others. He previously was a Director at Grant Thornton LLP, where he was responsible for advisory assignments during the global financial crisis, advising global private equity firms, hedge funds, and other large-scale financial institutions and insurance companies on their investment portfolios and matters related to complex financial instruments, derivatives, and other hard to price securities. In addition, he was part of large-scale and global multidisciplinary audit assignments involving companies in the United States, Europe and Asia, and served as a subject matter expert to audit teams on various Fair Value and IFRS matters. He also spent time with Ernst & Young's Corporate Finance practice in New York, where he provided M&A, valuation, and corporate restructuring advisory to large-scale Fortune 500 technology companies. He started his career in strategy and management consulting at Booz Allen Hamilton, exposing him to technology and innovation early on in his career, advising some of the world's largest private and government organizations. In addition, he spent time at the World Bank, working closely on fixed income securities and debt instruments with Central Banks and Finance Ministers across emerging markets in Asia and Latin America.

Mr. Tovar has managed corporate, financial reporting, legal and investor relations matters, along with all daily operations and fiduciary duties at the executive and board level; including financial reporting and accounting pursuant to GAAP and IFRS, as well as tax and international transfer pricing matters across foreign tax jurisdictions. Mr. Tovar has developed strategic plans and business models, structured various intellectual property and technology licensing deals, closed on various M&A transactions and debt and equity financing rounds, and formulated corporate growth and financial strategies for technology companies which have resulted in measurable execution strategies. He is a seasoned finance professional and entrepreneur in the technology ecosystem, and a subject matter expert in FinTech, Blockchain, AI, IoT, and cybersecurity.

Chad Arroyo, the Company's Chief Marketing Officer, is well-versed in blockchain technology, its uses in fintech platforms, financial transactions and various technology implementations on both public and private blockchain systems, and has developed operational and systems level experience in transaction management, order routing and management, digital securities, issuers services and funding portal operations, custodial wallet management, exchange operations, KYC/AML procedures.

Mr. Arroyo was deeply involved with marketing as well as general consulting and project management for Fundamental Interactions and the Delaware Board of Trade that together deliver a suite of blockchain capabilities for the issuance, trading and settlement of digital assets. Mr. Arroyo was previously a startup cofounder of SaaS-based platforms that were designed to integrate 3rd party payment and reporting systems for B2B transactions. Mr. Arroyo has worked with startups that are developing fintech solutions and has gained substantial experience in enterprise technology systems design, development and implementation through his experience as a Deloitte Technology Strategy Consultant as well as during his military career where he specialized in Defense telecommunications following his graduation from the US Naval Academy.

**Principal Factors Affecting Our Financial Performance**

Our operating results are primarily affected by the following factors:

- ***Our ability to transform our business and to meet internal or external expectations of future performance***. We are aiming to become a next generation Artificial-Intelligent (AI) & Blockchain-Powered, Fintech company. By managing and providing an infrastructure and environment that facilitates the transformation of traditional financial markets such as commodities, currency and credit into the asset digitalization era, SSC hopes to provide asset owners and holders a seamless method and platform for digital asset securitization, tokenization and trading. Separately, SSC offers a closed supply chain trading ecosystem for corporate buyers and sellers designed to eliminate standard transactional intermediaries and create a more direct and margin-expanding path for principals. In connection with this transformation, the Company is in the process of considerable changes, which including attempting to assemble a new management team, reconfiguring the business structure, and expanding the Company's mission and business lines. It is uncertain whether these efforts will prove beneficial or whether we will be able to develop the necessary business models, infrastructure and systems to support the business. This includes having or hiring the right talent to execute our business strategy. Market acceptance of new product and service offerings will be dependent in part on our ability to include functionality and usability that address customer requirements, and optimally price our products and services to meet customer demand and cover our costs.

- ***Our ability to make our products remain competitive***. Our current electronic and crude oil products and services compete in highly competitive global markets characterized by aggressive price competition and resulting downward pressure on gross margins, frequent introduction of new products, short product life cycles, evolving industry standards, continual improvement in product price/performance characteristics, rapid adoption of technological and product advancements by competitors and price sensitivity on the part of consumers. As part of our blockchain and AI focused strategy, we are currently focused on consumer electronics and the crude oil trading business in supply chain management with the intent to migrate this on to the blockchain with AI capabilities. As such, the company is co-developing the underlying technology platform with its technology partner with an aim to become a smart supply chain management platform with one token as means of settlement and digital wallet function. In the near future, once the technology platform is fully functional, the company will bring customers of traditional 3C consumer electronics business and crude oil trading business onto the platform, which will greatly improve the efficiency of capital utilization and inventory turnover for both consumer electronics and crude oil business by cutting middle-man cost. The above technology platforms will help both the consumer electronic and crude oil business to transform from supply chain only operations into digital ecosystem management platform.

**Taxation**

*United States*

Seven Stars Cloud Group, Inc. and M. Y. Products, LLC are subject to United States tax. No provision for income taxes in the United States has been made as both companies had no taxable profit in the United States since inception. Under U.S. Tax Reform Seven Stars Cloud Group, Inc. is required to pay, a one-time transition tax on certain unrepatriated earnings from non-U.S. subsidiaries that is payable over eight years. We have subsequently determined that there is only less than $150,000 unrepatriated earnings for each non-U.S. subsidiary in aggregate. Therefore, only a minimal tax is due under this provision.

*Cayman Islands and the British Virgin Islands*

Under the current laws of the Cayman Islands and the British Virgin Islands, we are not subject to tax on our income or capital gains. In addition, dividend payments are not subject to withholding tax in the Cayman Islands or British Virgin Islands.

*Hong Kong*

Our subsidiaries that were incorporated in Hong Kong were under the current laws of Hong Kong, are subject to Profits Tax of 16.5%. No provision for Hong Kong Profits Tax has been made as net operating loss carryovers offset current taxable income.

*The People's Republic of China*

Under the PRC's Enterprise Income Tax Law, our Chinese subsidiaries and VIEs are subject to an earned income tax of 25.0%.

Our future effective income tax rate depends on various factors, such as tax legislation, the geographic composition of our pre-tax income and non-tax deductible expenses incurred. Our management carefully monitors these legal developments to determine if there will be any change in the statutory income tax rate.

**Consolidated Results of Operations**

**Comparison of Three Months Ended June 30, 2018 and 2017**

|  | Three Months Ended | | Amount Change | % Change |
|---|---|---|---|---|
|  | June 30, 2018 | June 30, 2017 | | |
| Revenue | $ 132,986,538 | $ 43,327,868 | $ 89,658,670 | 207% |
| Cost of revenue | 131,454,004 | 43,272,723 | 88,181,281 | 204% |
| **Gross profit** | **1,532,534** | **55,145** | **1,477,389** | **2679%** |
|  |  |  |  |  |
| Operating expense: |  |  |  |  |
| Selling, general and administrative expenses expenses | 8,790,167 | 2,992,230 | 5,797,937 | 194% |
| Research and development | 679,587 | - | 679,587 | 100% |
| Professional fees | 640,365 | 777,583 | (137,218) | (18)% |
| Impairment of other intangible assets | - | 63,621 | (63,621) | (100)% |
| Depreciation and amortization | 13,020 | 61,100 | (48,080) | (79)% |
|  |  |  |  |  |
| **Total operating expense** | **10,123,139** | **3,894,534** | **6,228,605** | **160%** |
|  |  |  |  |  |
| **Loss from operations** | **(8,590,605)** | **(3,839,389)** | **(4,751,216)** | **124%** |
| Interest expense, net | (28,137) | (3,448) | (24,689) | 716% |
| Change in fair value of warrant liabilities | - | 26,117 | (26,117) | (100)% |
| Equity in loss of equity method investees | (10,691) | (33,090) | 22,399 | (68)% |
| Others | 18,512 | (11,030) | 29,542 | (268)% |
|  |  |  |  |  |
| **Loss before income taxes** | **(8,610,921)** | **(3,860,840)** | **(4,750,081)** | **123%** |
|  |  |  |  |  |
| Income tax benefit | - | - | - | 0% |
|  |  |  |  |  |
| **Net loss** | **(8,610,921)** | **(3,860,840)** | **(4,750,081)** | **123%** |
|  |  |  |  |  |
| Net loss attributable to non-controlling interest | 290,897 | 57,221 | 233,676 | 408% |
|  |  |  |  |  |
| **Net loss attributable to Seven Stars Cloud Group, Inc. shareholders** | $ **(8,320,024)** | $ **(3,803,619)** | $ **(4,516,405)** | **119%** |

*Revenues*

For 2017, through the acquisition and operation of the SVG and WAG, two new revenue sources were acquired and started to generate financial results – supply chain management and structured/alternative finance for carry trade businesses. The Company is currently primarily engaged with consumer electronics and smart supply chain management operations. Our end customers include about 15 to 20 corporations across the world. Starting from October 2017, through partnership with another business partner, our newly controlled Singapore joint venture has been conducting oil trading business in Singapore. Other than the trading business that Company already operated in 2017, the Company also intends to run the engine upon its Venus blockchain based platform, which includes TPaaS & VPaaS system. As of fourth quarter of 2017, TPaaS system went into trial operation. A significant portion of our operations will consist of these new lines of business, however since these are new business lines, customer demand is in the process of being validated, and the global regulatory environment is constantly adapting to these new fintech products and technologies so it is not reasonable to make a definitive prediction at this time. These services will be offered globally from our New York and China offices.

On January 30, 2017, the Company completed the acquisition of Sun Video Group HK Limited ("SVG"), which has a 51% ownership stake in Shanghai Wecast Supply Chain Management Limited ("Wecast SH"). On January 31, 2017, the Company acquired 55% of the outstanding capital stock of Wide Angle Group Limited ("Wide Angle"). The holdings and businesses from both of these aforementioned acquisitions now reside under "Wecast Services", our wholly-owned subsidiary Wecast Services Limited. Wecast Services business unit, is currently primarily engaged with consumer electronics and smart supply chain management operations. Our ending customers are about 15 to 20 other corporations across the world. Starting from October 2017, through partnership with another business partner, our newly controlled Singapore joint venture has been conducting oil trading business in Singapore.

| | 2018Q2 | | 2017Q2 | Diff | |
| --- | --- | --- | --- | --- | --- |
| | USD | % | USD | USD | % |
| Wecast Services | 132,986,538 | 100% | 43,327,868 | 89,658,670 | 207% |
| **Total** | **132,986,538** | **100%** | **43,327,868** | **89,658,670** | **207%** |

Revenue for the three months ended June 30, 2018 was $133.0 million as compared to $43.3 million for the same period in 2017, an increase of approximately $89.7 million, or 207%. The increase was mainly due to our expanding business of crude oil trading initiated in October 2017.

*Cost of revenues*

| | 2018Q2 | | 2017Q2 | Diff | |
| --- | --- | --- | --- | --- | --- |
| | USD | % | USD | USD | % |
| Wecast Services | 131,454,004 | 100% | 43,272,723 | 88,181,281 | 204% |
| **Total** | **131,454,004** | **100%** | **43,272,723** | **88,181,281** | **204%** |

Cost of revenues was approximately $131.5 million for the three months ended June 30, 2018, as compared to $43.3 million for the three months ended June 30, 2017. Our cost of revenues increased by $88.2 million which is in line with our increase in revenues. Our cost of revenues is primarily comprised of costs to purchase electronics products and crude oil from suppliers in our supply chain.

*Gross profit*

| | 2018Q2 | | 2017Q2 | Diff | |
| --- | --- | --- | --- | --- | --- |
| | USD | % | USD | USD | % |
| Wecast Services | 1,532,534 | 100% | 55,145 | 1,477,389 | 2679% |
| **Total** | **1,532,534** | **100%** | **55,145** | **1,477,389** | **2679%** |

Our gross profit for the three months ended June 30, 2018 was approximately $1.5 million, as compared to gross profit in the amount of $0.06 million during the same period in 2017. The gross profit ratio for the three months ended June 30, 2018 was 1.15%, while in 2017, it was 0.13%. The increase was mainly due to the gross profit ratio of our consumer electronics increased compared to the same period in 2017.

*Selling, general and administrative expenses*

Selling, general and administrative expense for the three months ended June 30, 2018 was $8.8 million as compared to $3.0 million for the same period in 2017, an increase of approximately $5.8 million or 194%.

The majority of the increase was due to 1) an increase in headcounts and relevant traveling expense in the amount of $1.2 million; 2) an increase of approximately $3.4 million in share based compensation that were paid to our employees; 3) an increase in our sales and marketing expense in the amount of $0.7 million relating to the introduction and promotion of our business models to various potential investors and business partners, as well as the marketing of Wecast Services, which was acquired in January 2017; 4) an increase in office rent expense of $0.4 million in 2018 Q2 related to an increase in headcount.

*Professional fees*

Professional fees are generally related to public company reporting and governance expenses as well as legal fees related to business transition and expansion. Professional fees for the three months ended June 30, 2018 were $0.6 million as compared to $0.8 million for the same period in 2017, a decrease of approximately $0.2 million. This decrease was mainly related to the decrease in auditing service fees in 2018Q2.

*Depreciation and amortization*

Depreciation and amortization for the three months ended June 30, 2018 was $0.01 million as compared to $0.06 million for the same period in 2017, a decrease of approximately $0.05 million. The decrease was mainly due to the sale of our Beijing office building in 2017.

*Change in fair value of warrant liabilities*

Certain of our warrants are recognized as derivative liabilities and re-measured at the end of every reporting period and upon settlement, with the change in value reported in the statement of operations. We reported a gain in the fair value of warrant liabilities of $0.03 million for the three months ended June 30, 2017. All the remaining warrant liabilities have been expired as of August 30, 2017.

*Income tax expenses*

The income tax expense for the three months ended June 30, 2018 is nil because net operating loss carryovers offset current taxable income and deferred tax assets related to the net operating loss carryovers utilized had been offset by a valuation allowance.

*Net loss attributable to non-controlling interest*

Hua Cheng previously had a 20% non-controlling interest in Zhong Hai Media and accounting for that interest under the equity method was recognized by recording 20% of the operating losses of Zhong Hai Media. For the three months ended June 30, 2017, operating loss attributable to Hua Cheng was approximately $0.1 million. The Company sold Zhong Hai Media on June 30, 2017 and there have been no more such allocations since then.

Dillon Yu has a 49% non-controlling interest in Shanghai Wecast Supply Chain Management Limited ("Wecast SH") and as such we allocate 49% of the operating loss of Wecast SH to Dillon Yu. During the three months ended June 30, 2018, approximately $760 of our operating loss from Wecast SH was allocated to Dillon Yu, which was approximately $0.2 million in the same period in 2017.

Swiss Guorong Limited has a 45% non-controlling interest in Wide Angle and as such we allocate 45% of the operating profit of Wide Angle to Swiss Guorong Limited. During the three months ended June 30, 2018, approximately $0.2 million of our operating loss from Wide Angle was allocated to Swiss Guorong Limited, which was approximately $0.01 million in the same period in 2017.

**Comparison of Six Months Ended June 30, 2018 and 2017**

| | Six Months Ended | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2018 | June 30, 2017 | Amount Change | % Change |
| Revenue | $ 318,920,359 | $ 76,495,611 | $ 242,424,748 | 317% |
| Cost of revenue | 316,994,689 | 72,615,141 | 244,379,548 | 337% |
| **Gross profit** | **1,925,670** | **3,880,470** | **(1,954,800)** | **(50)%** |
| | | | | |
| Operating expense: | | | | |
| Selling, general and administrative expenses | 12,528,166 | 4,337,076 | 8,191,090 | 189% |
| Research and development | 725,609 | - | 725,609 | 100% |
| Professional fees | 1,353,298 | 1,048,525 | 304,773 | 29% |
| Impairment of other intangible assets | - | 63,621 | (63,621) | (100)% |
| Depreciation and amortization | 23,225 | 257,320 | (234,095) | (91)% |
| | | | | |
| **Total operating expense** | **14,630,298** | **5,706,542** | **8,923,756** | **156%** |
| | | | | |
| **Loss from operations** | **(12,704,628)** | **(1,826,072)** | **(10,878,556)** | **596%** |
| Interest expense, net | (56,172) | (44,750) | (11,422) | 26% |
| Change in fair value of warrant liabilities | - | (243,999) | 243,999 | (100)% |
| Equity in loss of equity method investees | (30,434) | (76,836) | 46,402 | (60)% |
| Others | 367,500 | (110,600) | 478,100 | (432)% |
| | | | | |
| **Loss before income taxes** | **(12,423,734)** | **(2,302,257)** | **(10,121,477)** | **440%** |
| | | | | |
| Income tax benefit | - | - | - | 0% |
| | | | | |
| **Net loss** | **(12,423,734)** | **(2,302,257)** | **(10,121,477)** | **440%** |
| Net loss attributable to non-controlling interest | 382,341 | 631,633 | (249,292) | (39)% |
| | | | | |
| **Net loss attributable to Seven Stars Cloud Group, Inc. shareholders** | **$ (12,041,393)** | **$ (1,670,624)** | **$ (10,370,769)** | **621%** |

*Revenues*

| | Six months ended June 30, 2018 | | Six months ended June 30, 2017 | Diff | |
| | USD | % | USD | USD | % |
|---|---|---|---|---|---|
| Legacy YOD | - | - | 794,273 | (794,273) | (100)% |
| Wecast Services | 318,920,359 | 100% | 75,701,338 | 243,219,021 | 321% |
| **Total** | **318,920,359** | **100%** | **76,495,611** | **242,424,748** | **317%** |

Revenue for the six months ended June 30, 2018 was $318.9 million as compared to $76.5 million for the same period in 2017, an increase of approximately $242.4 million, or 317%. The increase was mainly due to our expanding business of crude oil trading initiated in October 2017. This increase was partially offset by a decrease of our legacy YOD business in the amount of $0.8 million, as the legacy YOD business shifts to a new exclusive distribution agreement with Zhejiang Yanhua Culture Media Co., Ltd., or Yanhua, which was announced in the fourth quarter of 2016.

In October, 2016, the Company signed an agreement to form a five years' partnership with Yanhua, where Yanhua will act as the exclusive distribution operator (within the territory of PRC) of the Company's licensed library of major studio films. Pursuant to the Yanhua agreement, the existing legacy Hollywood studio paid content as well as other IP content specified in the agreement, along with the corresponding authorized rights letter that the Company is entitled to, will be transferred over to Yanhua, which was agreed to be priced at RMB13,000,000 (approximately $2 million). According to the agreement, as a whole package, the payment is agreed to be paid in two installments equally in the amount of RMB6,500,000. As of the June 30, 2018, the Company only received the first installments and recorded it as revenue within Legacy YOD business, however, considering the second installment was due to be received if the license content fees due to studios for the existing legacy Hollywood paid contents was settled, while the Company did not expect and did not make the payment to the studios, we deemed this portion of the fee to be not fixed or determinable and therefore, this portion of the revenue did not meet the revenue recognition criteria to be recognized as of June 30, 2018. Meanwhile, as revenue generated by Yanhua did not exceed the revenue sharing threshold, no additional revenue was recorded.

In January, 2017, the Company completed acquisitions of SVG and Wide Angle. Within the Wecast Services segment, the Company conducted its supply chain business in different industrial vehicles. As of June 30, 2018, the Company had already set up two industrial vehicles for commercial electronics in Hong Kong and crude oil trading in Singapore. The Company expects to use its own platforms to expand its supply chain business.

*Gross profit*

| | 2018 1-6 | | 2017 1-6 | Diff | |
| | USD | % | USD | USD | % |
|---|---|---|---|---|---|
| Legacy YOD | - | - | 31,659 | (31,659) | (100)% |
| Wecast Services | 1,925,670 | 100% | 3,848,811 | (1,923,141) | (50)% |
| **Total** | **1,925,670** | **100%** | **3,880,470** | **(1,954,800)** | **(50)%** |

Our gross profit for the six months ended June 30, 2018 was approximately $1.9 million, as compared to gross profit in the amount of $3.9 million during the same period in 2017. The gross profit ratio for the six months ended June 30, 2018 was 0.60%, while in 2017, it was 5.07%. The decrease was mainly due to the low gross profit margin of the crude oil trading business which has expanded and caused our gross profit margin ratio to decrease significantly.

*Selling, general and administrative expenses*

Our selling, general and administrative expenses for the six months ended June 30, 2018 increased approximately $8.2 million, or 189%, as compared with the amount for the six months ended June 30, 2017. The majority of the increase was due to 1) an increase in headcounts and relevant traveling expense in the amount of $2.3 million; 2) an increase of approximately of $3.4 million in share based compensation that were paid to our employees; 3) an increase of approximately of $0.9 million in consulting service fees that were paid to our external consultants who provided various consulting services with respect to our on-going financial digital assets business; 4) an increase in our sales and marketing expense in the amount of $1.6 million relating to the introduction and promotion of our business models to various potential investors and business partners, as well as the marketing of Wecast Services, which was acquired in January 2017.

***Professional fees***

Professional fees are generally related to public company reporting and governance expenses as well as legal fees related to business transition and expansion. Our costs for professional fees increased approximately $0.3 million, or 29%, to $1.4 million for the six months ended June 30, 2018, compared with the same period in 2017. The increase was related to an increase in auditing service fees and the valuation service fees incurred in relation to the acquisitions in 2018Q1.

***Depreciation and amortization***

Depreciation and amortization for the six months ended June 30, 2018 was $0.02 million as compared to $0.26 million for the same period in 2017, a decrease of approximately $0.24 million. The decrease was mainly due to the sale of our Beijing office building in 2017.

***Change in fair value of warrant liabilities***

Certain of our warrants are recognized as derivative liabilities and re-measured at the end of every reporting period and upon settlement, with the change in value reported in the statement of operations. We reported a loss in the fair value of warrant liabilities of $0.2 million for the six months ended June 30, 2017. All the remaining warrant liabilities have been expired as of August 30, 2017.

---

*Net loss attributable to non-controlling interest*

Hua Cheng previously had a 20% non-controlling interest in Zhong Hai Media and accounting for that interest under the equity method was recognized by recording 20% of the operating losses of Zhong Hai Media. During the six months ended June 30, 2017, approximately $0.03 million of our operating profit from Zhong Hai Media was allocated to Hua Cheng. The Company sold Zhong Hai Media on June 30, 2017 and there have therefore no more such allocations since then.

Dillon Yu has a 49% non-controlling interest in Shanghai Wecast Supply Chain Management Limited ("Wecast SH") and as such we allocate 49% of the operating loss of Wecast SH to Dillon Yu. During the six months ended June 30, 2018, approximately $1,035 of our operating loss from Wecast SH was allocated to Dillon Yu, which was $0.6 million in the same period in 2017.

Swiss Guorong Limited has a 45% non-controlling interest in Wide Angle and as such we allocate 45% of the operating profit of Wide Angle to Swiss Guorong Limited. During the six months ended June 30, 2018, approximately $0.2 million of our operating loss from Wide Angle was allocated to Swiss Guorong Limited, which was $0.03 million in the same period in 2017.

**Liquidity and Capital Resources**

As of June 30, 2018, the Company had cash of approximately $1.8 million. Approximately $0.8 million was held in our Hong Kong, US and Singapore entities and $1.0 million was held in our mainland China entities. The Company has no plans to repatriate these funds.

As discussed in Note 2 to the consolidated financial statements included in this report, the Company has incurred significant continuing losses in 2018 and 2017, and total accumulated deficits were $138.7 million and $126.7 million as of June 30, 2018 and December 31, 2017, respectively. The Company also used cash for operations of approximately $11.4 million and $1.7 million for the six months ended June 30, 2018 and 2017, respectively. We must continue to rely on proceeds from debt and equity issuances to fund ongoing operating expenses to date, which could raise substantial doubt about the Company's ability to continue as a going concern. Management's plans regarding these matters are also described in Note 2 to the consolidated financial statements in this report. The consolidated financial statements included in this report have been prepared assuming that the Company will continue as a going concern and, accordingly, do not include any adjustment that might result from the outcome of this uncertainty.

On March 28, 2016, we completed a common stock financing for $10.0 million. On July 19, 2016, we completed a stock financing with SSW for $4.0 million. On August 12, 2016, we completed a common stock financing with Harvest Alternative Investment Opportunities SPC for $4.0 million. On November 17, 2016, we completed a common stock financing with SSSHK for $2.0 million. On May 19, 2017, we completed a common stock financing with certain investors, including officers, directors and other affiliates of the Company for $2.0 million. In addition, we completed a common stock financing with Hong Kong Guo Yuan Group Capital Holdings Limited for $10 million on October 23, 2017. In March 2018, the Company entered into a common stock financing with GT Dollar Pte. Ltd., for a private placement totaling $40.0 million, which agreement was subsequently amended and restated on June 28, 2018 to reduce such investment to $10.0 million (See Note 9). The Company has received $5.3 million and expects to receive the remaining $4.7 million in the third quarter. The Company entered into a Convertible Note Purchase Agreement with Advantech Capital Investment II Limited on June 28, 2018 for $12.0 million. The funds were delivered on July 5, 2018. Although the Company may attempt to raise funds by issuing debt or equity instruments, additional financing may not be available to the Company on terms acceptable to the Company or at all or such resources may not be received in a timely manner.

The following table provides a summary of our net cash flows from operating, investing and financing activities.

| | Six Months Ended | |
| --- | --- | --- |
| | June 30, 2018 | June 30, 2017 |
| Net cash used in operating activities | $ (11,423,711) | $ (1,727,356) |
| Net cash used in investing activities | (456,438) | (860,535) |
| Net cash provided by financing activities | 6,453,520 | 1,957,280 |
| Effect of exchange rate changes on cash | (12,896) | 40,130 |
| Net decrease in cash | (5,439,525) | (590,481) |
| Cash at beginning of period | 7,577,317 | 4,079,769 |
| Cash at end of period | $ 2,137,792 | $ 3,489,288 |

*Operating Activities*

Cash used in operating activities increased by $9.7 million for the six months ended June 30, 2018 compared to 2017, primarily due to an increase in accounts receivable because of a longer turnover period.

*Financing Activities*

We received $6.5 million proceeds in a private placement from the issuance of common shares, warrant and options for six months period ended June 30, 2018, to certain investors, including officers, directors and other affiliates.

**Effects of Inflation**

Inflation and changing prices have had an effect on our business and we expect that inflation or changing prices could materially affect our business in the foreseeable future. Our management will closely monitor the price change and make efforts to maintain effective cost control in operations.

**Off Balance Sheet Arrangements**

We do not have any off balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity or capital expenditures or capital resources that is material to an investor in our securities.

**Seasonality**

Our operating results and operating cash flows historically have not been subject to seasonal variations. However, we expect a disproportionate amount of our revenues generated from Wecast Services quarter over quarter to be subject to seasoned fluctuations at holiday periods and due to introduction of new products. This pattern may change, however, as a result of new market opportunities or new product introductions.

**Critical Accounting Policies**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires our management to make assumptions, estimates, and judgments that affect the amounts reported, including the notes thereto, and related disclosures of commitments and contingencies, if any. We have identified certain accounting policies that are significant to the preparation of our financial statements. These accounting policies are important for an understanding of our financial condition and results of operations. Critical accounting policies are those that are most important to the portrayal of our financial condition and results of operations and require management's difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Certain accounting estimates are particularly sensitive because of their significance to financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following critical accounting policies involve the most significant estimates and judgments used in the preparation of our financial statements.

*Variable Interest Entities*

We account for entities qualifying as variable interest entities ("VIEs") in accordance with Financial Accounting Standards Boards ("FASB") Accounting Standards Codification ("ASC") Topic 810, *Consolidation*. For our consolidated VIEs, management has made evaluations of the relationships between our VIEs and the economic benefit flow of contractual arrangement with VIEs. In connection with such evaluation, management also took into account the fact that, as a result of such contractual arrangements, we control the legal shareholders' voting interests and have power of attorney in the VIEs, and therefore we are able to direct all business activities of the VIEs. As a result of such evaluation, management concluded that we are the primary beneficiary of our consolidated VIEs.

We have consulted our PRC legal counsel in assessing our ability to control our PRC VIEs. Any changes in PRC laws and regulations that affect our ability to control our PRC VIEs may preclude us from consolidating these companies in the future.

41

*Revenue Recognition*

In the first quarter of 2018, we adopted ASU 2014-09, Revenue from Contracts with Customers (Topic 606), using the modified retrospective method. Topic 606 requires revenue to be recognized when promised goods or services are transferred to customers in amounts that reflect the consideration to which the Company expects to be entitled in exchange for those goods or services. Because the Company's primary source of revenues is from industrial trading business, the impact on its consolidated financial statements is not material.

Product sales, including electronic products and crude oil sales are recognized when or as we transfer control of the promised products to our customer. Revenue is measured as the amount of consideration we expect to receive in exchange for transferring goods. Sales orders are confirmed after negotiation on price between customers and us. Purchase orders are confirmed after careful selection of suppliers and negotiation on price. Company purchases finished goods from suppliers in accordance with sales orders from customers. Our suppliers then deliver goods to our customers directly. Company is required to bear the direct risk of damage to the goods that the direct default risk that cannot be delivered to the customer. When the delivery is completed, company recognizes revenue and the related cost at the same time. According to purchase orders with suppliers, company, as the owner of the goods, becomes the first responsible party for the goods. Therefore, the Company accounts for revenue from sales of goods on a gross basis. The Company is the primary obligor in the arrangements, as company has the ability to establish prices, and has discretion in selecting the independent suppliers and other third-party that will perform the delivery service, the Company is responsible for the defective products and the Company bears credit risk with customer payments. Accordingly, all such revenue billed to customers is classified as revenue and all corresponding payments to suppliers are classified as cost of revenues.

For certain contracts that involve sub-licensing content within the specified license period, revenue is recognized upon delivery of films when the arrangement includes a nonrefundable minimum guarantee, delivery is complete and we have no substantive future obligations to provide future additional services. Payments received from customers for the performance of future services are recognized as deferred revenue, and subsequently recognized as revenue in the period that the service obligations are completed.

*Licensed Content*

We obtain content through content licensing agreements with studios and distributors. We recognize licensed content when the license fee and the specified content titles are known or reasonably determinable. Prepaid license fees are classified as an asset on the consolidated balance sheets as licensed content and accrued license content fees payable are classified as a liability on the consolidated balance sheets.

We amortize licensed content in cost of revenues over the contents contractual window of availability based on the expected revenue derived from the licensed content, beginning with the month of first availability, such that our revenues bear a representative amount of the cost of the licensed content. We review factors that impact the amortization of licensed content on a regular basis, including factors that may bear direct impact on expected revenue from specific content titles. We estimate expected revenue by reviewing relevant factors, including marketing considerations, programming efforts, relationship with our channel partners, expected customer renewals and content offered by other distributors on the same platform. Changes in our expected revenue from licensed content could have a significant impact on our amortization pattern.

*Standards Issued and Not Yet Implemented*

In February 2016, the Financial Accounting Standards Board issued Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842). The new standard is effective for reporting periods beginning after December 15, 2018 and early adoption is permitted. The standard will require lessees to report most leases as assets and liabilities on the balance sheet, while lessor accounting will remain substantially unchanged. The standard requires a modified retrospective transition approach for existing leases, whereby the new rules will be applied to the earliest year presented. We do not expect the new lease standard to have a material effect on our financial position, results of operations or cash flows.

In June 2016, the FASB issued ASU 2016-13, "Financial Instruments—Credit Losses (Topic 326)". The pronouncement changes the impairment model for most financial assets, and will require the use of an "expected loss" model for instruments measured at amortized cost. Under this model, entities will be required to estimate the lifetime expected credit loss on such instruments and record an allowance to offset the amortized cost basis of the financial asset, resulting in a net presentation of the amount expected to be collected on the financial asset. This pronouncement is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019. We do not expect a material impact to its consolidated financial statement upon adoption of this ASU.

42

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

We are a smaller reporting company as defined by Rule 12b-2 of the Securities Exchange Act of 1934 and are not required to provide the information under this item.

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) that are designed to ensure that information that would be required to be disclosed in Exchange Act reports is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including to our Chief Executive Officer and Chief Financial Officer , as appropriate, to allow timely decisions regarding required disclosure.

As required by Rule 13a-15 under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of June 30, 2018. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that as of June 30, 2018, and as of the date that the evaluation of the effectiveness of our disclosure controls and procedures was completed, our disclosure controls and procedures were not effective to satisfy the objectives for which they are intended, as a result of one material weakness described below.

**Changes in Internal Control Over Financial Reporting**

On April 6, 2018, Mr. Simon Wang resigned from his position as Chief Financial Officer ("CFO") of the Company. On April 11, 2018, the Board unanimously appointed its previous Finance Director, Mr. Jason Wu, as the interim CFO and principal accounting officer of the Company, effective immediately. On June 1, 2018, the Board appointed Mr. Federico Tovar as CFO of the Company.

In 2016, a material weakness identified in the internal control of financial reporting related to the design, documentation and implementation of effective internal controls over the review of the cash flow forecasts used in the accounting for licensed content recoverability. Specifically, the Company did not design and maintain effective internal controls related to management's review of the data inputs and assumptions used in its cash flow forecasts for licensed content recoverability. Management believes that this material weakness still exists even though we may no longer operate any license content business in the future. Management believes this material weakness still exists as of the issuance of this quarterly report.

Other than the changes stated above, there have been no other significant changes in internal control for the six months ended June 30, 2018, which have materially affected or would likely materially affect our internal control over financial reporting. The Company continues to invest resources in order to upgrade internal controls.

**PART II – OTHER INFORMATION**

**Item 1. Legal Proceedings**

There are no material pending legal proceedings to which we are a party or to which any of our property is subject. To the best of our knowledge, no such actions against us are contemplated or threatened.

**Item 1A. Risk Factors**

In addition to the other information set forth in this report, you should carefully consider the factors discussed in Part I, "Item 1A. Risk Factors" in our 2017 Annual Report which could materially affect our business, financial condition or future results. The risks described in our Annual Report on Form 10-K are not the only risks facing our Company. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition or future results. Other than as noted below, there have been no material changes in the risk factors from those disclosed in the Annual Report on Form 10-K for the year ended December 31, 2017.

*The Company is in the process of transforming its business model and this transformation may not be successful.*

2018 has been a year of transition from the Company's legacy business to the Company's new business. The Company is aiming to become a next generation Artificial-Intelligent (AI) & Blockchain-Powered, Fintech company. By managing and providing an infrastructure and environment that facilitates the transformation of traditional financial markets such as commodities, currency and credit into the asset digitalization era, SSC hopes to provide asset owners and holders a seamless method and platform for digital asset securitization, tokenization and trading. Separately, SSC is aiming to offer a closed supply chain trading ecosystem for corporate buyers and sellers designed to eliminate standard transactional intermediaries and create a more direct and margin-expanding path for principals.

As part of our strategy to become a leading AI and Blockchain enabled Fintech services company, SSC aims to be a digital asset manager of a portfolio of digital assets across industry verticals. In this capacity, the Company's strategy utilizes AI and Blockchain technologies to build out its ecosystem.

In connection with this transformation, the Company has recently assembled a new experienced management team, stabilized the foundation, capitalized and rebranded the Company, reconfigured the business structure, expanded the Company's mission and business lines, made several key investments and finally, injected several privately held and revenue producing assets into the corporation. It is uncertain whether these efforts will prove beneficial or whether we will be able to develop the necessary business models, infrastructure and systems to support the business. This includes having or hiring the right talent to execute our business strategy. Market acceptance of new product and service offerings will be dependent in part on our ability to include functionality and usability that address customer requirements, and optimally price our products and services to meet customer demand and cover our costs.

Any failure to implement this plan in accordance with our expectations could have a material adverse effect on our financial results. Even if the anticipated benefits and savings are substantially realized, there may be consequences, internal control issues, or business impacts that were not expected. Additionally, as a result of our restructuring efforts in connection with our business transformation plan, we may experience a loss of continuity, loss of accumulated knowledge or loss of efficiency during transitional periods. Reorganization and restructuring can require a significant amount of management and other employees' time and focus, which may divert attention from operating activities and growing our business. If we fail to achieve some or all of the expected benefits of these activities, it could have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows.

*The Company experiences significant competitive pressure, which may negatively impact its results.*

The market for the Company's products and services is very competitive and subject to rapid technological advances, new market entrants, non-traditional competitors, changes in industry standards and changes in customer needs and consumption models. Not only does the Company compete with global distributors, it also competes for customers with regional distributors and some of the Company's own suppliers that maintain direct sales efforts. In addition, as the Company expands its offerings and geographies, the Company may encounter increased competition from current or new competitors. The Company's failure to maintain and enhance its competitive position could adversely affect its business and prospects. Furthermore, the Company's efforts to compete in the marketplace could cause deterioration of gross profit margins and, thus, overall profitability.

The size of the Company's competitors varies across market sectors, as do the resources the Company has allocated to the sectors and geographic areas in which it does business. Therefore, some competitors may have greater resources or a more extensive customer or supplier base than the Company has in one or more of its market sectors and geographic areas, which may result in the Company not being able to effectively compete in certain markets which could impact the Company's profitability and prospects.

***Our International Operations Expose Us to a Number of Risks***

Our international activities are significant to our revenues and profits, and we plan to further expand internationally. In certain international market segments, we have relatively little operating experience and may not benefit from any first-to-market advantages or otherwise succeed. It is costly to establish, develop, and maintain international operations and platforms, and promote our brand internationally.

Our international sales and operations are subject to a number of risks, including:

- local economic and political conditions;
- government regulation of e-commerce and other services, electronic devices, and competition, and restrictive governmental actions (such as trade protection measures, including export duties and quotas and custom duties and tariffs), nationalization, and restrictions on foreign ownership;
- restrictions on sales or distribution of certain products or services and uncertainty regarding liability for products, services, and content, including uncertainty as a result of less Internet-friendly legal systems, local laws, lack of legal precedent, and varying rules, regulations, and practices regarding the physical and digital distribution of media products and enforcement of intellectual property rights;
- limitations on the repatriation and investment of funds and foreign currency exchange restrictions;
- limited technology infrastructure;
- shorter payable and longer receivable cycles and the resultant negative impact on cash flow;
- laws and regulations regarding consumer and data protection, privacy, network security, encryption, payments, and restrictions on pricing or discounts;
- geopolitical events, including war and terrorism.

***We may face challenges in expanding our international and cross-border businesses and operations.***

As we expand our international and cross-border businesses into an increasing number of international markets, we will face risks associated with expanding into markets in which we have limited or no experience and in which we may be less well-known. We may be unable to attract a sufficient number of customers and other participants, fail to anticipate competitive conditions or face difficulties in operating effectively in these new markets. The expansion of our international and cross-border businesses will also expose us to risks inherent in operating businesses globally, including:

- inability to recruit international and local talent and challenges in replicating or adapting our company policies and procedures to operating environments different than that of China;
- lack of acceptance of our product and service offerings;
- challenges and increased expenses associated with staffing and managing international and cross-border operations and managing an organization spread over multiple jurisdictions;
- trade barriers, such as import and export restrictions, customs duties and other taxes, competition law regimes and other trade restrictions, as well as other protectionist policies;
- differing and potentially adverse tax consequences;
- increased and conflicting regulatory compliance requirements;
- challenges caused by distance, language and cultural differences;
- increased costs to protect the security and stability of our information technology systems, intellectual property and personal data, including compliance costs related to data localization laws;
- availability and reliability of international and cross-border payment systems and logistics infrastructure;
- exchange rate fluctuations; and
- political instability and general economic or political conditions in particular countries or regions.

As we expand further into new regions and markets, these risks could intensify, and efforts we make to expand our international and cross-border businesses and operations may not be successful. Failure to expand our international and cross-border businesses and operations could materially and adversely affect our business, financial condition and results of operations.

Transactions conducted through our international and cross-border platforms may be subject to different customs, taxes and rules and regulations, and we may be adversely affected by the complexity of and developments in customs and import/export laws, rules and regulations in the PRC and other jurisdictions. For example, effective as of April 8, 2016, the Notice on Tax Policies of Cross-Border E-Commerce Retail Importation, or the New Cross-Border E-commerce Tax Notice, replaced the previous system for taxing consumer goods imported into the PRC and introduced a 17% value-added tax, or VAT, on most products sold through e-commerce platforms and consumption tax on high-end cosmetics.

Changes to trade policies, treaties and tariffs in the jurisdictions in which we operate, or the perception that these changes could occur, could adversely affect our international and cross-border operations, our financial condition and results of operations. For example, the U.S. administration under President Donald Trump has advocated greater restrictions on trade generally and significant increases on tariffs on goods imported into the United States, particularly from China.

We may also have operations in various markets with volatile economic or political environments and may pursue growth opportunities in a number of newly developed and emerging markets.  These investments may expose us to heightened risks of economic, geopolitical, or other events, including governmental takeover (i.e., nationalization) of our manufacturing facilities or intellectual property, restrictive exchange or import controls, disruption of operations as a result of systemic political or economic instability, outbreak of war or expansion of hostilities, and acts of terrorism, each of which could have a substantial adverse effect on our financial condition and results of operations.  Further, the U.S. government, other governments, and international organizations could impose additional sanctions that could restrict us from doing business directly or indirectly in or with certain countries or parties, which could include affiliates.

***Our Results could be adversely affected by the trade tensions between the United States and China***

With the increasing interconnectedness of global economic and financial systems and our business related to China, trade tensions between the United States and China can have an immediate and material adverse impact on our business.  Changes to trade policies, treaties and tariffs in the jurisdictions in which we operate, or the perception that these changes could occur, could adversely affect our international and cross-border operations, our financial condition and results of operations. For example, the U.S. administration under President Donald Trump has advocated greater restrictions on trade generally and significant increases on tariffs on goods imported into the United States, particularly from China. Further, the U.S. or China could impose additional sanctions that could restrict us from doing business directly or indirectly in either country. Such actions could have material adverse impact on our profitability and operations.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

There were no unregistered sales of equity securities during the fiscal quarter ended June 30, 2018, other than those that were previously reported in our Current Reports on Form 8-K.

**Item 3. Defaults Upon Senior Securities**

There were no defaults upon senior securities during the fiscal quarter ended June 30, 2018.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

Not applicable.

**Item 6. Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 31.1* | Certifications of Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certifications of Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1** | Certification of Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | Taxonomy Extension Schema Document |
| 101.CAL* | Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Taxonomy Extension Presentation Linkbase Document |

*Filed herewith
**Furnished herewith

**SIGNATURES**

In accordance with the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized on August 13, 2018.

**Seven Stars Cloud Group, Inc.**

By: /s/ Federico Tovar

Name: Federico Tovar
Title: Chief Financial Officer
(Principal Financial Officer and an Authorized Officer)

---

48

**Exhibit 31.1**

### CERTIFICATIONS

I, Bruno Wu, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Seven Stars Cloud Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 13, 2018

/s/ Bruno Wu
Bruno Wu
Chairman and Chief Executive Officer
(*Principal Executive Officer*)

**Exhibit 31.2**

**CERTIFICATIONS**

I, Federico Tovar, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Seven Stars Cloud Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 13, 2018

/s/ Federico Tovar
Federico Tovar
Chief Financial Officer
*(Principal Financial Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

The undersigned, Bruno Wu, Chief Executive Officer of Seven Stars Cloud Group, Inc. (the "Company"), DOES HEREBY CERTIFY that:

1.  The Company's Quarterly Report on Form 10-Q for the period ended June 30, 2018 (the "Report"), fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

IN WITNESS WHEREOF, the undersigned has executed this statement this 13th day of August, 2018.

                                                /s/ Bruno Wu
                                                Bruno Wu
                                                Chairman and Chief Executive Officer
                                                (*Principal Executive Officer*)

A signed original of this written statement required by Section 906 has been provided to Seven Stars Cloud Group, Inc. and will be retained by Seven Stars Cloud Group, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

The forgoing certification is being furnished to the Securities and Exchange Commission pursuant to § 18 U.S.C. Section 1350. It is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO SECTION 906
OF THE SARBANES-OXLEY ACT OF 2002**

The undersigned, Federico Tovar, Chief Financial Officer of Seven Stars Cloud Group, Inc. (the "Company"), DOES HEREBY CERTIFY that:

1.  The Company's Quarterly Report on Form 10-Q for the period ended June 30, 2018 (the "Report"), fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

IN WITNESS WHEREOF, the undersigned has executed this statement this 13th day of August, 2018.

/s/ Federico Tovar
Federico Tovar
Chief Financial Officer
*(Principal Financial Officer)*

A signed original of this written statement required by Section 906 has been provided to Seven Stars Cloud Group, Inc. and will be retained by Seven Stars Cloud Group, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

The forgoing certification is being furnished to the Securities and Exchange Commission pursuant to § 18 U.S.C. Section 1350. It is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.