**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JAYSUKH RUDANI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>IDEANOMICS, INC. f/k/a SEVEN STARS CLOUD GROUP, INC. f/k/a WECAST NETWORK, INC., *et al.*,<br><br>Defendants. | No.    1:19-cv-06741-GBD<br><br>Oral Argument Requested |

**MEMORANDUM OF LAW OF DEFENDANTS IDEANOMICS, INC., BRUNO WU, BING YANG, AND ROBERT BENYA IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED <u>SECURITIES CLASS ACTION COMPLAINT</u>**

VENABLE LLP
1270 Avenue of the Americas,
Twenty-Fourth Floor
New York, New York 10020

– and –

VENABLE LLP
600 Massachusetts Avenue NW
Washington DC 20001

*Counsel for Defendants Ideanomics, Inc., Bruno Wu, Bing Yang, and Robert Benya*

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  STATEMENT OF FACTS .........................................................................................3

    A.   IDEANOMICS AND ITS BUSINESS ..........................................................3

    B.   RELEVANT FILINGS AND STATEMENTS AT ISSUE IN
        PLAINTIFF'S AMENDED COMPLAINT.....................................................4

        1.   Ideanomics's Acquisition of SVG and WAG and 2017 Revenue
                Guidance. ....................................................................................................4

        2.   Ideanomics's January 16, 2018 Press Release Regarding Q4 2017
                Crude Oil Revenue and Later Revision of 2017 Guidance.............................7

        3.   Ideanomics's Statements Regarding Blockchain and Artificial
                Intelligence Technology Integration into Its Crude Oil Supply
                Chain Business. ............................................................................................8

III. STANDARD OF REVIEW .......................................................................................9

IV.  ARGUMENT .........................................................................................................10

    A.   PLAINTIFF'S SECURITIES FRAUD CLAIM SHOULD
        BE DISMISSED. .......................................................................................10

        1.   The Challenged Statements Are Forward-Looking Statements
                Protected by the Statutory Safe Harbor Provision and the Bespeaks
                Caution Doctrine.......................................................................................10

              a)   Plaintiff's Claims Regarding Ideanomics's 2017 Revenue
                    Guidance Are Barred by the Safe Harbor......................................... 11

              b)   Plaintiff's Claim Arising From the Company's January 16,
                    2018 Oil Revenue Statement Is Barred by the Safe Harbor. ............. 13

               c)   The Company's Statements Regarding Blockchain Are Also
                    Nonactionable. .................................................................................. 15

        2.   Plaintiff's Securities Fraud Claim Must Be Dismissed Because the
                Amended Complaint Does Not Adequately Plead Scienter. ..........................16

a)     Plaintiff's Motive Allegations Do Not Raise an Inference of Scienter. ...................................................................................... 18

b)     Plaintiff Does Not Adequately Allege Conscious Misbehavior or Recklessness. ................................................................................ 20

B.     PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED. ..................................................................................................24

C.     PLAINTIFF SHOULD NOT BE GRANTED LEAVE TO AMEND THE AMENDED COMPLAINT. ................................................................24

V.     CONCLUSION ..............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Agnico-Eagle Mines Sec. Litig.*,
  No. 11 Civ. 7968 (JPO), 2013 U.S. Dist. LEXIS 5287 (S.D.N.Y. Jan. 14,
  2013) ..................................................................................................................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..............................................................................................3, 9

*In re Avon Prods., Inc. Sec. Litig.*,
  No. 05 Civ. 6803 (LAK) (MHD), 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) .....................11

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018).............................................................................15, 24

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................................9

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005)...................................................................................23

*Capital Mgmt. Select Fund Ltd. v. Bennett*,
  680 F.3d 214 (2d Cir. 2012)................................................................................................20

*In re CIT Grp., Inc.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004)...................................................................................15

*City of Brockton Retirement Sys. v. Shaw Grp. Inc.*,
  540 F. Supp.2d 464 (S.D.N.Y. 2008)....................................................................................21

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018)...................................................................................23

*In re Duane Reade Inc. Sec. Litig.*,
  No. 02 Civ. 6478 (NRB), 2003 U.S. Dist. LEXIS 21319 (S.D.N.Y. Nov. 24,
  2003) ..................................................................................................................................11

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)................................................................................................19

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)..................................................................................18

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................................................................19

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................................22, 23

*Greenwald v. Orb Commc'ns & Mktg., Inc.*,
    192 F. Supp. 2d 212 (S.D.N.Y. 2002)..................................................................................10

*Johnson v. Sequans Commc'ns. S.A.*,
    No. 11 Civ. 6341 (PAC), 2013 U.S. Dist. LEXIS 8115 (S.D.N.Y. Jan. 17,
    2013) ....................................................................................................................................11

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................................20

*Kalnit v. Eichler*,
    99 F. Supp. 2d 327 (S.D.N.Y. 2000)....................................................................................21

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    962 F. Supp. 2d 606 (S.D.N.Y. 2013)..................................................................................24

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)..................................................................................20

*Lopez v. CTPartners Exec. Search, Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016)................................................................................14, 15

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)..................................................................................20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................................9

*Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Tr. Fund v.
    Arbitron, Inc.*,
    741 F. Supp. 2d 474 (S.D.N.Y. 2010)..................................................................................23

*In re PXRE Grp., Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)..................................................................................18

iv

*Ross v. Lloyds Banking Grp., PLC*,
    Nos. 12-4600-cv (L), 13-729-cv, 546 F. App'x 5 (2d Cir. Sept. 19, 2013)..............................24

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)..................................................................................................17, 20

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996)..........................................................................................................19

*In re Satyam Computer Servs. Sec. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y 2013)........................................................................................17

*Schwab v. E\*Trade Fin. Corp.*,
    285 F. Supp. 3d 745 (S.D.N.Y. 2018)........................................................................................16

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)................................................................................................10, 12

*In re Supercom Inc. Sec. Litig.*,
    No. 15 Civ. 9650 (PGG), 2018 U.S. Dist. LEXIS 175467 (S.D.N.Y. Oct. 10,
    2018) ..........................................................................................................................................17

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)........................................................................................................24

*Tellabs Inc. v. Makor Issues & Rights Ltd.*,
    551 U.S. 308 (2007)................................................................................................................9, 10

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)........................................................................................................22

**Statutes**

15 U.S.C. § 78u.................................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................................................................10

Defendants Ideanomics, Inc. (the "Company" or "Ideanomics"), Bruno Wu, Bing Yang, and Robert Benya (collectively the "Individual Defendants," and together with Ideanomics, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss with prejudice the Amended Class Action Complaint, Dkt. 40 (the "Amended Complaint"), in its entirety pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

## I.    PRELIMINARY STATEMENT

As courts have recognized, not every drop in a Company's stock price denotes fraud and the securities laws are not intended to provide insurance against every stock drop. Such is the case here. Plaintiff's Amended Complaint is long in allegations that are no more than conclusory and fraud-by-hindsight allegations. Plaintiff alleges that Defendants committed securities fraud by making three categories of purported misstatements. Two of the categories of purported misstatements concern the Company's 2017 revenue projections. The third category of alleged misstatements consists of cherry-picked Company statements purportedly touting the integration of blockchain technology into its crude oil trading and consumer electronics business in which the Company stated that it "intended" and was "aiming" to become a "next generation Artificial-Intelligent and Blockchain-Powered, Fintech company." As set forth below, Plaintiff's Amended Complaint does not satisfy the stringent standards applicable to securities fraud claims under the PSLRA and should be dismissed.

First, the purported misstatements are non-actionable under the PSLRA's safe harbor provision and the bespeaks caution doctrine as forward-looking statements with meaningful cautionary language. The Company's revenue projections and statements regarding the Company's "intent" and "aim" to become a "next-generation Artificial-Intelligent (AI) & Blockchain-Powered, Fintech company" fall squarely within the safe harbor protection of the

PSLRA and the bespeaks caution doctrine. Defendants' statements are also non-actionable because Plaintiff's allegations do not pass muster under the PSLRA, which erected a strict scienter requirement that only imposes liability where a plaintiff has pleaded "knowing falsity" as to a forward-looking statement. Plaintiff does not make this showing.

Second, Plaintiff has not pleaded scienter—either on grounds of motive or recklessness. Improperly relying on group pleading, Plaintiff attempts to create motive by alleging (in conclusory fashion) that Defendants engaged in fraud to avoid insolvency. These motives are universal among all companies and executives and are thus too general to establish scienter. Plaintiff also alleges that Defendants were motivated to artificially inflate Ideanomics's stock price in order to acquire two companies in December 2017. Plaintiff, however, does not connect Defendants' alleged fraudulent statements to the timing of the two acquisitions—a failing that is fatal to Plaintiff's claims. This is not surprising given that two of the purported misstatements were made *after* the two acquisitions referenced in the Amended Complaint. As to Defendant Bruno Wu, Plaintiff alleges that he was motivated to artificially inflate Ideanomics's stock price so that Ideanomics could acquire more Bruno Wu-related entities and purportedly enrich defendant Bruno Wu. Along with not connecting the acquisitions to the alleged fraudulent statements, Plaintiff's scienter allegation fails because Bruno Wu-related entities *acquired* Ideanomics's stock as part of those acquisitions—exactly opposite the type of conduct (an executive selling shares) that courts have found as potentially indicative of scienter.

Plaintiff also fails to offer facts that could establish, with the strong inference the PSLRA requires, recklessness on Defendants' part. Plaintiff offers purely conclusory and speculative conclusions regarding Defendants' scienter, which simply do not suffice and compels dismissal of Plaintiff's Section 10(b) claim.

2

Finally, because Plaintiff has not sufficiently pleaded a primary violation of Section 10(b) and Rule 10b-5 for the reasons set forth above and in greater detail below, Plaintiff's Section 20(a) claim must be dismissed.

## II.   STATEMENT OF FACTS[1]

### A.   IDEANOMICS AND ITS BUSINESS

Ideanomics ("Ideanomics" or the "Company") is a financial technology and asset digitization services company whose stock trades on the NASDAQ stock exchange under the ticker symbol "IDEX." Am. Compl. ¶¶ 2, 21. From 2010 through 2017, the Company provided premium content video on demand services under the brand name "You-on-Demand" with primary operations in the People's Republic of China. *Id.* ¶ 28. In 2016, the Company changed its name to "WeCast Network, Inc." to "reflect its new direction, forward-looking strategy and near-term product and service roadmap." *Id.*; Ex.1 (Sept. 19, 2016 Press Release).

Starting in 2017, the Company was "aiming to become a next generation Artificial-Intelligent (AI) & Blockchain-Powered, Fintech company." Ex. 2 (2017 10-K filed on March 30, 2018) at 4. As part of this transition, in early 2017, the Company acquired Sun Video Group HK Limited ("SVG") and Wide Angle Group Limited ("WAG") and, as a result of the acquisitions, became involved in consumer electronics and smart supply chain management. Am. Compl. ¶ 29. In June 2017, the Company changed its name to Seven Stars Cloud Group, Inc. to "better encompass and further establish its identity in the industry and to more accurately represent its

---

[1]     The allegations are drawn from the Amended Complaint as well as statements or documents incorporated into the complaint by reference and legally required public disclosure documents filed with the SEC. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

portfolio of cloud-based solutions and services aimed at Chinese and global businesses and enterprises." *Id.*; Ex. 3 (June 5, 2017 Press Release).

In August 2017, the Company announced it entered into a joint venture partnership deal with Ocasia Group Holdings, a company engaged in, among other things, the trading of crude oil. Am. Compl. ¶ 30; Ex. 4 (August 14, 2017 Press Release). Later in August 2017, the Company made a strategic investment of $250,000 in the Delaware Board of Trade Holdings, Inc. ("DBOT"). Ex. 2 at 28. DBOT is a blockchain based Alternative Trading System registered with the SEC.

In August 2018, the Company announced the adoption of "Ideanomics" as its new business name. Am. Compl. ¶ 31. The Company further stated that the new name "is aligned with the Company's vision and mission for transforming traditional assets and their associated industries into the asset digitization era." Ex. 5 (August 27, 2018 Press Release).

In November 2018, the company announced its third quarter 2018 results. Ex. 6 (November 14, 2018 Press Release). Although the Company's commodities trading business generated the majority of its revenues for 2018, the Company disclosed that it intended to phase out its oil trading and consumer electronics business because that business had realized low margins. *Id.* Instead, the Company decided to focus on the higher margins it believed may be achievable in its digital securitized asset business. *Id.*

## B. RELEVANT FILINGS AND STATEMENTS AT ISSUE IN PLAINTIFF'S AMENDED COMPLAINT

### 1. Ideanomics's Acquisition of SVG and WAG and 2017 Revenue Guidance.

As set forth in Plaintiff's Amended Complaint, on February 1, 2017, the Company announced the completion of its acquisition of supply chain company SVG along with SVG's

51% ownership stake in smart supply chain management operator M.Y. Products, LLC from Bruno Wu-related BT Capital. Am. Compl. ¶ 36. In exchange for the outstanding SVG shares and a guarantee that SVG would achieve certain financial goals within 12 months of closing, BT Capital received $800,000 in cash and a promissory note of $50 million with the principal and interest convertible into shares of the Company at a conversion rate of $1.5 per share. *Id.* ¶ 36; Ex. 7 (February 1, 2017 Press Release). As part of the agreement, BT Capital agreed that if SVG, along with its subsidiaries and new business, did not achieve $250 million in revenues and $15 million in audited profits, then BT Capital must forfeit back to the Company the stock it received on a pro-rata basis. *Id.*[2] The Company also announced in the February 1, 2017 press release that, based on the SVG deal, as well as "other M&A currently being vetted", it "is confident in issuing Company-wide 2017 guidance of $280 million in top-line revenue." *Id.*

The Company's February 1, 2017 press release also included a "Safe Harbor Statement" that stated that the press release contains forward-looking statements. *Id.* at 2-3. Further, the press release stated that "[t]he Company's actual results could differ materially from those anticipated in these forward-looking statements as a result of a variety of factors, including those discussed in the Company's periodic reports that are filed with the Securities and Exchange Commission." *Id.* The Company's 10-K included a "Special Note Regarding Forward Looking Statements" that set forth the following:

> In addition to historical information, this report contains forward-looking statements . . . . We use words such as "believe," "expect," "anticipate," "project," "target," "plan," "optimistic," "intend," "aim," "will" or similar expressions which are intended to identify forward-looking statements. Such statements include, among others, . . . projections of sales, earnings, revenue, . . .

---

[2]    Pursuant to the terms of the parties' agreement, a summary of which were disclosed in the February 1, 2017 Press Release, Ideanomics issued 16.5 million "Earn Out Shares" in connection with paying to the seller a pro rata portion of the promissory note. Ex. 8 (2018 10/K) at F-20. Had SVG achieved its revenue target of $250 million and $15 million in gross profit, the seller would have been entitled to 33,333,333 Earn Out Shares. Ex. 7.

and all assumptions, expectations, predictions, intentions or beliefs about future events. You are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, including, and without limitation, those identified in Item 1A, "Risk Factors" included herein, as well as assumptions, which, if they were to ever materialize or prove incorrect, could cause the results of the Company to differ materially from those expressed or implied by such forward-looking statements.

Ex. 9 (2015 10-K) at 4. The "Risk Factors" listed in the Company's 10-K included that "[o]ur operating results are likely to fluctuate significantly and may differ from market expectations," "Substantial doubt about our ability to continue as a going concern," "Expansion of our business may put added pressure on our management and operational infrastructure, impeding our ability to meet any potential increased demand for our services and possibly hurting our future operating results." Ex. 9 at 14.

On February 2, 2017, the Company announced its acquisition of 55% of industrial/trade media and commerce company WAG from BT Capital. Am. Compl. ¶ 38. The sole consideration was that the Company add WAG to the SVG business and thereby include any revenue and gross profit from WAG in the calculation of the SVG performance guarantee. *Id.* The Company again included a Safe Harbor Statement in the press release. Ex. 10 (February 2, 2017 Press Release).

On March 31, 2017, the Company announced Q4 2017 and full year 2016 results and also raised full year 2017 revenue guidance to $300 million "based on our current visibility of, and internal projections for, 2017."[3] Ex. 14 (March 31, 2017 Press Release). The Company further stated that "[i]f realized, this would represent an approximate 66x increase over 2016 revenue." *Id.* As with its prior press releases, the Company again included a Safe Harbor Statement that the press release contained forward-looking statements and that although the Company believes that

---

[3]  As set forth in Plaintiff's Amended Complaint, the Company reiterated its revenue guidance in subsequent statements. *See* Am. Compl. ¶¶ 47 (Ex. 11 (March 31, 2017 Earnings Call)), 49 (Ex. 12 (May 15, 2017 Earnings Call)), 54 (Ex. 13 (November 13, 2017 Press Release)).

expectations reflected in those statements are reasonable, "these expectations may prove to be incorrect" and that "[t]he Company's actual results could differ materially." *Id.* The press release also referenced the risk factors disclosed in the Company's periodic reports filed with the SEC. *Id.* The Company filed its 2016 10-K that same day that included the same "Special Note Regarding Forward Looking Statements" and risk factors listed in the 2015 10-K referenced above, as well as the additional risk factor that "[t]he Company is in the process of transforming its business model and this transformation may not be successful." Ex. 15 (2016 10-K) at 3, 13-15.

> **2.**      **Ideanomics's January 16, 2018 Press Release Regarding Q4 2017 Crude Oil Revenue and Later Revision of 2017 Guidance.**

As mentioned above, in August 2017, the Company announced it entered into a joint venture partnership deal with Ocasia, which was engaged in crude oil trading. Am. Compl. ¶ 30. On January 16, 2018, Ideanomics announced several crude oil-based trading products. In addition to announcing those products, the Company noted that its "crude oil supply finance and management business alone . . . **did a preliminarily reviewed, but still unaudited, $170 million USD in revenue in Q4 2017**." Ex. 16 (January 16, 2018 Press Release). Included within the January 16, 2018 press release is a Safe Harbor Statement advising that the press release contains forward-looking statements and that "[a]lthough the Company believes that the expectations reflected in such forward-looking statements are reasonable, they do involve assumptions, risks and uncertainties, and these expectations may prove to be incorrect." *Id.* Moreover, the Company stated that "actual results could differ materially from those anticipated in these forward-looking statements." *Id.*

In a February 23, 2018 press release, the Company announced that it "foresees full-year 2017 revenue to be in the range of $125 million - $144 million . . . ." Ex. 17 (February 23, 2018 Press Release). The Company further stated that "[w]hile this was short of the Company's earlier and recent guidance, *the result is anticipated to be in the 256% - 310% growth range over 2016 revenue*." *Id.* The Company explained that "[u]nanticipated personnel issues that led to internal communication and internal administrative oversights that materialized during the Company's 2017 fiscal year, resulted in what is anticipated to be 2017 revenue that is below prior and recent guidance expectations." *Id.*

In its annual filing for 2017 filed on March 30, 2018, the Company disclosed total revenues of $144.3 million and a gross profit of $7.15 million for 2017. Ex. 2 at 30. The $144 million in recognized revenues is in line with the Company's revised guidance issued on February 23, 2018 and represented revenue growth of 310% from 2016, and gross profit growth of 2055% from 2016. *Id.* Of the Company's $144.3 million in revenues and $7.15 million in gross profits, $143.5 million in revenues and $7.118 million in gross profits were attributable to WeCast Services. *Id.* at 31-32. In its 2018 annual filing, the Company reported total revenues of $377 million, all of which was attributable to WeCast Services. Ex. 8 at 48. Of that full amount, $260 million was attributable to crude oil trading as compared to $19 million in 2017. *Id.*

**3.  Ideanomics's Statements Regarding Blockchain and Artificial Intelligence Technology Integration into Its Crude Oil Supply Chain Business.**

Plaintiff claims that starting in May 2018, the Company "began to represent that its crude oil business was *already utilizing* blockchain technology and artificial intelligence" purportedly to seize upon the "blockchain craze around this time." Am. Compl. ¶ 12. Plaintiff's Amended Complaint then goes on to cherry-pick certain statements made by the Company. *See* Am.

8

Compl. ¶¶ 12, 68, 70, 77, 79. As set forth throughout its SEC filings, however, the Company stated that it was "*aiming* to become a next generation and global Artificial Intelligence (AI) & Blockchain-Powered, Fintech company." Ex. 2 at 4 (emphasis added). Further, many of the statements referenced by the Plaintiff in the Amended Complaint are consistent with the Company's disclosures that it was "aiming" and "intended" to become an Artificial Intelligence & Blockchain-powered financial services company. *See* Am. Compl. ¶¶ 68 (Ex. 18 (2nd Quarter 2018 10-Q filed on August 13, 2018) at 33 stating that "we are currently focused on consumer electronics and the crude oil trading business in supply chain management with the <u>intent</u> to migrate this on to the blockchain with AI capabilities" (emphasis added)); 70 (Ex. 19 (August 13, 2018 Earnings Call) discussing Ideanomics's *future plans* to integrate blockchain technology into its consumer electronics and supply chain businesses).

## III.     <u>STANDARD OF REVIEW</u>

To survive a motion to dismiss, the complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading that merely recites conclusory allegations or a formulaic recitation of the elements of a cause of action fails to state a claim. *Iqbal*, 556 U.S. at 678. Well-pleaded allegations are assumed to be true only to the extent not contradicted by other allegations or documents incorporated by reference, including filings with the SEC and other materials as to which the Court can take judicial notice. *See Tellabs Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322-23 (2007); *ATSI Commc'ns*, 493 F.3d at 98. Challenged public statements must be evaluated "fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).

Under the heightened pleading requirements imposed by Rule 9(b) and the PSLRA, a securities fraud complaint must specify each alleged misstatement or omission, explain why it is false or misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted" with a fraudulent state of mind, that is, scienter. *Tellabs*, 551 U.S. at 321 (citing 15 U.S.C. § 78u-4(b)(1), (2)); *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). A complaint will only survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## IV.   ARGUMENT

### A.   PLAINTIFF'S SECURITIES FRAUD CLAIM SHOULD BE DISMISSED.

To state a Section 10(b) and Rule 10b-5 claim, Plaintiff must allege that each of the Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Greenwald v. Orb Commc'ns & Mktg., Inc.*, 192 F. Supp. 2d 212, 226 (S.D.N.Y. 2002) (citations omitted). As set forth below, Plaintiff's securities fraud claim should be dismissed under the PSLRA's Safe Harbor and the bespeaks caution doctrine.

#### 1.   The Challenged Statements Are Forward-Looking Statements Protected by the Statutory Safe Harbor Provision and the Bespeaks Caution Doctrine.

Under the PSLRA, "a defendant is not liable if [a] forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). A forward-looking statement is, among

10

other things, any "statement containing a projection of revenues, . . . or other financial items," any "statement of the plans and objectives of management for future operations," or any "statement of future economic performance." 15 U.S.C. § 78u-5(i)(l). To be "meaningful," the cautionary language "need only cite 'important factors' . . . and need not mention 'the particular factor that ultimately causes the forward-looking statement not to come true . . .'" *In re Avon Prods., Inc. Sec. Litig.*, No. 05 Civ. 6803 (LAK) (MHD), 2009 WL 848017, at *17 (S.D.N.Y. Feb. 23, 2009) (internal citations omitted). Similarly, the bespeaks caution doctrine provides that "[a] company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws." *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 U.S. Dist. LEXIS 21319, at *15 (S.D.N.Y. Nov. 24, 2003); *see, e.g.*, *Johnson v. Sequans Commc'ns. S.A.*, No. 11 Civ. 6341 (PAC), 2013 U.S. Dist. LEXIS 8115, at *42-43 (S.D.N.Y. Jan. 17, 2013) (finding the statements "believe we have a strong position" and "believe we are better positioned to drive our roadmap to meet those needs" to be non-actionable). As set forth below, each of the three categories of misstatements Plaintiff alleges are barred by the PSLRA's Safe Harbor.

### a) Plaintiff's Claims Regarding Ideanomics's 2017 Revenue Guidance Are Barred by the Safe Harbor.

The Company's statements regarding its 2017 revenue guidance are non-actionable as forward-looking statements that were accompanied by meaningful cautionary statements. The statements are projections of revenues and thus squarely fit within the definition of a forward-looking statement under the PSLRA. 15 U.S. Code § 78u–5(i)(1)(A). Ideanomics's cautionary language included that actual results could "differ materially from these statements due to risks and uncertainties related to the business." Ex. 11; *see also* Ex. 15 at 13 (Ideanomics's

11

"operating results are likely to fluctuate significantly and may differ from market expectations"). The Company's SEC filings also stated that Ideanomics "cannot guarantee future results", "[t]he Company is in the process of transforming its business model and this transformation may not be successful" and that "[i]t is uncertain whether these efforts will prove beneficial or whether we will be able to develop the necessary business models, infrastructure and systems to support the business." Ex. 2 at 3, 14. This includes "having or hiring the right talent to execute our business strategy." Ex. 15 at 13; *see also* Ex. 2 at 14. The Company ultimately reported that its miss in guidance was caused by "[u]nanticipated personnel issues that led to internal communication and administrative oversights . . ." Ex. 17. Given the risk disclosures disclosed in the Company's filings and press releases, the Company's 2017 projections are non-actionable forward-looking statements under the PSLRA's Safe Harbor and the bespeaks caution doctrine.

In addition to being forward-looking statements with meaningful cautionary language, Plaintiff has not pleaded facts showing that Defendants ***knowingly*** made a false statement as to the 2017 revenue projections. The PSLRA's Safe Harbor also specifies that a defendant is not liable if "the plaintiff fails to prove that [a forward-looking statement] was made with actual knowledge that it was false or misleading." *See Slayton*, 604 F.3d at 766. As the Second Circuit has held, "the scienter requirement for forward-looking statements is stricter than for statements of current fact" and recklessness does not suffice, rather "liability for the former attaches only upon proof of knowing falsity." *Id.* at 773.

Plaintiff seeks to avoid dismissal by alleging that the Company failed to disclose that SVG and WAG generated *only* $30 million in revenue and collectively lost $475,046 in the

quarter just prior to being acquired.[4] Am. Compl. ¶¶ 42-50, 54-55. In a purely conclusory statement, Plaintiff alleges that SVG's and WAG's fourth quarter 2016 results made it "doubtful" or "materially less likely" that it would meet the revenue guarantees made by BT Capital and Ideanomics's 2017 revenue guidance. *Id.* ¶¶ 42, 141. Plaintiff offers no reason why Ideanomics's revenue should have been limited to SVG's and WAG's collective revenues for the one quarter prior to their acquisition.

Plaintiff also alleges that the Company's guidance was misstated because the Company later disclosed in December 2018 that "[w]hile we generate revenues from our crude oil and consumer electronics business, we engage in this business largely for research purposes to support our development of fintech solutions for this space, and not primarily with a view to competitive returns." *Id.* ¶¶ 44, 46, 48, 50, 55; Ex. 20 at 12. Plaintiff's allegation does nothing to show that Defendants had actual knowledge that the revenue guidance was incorrect at the time issued and is belied by the fact that the Company's consumer electronics and oil trading business had revenues of over $140 million and a gross profit of over $7 million in 2017 and in 2018 had gross revenue of over $370 million and gross profit of $3.1 million. *See* Ex. 20 at 43-44; Ex. 8 at 48.

### b) Plaintiff's Claim Arising From the Company's January 16, 2018 Oil Revenue Statement Is Barred by the Safe Harbor.

Like the 2017 revenue projections, Defendants' January 16, 2018 press release regarding its crude oil trading revenue for the fourth quarter 2017 is forward-looking and non-actionable. The January 16, 2018 press release described the $170 million of crude oil revenue, which was

---

[4] To the extent Plaintiff alleges the performance guarantee made to the Company was misstated, that is incorrect. The performance guarantee was set forth in the parties' agreement, is correctly disclosed in the February 1, 2017 Press Release, and ultimately was paid pro rata pursuant to the terms of the purchase agreement and disclosed in the Company's filings. Ex. 2 at 52, F-20; Ex. 8 at F-20; Ex. 20 (2017 10-K/A filed on December 14, 2018) at 71, 110.

highlighted in bold text, as "**preliminarily reviewed, but still unaudited**" and made as of that date. Am. Compl. ¶ 57. In addition to the reasons set forth above, statements that reference "preliminary" results—which are "'based on currently available financial and operating information and management's preliminary analysis of the unaudited financial results for the quarter'" are forward-looking. *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016). In *Lopez*, the company issued a January 2015 press release announcing preliminary results for the fourth quarter of 2014 and all of 2014. *Lopez*, 173 F. Supp. 3d at 39. The press release there, like here, included language identifying the information in the press release as forward-looking and identified risks. *Id.* The court rejected plaintiff's claim that, because the quarter was concluded, defendant's statements were not forward-looking. *Id.* The court recognized that, just because the quarter had ended, did not mean that the results had been calculated and held that because the press release "gave a 'preliminary' calculation" and was "a prediction, based on incomplete or provisional information . . . ," it was forward-looking. *Id.* at 39-40.

As in *Lopez*, Ideanomics's January 16, 2018 press release described fourth quarter 2017 oil revenue as "preliminary" and further described it as "unaudited," identified relevant risk factors, and warned investors not to rely on forward-looking statements that "may prove to be incorrect," including that the "Company's actual results could differ materially from those anticipated . . . ." Ex. 16. As a forward-looking statement with meaningful cautionary language, Plaintiff's claim concerning the Company's January 16, 2018 statement is barred by the PSLRA's Safe Harbor and the bespeaks caution doctrine.

As with the Company's 2017 revenue guidance, Plaintiff also does not allege facts to meet the strict standard under the PSLRA that Defendants had actual knowledge that the fourth

quarter 2017 revenue statement was false when made. The phrase "**preliminarily reviewed, but still unaudited**" reflects a belief that the numbers could change—and thus signaled to reasonable investors that the revenue figures were, as of then, contingent. That the recognized revenue numbers later changed does not prove that the Defendants knew that the statement was false when made. *Lopez,* 173 F. Supp. 3d at 40 (rejecting attempt to plead a misstatement of fact by pointing to subsequent change in price).

### c)    The Company's Statements Regarding Blockchain Are Also Nonactionable.

Plaintiff alleges that the Company misrepresented that it had integrated blockchain into its crude oil and consumer electronics businesses. Am. Compl. ¶¶ 64-71, 75-77. The Company's disclosures and statements, however, must be viewed in their full context. *In re CIT Grp., Inc.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004). Viewed in whole, the Company's disclosures make the status of its blockchain efforts clear—that the Company had not yet integrated such technology. Even the Company statements upon which Plaintiff relies and quotes in the Amended Complaint make this clear—

- "[The Company] is ***aiming to become*** a next generation and global Artificial Intelligence & Blockchain-powered disruptive financial services company . . ." Ex. 21 (January 2, 2018 Press Release) (emphasis added); *see* Am. Compl. ¶ 64;

- "As part of our blockchain and AI focused strategy, we are currently focused on consumer electronics and the crude oil trading business in supply chain management with the ***intent*** to migrate this on to the blockchain with AI capabilities." Ex. 18 at 33 (emphasis added); *see* Am. Compl. ¶ 68.

The conditional or predictive language—e.g., aiming or intent—in these materials is consistently recognized as forward-looking and fits squarely with the PSLRA's definition of a forward-looking statement. 15 U.S. Code § 78u–5(i)(1)(B); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375-76 (S.D.N.Y. 2018) (dismissing securities fraud claims and finding

15

that defendant's statements that it "expected" to produce a certain amount of gold were non-actionable forward-looking statements). In addition, in each press release and call transcript, Defendants warned investors not to rely on forward-looking statements that "may prove to be incorrect," warned that the "actual results could differ materially from those anticipated . . . ," and directed investors to the risk factors disclosed in the Company's SEC filings. Those filings disclosed the Company's "aims" and "intentions" as forward-looking statements and cautioned that "such forward-looking statements are not guarantees." Ex. 2 at 3.

Plaintiff goes on to allege that the Company "never intended to migrate the consumer electronics and crude businesses onto blockchain as it only intended to operate these businesses for research purposes." Am. Compl. ¶ 69. Plaintiff cites to the Company's disclosure in December 2018 that it engages in this business "largely for research purposes to support our development of fintech solutions for this space, and not primarily with a view to competitive returns." Ex. 20 at 12. This statement, however, does not support the purely conclusory allegation that the Company's prior statements regarding its intention and business were false or misleading when made.

### 2.   Plaintiff's Securities Fraud Claim Must Be Dismissed Because the Amended Complaint Does Not Adequately Plead Scienter.

Plaintiff's securities fraud claim must also be dismissed for the additional and independent reason that the Plaintiff fails to allege facts giving rise to the required "strong inference" of scienter under the PSLRA. 15 U.S.C. § 78u-4(b)(2)(A). A securities fraud complaint sufficiently alleges scienter only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 756 (S.D.N.Y. 2018) (citing

16

*Tellabs*, 551 U.S. at 324) (dismissing putative class action securities fraud complaint). Plaintiffs must allege facts: (1) that constitute strong circumstantial evidence of conscious misbehavior or recklessness; or (2) show that defendants had the motive and opportunity to commit fraud. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108-10 (2d Cir. 2009); *Novak*, 216 F.3d at 311.

As an initial matter, Plaintiff's scienter allegations fail because Plaintiff relies on group pleading, which cannot be used to allege scienter. *See In re Satyam Computer Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 477-78 (S.D.N.Y 2013). In its Amended Complaint, Plaintiff repeatedly groups all Defendants together without pleading specific facts as to the scienter for each, even though several of the Defendants were not even with the Company at the time of the alleged misstatements.[5] *See* Am. Compl. ¶¶ 82, 84, 89, 90, 94-96. Apart from the insufficient allegations regarding Mr. Yang's and Mr. Benya's resignations, Plaintiff never names Mr. Yang or Mr. Benya separately from Mr. Wu when alleging scienter. *See id.* ¶¶ 85, 87-88, 95-96. Indeed, Plaintiff only pleads one specific (and still inadequate) scienter allegation with respect to Mr. Wu, which is alone fatal to Plaintiff's claim as to the remaining Individual Defendants. *See, e.g.*, *In re Supercom Inc. Sec. Litig.*, No. 15 Civ. 9650 (PGG), 2018 U.S. Dist. LEXIS 175467, at *81-82 (S.D.N.Y. Oct. 10, 2018) (dismissing claims against certain individual defendants where plaintiffs allege "scienter as to all defendants indiscriminately").

For the additional reasons set forth below, the allegations as to scienter fail.

---

[5]     For example, Plaintiff lumps Mr. Benya in with all other Defendants, but Mr. Benya joined the Company in or around October 2017, Am. Compl. ¶ 25, after the purported misstatements relating to SVG/WAG revenue, *see id.* ¶¶ 29, 38, and the initial statement relating to 2017 revenue guidance, *id.* ¶¶ 41-47. Similarly, although Plaintiff groups Mr. Yang in with the other Defendants, Mr. Yang left the Company on or around October 9, 2017, *id.* ¶ 23, before Defendants' alleged misstatements pertaining to fourth quarter 2017 crude oil revenue, *id.* ¶¶ 57-58 and integration of blockchain, *id.* ¶¶ 64-71. Finally, Plaintiff groups Mr. Tovar in with the other Defendants, but Mr. Tovar did not start at the Company until June 1, 2018, *id.* ¶ 24—well after Defendants' purported misstatements regarding 2017 annual revenue guidance, crude oil revenues, and integration of blockchain.

### a)   Plaintiff's Motive Allegations Do Not Raise an Inference of Scienter.

Plaintiff's general allegations of motive as to all Defendants are the exact type of allegations that courts have held insufficient to establish scienter. Specifically, Plaintiff alleges that Defendants were motivated to artificially inflate Ideanomics's stock price to raise capital to avoid insolvency. Am. Comp. ¶ 104. These types of allegations are universal to every company and thus do not establish scienter. *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 531-32 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price . . . is far too generalized"); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187 (S.D.N.Y. 2008) ("Any corporation would be motived to . . . avoid bankruptcy . . . .").

Additionally, Plaintiff's allegations that all Defendants were motivated to artificially inflate the Company's stock price to make acquisitions also does not suffice to establish scienter. "Before grounding scienter on this manifestation of motive, courts ordinarily require evidence that the allegedly fraudulent inflation of stock prices was aimed at the specific acquisitions identified in the pleadings." *In re Agnico-Eagle Mines Sec. Litig.*, No. 11 Civ. 7968 (JPO), 2013 U.S. Dist. LEXIS 5287, at *33 (S.D.N.Y. Jan. 14, 2013). Courts assessing this question require a plaintiff to allege "facts that specifically connect the alleged pattern of concealment and misrepresentation to the particular transactions." *Id.* at *46 (citing *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009)). Plaintiff makes no connection here. Plaintiff does not allege that Defendants' misstatements were timed to affect these transactions; in fact, Plaintiff's chronology of events establishes that two of the three

18

misstatements Plaintiff alleges the Company made occurred *after* these acquisitions closed.[6] Without tying the alleged misstatements to these acquisitions, Plaintiff has not pleaded motive. *See ECA*, 553 F.3d at 201 (finding no motive where alleged fraud was not tied to facilitating the acquisition).

As to Mr. Wu, Plaintiff's allegations of motive also fail. Plaintiff alleges that "Bruno Wu was motivated to artificially inflate Ideanomics's stock price because doing so allowed Ideanomics to acquire more Bruno Wu companies, further enriching him." Am. Compl. ¶ 102. But, in those transactions Bruno Wu-related entities acquired shares—the exact opposite conduct that typically suffices to establish motive, which is a company executive selling shares at inflated prices prior to disclosure of the true facts about the company. *See Novak*, 216 F.3d at 307–08 (holding that motive was sufficiently pled where defendants allegedly misrepresented corporate performance to inflate stock price while selling their own shares). Simply put, the fact that Bruno Wu-related entities acquired shares undermines Plaintiff's motive allegations. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (finding no scienter where the only defendant who sold stock in the company retained a large investment and acquired more shares during the relevant time period); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n. 182 (S.D.N.Y. 2006) (noting "dozens of cases" dismissing complaints where "motive allegations were undermined by increases in total holdings").

---

[6]   The acquisitions occurred on December 4, 2017 and December 20, 2017, both of which are before the Company's January 16, 2018 statement regarding its preliminary and unaudited fourth quarter 2017 revenue and before the alleged misstatements regarding incorporating blockchain and artificial intelligence into Ideanomics's crude oil supply chain business.

**b)** **Plaintiff Does Not Adequately Allege Conscious Misbehavior or Recklessness.**

Nor does the Plaintiff's Amended Complaint allege "strong circumstantial evidence of conscious misbehavior or recklessness." *Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 225 (2d Cir. 2012). To plead scienter under such a theory, at a minimum Plaintiff must plead facts giving rise to a strong inference of "conscious recklessness", *i.e.*, a "state of mind approximating actual intent" and engaged in conduct that is "highly unreasonable and . . . an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *S. Cherry Street, LLC*, 573 F.3d at 109 (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). Because Plaintiff does not plead a fraudulent motive, their allegations regarding conscious misbehavior or recklessness must be "correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

To support their scienter allegations, Plaintiff offers conclusory allegations that all Defendants had access to information showing that the alleged statements were false when made. *See* Am. Compl. ¶¶ 84, 90, 94. Courts consistently recognize that "generalized allegations" that defendants "knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company" are "insufficient, as a matter of law, to establish scienter." *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions.").

As to the Company's 2017 revenue guidance, Plaintiff alleges that Messrs. Wu and Yang and Ideanomics knew or should have known that SVG and WAG earned $30 million in revenues and were unprofitable in the fourth quarter of 2016. Am. Compl. ¶¶ 85-88. As explained *infra*, Plaintiff simply points to no alleged facts showing why the Company's projected revenues should be limited to revenues based only upon SVG's and WAG's historical revenue for one quarter. Plaintiff does not take into account the Company's other acquisitions and its plans for the future or that the Company missed its guidance because of "[u]nanticipated personnel issues that led to internal communication and administrative oversights . . . ." Ex. 17.

Plaintiff also alleges that Ideanomics's replacing its auditor, Grant Thornton, somehow suggests knowing misstatements, Am. Compl. ¶ 89, but does not allege any facts showing that the auditors resigned or were replaced due to a dispute relevant to the 2017 annual revenue guidance (or any of Defendants' other statements). Plaintiff's speculation is also directly rebutted by Grant Thornton's confirmation that since its engagement there have been no disagreements with the Company. Ex. 22 (February 22, 2018 8-K). Thus, no inference of fraud can be drawn from the auditors' resignation. *See City of Brockton Retirement Sys. v. Shaw Grp. Inc.*, 540 F. Supp.2d 464, 474-75 (S.D.N.Y. 2008) (finding given auditors' letter confirming no disagreements with the issuer, "no inference of fraud or scienter can be drawn from [the auditor's] resignation in this case").

As to the Company's January 16, 2018 statement, Plaintiff alleges, again in a purely conclusory fashion, that "a review of the relevant data would have shown that the $170 million figure was incorrect." Am. Compl. ¶ 91. Such purely conclusory allegations are insufficient. *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 341 (S.D.N.Y. 2000) ("[P]laintiffs do not 'enjoy a license to base claims of fraud on speculation and conclusory allegations [of scienter]'" (internal

21

quotations omitted) (alteration in original)). Plaintiff also alleges that because the majority of the recognized revenue from the Company's crude oil trading business came from an entity that is partially owned by a minority shareholder in Ideanomics's subsidiary, Ideanomics purportedly possessed information that its crude oil revenue for the fourth quarter of 2017 was only $19 million and that the Company did virtually no crude oil business with third parties. Plaintiff's allegations are purely conclusory fraud-by-hindsight allegations that do not suffice. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) ("Fraud depends on the state of events when a statement is made, not on what happens later.") (citation omitted).

Plaintiff also alleges that the magnitude of the deviation is evidence of Ideanomics's scienter. Am. Compl. ¶ 91. "[I]t is well established that the size of the [alleged] fraud alone does not create an inference of scienter . . .  absent facts indicating that defendants knew of the falsity of their statements," and a purportedly large miss "does not support the required strong inference of scienter." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596-97 (S.D.N.Y. 2011). In *Glaser*, the court found that the fact "that defendants wrote down seventy-two percent of their net income d[id] not support the required strong inference of scienter." *Id.* Similarly here, a strong inference of scienter cannot be inferred from the magnitude of the deviation in the amount of revenue that was ultimately recognized from Ideanomics's fourth quarter 2017 crude oil transactions.

As to the Company's statements regarding integration of blockchain into its crude oil and consumer electronics businesses, Plaintiff offers no allegation that supports a finding of scienter. As explained *infra*, many of the statements Plaintiff has cherry-picked show that Ideanomics consistently disclosed its goal of "offering financing solutions and logistics solutions, each based on the emergence of systems that utilize blockchain and artificial intelligence . . . ." Ex. 8 at F-8. *See also* Ex. 2 at 10; Ex. 20 at 3; Ex. 23 (2017 10-K/A filed on August 28, 2018) at 4.

22

Plaintiff offers several additional general allegations of scienter that also fail. Plaintiff alleges that certain terminations and resignations suggest that those resignations and terminations related to the alleged misstatements. Am. Compl. ¶ 105. The departure of employees alone, whether by resignation or termination, is insufficient to establish scienter. *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 & n.85 (S.D.N.Y. 2005) (rejecting argument that resignations supported inference of scienter because "[i]n reality, there are any number of reasons that an executive might resign, most of which are not related to fraud"). To serve as indicia of recklessness, "resignations must be 'highly unusual and suspicious.' Such can be the case when independent facts indicate that the resignation was somehow tied to the fraud alleged, that the resignation somehow alerted defendants to the fraud, or that defendants' scienter was otherwise evident." *Glaser*, 772 F. Supp. 2d at 598. Plaintiff offers only conclusory allegations that do not lead to an inference of scienter that is as compelling as "any opposing inference of nonfraudulent intent." *Id.* at 586.

Additionally, Plaintiff claims that "[b]ecause the fraud alleged . . . relates to the primary business of Ideanomics, knowledge of the facts underlying the fraud may be imputed to the Defendants." *See* Am. Compl. ¶¶ 111-12. To the extent Plaintiff seeks to rely on the "core operations doctrine," courts in this Circuit have questioned whether the "core operations" doctrine has survived the PSLRA at all. *Plumbers & Pipefitters Local Union No. 630 Pension– Annuity Tr. Fund v. Arbitron, Inc.*, 741 F. Supp. 2d 474, 490 (S.D.N.Y. 2010). In any event, courts in this Circuit have recognized, an allegedly fraudulent statement concerning "core operations," standing alone, is insufficient to support strong circumstantial evidence of scienter. *Glaser*, 772 F. Supp. 2d at 595. Thus, Plaintiff cannot use the core operation doctrine to manufacture scienter they otherwise have not pleaded.

23

In sum, Plaintiff simply does not allege any facts—*i.e.*, review of specific data or information—showing that the Defendants knew, or were reckless in not knowing, that any of the purported misstatements were false when made. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008), something Plaintiff does not accomplish just by pointing to "financial records."

## B.    PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED.

For the reasons set forth herein, Plaintiff has not pleaded a Section 10(b) and Rule 10b-5 claim and Plaintiff's Section 20(a) claim should be dismissed. *Ross v. Lloyds Banking Grp., PLC*, Nos. 12-4600-cv (L), 13-729-cv (Con), 546 F. App'x 5, 12 (2d Cir. Sept. 19, 2013).

## C.    PLAINTIFF SHOULD NOT BE GRANTED LEAVE TO AMEND THE AMENDED COMPLAINT.

A court may deny leave to amend a complaint for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 624-25 (S.D.N.Y. 2013). "An amendment . . . is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *Id.* at 625 (alteration in original). "Where the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *Barrick Gold*, 341 F. Supp. 3d at 381. Even after having months to investigate and being permitted to assert claims a *second* time, Plaintiff still cannot point to facts supporting any colorable basis for establishing scienter or actionable misstatements made with knowledge of their falsity. There is no reason to believe allowing

24

Plaintiff a third bite at the apple will remedy these issues. Accordingly, Defendants respectfully submit that the Court deny as futile any request by Plaintiff to again amend the Complaint.

## V.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the claims against it with prejudice and grant all such other relief the Court deems just and proper.[7]

Dated:  January 17, 2020

Respectfully submitted,

**VENABLE LLP**

By:   /s/ George Kostolampros
George Kostolampros
600 Massachusetts Avenue NW
Washington DC  20001
Tel.: (202) 344-4426
Fax: (202) 344-8300

- and -

Xochitl S. Strohbehn
Dakota L. Kann
1270 Avenue of the Americas
Twenty-Fourth Floor
New York, New York 10020
Tel.:  (212) 307-5500
Fax:  (212) 307-5598

*Attorneys for Defendants Ideanomics, Inc., Bruno Wu, Bing Yang, and Robert Benya*

---

[7]   The Amended Complaint should also be dismissed as to all Defendants, including Federico Tovar, for the reasons set forth in Mr. Tovar's Motion to Dismiss the Amended Securities Class Action Complaint.