# EXHIBIT 20

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K/A**
(Amendment No. 2)

(Mark One)
☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: **December 31, 2017**

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File No. **001-35561**

# IDEANOMICS, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **20-1778374** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**55 Broadway, 19th Floor, New York, NY 10006**
(Address of principal executive offices)

**(212) 206-1216**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, par value $0.001 per share** | **Nasdaq Capital Market** |

Securities registered pursuant to Section 12(g) of the Exchange Act: **None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act

| | |
|---|---|
| Large Accelerated Filer ☐ | Accelerated Filer ☐ |
| Non-Accelerated Filer ☒ | Smaller reporting company ☒ |
| Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2017 (the last business day of the registrant's most recently completed second fiscal quarter as of the original date of this filing), the market value of the shares of the registrant's common stock held by non-affiliates (based upon the closing price of shares as reported by Nasdaq) was approximately $63,222,176. Shares of the registrant's common stock held by each executive officer and director and each by each person who owns 10% or more of the

outstanding common stock have excluded from the calculation in that such persons may be deemed to be affiliates of the registrant. This determination affiliate status is not necessarily a conclusive determination for other purposes.

There were a total of 68,865,056 shares of the registrant's common stock outstanding as of March 26, 2018.

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

**IDEANOMICS, INC.**
*Annual Report on FORM 10-K/A*
*For the Fiscal Year Ended December 31, 2017*

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| PART I |  | 1 |
| ITEM 1. | BUSINESS | 1 |
| ITEM 1A. | RISK FACTORS | 18 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 38 |
| ITEM 2. | PROPERTIES | 38 |
| ITEM 3. | LEGAL PROCEEDINGS | 39 |
| ITEM 4. | MINE SAFETY DISCLOSURES | 39 |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 39 |
| ITEM 6. | SELECTED FINANCIAL DATA | 39 |
| PART II |  | 40 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 40 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 50 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 51 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 93 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 94 |
| ITEM 9B. | OTHER INFORMATION | 95 |
| PART III |  | 96 |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 96 |
| ITEM 11. | EXECUTIVE COMPENSATION | 103 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS | 107 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 110 |
| ITEM 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 112 |
| PART IV |  | 113 |
| ITEM 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 113 |
| ITEM 16. | FORM 10-K SUMMARY | 113 |

**EXPLANATORY NOTE**

Ideanomics, Inc. is filing this Amendment No. 2 on Form 10-K/A (this "Amendment") to its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "Original Filing"), which was originally filed with the U.S. Securities and Exchange Commission ("SEC") on March 30, 2018, and amended on Form 10-K/A and filed with the SEC on August 28, 2018 ("Amendment No. 1").

The purpose of this amendment is to amend certain Items of our Original Filing and our Amendment No. 1 in response to comments received from the SEC. The Company is not required to update disclosures to reflect any events that occurred subsequent to March 30, 2018, but we have elected to update certain of the disclosures set forth in Part I—Item 1—"Business," Part I—Item 1A—"Risk Factors," Part I—Item 2—"Properties" and Part II—Item 7—"Management's Discussion and Analysis of Financial Condition and Results of Operations" to reflect recent developments.

**Special Note Regarding Forward Looking Statements**

In addition to historical information, this report contains forward-looking statements within the meaning of Section 27A of the Securities Act (as defined below), and Section 21E of the Exchange Act (as defined below). We use words such as "believe," "expect," "anticipate," "project," "target," "plan," "optimistic," "intend," "aim," "will" or similar expressions which are intended to identify forward-looking statements. Such statements include, among others, those concerning our transition to become a next-generation financial technology company; our expectations regarding the market for our new and existing products and industry segment growth; our expectations regarding demand for and acceptance of our new and existing products or services; our expectations regarding our partnerships and joint ventures, acquisitions, investments; our beliefs regarding the potential benefits and opportunities from integrating digital artificial intelligence and blockchain technology as part of our product and services offerings; our business strategies and goals; any projections of sales, earnings, revenue, margins or other financial items; any statements regarding the plans, strategies and objectives of management for future operations; any statements regarding future economic conditions or performance; uncertainties related to conducting business in the PRC; and all assumptions, expectations, predictions, intentions or beliefs about future events. You are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, including, and without limitation, those identified in Item 1A—"Risk Factors" included herein, as well as assumptions, which, if they were to ever materialize or prove incorrect, could cause the results of the Company to differ materially from those expressed or implied by such forward-looking statements.

Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, level of activity, performance, or achievements. Moreover, neither we nor any other person assumes responsibility for the accuracy or completeness of any of these forward-looking statements. You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements included herein are made as of the date of this report. We undertake no obligation to update any of these forward-looking statements, whether written or oral, that may be made, from time to time, after the date of this report to conform our prior statements to actual results or revised expectations.

**Use of Terms**

Except as otherwise indicated by the context, references in this report to "we," "us," "our," "our Company," "the Company," "IDEX," or "Ideanomics," are to the business of Ideanomics, Inc. (formerly known as "Seven Stars Cloud Group, Inc.," "SSC" and "Wecast Network, Inc."), a Nevada corporation, and its consolidated subsidiaries and variable interest entities.

In addition, unless the context otherwise requires and for the purposes of this report only:

- "CB Cayman" refers to our wholly-owned subsidiary China Broadband, Ltd., a Cayman Islands company;
- "Exchange Act" refers to the Securities Exchange Act of 1934, as amended;
- "FINRA" refers to the Financial Industry Regulatory Authority;
- "HK SAR" refers to the Hong Kong Special Administrative Region of the People's Republic of China;
- "Hua Cheng" refers to Hua Cheng Hu Dong (Beijing) Film and Television Communication Co., Ltd., a PRC company that is 39% owned by Sinotop Beijing and is a 20% owner of Zhong Hai Media;
- "PRC," "China," and "Chinese," refer to the People's Republic of China;

- "Renminbi" and "RMB" refer to the legal currency of the PRC;
- "SEC" refers to the United States Securities and Exchange Commission;
- "Securities Act" refers to the Securities Act of 1933, as amended;
- "SSF" refers to Tianjin Sevenstarflix Network Technology Limited, a PRC company controlled by YOD Hong Kong through contractual arrangements;
- "Shandong Broadcast" refers to Shandong Broadcast & TV Weekly Press, a PRC company;
- "Shandong Media" refers to Shandong Lushi Media Co., Ltd., a PRC company and a joint venture with respect to which we previously directly owned 50%; effective July 1, 2012, our interest in Shandong Media was reduced to a 30% stake held by Sinotop Beijing, which we indirectly control;
- "Sinotop Beijing" refers to Beijing Sino Top Scope Technology Co., Ltd., a PRC company controlled by YOD Hong Kong through contractual arrangements;
- "U.S. dollars," "dollars," "USD," "US$," and "$" refer to the legal currency of the United States;
- "U.S. Tax Reform" refers to the Tax Cuts and Jobs Act, enacted by the United States of America on December 22, 2017;
- "VIEs" refers to our current variable interest entities Sinotop Beijing, and SSF;
- "VOD" refers to video on demand, which includes near video on demand ("NVOD"), subscription video on demand ("SVOD"), and transactional video on demand ("TVOD");
- "Wecast Services" refers to our wholly-owned subsidiary Wecast Services Group Limited (formerly known as Sun Video Group Hong Kong Limited), a Hong Kong company;
- "Wecast SH" refers to Shanghai Wecast Supply Chain Management Limited, a PRC company that is 51% owned by the Company;
- "WFOE" refers to Beijing China Broadband Network Technology Co., Ltd., a PRC company and a "wholly foreign-owned enterprise," which we previously wholly owned and which was sold during the quarter ended March 31, 2014;
- "Wide Angle" refers to Wide Angle Group Limited, a Hong Kong company that is 55% owned by the Company;
- "YOD Hong Kong" refers to YOU On Demand (Asia) Limited, formerly Sinotop Group Limited, a Hong Kong company, which is wholly- owned by CB Cayman;
- "YOD WFOE" refers to YOU On Demand (Beijing) Technology Co., Ltd., a PRC company and a "wholly foreign-owned enterprise," which is wholly-owned by YOD Hong Kong; and
- "Zhong Hai Media" refers to Zhong Hai Shi Xun Media Co., Ltd., a PRC company that was 80% owned by Sinotop Beijing until June 30, 2017.

**PART I**

**ITEM 1.**          **BUSINESS**

**Overview**

Ideanomics, Inc. (Nasdaq: IDEX) was incorporated in the State of Nevada on October 19, 2004. From 2010 through 2017, our primary business activities have been providing premium content video on demand ("VOD") services, with primary operations in the PRC, through our subsidiaries and variable interest entities under the brand name You-on-Demand ("YOD"). In our YOD business, we provide premium content and integrated value-added service solutions for the delivery of VOD and paid video programming to digital cable providers, Internet protocol television ("IPTV") providers, Over-the-Top ("OTT") streaming providers, mobile manufacturers and operators, as well as direct customers.

Starting in early 2017, while continuing to support our YOD business, we began transitioning our business model to become a next-generation financial technology ("fintech") company, with the intention of offering customized products and services based on best-in-class blockchain, artificial intelligence ("AI") and other technologies to mature and emerging businesses across various industries. To do so, we are building a technology ecosystem through license agreements, joint ventures and strategic acquisitions, which we refer to as our "Fintech Ecosystem." In parallel, through strategic acquisitions, equity investments and joint ventures, we are building a network of businesses, operating across industry verticals, that we believe have significant potential to recognize benefits from blockchain and AI technologies including, for example, enhancing operations, addressing cost inefficiencies, improving documentation and standardization, unlocking asset value and improving customer engagement.

Our core business strategy is to promote the use, development and advancement of blockchain- and AI-based technologies, and our positioning in the fintech industry overall, by bringing technology leaders together with industry leaders and creating synergies between the businesses in our expanding Fintech Ecosystem and the businesses in our network of industry verticals, which we refer to as our "Industry Ventures." Specifically, we believe that the technologies being developed in our Fintech Ecosystem can be customized and leveraged to address various use cases presented by our Industry Ventures, which we believe will not only enhance the performance of our Industry Ventures, but also enhance the capabilities of our Fintech Ecosystem. For example, in 2017, we acquired a crude oil trading business and a consumer electronics trading business with the goal of gaining experience in the traditional logistics management and financing business, providing an initial use case for technologies in our Fintech Ecosystem, and enabling the application of our learnings from operating these businesses to the development of an AI- and blockchain-enabled platform for more efficient logistics management and finance generally.

We refer to our YOD business as our legacy YOD segment and all our other operations, including the development of our Fintech Ecosystem and our Industry Ventures, as our Wecast Services segment. The commodities trading component of the logistics management and financing businesses we acquired in 2017 provided 95.6% and 99.9% of our revenue for the year ended December 31, 2017 and for the nine months ended September 30, 2018, respectively. The other aspects of the development of our Fintech Ecosystem and our Industry Ventures, as described below, are still in the planning and testing phase and are generally not operational or revenue generating.

*Fintech Ecosystem*

We primarily rely upon third-party intellectual property ("IP") for the AI and blockchain technology being developed for our Wecast Services segment. In evaluating prospective technologies we seek to acquire, in-license or promote through joint ventures, we are focused on identifying industry leaders with strong and established engineering teams and technologies that are substantially developed. In doing so, we believe we can reduce the risks of reliance on a single technology with speculative functionality and adoption potential, while enhancing our flexibility and adaptability in a rapidly evolving technological environment.

Our strategy is to leverage the technology and teams that comprise our Fintech Ecosystem to create customized solutions for the use cases presented to us by our Industry Ventures. The customization of these business applications would be undertaken by our acquired subsidiaries or the joint ventures, as applicable, with the business development efforts of our parent company focused on expanding the network of technologies in our Fintech Ecosystem and facilitating other synergies between our Fintech Ecosystem and our Industry Ventures. While the development and expansion of our Fintech Ecosystem is primarily driven by a desire to match specific technologies with specific use applications in our Industry Ventures, we believe that many of the technologies in our Fintech Ecosystem will have applications outside of our own Industry Ventures, and that the work in customizing technology to our Industry Ventures can be leveraged to develop products and services for third parties.

BDCG Joint Venture

Between December 2017 and April 2018, we formed BBD Digital Capital Group Ltd., a New York corporation ("BDCG"), as a joint venture with management partners Tiger Sports Media Limited and Seasail, an affiliate of Big Business Data ("BBD"). We hold approximately 60% of the equity interest of BDCG and have the power to appoint three of the five directors of the board of BDCG. BDCG intends to capitalize on commodity and energy providers' needs for more precise risk management services, more informed operational planning and more strategic decision-making, specifically in the trading of index funds, futures and commodities. BDCG focuses on developing AI-driven financial data services as well as building transactional platforms for index, futures and derivative trading, for both global commodity and energy clients. Planned financial data services include risk management solutions, platforms for trading derivatives and indices, and debt and credit product offerings, with the primary objective being enhancing trading and risk management strategies.

BDCG leverages Pluto, Seasail's AI technology, which Seasail licenses to BDCG.  Pluto takes in dynamic, multi-variable inputs, such as, in the case of crude oil, information regarding trading, production origination, economic data and weather, and processes them according to flexible programmed models. For debt and credit products, BDCG has focused on data collection and integration capabilities based on "massive public data" and "acquired third-party data," including credit and multi-party loans. BBD has accumulated the information of over 100 million companies. Such information contains more than 150 data tables and over 3,700 data fields, and the amount of data continues to grow rapidly. BDCG can use the data accumulated by BBD to create risk and index models. Once these models are layered into a rating and risk management system and loan approval system for trade finance, the AI system can make informed recommendations as to trading and risk management. Pluto is then sold and licensed to third party financial product stakeholders for these services.

We believe we can leverage BDCG's AI services for the creation of financial products, risk ratings and indexing, and selection and recommendation systems on behalf of key stakeholders. By using AI technology to analyze the digital securitized assets we intend to develop, we aim to elevate not only the quality of the financial product, but also interactions among stakeholders. We also intend to design the digital securitized assets we develop to have data attributes that can be integrated into BDCG's approach for processing financial data.

Fundamental Interactions

In June 2018, we entered into a non-exclusive, royalty-bearing licensing agreement with Fundamental Interactions, Inc. ("FI"), which currently expires on June 25, 2021, with respect to certain blockchain technologies, including FI's Velocity Ledger, a blockchain-based, software-as-a-service (SaaS) platform that operates as a private blockchain solution for financial services. Through this agreement, we intend to leverage core FI technology and the Velocity Ledger platform to support the tokenization, secondary trading and settlement of new blockchain-based securities.

FinTalk

In September 2018, we entered into an agreement for the acquisition of FinTalk, a secure mobile messaging, collaboration and information services platform that delivers encrypted text and media messaging, with high performance large file transfer capabilities.

***Industry Ventures***

We believe there are a number of industries that can benefit from the application of next-generation technologies, such as blockchain, AI, machine learning and big data. Our strategy is not only to promote the development of promising technologies through our Fintech Ecosystem, but also to acquire, invest in and form joint ventures with businesses in the various industries that we believe can be well served by our Fintech Ecosystem. In so doing, we believe that we can benefit both from growth in the Industry Ventures themselves, as well as from the enhanced potential for monetizing the technologies in our Fintech Ecosystem that would come with refining these technologies for our Industry Ventures.

<u>Logistics Management and Financing</u>

Our first group of Industry Ventures has focused on the logistics management and financing industry. Logistics management is the component of supply chain management that helps organizations plan, manage and implement processes to store and move goods from origin to destination. Logistics financing supports businesses where the order-to-delivery cycle may not correlate with cash flow needs. We believe that by ensuring that information is transparent, accurate and verifiable at various stages during the shipping process, blockchain-enabled logistics management platforms can streamline and standardize the product flow from sellers to buyers and eliminate standard transactional intermediaries in the freight and shipping industry. Further, we believe that by decreasing middle-man costs, we can greatly improve the efficiency of capital utilization, expand margins and accelerate inventory turnover for companies shipping and ordering goods. In addition, we believe that the transparency and security provided by blockchain technologies, combined with the computing power of AI technologies, can reduce existing logistics financing costs, including by improving risk management and decision making, and enable alternative logistics financing solutions.

To support the development of blockchain- and AI-based technologies for the logistics management and financing industries, we entered the commodities trading business, with the primary goal of learning about the needs of buyers and sellers in industries that rely heavily on the shipment of goods to inform our understanding of the features a blockchain platform would need in order to serve this industry vertical. Specifically, we elected to focus on the crude oil and consumer electronics businesses, which are industries that we estimate are sufficiently commoditized and high volume, in order to (i) serve as meaningful controls, (ii) identify inefficiencies in the logistics management and finance industries and (iii) generate data to support the potential future application of AI solutions.

Our crude oil trading business commenced in October 2017, when we formed our Singapore joint venture, Seven Stars Energy Pte. Ltd. ("SSE"), which is 51% owned by us. The other partner in the joint venture is a businessman based in Singapore with extensive experience in the oil trading industry and ownership or control of several large oil tankers. Our consumer electronics trading business commenced on January 2017, and is operated by our subsidiary Amer Global Technology Limited ("Amer"), which is held by Wide Angle Group Limited ("Wide Angle"), in which we have a 55% interest. The end customers in our crude oil and consumer electronics trading businesses include about 15 to 20 corporations across the world. Our crude oil trading business does not currently integrate blockchain- or AI-based logistics solutions. For our consumer electronics trading business, we developed a TPaaS (Transactional Platform as a Service) system, which we began testing through Amer in the fourth quarter of 2017. This system is designed to allow participants to place orders and complete transactions on their own, with transaction-based platform service fees at lower costs than traditional methods.

<u>Consumer Digital Products</u>

Our second group of Industry Ventures focuses on consumer digital products. We believe that existing communities of consumers, merchants and service providers can significantly benefit from platforms that leverage blockchain technologies to aggregate content and services and products, such as blockchain-based digital membership cards, digital wallets, and loyalty programs that offer cash or other token-based rewards to users within these communities.

In September 2018, we purchased a 65.65% equity interest in Grapevine Logic Inc. ("Grapevine"), and an affiliate of Dr. Bruno Wu, our former Chairman of the Board and Chief Executive Officer, has an option to sell the remaining 34.35% stake in Grapevine to us for fair value. Grapevine is an end-to-end influencer marketing platform that facilitates collaboration between advertisers and brands with video based social influencers and content creators. Through the Grapevine platform, more than 4,700 companies have been able to hire the services of over 177,000 social influencers, ultimately helping these companies to promote their products and strengthen their brand. We believe that Grapevine will help us develop strength in the consumer digital products industry vertical by providing the platform for connecting brands with content-producing influencers and their large-scale audience of consumer-driven followers to whom digital tokens, loyalty and discount cards, multi-purpose digital wallets, and other services may be marketed via Grapevine on behalf of Ideanomics, brand advertisers and influencers, all according to a follower's areas of interest.

Also in September 2018, we announced the proposed joint venture with Asia Times Holdings, a Hong Kong company which owns the Asia Times newspaper, to be named Asia Times Financial Limited. We intend for the joint venture to use the FinTalk platform we are acquiring to provide a next generation financial information and communication service through AI-enabled financial data analytics and an end-to-end encrypted messaging system.

<u>Financial Services</u>

As evidenced by the proliferation of offerings of blockchain-based tokens in recent years, and the rapid growth of an industry to support these offerings, we believe that a core use case for blockchain and AI technology lies in financial services, digital asset securitization, and blockchain-enabled trading platforms. We plan to provide consulting services to companies seeking financing both through the sales of blockchain based instruments, such as securitized assets represented by digital tokens, which we refer to as "digital securitized assets," as well as through conventional means, such as sales of traditional equity and debt securities. We believe that this dual approach to financial transactions, coupled with a related AI and blockchain enabled financial services platform, will provide us with flexibility to address the needs of issuers and investors. We also aim to use AI-powered analytics from our technology investments for different use cases, such as the trading, pricing, indexing and ratings of digital tokens (including digital securitized assets). Although we do not yet offer products or services in this industry vertical, we believe that ultimately, the Industry Ventures we form, acquire or invest in in this area will become the core of our business.

*Digital Asset Securitization*

We believe that we can use AI- and blockchain-enabled technology to provide a seamless method and platform for the creation and trading of digital securitized assets. Specifically, we plan to facilitate the securitization of tangible and intangible assets, such as data and IP, into new financial products, to "tokenize" these financial products by digitally recording them on a blockchain, to enable advanced platforms and capabilities using AI and blockchain technology, and to support the distribution and monetization of digital securitized assets. In so doing, we can be a leader in the transition of traditional financial products, such as commodities, currencies, credit, leasing, real estate and other asset classes, into the asset digitalization era.

Creating digital securitized assets requires the conversion of illiquid, tangible and intangible assets into blockchain enabled securities that we anticipate will, subject to future regulatory approval, be easily traded via exchanges, and as such, are more liquid than the underlying asset. We refer to this process as "digital asset securitization."

As a first step in this process, we are identifying and engaging in discussions, negotiations and, in some cases, joint ventures, with third parties that own the specific tangible and intangible assets to be securitized, who we refer to as "asset originators," or that have relationships with asset originators. We may also elect to securitize assets owned by our Company, potentially including assets held by our other Industry Ventures, such as crude oil and consumer electronics products. Next, we will work with domestic and international securities market professionals, including licensed broker-dealers, merchant banks, ratings agencies and financial institutions, to structure and document the securitization of the assets, creating an asset backed financial product that can be more easily distributed and traded. This securitization process may include the pooling of assets, whether within the same asset class or across asset classes or asset originator types, or fractionalization of ownership of individual assets.

Once assets have been securitized, the new asset backed financial product will be represented in the form of digital, blockchain based tokens. We refer to this process as "digital tokenization." Digital tokens are representative units of value, analogous to a stock certificate or a book-entry position, each of which reflects a holder's ownership of a security, the terms of which are established in the investment documentation. Each of these tokens will be created by a "smart contract," a self-executing agreement whose lines of code will reflect the economic and governance terms determined in the asset securitization process.

We intend for our digital tokenization process largely to rely upon technologies already in use and accessible in today's blockchain market, such as Ethereum's ERC-20 tokens, thus reducing the need, costs and execution risks of new technology development. We also intend to enter into leverage our Fintech Ecosystem to use blockchains that may be optimized for tokenization of assets in specific industry verticals, including, potentially basing these technologies on FI's Velocity Ledger. We believe there are myriad benefits that can potentially be afforded by tokenizing securities via Velocity Ledger, including new product creation and market exposure, competitive fees, fast deal execution, and access to institutional investors and broker dealers.

*Trading and Financial Services Platforms*

We believe that regulated alternative trading systems ("ATSs") and sophisticated risk management software are important for the development of trading markets for blockchain based digital tokens, including the digital securitized assets we plan to originate as part of our financial services business. Accordingly, we are making strategic investments that are intended to promote the development of regulated ATSs that will enhance the blockchain token trading ecosystem and AI-based ratings systems to enhance the market viability of our digital securitized assets.

Between August 2017 and March 2018, we acquired approximately 28% of the capital stock of Delaware Board of Trade Holdings, Inc. ("DBOT"), which is a FINRA member firm and has filed an initial operations report on Form ATS to give notice of operations of DBOT ATS, LLC ("DBOT ATS"), and which we believe is well positioned to develop blockchain-enabled transactional platforms. DBOT operates three business lines, (i) DBOT ATS, which is intended to be an ATS for equity securities not listed on the New York Stock Exchange or the Nasdaq, (ii) DBOT Issuer Services LLC, which is focused on setting and maintaining issuer standards, as well as the provision of issuer services to DBOT designated issuers, and (iii) DBOT Technology Services LLC, which is focused on the provision of market data and marketplace connectivity.

DBOT has entered into agreements with FI (which is also a licensor to Ideanomics), pursuant to which FI is developing a blockchain enabled primary issuance and secondary trading platform for DBOT ATS using the Velocity Ledger. Under the agreements, DBOT will maintain licensing rights for the technology.

### Legacy YOD Segment

Since 2010, we have provided premium content and integrated value-added service solutions for the delivery of VOD and paid video programming to digital cable providers, IPTV providers, OTT streaming providers, mobile manufacturers and operators, as well as direct customers. The core revenues were generated from both minimum guarantee payments and revenue sharing arrangements with distribution partners as well as subscription or transactional fees from subscribers.

In October 2016, we signed an agreement to form a five year partnership with Zhejiang Yanhua Culture Media Co., Ltd., a company organized under the laws of the PRC ("Yanhua"), where Yanhua will act as the exclusive distribution operator (within the territory of PRC) of our licensed library of major studio films (the "Yanhua Partnership"). We entered into the Yanhua Partnership and exclusive distribution agreement in order to offset losses from high upfront minimum guarantee licensing fees to studios. The Yanhua Partnership modified and improved our legacy major studio paid content business model by moving from a framework that included high and fixed costs and upfront minimum guaranteed payments, rising content costs from major Hollywood studios and low margins to a structure that will now include relatively nominal costs to our Company and the opportunity to reach an even wider audience. With the Yanhua Partnership, Yanhua assumed all sales and marketing costs and will pay us a minimum guarantee in exchange for a percentage of the total revenue share.

Pursuant to the Yanhua Partnership, the existing legacy Hollywood studio paid content as well as other IP content specified in the agreement, along with the corresponding authorized rights letter that we are entitled to, will be transferred to Yanhua for RMB13,000,000 (approximately $2 million), to be paid in two equal installments in the amount of RMB6,500,000 (approximately $1 million). The first installment was received on December 30, 2016 and was recognized as revenue in 2017 based on the relative fair value of licensed content delivered to Yanhua. The second installment will be paid if the license content fees due to studios for the existing legacy Hollywood paid contents are settled. To date, the legacy Hollywood studio paid content and other IP has not been transferred, as the second installment was not yet made.

We still run our legacy YOD segment with limited resources and plan to continue to run it through the Yanhua Partnership, where Yanhua will act as the exclusive distribution operator (within the PRC) of our licensed library of major studio films. We launched our legacy VOD service through the acquisition of YOD Hong Kong (formerly Sinotop Group Limited) on July 30, 2010, by China CB Cayman. Through a series of contractual arrangements, YOD WFOE, the subsidiary of YOD Hong Kong, controls Sinotop Beijing, a corporation established in the PRC. Sinotop Beijing was the 80% owner of Zhong Hai Media until June 30, 2017, through which we provided: (1) integrated value–added business–to–business ("B2B") service solutions for the delivery of VOD and enhanced premium content for digital cable; (2) integrated value–added business–to–business–to–customer ("B2B2C") service solutions for the delivery of VOD and enhanced premium content for IPTV and OTT providers; and (3) a direct to user, or business-to-customer ("B2C"), mobile video service app. We sold Zhong Hai Media on June 30, 2017 to Hanghzou for a nominal amount.

### Management Team with Significant Blockchain and AI Experience

To support our transition to a next-generation AI and blockchain enabled fintech company, we have strategically secured a management team with diversified expertise in operations, technology, fintech, blockchain, AI, capital markets and the financial services industry, and are transitioning our operations toward the United States, having 19 U.S. employees as of September 30, 2018, as compared to three as of December 31, 2017. As of the date of this filing, we the key members of our management team include:

*Loan Agreement*

Pursuant to the Loan Agreement among YOD WFOE and the nominee shareholders, YOD WFOE agrees to lend RMB19.8 million and RMB0.2 million, respectively, to the nominee shareholders of SSF for the purpose of establishing SSF and for development of its business. As of December 31, 2017, RMB27.6 million ($4.2 million) and RMB nil have been lent to Lan Yang and Yun Zhu, respectively. Lan Yang has contributed all of the RMB27.6 million ($4.2 million) in the form of capital contribution and accordingly the loan is eliminated with the capital of SSF upon consolidation. The loan can only be repaid by a transfer by the nominee shareholders of their equity interests in SSF to YOD WFOE or YOD WFOE's designated persons, through (i) YOD WFOE having the right, but not the obligation to at any time purchase, or authorize a designated person to purchase, all or part of the Nominee Shareholders' equity interests in SSF at such price as YOD WFOE shall determine (the "Transfer Price"), (ii) all monies received by the nominee shareholders through the payment of the Transfer Price being used solely to repay YOD WFOE for the loans, and (iii) if the Transfer Price exceeds the principal amount of the loans, the amount in excess of the principal amount of the loans being deemed as interest payable on the loans, and to be payable to YOD WFOE in cash. Otherwise, the loans shall be deemed to be interest-free. The term of the Loan Agreement is perpetual, and may only be terminated upon the nominee shareholders receiving repayment notice, or upon the occurrence of an event of default under the terms of the agreement.

**Our Unconsolidated Equity Investments**

We hold a 30% ownership interest in Shandong Media, which is our print based media business, and account for our investment in Shandong Media under the equity method. The business of Shandong Media includes a television programming guide publication, the distribution of periodicals, the publication of advertising, the organization of public relations events, the provision of information related services, copyright transactions, the production of audio and video products, and the provision of audio value added communication services.

We hold a 39% ownership interest in Hua Cheng, and account for our investment in Hua Cheng under the equity method. The business of Hua Cheng mainly includes distribution of content and VOD business on television terminal.

We hold a 50% ownership interest in Wecast Internet Limited, a Hong Kong company ("Wecast Internet"), and account for our investment in Wecast Internet under the equity method. The business of Wecast Internet mainly includes computer network technology development, integrated circuit of software and hardware technology development, technical consultation.

From August 2017 through March 2018, we acquired 28% ownership interest in DBOT, and are accounting for our investment in DBOT under the equity method starting from October 2018. DBOT is a FINRA member firm, and filed an initial operations report on Form ATS to give notice of DBOT ATS's operations. DBOT is powered through blockchain technology licensed from one of our strategic licensing partners.

Our investments in Shandong Media, Hua Cheng, Wecast Internet and DBOT where we may exercise significant influence, but not control, is classified as a long-term equity investment and accounted for using the equity method. Under the equity method, the investment is initially recorded at cost and adjusted for our share of undistributed earnings or losses of the investee. Investment losses are recognized until the investment is written down to nil, provided that we do not guarantee the investee's obligations or we are committed to provide additional funding.

**Our Competition**

*Wecast Services Segment*

We will face significant competition with respect to the products and services we plan to offer in the blockchain and AI enabled fintech business we are building, and we currently face significant competition with respect to the businesses we operate that currently generate revenue. Our long term strategic goal is to leverage blockchain and AI based fintech solutions to offer products and services that will bring transparency, efficiency and cost savings to various markets, including finance, commodities, energy, consumer products and transportation logistics. We therefore face significant competitive pressure not only with other developers of blockchain and AI technologies in the fintech space, but also in the markets for the products and services we offer or plan to offer, which are very competitive and subject to rapid technological advances, new market entrants, non-traditional competitors, changes in industry standards and changes in customer needs and consumption models.

We believe that our parallel strategy of building out our Fintech Ecosystem while developing a network of Industry Ventures will enable us to compete in our planned businesses on the basis of our ability to offer a wider range of value-added services than our competitors. We also believe that our unique position as a cross-border company will give us the ability to create partnerships with companies developing new technologies in both the United States and Asia.

While we generate revenues from our crude oil and consumer electronics business, we engage in this business largely for research purposes to support our development of fintech solutions for this space, and not primarily with a view to competitive returns.

*YOD Segment*

While we are developing our new businesses, we are primarily generating revenues from our legacy YOD segment. The market for video entertainment is subject to continuous change and aggressive competition. Our primary competitors in this space include Internet based content providers and the DVD market, such as iQiyi.com, Youku, Tencent and Sohu. We also face competitors who may attempt to undercut the market by providing pirated (illegal) content. Although we can provide no assurances that other companies will not enter the market of providing such services, we believe that we will have a competitive advantage over any new market entrant because of our exclusive joint venture partnership with CCTV-6's pay channel, CHC, and first to market advantage.

**Seasonality Variations in Business**

Our operating results and operating cash flows historically for our legacy YOD segment have not been subject to seasonal variations. However, we expect a disproportionate amount of our revenues generated from Wecast Services quarter over quarter to be subject to seasoned fluctuations at holiday periods and due to introduction of new consumer electronics products. There may also be fluctuations related to weather changes for the crude oil trading business. This pattern may change, however, as a result of new market opportunities or new product introductions.

**Regulation**

*General Regulation of Businesses in the PRC*

We are required to obtain government approval from the Ministry of Commerce of the PRC ("MOFCOM"), and other government agencies in the PRC for transactions, such as our acquisition or disposition of business entities in the PRC. Additionally, foreign ownership of business and assets in the PRC is not permitted without specific government approval. For this reason, Sinotop Beijing was acquired through our acquisition of YOD Hong Kong, which controls Sinotop Beijing through a series of contractual agreements with YOD Hong Kong and YOD WFOE. We use voting control agreements among the parties so as to obtain equitable and legal ownership or control of our subsidiaries and VIEs to conduct our legacy YOD business.

Investment activities in the PRC by foreign investors are principally governed by the Guidance Catalogue of Industries for Foreign Investment, or the Catalogue, which was promulgated and is amended from time to time by the MOFCOM and the National Development and Reform Commission. The Catalogue sets forth the industries in which foreign investments are "encouraged", "restricted", or "prohibited". Industries that are not listed in any of the above three categories are permitted areas for foreign investments and are generally open to foreign investment unless specifically restricted by other PRC regulations. Establishment of wholly foreign owned enterprises is generally allowed in encouraged and permitted industries. Foreign investors are not allowed to invest in industries in the prohibited category.

According to the latest version of the Catalogue, which came into effect on July 28, 2017, foreign investments in value-added telecommunications services (except for e-commerce) are "restricted". Therefore, we provide value-added telecommunications services through our VIE in the PRC.

Other than value-added telecommunications, most of our PRC subsidiaries mainly engage in technical services, consultations and trading activities, which are "encouraged" under the latest version of the Catalogue.

Under PRC law, the establishment of a wholly foreign owned enterprise is subject to the approval of or filing with the MOFCOM or its local counterparts and the wholly foreign owned enterprise must register with the competent industry and commerce bureau. Our significant PRC subsidiaries have duly obtained all material approvals required for their business operations.

Foreign direct investment in telecommunications companies in the PRC is governed by the Regulations for the Administration of Foreign-Invested Telecommunications Enterprises, which was promulgated by the State Council on December 11, 2001 and recently amended on February 6, 2016. The regulations provide that a foreign investor's beneficial equity ownership in an entity providing value-added telecommunications services in the PRC is not permitted to exceed 50%. In addition, the main foreign investor who invests in a foreign-invested value-added telecommunications enterprise operating the value-added telecommunications business in the PRC must demonstrate a good track record and experience in operating a value-added telecommunications business, provided such investor is a major one among the foreign investors investing in a value-added telecommunications enterprise in the PRC. Moreover, foreign investors that meet these requirements must obtain approvals from the Ministry of Industry and Information Technology, or the MIIT, and the MOFCOM, or their authorized local counterparts, which retain considerable discretion in granting approvals, for its commencement of value-added telecommunications business in the PRC.

The MIIT's Notice Regarding Strengthening Administration of Foreign Investment in Operating Value-Added Telecommunication Businesses, or the MIIT Notice, issued on July 13, 2006 prohibits holders of these services licenses from leasing, transferring or selling their licenses in any form, or providing any resources, sites or facilities, to any foreign investors intending to conduct such businesses in the PRC.

The PRC market, in which we operate our legacy YOD business, poses certain macro-economic and regulatory risks and uncertainties. These uncertainties extend to the ability of us to conduct wireless telecommunication services through contractual arrangements in the PRC since the industry remains highly regulated. We conduct those operations in the PRC through a series of contractual arrangements entered among YOD WFOE, Sinotop Beijing as the parent company of Zhong Hai Media, SSF and the respective legal shareholders of Sinotop Beijing and SSF. We believe that these contractual arrangements are in compliance with PRC law and are legally enforceable. If Sinotop Beijing, SSF or their respective legal shareholders fail to perform the obligations under the contractual arrangements or any dispute relating to these contracts remains unresolved, YOD WFOE or YOD HK can enforce its rights under the VIE contracts through PRC law and courts. However, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. In particular, the interpretation and enforcement of these laws, rules and regulations involve uncertainties. If YOD WFOE had direct ownership of Sinotop Beijing and SSF, it would be able to exercise its rights as a shareholder to effect changes in the board of directors of Sinotop Beijing or SSF, which in turn could effect changes at the management level, subject to any applicable fiduciary obligations. However, under the current contractual arrangements, we rely on Sinotop Beijing, SSF and their respective legal shareholders to perform their contractual obligations to exercise effective control. We also give no assurance that PRC government authorities will not take a view in the future that is contrary to our opinion. If our current ownership structure and our contractual arrangements with the VIEs and their equity holders were found to be in violation of any existing or future PRC laws or regulations, our ability to conduct its business could be impacted and we may be required to restructure our ownership structure and operations in the PRC to comply with the changes in the PRC laws which may result in deconsolidation of the VIEs.

In addition, the telecommunications, information and media industries remain highly regulated. Restrictions are currently in place and are unclear with respect to which segments of these industries foreign owned entities, like YOD WFOE, may operate. The PRC government may issue from time to time new laws or new interpretations on existing laws to regulate areas, such as telecommunications, information and media, some of which are not published on a timely basis or may have retroactive effect. For example, there is substantial uncertainty regarding the Draft Foreign Investment Law, including, among others, what the actual content of the law will be as well as the adoption and effective date of the final form of the law. Administrative and court proceedings in the PRC may also be protracted, resulting in substantial costs and diversion of resources and management attention. While such uncertainty exists, we cannot assure that the new laws, when it is adopted and becomes effective, and potential related administrative proceedings will not have a material and adverse effect on our ability to control the affiliated entities through the contractual arrangements. Regulatory risk also encompasses the interpretation by the tax authorities of current tax laws, and our legal structure and scope of operations in the PRC, which could be subject to further restrictions resulting in limitations on our ability to conduct business in the PRC.

Chinese regulations will also significantly impact our Wecast Services segment. For example, in September 2017, reports were published that the PRC may begin prohibiting the practice of using digital assets for capital fundraising. In 2018, reports surfaced that the PRC had banned local digital asset exchanges from operating within the country. Until there is greater regulatory clarity and acceptance of digital token and blockchain-based financial products in the PRC, we may not be able to provide certain services under our Wecast Services segment in the PRC.

13

**Consolidated Results of Operations**

**Comparison of Years Ended December 31, 2017 and 2016**

| | Year Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2017 | December 31, 2016 | Amount Change | % Change |
| Revenue (including related party revenue of $18,973,054 and nil for the years ended December 31, 2017 and 2016, respectively) | $   144,338,805 | $   35,185,508 | $   109,153,297 | 310% |
| Cost of revenue | 137,188,353 | 35,551,198 | 101,637,155 | 286% |
| **Gross profit (loss)** | **7,150,452** | **(365,690)** | **7,516,142** | **2055%** |
| | | | | |
| Operating expenses: | | | | |
| Selling, general and administrative expenses | 12,848,184 | 10,898,323 | 1,949,861 | 18% |
| Research and development expenses | 406,845 | - | 406,845 | 100% |
| Professional fees | 3,153,697 | 1,400,139 | 1,753,558 | 125% |
| Depreciation and amortization | 306,801 | 505,028 | (198,227) | (39)% |
| Impairments of other intangible assets | 216,468 | 2,018,628 | (1,802,160) | (89)% |
| Earn-out share award expenses | - | 13,700,000 | (13,700,000) | (100)% |
| **Total operating expense** | **16,931,995** | **28,522,118** | **(11,590,123)** | **(41)%** |
| | | | | |
| **Loss from operations** | **(9,781,543)** | **(28,887,808)** | **19,106,265** | **(66)%** |
| | | | | |
| Interest & other income/(expense): | | | | |
| Interest expense, net | (95,658) | (254,725) | 159,067 | (62)% |
| Change in fair value of warrant liabilities | (112,642) | 324,432 | (437,074) | (135)% |
| Equity in loss of equity method investees | (129,193) | (31,557) | (97,636) | 309% |
| Impairment of equity method investments | - | (38,448) | 38,448 | (100)% |
| Others | (73,833) | 57,017 | (130,850) | (229)% |
| | | | | |
| **Loss before income taxes and non-controlling interests** | **(10,192,869)** | **(28,831,089)** | **18,638,220** | **(65)%** |
| | | | | |
| Income tax benefit | - | 330,124 | (330,124) | (100)% |
| | | | | |
| **Net loss** | **(10,192,869)** | **(28,500,965)** | **18,308,096** | **(64)%** |
| | | | | |
| Net loss attributable to non-controlling interests | 357,268 | 2,092,991 | (1,735,723) | (83)% |
| | | | | |
| **Net loss attributable to shareholders** | **(9,835,601)** | **(26,407,974)** | **16,572,373** | **(63)%** |

*Revenues*

| | 2017 USD | 2016 USD | Difference USD | % |
| --- | --- | --- | --- | --- |
| Legacy YOD | 794,273 | 4,543,616 | (3,749,343) | (83)% |
| Wecast Services | 143,544,532 | 30,641,892 | 112,902,640 | 368% |
| **Total** | **144,338,805** | **35,185,508** | **109,153,297** | **310%** |

Revenue for the year ended December 31, 2017 was $144.3 million, as compared to $35.2 million for the same period in 2016, an increase of approximately $109.2 million, or 310%. The increase was mainly due to a $112.9 million increase in revenues from our Wecast Services segment, which was partially offset by a $3.7 million decrease in revenues from our legacy YOD segment. Specifically, for the year ended December 31, 2017, the commodities trading component of the logistics management and financing businesses we acquired in 2017 provided 95.6% of our revenue, our legacy YOD segment provided 0.6% of our revenue and the remaining 3.8% of our revenue was provided by one-time consulting services, one-time platform maintenance services and certain technology support services.

43

In our legacy YOD segment, the decrease in revenue was primarily due to the change of our strategy, namely the transition away from our legacy YOD business (acting as a premium content VOD service provider) to the Wecast Services segment (focusing on becoming a next-generation fintech company). This transition limits the support of the YOD business and the YOD segment revenue is mainly from legacy contracts. Currently, we have a partnership with a third party acts that as the exclusive distribution operator (within the territory of PRC) of our licensed library of major studio films.

In our Wecast Services segment, the increase in revenue was mainly due to our new business lines, namely consumer electronics trading starting in January 2017 and crude oil trading starting in October 2017, and to a lesser extent, one-time consulting services that we provided to certain customers. In particular, Wecast Services segment revenue for the year ended December 31, 2016 only included the revenue of SVG and Wide Angle from November 10, 2016, while for the year ended December 31, 2017 it included the revenue of SVG and Wide Angle for the full fiscal year. In addition, our acquisitions of SVG and Wide Angle resulted in new customer channels for our business and incremental sales, all of which allowed us to experience strong growth in 2017.

*Cost of revenue*

| | 2017 | 2016 | Difference | |
|---|---|---|---|---|
| | USD | USD | USD | % |
| Legacy YOD | 762,614 | 4,434,260 | (3,671,646) | (83)% |
| Wecast Services | 136,425,739 | 31,116,938 | 105,308,801 | 338% |
| **Total** | **137,188,353** | **35,551,198** | **101,637,155** | **286%** |

Cost of revenues was $137.2 million for the year ended December 31, 2017, as compared to $35.6 million for the year ended December 31, 2016. Our cost of revenues increased by $101.6 million which is in line with our increase in revenues. Our cost of revenues is primarily comprised of costs to purchase consumer electronics products and crude oil from suppliers in our supply chain business as well as the cost of sales from the legacy YOD segment, which is primarily comprised of content licensing fees. Our content license agreements with production companies incorporate minimum guaranteed payment levels.

*Gross profit*

| | 2017 | 2016 | Difference | |
|---|---|---|---|---|
| | USD | USD | USD | % |
| Legacy YOD | 31,659 | 109,356 | (77,697) | (71)% |
| Wecast Services | 7,118,793 | (475,046) | 7,593,839 | 1,599% |
| **Total** | **7,150,452** | **(365,690)** | **7,516,142** | **2055%** |

Our gross profit for the year ended December 31, 2017 was approximately $7.2 million, as compared to a gross loss of $0.4 million during the same period in 2016. Gross profit ratio for the year ended December 31, 2017 was 5.0%, while in 2016, it was negative. The reason for the gross loss in 2016 was due to the costs associated with the consumer electronic supply chain business that had large startup costs in its infancy, as we looked to expand our customer base and sales volume. For the year ended December 31, 2017, gross margin for the consumer electronic supply chain business has increased to 2.7%, which contributed gross profit in the amount of $3.3 million.

*Selling, general and administrative expenses*

Our selling, general and administrative expense for the year ended December 31, 2017 was $12.8 million as compared to $10.9 million for the same period in 2016, an increase of approximately $1.9 million or 18%. The majority of the increase was due to (1) an increase in our sales and marketing expense in the amount of $1.6 million to introduce and promote our business to various new potential business partners; (2) an increase of approximately of $0.9 million of share based compensation due to the option and restricted stock units that we approved for grant to independent board members for their 2017 compensation, which included a significant increase in board related work during 2017 as compared with prior years; (3) an increase in headcount and relevant traveling expenses in the amount of $1.1 million and (4) leasehold improvement disposal losses of approximately $0.7 million that were incurred when we canceled our purchase of the Beijing office building in 2017.

| | | | | |
|---|---|---|---|---|
| **Net cash provided by financing activities[i]** | $ | 189,515 | $ | 6,555,377 |

(i)   Intercompany receivables and payables are eliminated upon consolidation. The intercompany financing activities include the capital injection of $0.2 million to SSF in 2017.

70

The decrease in assets and liabilities mainly due to disposal of Zhong Hai Shi Xun Media as of June 30, 2017.

**5.    Acquisition**

*(a)    Acquisition of SVG and Wide Angle*

On January 30, 2017, the Company entered into a Securities Purchase Agreement (the "Sun Video SPA") with BT Capital Global Limited, a British Virgin Islands company ("BT") which is controlled by Company's Chairman Bruno Wu, for the purchase by the Company of all of the outstanding capital stock of Sun Video Group Hong Kong Limited, a Hong Kong corporation ("SVG"), for an aggregate purchase price of $800,000 and a $50 million Promissory Note (the "SVG Note") with the principal and interest thereon convertible into shares of the Company's common stock at a conversion rate of $1.50 per share. BT has guaranteed that SVG will achieve certain financial goals within 12 months of the closing. Until receipt of necessary shareholder approvals, the SVG Note is not convertible into shares of the Company's common stock, but once the necessary shareholder approval is received, the unpaid principal and interest thereon will automatically convert. Under the terms of the Sun Video SPA, BT has guaranteed that the business of SVG and its subsidiaries (the "Sun Video Business") shall achieve revenue of $250 million and $15 million of gross profit (collectively the "Performance Guarantees") within 12 months of the closing. If the Sun Video Business fails to meet either of the Performance Guarantees within such time, BT shall forfeit back to the Company the shares of the Company's common stock or the SVG Note, on a pro rata basis based on the Performance Guarantee for which the Sun Video Business achieves the lowest percentage of the respective amount guaranteed.

In addition, if the Sun Video Business achieves more than $50 million in cumulative net income within 3 years of closing, (the "Net Income Threshold"), the Company shall pay BT 50% of the amount of any cumulative net income above the Net Income Threshold. Profit share payments shall be made on an annual basis, in either cash or stock at the discretion of the Board. If the Board decides to make the payment in stock, the number of the Company's shares of common stock to be awarded shall be calculated based on the market price of such shares.

After the acquisition SVG, the Company changed its name to Wecast Services Group Limited, and is therefore also referred to herein as Wecast Services.

On January 31, 2017, the Company entered into the Wide Angle Purchase Agreement with BT and SSS, one of the Company's largest shareholders, controlled by the Company's Chairman Bruno Wu, as guarantor, for the purchase by the Company of 55% of the outstanding capital stock of Wide Angle for the sole consideration of the Company adding Wide Angle to the Sun Video Business acquired by the Company under the Sun Video SPA and thereby including 100% of the revenue and gross profit from Wide Angle in the calculation of the SVG Performance Guarantees set forth in the Sun Video SPA considering the Company has consolidated Wide Angle.

71

Since the Company, Wecast Services and Wide Angle were controlled by the Company's Chairman Bruno Wu since November 10, 2016, as well as both before and after the acquisition, this transaction was accounted for as a business combination between entities under common control by Mr. Wu. Therefore, in accordance with ASC Subtopic 805-50, the consolidated financial statements of the Company include the acquired assets and liabilities of the SVG and Wide Angle at their historical carrying amounts. In addition, the Company's consolidated financial statements as of December 31, 2016 have been prepared as if the Wecast Services and Wide Angle had been owned by the Company since November 10, 2016 presented and the Company's consolidated financial statements as of December 31, 2016 has been retrospectively adjusted accordingly.

As of December 31, 2017, the Company recorded the $24.3 million SVG Note as additional paid in capital based on the actual performance Considering the proceeds transferred were larger than carrying amounts of the net assets received, such $24.3 million was then recognized as a reduction to the Company's additional paid in capital. The Company has not begun accruing any reserves relating to potential Net Income Threshold earnout payments, since the Sun Video Business is currently not close to exceeding this threshold.

**(b)  Acquisition of BDCG**

On December 7, 2017, the Company entered into a Securities Purchase Agreement (the "BBD Purchase Agreement") with Tiger Sports Media Limited, a Hong Kong limited liability company ("Tiger") pursuant to which the Company agreed to purchase Tiger's 20% equity ownership in BBD Digital Capital Group Ltd. ("BDCG") . The Company will purchase the 20% equity from Tiger for a total purchase price of $9.8 million (the "Transaction") which consists of $2 million in cash and $7.8 million to be paid in the form of the Company's capital stock (valued at $2.60 per share and equal to 3 million shares of the Company's common stock). The valuation report will be received post-signing of the BBD Purchase Agreement with both parties agreeing that there is no obligation to close the transaction until a satisfactory valuation report has been received, evaluated and approved by the Audit Committee. The Company shall pay the $2 million in cash upon the execution of the BBD Purchase Agreement and will issue the 3 million shares of Company common stock upon the closing of the Transaction which is contingent upon the receipt of a valuation report satisfactory to the Audit Committee. If the closing conditions to the Transaction are not satisfied, then Tiger has agreed to refund the $2 million cash payment to the Company within 15 days of notice from the Company. As of December 31, 2017, the Company has paid $2 million cash, however considering the deal was not closed until a satisfactory valuation report was obtained and approved by Audit Committee, and valuation report was not yet finished, the Company recorded it as prepaid expenses in its consolidated balance sheet.

**6.   Accounts Receivable**

Accounts receivable is consisted of the following:

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Accounts receivable, gross | $     26,965,731 | $     12,350,947 |
| Less: allowance for doubtful accounts | (3,646) | (2,828,796) |
| Accounts receivable, net | $     26,962,085 | $     9,522,151 |

The movement of the allowance for doubtful accounts is as follows:

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| **Balance at the beginning of the year** | $     (2,828,796) | $     - |
| Additions charged to bad debt expense | (145,512) | (2,825,124) |
| Write-off of bad debt allowance | 89,851 | - |
| Disposal of Zhong Hai Shi Xun | 2,880,811 | - |
| Acquisition of Wide Angle | - | (3,672) |
| **Balance at the end of the year** | $     (3,646) | $     (2,828,796) |

72

**ITEM 13.        CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

**Transactions with Related Persons**

We have adopted a written policy with respect to the review, approval and ratification of related person transactions. The Audit Committee has primary responsibility for reviewing all related party transactions involving the Company's directors, officers and directors' and officers' immediate family members. The Board may determine to permit or prohibit the Related Party Transaction. For any ongoing relationships, the Board shall annually review and assess the relationships with the Related Party and whether the Related Party Transaction should continue.

Under the policy, a "related party transaction" means any transaction directly or indirectly involving any Related Party that would need to be disclosed under Item 404 of Regulation S-K. Under Item 404, the Company is required to disclose any transaction occurring since the beginning of the Company's last fiscal year, or any currently proposed transaction, in which the Company was or is a participant and the amount involved exceeds $120,000, and in which any related party had or will have a direct or indirect material interest. "Related Party Transaction" also includes any material amendment or modification to an existing Related Party Transaction. For the purposes of this policy, a "Related Party" means (A) a director, including any director nominee, (B) an executive officer; (C) a person known by the Company to be the beneficial owner of more than 5% of the Company's common stock; or (D) a person known by the Company to be an immediate family member of any of the foregoing. "Immediate family member" means a child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such director, executive officer, nominee for director, or beneficial owner, and any person (other than a tenant or employee) sharing the household of such director, executive officer, nominee for director, or beneficial owner.

The following is a summary of transactions since the beginning of the 2017 fiscal year, or any currently proposed transaction, in which we were or are to be a participant and the amount involved exceeded or exceeds the lesser of $120,000 or one percent of the average of our total assets at year-end for the last two completed years, and in which any related person had or will have a direct or indirect material interest (other than compensation described under Item 11 —"Executive Compensation"). We believe the terms obtained or consideration that we paid or received, as applicable, in connection with the transactions described below were comparable to terms available or the amounts that would be paid or received, as applicable, in arm's-length transactions.

**_Related Party Transactions with Bruno Wu_**

On January 30, 2017, based on the terms of a non-binding term sheet entered into on September 19, 2016, the Company entered into a Securities Purchase Agreement (the "Sun Video SPA") with BT and affiliate of the Company's Chief Executive Officer and Chairman Bruno Wu, for the purchase by us of all of the outstanding capital stock of SVG for an aggregate purchase price of $800,000 and a $50 million Promissory Note (the "SVG Note") with the principal and interest thereon convertible into shares of the Company's common stock at a conversion rate of $1.50 per share. Until receipt of necessary shareholder approvals, the SVG Note is not convertible into shares of our common stock, but once the necessary shareholder approval is received, the unpaid principal and interest thereon will automatically convert. On May 11, 2017, the Company received the written consent of the shareholders holding a majority of the voting power of the Company approving the issuance of up to $50 million shares of Common Stock upon conversion of the SVG Note. The issuance of the shares was approved by a total of 41,832,590 of the outstanding votes entitled to vote on the matter, representing 59.3% of the votes of the Company's issued and outstanding voting shares. As a result of such shareholder approval, in 2017, the unpaid principal and interest on the SVG Note automatically converted into shares of the Company's common stock. BT has guaranteed that SVG will achieve certain financial goals within 12 months of the closing. Under the terms of the Sun Video SPA, BT has guaranteed that the business of the SVG and its subsidiaries (the "Sun Video Business") shall achieve (i) revenue of $250 million, and (ii) $15 million of gross profit (collectively the "SVG Performance Guarantees") within 12 months of the closing. If the Sun Video Business fails to meet either of the Performance Guarantees within such time, BT shall forfeit back to us the shares of our common stock or SVG Note, on a pro rata basis based on the Performance Guarantee for which the Sun Video Business achieves the lowest percentage of the respective amount guaranteed. On January 31, 2017, the Company entered into the Wide Angle Purchase Agreement with BT and SSS, one of the Company's largest shareholders, controlled by our Chairman and Chief Executive Officer Bruno Wu, as guarantor, for the purchase by us of 55% of the outstanding capital stock of Wide Angle for the sole consideration of the Company adding Wide Angle to the Sun Video Business acquired by the Company under the Sun Video SPA and thereby including the revenue and gross profit from Wide Angle in the calculation of the SVG Performance Guarantees set forth in the Sun Video SPA. On June 9, 2017, the Company entered into a Securities Purchase Agreement (the "Redrock SPA") with Redrock Capital Group Limited, a Cayman Islands company ("Redrock") and affiliate of the Company's Chief Executive Office and Chairman Bruno Wu, and SSS, one of the Company's largest shareholders which is also controlled by Dr. Wu, as guarantor, pursuant to which the Company agreed to purchase and Redrock agreed to sell 51% of the outstanding capital stock (the "NexGen Common Shares") of NextGen Exchange Group Inc., a Cayman Islands company ("NexGen"), for the sole consideration of the Company adding NexGen to the Sun Video Business acquired by the Company under the Sun Video SPA and thereby including the revenue and gross profit from NexGen in the calculation of the SVG Performance Guarantees set forth in the Sun Video SPA. In addition, if the Sun Video Business achieves more than $50 million in cumulative net income within 3 years of closing (the "Net Income Threshold"), we shall pay BT 50% of the amount of any cumulative net income above the Net Income Threshold. Profit share payments shall be made on an annual basis, in either cash or stock at the discretion of our Board. If the Board decides to make the payment in stock, the number of our shares of common stock to be awarded shall be calculated based on the market price of such shares.

On March 14, 2017, the Company, through its PRC subsidiary Shanghai Blue World Investment Management Consulting Limited ("SVG WFOE"), entered into a Capital Increase Agreement (the "Capital Increase Agreement") with Guizhou Sun Seven Stars Technology Company Limited, a PRC company ("GZSSS"), which is an affiliate of the Company's Chief Executive Officer and Chairman Bruno Wu and SSGCG, one of the Company's largest shareholders, controlled by Bruno Wu. Pursuant to the terms of the Capital Increase Agreement, Guizhou Sun Seven Stars Technology Trading Platform Limited ("GZ"), a PRC company formed in February 2017 and initially 100% owned by SVG WFOE, issued new shares equal to 94.12% of its equity to GZSSS in exchange for RMB80 million (approximately $11.6 million). The total registered capital of GZ was RMB85 million (approximately $12.3 million). The parties intended to share the dividends and other profits of GZ at a ratio of 70% to the Company and 30% to GZSSS. In addition, the Company had the right to appoint two of GZ's three board members and GZSSS will have the right to appoint one board member. However, on March 31, 2017, SVG WFOE entered into an Equity Agreement with Shanghai Pulse Consulting Company Limited, a non-related PRC company, selling, at cost, its entire 5.88% equity stake in GZ, since the Company determined that owning an equity stake in GZ was no longer prudent due to the financial uncertainty relating to the multiple projects and subsidiaries that GZ is in the process of starting.

On June 30, 2017, the Company entered into a Securities Purchase Agreement (the "BT SPA") with BT and affiliate of the Company's Chief Executive Officer and Chairman Bruno Wu, pursuant to which the issued and outstanding stock that the Company holds in three separate non-core assets were sold to BT in exchange for RMB100 million (approximately $14.75 million), with such consideration to be a combination of cash and publicly traded stock to be paid to the Company within one year of closing. A minimum of 20% of the total consideration to the Company will be paid in cash (approximately $2.95 million). A portion of the consideration may be paid in the form of publicly traded stock at the discretion of BT, and in that case the securities will represent a public company affiliated with BT Capital, in an industry related to the Company's and with an average daily trading value of at least $146,000. A fairness opinion, or an independent opinion on the financial fairness of the proposed transaction, will be conducted by a third-party valuation firm before the consideration is delivered to the Company. The assets sold to BT include:(i) the Company's 80% equity interest in Zhong Hai Shi Xun Media; (ii) the Company's 13% equity interest in Topsgame; and (iii) a portion of the Company's 40% total equity interest in the Pantaflix JV, which will leave the Company with a remaining 15% stake post transaction. On November 28, 2017, due to strategic reasons, the Company and BT amended the BT SPA, to reflect that the Company would not sell to BT either the equity of Topsgame or the equity of the Pantaflix joint venture, with the overall sale price under the BT SPA reduced to reflect the removal of these assets from the BT SPA. The Company will still sell to BT 80% of the outstanding capital stock of Zhong Hai Shi Xun Media to streamline the operations of the Company and to eliminate the Company's exposure to any liabilities and obligations of Zhong Hai Shi Xun Media.

On December 7, 2017, the Company entered into a Securities Purchase Agreement with Shanghai Guang Ming Investment Management Limited, a PRC limited liability entity ("Guang Ming"), Tianjin and Beijing Nanbei Huijin Investment Co. Ltd. pursuant to which the Company will purchase 100% of Guang Ming's issued and outstanding shares for a total purchase price of RMB2.4 million (approximately $363,436). Guang Ming holds a special fund management license and is the Company intends to use its purchase of Guang Ming to develop a fund management platform. The closing of the acquisition is conditioned upon, among other things, the sellers, including Guang Ming, obtaining all of the necessary approvals from AMAC. In the event that AMAC does not accept the sellers' submission for change of ownership, this agreement shall be rescinded and the sellers shall continue to own Guang Ming and shall refund any portion of the purchase price previously paid within 15 days of notice from the Company. This agreement was approved by the Audit Committee and the closing of the Acquisition is also subject to the receipt of a fairness opinion and valuation report satisfactory to the Company and which concludes that the purchase price of the acquisition is fair from a financial point of view to the Company. The acquisition is deemed to be a related party transaction because Tianjin is an affiliate of Bruno Wu, the Company's Chairman and Chief Executive Officer. As of December 31, 2017, the fairness opinion was not yet obtained, and the Company did not account for this acquisition as part of its year-end 2017 financial statements as the transaction had not closed due to closing condition not yet being satisfied.

111