**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAYSUKH RUDANI, Individually And On Behalf Of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> IDEANOMICS, INC. f/k/a SEVEN STARS CLOUD GROUP, INC. f/k/a WECAST NETWORK, INC., ZHENG WU a/k/a BRUNO WU, BING YANG, and ROBERT BENYA, and FEDERICO TOVAR, <br><br> Defendants. | No: 1:19-cv-06741-GBD |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS IDEANOMICS, INC., BRUNO WU, BING YANG, AND ROBERT BENYA'S MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

    A.    Ideanomics Acquires SVG And WAG From Defendant Wu's BT Capital............ 2

    B.    Ideanomics, Wu, And Yang Fraudulently Tout The Significance Of The SVG And WAG Acquisitions And Their Impact On 2017 Revenue Guidance .............. 3

    C.    Ideanomics Fraudulently Touts $170 Million In Q4 2017 Crude Oil Revenue ..... 4

    D.    Ideanomics Reports Dismal 2017 Revenues........................................................ 4

    E.    Ideanomics, Wu, And Benya Fraudulently Tout The Integration Of Blockchain Into Ideanomics' Businesses................................................................................ 5

    F.    Post-Class Period Revelations ............................................................................ 6

LEGAL ARGUMENT............................................................................................................ 7

I.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD .............................................................. 7

    A.    Defendants' Statements Regarding The SVG And WAG Acquisitions, The Guarantees, And Ideanomics' Related 2017 Revenue Guidance Were Materially False And Misleading When Made ...................................................... 8

        1.    Ideanomics' Statements That SVG Was Guaranteed To Make $250 Million in Revenue and $15 Million in Profits Were Materially Misleading When Made.................................................................... 8

        2.    Defendants' Statements About 2017 Revenue Guidance Were Materially Misleading When Made .............................................. 9

        3.    Wu's and Ideanomics' November 2017 Statement That Ideanomics Was "On Track" To Meet Its 2017 Revenue Guidance Was Materially False When Made ................................................................ 12

    B.    Ideanomics' Statement That The Company Made $170 Million In Q4 2017 Crude Oil Revenue Was Materially False When Made........................................ 14

    C.    Defendants' Statements That Ideanomics Had Integrated Blockchain Technology Into Ideanomics' Businesses Were Materially False When Made ... 15

II.    DEFENDANTS ACTED WITH THE REQUISITE SCIENTER ................................. 16

    A.    Ideanomics' Scienter Results From Respondeat Superior Principles.................. 17

B.  Defendants Acted With Conscious Misbehavior And Recklessness .................... 18

    1.  Defendants Acted With Conscious Misbehavior and Recklessness as to the Guarantees, 2017 Revenue Guidance, and "On Track" Statements ................................................................................................ 18

    2.  Defendants Acted With Conscious Misbehavior and Recklessness as to the Actual Crude Oil Revenues in Q4 2017 ......................................... 20

    3.  Defendants Acted with Conscious Misbehavior and Recklessness as to the Implementation of Blockchain into Ideanomics' Businesses ......... 21

C.  Defendants Had The Motive And Opportunity To Commit Fraud ....................... 22

D.  Defendants Had Access To Information Regarding Q4 2016 Revenues And Blockchain Integration Due To Their Importance To The Company ................... 23

E.  Suspicious Resignations And Concealment Of Defendant Yang's Firing Support An Inference of Scienter ........................................................................ 24

III.  PLAINTIFF STATES CONTROL PERSON CLAIMS UNDER SECTION 20(a) ........ 25

IV.  ALTHOUGH UNNECESSARY, AMENDMENT SHOULD BE PERMITTED ........... 25

CONCLUSION ............................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*In re AIG, Inc. 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010)...................................................................................14

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)..............................................................................19, 24

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)...................................................................................19

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)...................................................................................14

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009).............................................................................................................7

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.2d 784 (9th Cir. 2017) ................................................................................................15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...............................................................................................16, 17

*In re Barrick Gold Corp. Sec. Litig.*,
    341 F. Supp. 3d 358 (S.D.N.Y. 2018)...................................................................................16

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)...................................................................................22

*In re BHP Billiton*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017)....................................................................................17

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)...................................................................................25

*In re BP P.L.C. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................................................21

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002)...................................................................................................23

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002)..................................................................................................15

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)....................................................................................................7

*Cherednichenko v. Quarterdeck Corp.*,
    1997 WL 809750 (C.D. Cal. Nov. 26, 1997)..........................................................................11

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)..............................................................................13, 25

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................................21

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................................................................................19

*Cresci v. Mohawk Valley Cmty. Coll.*,
    693 F. App'x 21 (2d Cir. 2017) ..............................................................................................25

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................................................23

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)..........................................................................7, 18, 22

*Emp. Ret. Sys. v. Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)....................................................................................................24

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. 2015) ...........................................................................................13

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)....................................................................................23

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    2013 WL 1139408 (S.D.N.Y. Dec. 12, 2013) ..................................................................15, 16

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017).....................................................................................21

*Freudenberg v. E\*TRADE Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ....................................................................................20

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)...............................................................................10, 11

*Gammel v. Hewlett-Packard Co.*,
    2013 WL 1947525 (C.D. Cal. May 8, 2013) ..........................................................................16

*In re General Elec. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)......................................................................................9

*Glaser v. The9, Ltd.*,
　772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................................21, 25

*Global Network Commc'ns, Inc. v. City of New York*,
　458 F.3d 150 (2d Cir. 2006)........................................................................................................7

*In re Globalstar Sec. Litig.*,
　2003 WL 22953163 (S.D.N.Y. Dec. 5, 2003) ........................................................................12

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Ent. Holdings, Inc.*,
　2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019)........................................................................11

*Ho v. Duoyuan Glob. Water, Inc.*,
　887 F. Supp. 2d 547 (S.D.N.Y. 2012)......................................................................................24

*In re IMAX Sec. Litig.*,
　587 F. Supp. 2d 471 (S.D.N.Y. 2008)......................................................................................23

*In re Initial Pub. Offering Sec. Litig.*,
　241 F. Supp. 2d 281 (S.D.N.Y. 2003)......................................................................................17

*In re Insys Therapeutics, Inc. Sec. Litig.*,
　2018 WL 2943746 (S.D.N.Y. June 12, 2018) .........................................................................14

*In re KeySpan Corp.*,
　2003 WL 21981806 (E.D.N.Y. July 30, 2003)........................................................................20

*Lipow v. Net1 UEPS Techs., Inc.*,
　131 F. Supp. 3d 144 (S.D.N.Y. 2015)......................................................................................18

*Lopez v. CTPartners Exec. Search, Inc.*,
　173 F. Supp. 3d 12 (S.D.N.Y. 2016)........................................................................................15

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
　797 F.3d 160 (2d Cir. 2015)...............................................................................................17, 25

*Manavazian v. Atec Group, Inc.*,
　160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...............................................................................12, 13

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011)......................................................................................................................7

*McMahan & Co. v. Wherehouse Ent., Inc.*,
　900 F.2d 576 (2d Cir. 1990).....................................................................................................7, 8

*Merck & Co., Inc. v. Reynolds*,
　559 U.S. 633 (2010).............................................................................................................21, 22

v

*Mulligan v. Impax Labs, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ....................................................................13

*New Orleans Empls. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ........................................................................7, 23

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)..................................................................18

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..................................................................................17

*In re NTL, Inc. Sec. Litig.*,
  347 F. Supp. 2d 15 (S.D.N.Y. 2004)....................................................................20

*Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*,
  2019 WL 4674839 (D. Conn. Sept. 25, 2019)...........................................14, 22, 23

*Plumbers and Pipefitters Local Union No. 630 Pension Annuity Trust Fund v.
  Arbitron Inc.*,
  741 F. Supp. 2d 474 (S.D.N.Y. 2010)..................................................................13

*In re Sadia SA Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009)..............................................................24, 25

*In re Salix Pharmaceuticals, Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)................................................. *passim*

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris
  Companies, Inc.*,
  75 F.3d 801 (2d Cir. 1996)....................................................................................23

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y. 2013)..................................................................18

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)....................................................................................20

*Schwab v. E\*TRADE Fin. Corp.*,
  258 F. Supp. 3d 418 (S.D.N.Y. 2017)..................................................................17

*In re Secure Computing Corp.*,
  184 F. Supp. 2d 980 (N.D. Cal. 2001) .................................................................13

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)............................................................................11, 16

*Stratte-McClure v. Morgan Stanley*,
    784 F. Supp. 2d 373 (S.D.N.Y. 2011)..................................................................................22

*In re Supercom Inc. Sec. Litig.*,
    2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ......................................................................18

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)..........................................................................................20, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................16, 22

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011).......................................................................... *passim*

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...........................................................................................20, 21

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...........................................................................21

*Wilson v. LSB Indus., Inc.*,
    2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ................................................................10, 11

*Winn Consulting LLC v. Circle Line-Statute of Liberty Ferry, Inc.*,
    2007 WL 900772 (S.D.N.Y. Mar. 23, 2007) .........................................................................9

## Statutes

15 U.S.C. § 78u-5(c)(1)(A)(i) ...................................................................................................11

## Other Authorities

Fed. R. Civ. P. 12(b), 12(d), 56(d)...............................................................................................7

Lead Plaintiff Jaysukh Rudani ("**Plaintiff**") respectfully submits this memorandum of law in opposition to the motion to dismiss filed by defendants Ideanomics, Inc. ("**Ideanomics**" or the "**Company**"), Zheng Wu a/k/a Bruno Wu ("**Wu**"), Bing Yang ("**Yang**"), and Robert Benya ("**Benya**") (collectively, "**Defendants**").[1]

**PRELIMINARY STATEMENT**

This securities fraud action is about a company in search of a business, with Defendants concocting lies as they went along in order to generate interest in and the survival of their foundering company and to enable the company's founder Wu to enrich himself through self-dealing with his related enterprises.  In fact, over a period of just three years, Ideanomics changed its name three times and went from providing video-on-demand services to becoming involved in consumer electronics, smart supply chain management, and crude oil trading, all while purportedly in pursuit of becoming a "next generation Artificial-Intelligence and Blockchain-Powered Financial Technology Company"—whatever that means.  ¶¶2, 28-30.

During the Class Period, Defendants made three categories of fraudulent misrepresentations and omissions concerning Ideanomics' businesses.  First, Defendants touted Ideanomics' acquisitions of Sun Video Group HK Limited ("**SVG**") and Wide Angle Group Limited ("**WAG**") (collectively, "**Acquisitions**")—from a private equity fund controlled by Wu ("**BT Capital**")—hyping the fact that the Acquisitions came with guarantees of $250 million in revenue and $15 million in gross profit, which Ideanomics used to support its 2017 revenue guidance of $280 million (later raised to $300 million) ("**2017 Revenue Guidance**").

---

[1]     Unless stated otherwise, Plaintiff uses the following conventions: (1) capitalized terms mean the same as they do in the Amended Securities Class Action Complaint ("**AC**") (ECF No. 41) and its Table of Defined Terms and Abbreviations, AC at iii-iv; (2) all "¶__" references are to the AC; (3) all "Q_" references are to Ideanomics' fiscal quarters, which track the calendar year, ¶4 n.3; (4) all " **Co. MTD**" references are to the brief filed in support of Ideanomics, Wu, Yang, and Benya's motion to dismiss, ECF No. 52; (5) all emphases are added to quotations; and (6) all internal citations and quotations are omitted.

1

Defendants *omitted*, however, that (1) in the quarter preceding the Acquisitions, SVG and WAG only generated $30 million in revenue and incurred a $0.4 million loss; and (2) the Acquisitions were primarily being run for experimental purposes and *not* to maximize revenues and profits. Second, on January 16, 2018, Ideanomics stated that it *had generated* oil revenues in Q4 2017 of $170 million, when revenues were in fact $19 million at most. Third, after disappointing investors in 2017, Ideanomics, Wu, and Benya began touting the Company's successful integration of blockchain and artificial intelligence ("**AI**") technology into its consumer electronics and crude oil businesses when no such integration had occurred.

Defendants argue Plaintiff's § 10(b) claims should be dismissed for two reasons. First, Defendants argue that their statements were forward-looking and protected by the PSLRA's safe harbor and bespeaks caution doctrine. Second, Defendants argue that their scienter has been inadequately pleaded. Defendants additionally assert Plaintiff's § 20(a) control person claims fail because they are contingent on Plaintiff's purportedly deficient § 10(b) claims. Defendants are wrong on all counts; and, in any event, Defendants impermissibly rely on extrinsic evidence to construct a counter-narrative to dispute Plaintiff's allegations in violation of Fed. R. Civ. P. 12(b)(6) & 12(d). Plaintiff respectfully submits that Defendants' motion should be denied for the reasons herein and in the brief in support of Plaintiff's motion to strike ("**MTS**"), ECF No. 55.

STATEMENT OF FACTS

**A.      Ideanomics Acquires SVG And WAG From Defendant Wu's BT Capital**

On February 1, 2017, Ideanomics acquired supply chain company SVG from Wu-controlled BT Capital in exchange for $800,000 in cash and a promissory note of $50 million with principal and interest automatically convertible into Ideanomics shares at $1.50 per share. ¶36. SVG was to be rebranded as the "Wecast Services Group" ("**WSG**") and would primarily

2

engage in consumer electronics and smart supply chain management operations. ¶36. In exchange, BT Capital *guaranteed* that SVG would achieve $250 million in revenue and $15 million in gross profits ("**Guarantees**") within a year. ¶37. The Guarantees were based on the consolidated revenue and gross profit of SVG, its subsidiaries, any new businesses started by SVG or its subsidiaries, and "any companies acquired by [SVG] or its subsidiaries" provided that Ideanomics' board approved the acquisitions. *Id.* If SVG and its subsidiaries/new businesses failed to meet the Guarantees, BT Capital *was required to forfeit* Ideanomics shares it received from the convertible $50 million promissory note on a *pro rata* basis. *Id.*

On February 2, 2017, Ideanomics acquired 55% of industrial/trade media and commerce company WAG from Wu's BT Capital in exchange for Ideanomics counting WAG's revenues and profits towards the Guarantees. ¶38.

      **B.**       **Ideanomics, Wu, And Yang Fraudulently Tout The Significance Of The SVG And WAG Acquisitions And Their Impact On 2017 Revenue Guidance**

Defendants immediately began touting the Acquisitions, the Guarantees, and Ideanomics' prospects. On February 1, 2017, the start of the Class Period, Ideanomics touted the Guarantees in a press release, stating "*[a]s part of the original <u>deal</u>, SVG <u>guaranteed</u> it would achieve certain revenue and profitability milestones within 12 months of closing the transaction. . . . As part of the negotiation process, that revenue milestone has been increased to $250 million (up from $200 million) and the gross profit milestone has been established at $15 million*." ¶41. Yang further stated, "*Based on all of this, today [Ideanomics] is confident in issuing Company-wide 2017 guidance of $280 million top-line revenue*." ¶43. Later, on March 31, 2018, during an earnings call, Wu announced that Ideanomics was "*<u>raising its full-year revenue guidance from $280 million to $300 million</u>*" based "*on the Wecast Service Group*," *i.e.*, the Acquisitions. ¶47. Yang reiterated the increased guidance on the same call. *Id.* On May 15,

3

2017, Wu "*reiterat[ed] [the] full-year top-line revenue guidance of $300 million*."  ¶49.  And

on November 13, 2017, Ideanomics issued a press release quoting Wu that Ideanomics was "*still

on track to reach [its] top line revenue guidance of $300 million USD*[.]"  ¶54.

Unbeknownst to investors, in the quarter preceding the Acquisitions, SVG and WAG

were unprofitable businesses with revenues that were a small fraction of the Guarantees—having

only collectively obtained *$30 million in revenue while incurring a loss of $475,046 in Q4

2016 alone*.  ¶39.  Additionally, Defendants omitted that the Acquisitions were being operated

largely for "research purposes," and "not primarily with a view to competitive returns[.]"  ¶79.

As a result, investors were materially misled as to the likelihood that SVG and WAG would

generate the revenues and profits that were guaranteed and the likelihood that Ideanomics would

make—or was on track to make—its 2017 Revenue Guidance.  ¶¶39, 62, 79.

### C.      Ideanomics Fraudulently Touts $170 Million In Q4 2017 Crude Oil Revenue

During the Class Period, Ideanomics additionally entered into a joint venture with Ocasia

Group Holdings ("**Ocasia**") and began trading in crude oil.  ¶¶52-53.  On January 16, 2018,

Ideanomics issued a press release claiming to "provide[] preliminary and unaudited update on

Q4 2017 revenues."  ¶57.  In the press release, the Company stated, "*[Ideanomics'] crude oil

supply chain finance and management business alone* . . . *did a preliminarily reviewed, but

still unaudited, $170 million USD in revenue in Q4 2017*."  ¶57.  This statement was false when

made because the Company's crude oil business' revenue for Q4 2017 was only $19,028,003—

roughly 11% of the *$170 million* stated.  ¶58.

### D.      Ideanomics Reports Dismal 2017 Revenues

On February 23, 2018, Ideanomics issued a pair of press releases, the first of which

revealed that Ideanomics replaced its independent auditor Grant Thornton with BF Borgers CPA

PC—a firm with only 16 professional staff and a history of issuing at least 7 faulty audit

opinions. ¶¶60-61.  The second press release revealed that Ideanomics generated at most $144 million in revenue for 2017—well below both Ideanomics' $300 million guidance and the $170 million in crude oil revenue that the Company boasted of a month earlier.  ¶62.  Ideanomics also admitted that in October 2017 it fired defendant Yang, whose exit it previously described as a "resignation," to remedy "communication" deficiencies that "materialized during the [] 2017 fiscal year[.]"  ¶62.  On this news, Ideanomics' stock price dropped 39.3%.  ¶63.

On August 28, 2018, pre-market open, Ideanomics filed an amended Annual Report for the year 2017 on Form 10-K/A ("**Second 2017 10-K**") with the SEC in response to SEC comments.  ¶72.  The Second 2017 10-K revealed that Ideanomics' crude oil revenue *for the year* consisted of $18,973,054 exclusively from related parties—a far cry from the $170 million the Company bragged about on January 16, 2018, ¶72, and almost all of the $19,028,003 crude oil generated that year, ¶58.  On this news, Ideanomics' stock price dropped 18.2%.  ¶73.

> **E.**     **Ideanomics, Wu, And Benya Fraudulently Tout The Integration Of Blockchain Into Ideanomics' Businesses**

At the end of 2017, Ideanomics began touting itself as "a next generation global [AI] & Blockchain-powered disruptive *financial services company*[.]"  ¶64.  By way of background, blockchain is a decentralized data record managed by a cluster of computers, rather than a single entity.  ¶32.  Information held on a blockchain exists as a shared database that is continually updated across a network of computers rather than a single one.  *Id*.  Blockchain's decentralized nature provides the following advantages: (1) greater transparency; (2) increased efficiency due to the removal of middlemen; and (3) better security as no centralized version of information exists for a hacker to corrupt.  ¶¶32, 33.  Due to these perceived benefits, several publicly traded companies incorporated blockchain into their names or businesses, resulting in a "more than threefold" increase in those companies' stock prices.  ¶34.  As a result, the SEC has scrutinized

such companies to determine whether their public disclosures comply with the securities laws. ¶35. Seizing on the public's interest, Ideanomics began to fraudulently tout its integration of blockchain into its crude oil and consumer electronics businesses. ¶65.

On a May 15, 2018 earnings call, Wu discussed applying "four layers" of blockchain technology onto the Company's consumer electronics and crude oil businesses. ¶66. Wu claimed that Ideanomics was "*in the middle of*" applying blockchain and AI into its businesses and that Ideanomics already "*did*" this "*with [] crude oil*" "*to greatly increase the margin of Ocasia subsidiary*" and that the Company was "*ready to in the next couple of quarters do the same*" with the consumer electronics business. *Id*. This statement was false when made because blockchain and AI *were not integrated into Ideanomics' crude oil business*. ¶¶67, 77, 79.

On August 13, 2018, during an earnings call, Benya touted that one of the Company's products, "*TradeTech[,] which involves the use of blockchain,*" was "*a key driver of our current and rapid topline revenue growth*." ¶70. Benya's statement, however, was false when made because blockchain was not integrated into the crude oil or consumer electronics businesses, and thus, blockchain was not driving Ideanomics' revenues, ¶¶71, 77, 79.

### F. Post-Class Period Revelations

On November 14, 2018, Ideanomics revealed it was divesting its oil trading and consumer electronics businesses. ¶75. On this news, Ideanomics' stock price dropped 48.8%. ¶76. In a Form 10-Q filed later that day, Ideanomics finally revealed that its "*commodities trading business,*" *i.e.*, its crude oil and consumer electronics businesses, ¶75, "*does not currently integrate blockchain or AI based logistics solutions[.]*" ¶77. In response to SEC comments on December 14, 2018, Ideanomics filed a second amended 2017 Annual Report, similarly revealing that its crude oil and consumer electronics businesses were operated "*largely for research purposes*" and "*not primarily with a view to competitive returns.*" ¶79.

6

## LEGAL ARGUMENT

In evaluating a Rule 12(b)(6) motion, the Court must accept as true the facts alleged and draw all reasonable inferences in Plaintiff's favor. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006). Matters outside the pleading must be excluded; otherwise the Court must convert the 12(b)(6) motion into a Rule 56 summary judgment motion and provide Plaintiff an opportunity to respond after conducting appropriate discovery. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); Fed. R. Civ. P. 12(b), 12(d), 56(d); MTS. A plaintiff need only allege "enough facts to state a claim for relief that is plausible on its face[,]" meaning that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). The Court's function is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 456 (S.D.N.Y. 2017); *see also New Orleans Empls. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) ("Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation.").

## I.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

It is unlawful to (1) "make any ***untrue*** statement of a material fact" ***or*** (2) "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not ***misleading***." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, statements are actionable if they are either materially false or materially misleading. Hence, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."

7

*McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

>    **A.     Defendants' Statements Regarding The SVG And WAG Acquisitions, The Guarantees, And Ideanomics' Related 2017 Revenue Guidance Were Materially False And Misleading When Made**

>    **1.     Ideanomics' Statements That SVG Was Guaranteed To Make $250 Million in Revenue and $15 Million in Profits Were Materially Misleading When Made**

On February 1, 2017, Ideanomics boasted that as part of the SVG acquisition, "***SVG guaranteed it would achieve***" a "revenue milestone" of "***$250 million (up from $200 million)***" and a "***gross profit milestone***" of "***$15 million***" "***within 12 months of closing the transaction***." ¶41. These statements were misleading when made because in context they gave investors the impression that these Guarantees were realistic revenue and profitability milestones—despite the fact that SVG and WAG were ***then*** unprofitable businesses (a collective loss of $475,046) and generated only $30 million in Q4 2016 revenues. ¶42. Disclosure of these facts was required so that investors could accurately value the Acquisitions, understanding that the companies would need to almost ***triple their revenue per quarter*** (from $30 million quarterly to $75 million quarterly) ***and begin to generate profits***—for Ideanomics investors to reap the rewards of these pie-in-the-sky Guarantees.

These statements are not forward-looking and therefore not subject to the PSLRA's safe harbor or the bespeaks caution doctrine. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 568 (S.D.N.Y. 2011) ("[T]he safe harbor, and the closely related bespeaks caution doctrine, do not apply to statements of present or historical facts."). These statements concern historical facts regarding the then-existing contractual terms of the Acquisitions. The statements themselves begin with past-tense references to then-existing facts including that the deal was "***previously mentioned,***" and that the revenue and profitability milestones ***had*** "***been established***." Indeed, the existence of the Acquisitions' terms was a *sine qua non* for them to be

8

described as it is a bedrock principle of contract law that a contract cannot exist where the parties have failed to reach agreement on the material terms. *See Winn Consulting LLC v. Circle Line-Statute of Liberty Ferry, Inc.*, 2007 WL 900772, at \*5 n.57 (S.D.N.Y. Mar. 23, 2007) ("In order to create a binding contract, there must be a meeting of the minds as to the essentials of the agreement. . . . [N]o contract can be created where a material element has been left for future negotiations.") (citing 22 N.Y. Jur. 2d Contracts § 21 (2007)).

### 2. Defendants' Statements About 2017 Revenue Guidance Were Materially Misleading When Made

Defendants also misleadingly touted Ideanomics' 2017 Revenue Guidance, which was based in material part on the Guarantees. ¶¶43-50. For example, on February 1, 2017, Ideanomics and Yang announced that the Company "***is confident in issuing Company-wide 2017 guidance of $280 million top-line revenue***." ¶43. On a March 31, 2017 earnings call, Wu and Ideanomics upped the ante, stating that Ideanomics was "***<u>raising its full-year revenue guidance from $280 million to $300 million</u>*** based on recent visibility of and internal projections for 2017," which "***is based currently on the WeCast Service Group***, which, as a reminder, is a new operational and branding for the recently purchased [SVG]." ¶47. And, lastly, on May 15, 2017, Wu and Ideanomics "***reiterate[ed] [the] full-year*** " $300 million guidance "***based on the progression . . . seen thus far***." ¶49.

These statements were misleading when made because Defendants lacked "a reasonable basis" for these statements and they were "aware of [] undisclosed facts tending to seriously undermine the accuracy of the statement[s]." [.]" *In re General Elec. Sec. Litig.*, 857 F. Supp. 2d 367, 388 (S.D.N.Y. 2012) (citing *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 774 (2d Cir. 2010) (setting forth the test for when forward looking statements are actionable under the PSLRA); *see also* Tovar MTD Opp. at 6 (concurrently filed herewith).

9

That is, by omitting that SVG and WAG were unprofitable businesses that collectively lost $475,000 and only generated $30 million in revenues in the quarter prior to the Acquisitions, investors were misled as to the likelihood Ideanomics would meet its estimates.  ¶¶39, 62; *see In re Salix Pharmaceuticals, Ltd.*, 2016 WL 1629341, at \*10 (S.D.N.Y. Apr. 22, 2016) (finding the omission of "any information with respect to current inventory levels" rendered forward-looking inventory projections as misleading).  Common sense—not to mention Rule 12(b)(6)—dictate that the quarter prior to the Acquisitions would provide relevant information about SVG's and WAG's ability to meet the Guarantees.  And, if SVG's and WAG's revenues and gross profits from previous periods supported the Guarantees and 2017 Revenue Guidance, Defendants would undoubtedly have included such extrinsic information with the 23 exhibits they improperly submitted with their motion.  *See generally* MTS.

The Company's guidance was ***additionally*** misleading because, unbeknownst to investors, Ideanomics was only operating its consumer electronics business (*i.e.*, SVG and WAG) ***<u>for research purposes</u>—and not primarily with a view to competitive returns***.  ¶¶44, 46, 48, 50; *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 287, 293 (S.D.N.Y. 2018) (finding revenue projections actionable where company omitted that it was shifting its focus towards secured rather than personal loans).  If Defendants were not primarily trying to hit their numbers, in fairness, they ought to have disclosed that fact so as not to mislead investors.

And while the Company's revenue projections are forward-looking statements subject to the PSLRA's safe harbor provisions, neither the safe harbor nor the bespeaks caution doctrine affords protection under the circumstances.  First, "the PSLRA safe harbor [provision] ... [does not] protect [ ] material omissions."  *OneMain*, 348 F. Supp. at 304; *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at \*3 (S.D.N.Y. Mar. 2, 2017) ("Court[s] in this circuit have

10

consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions."). Defendants omitted SVG/WAG's operating history and that Ideanomics was primarily operating these businesses for experimental purposes—facts which if disclosed "would have influenced the decisions of reasonable investors as to the purchase or sale of the Company's securities." *OneMain*, 348 F. Supp. at 304; *see also Salix*, 2016 WL 1629341, at *10-11 (finding statements regarding future projections of inventory levels actionable because they "were made misleading by material omissions" regarding current inventory levels).

Second, the safe harbor is also inapplicable because Defendants' statements were not accompanied by meaningful cautionary language. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). To be meaningful, "[c]autionary language must be ***extensive and specific***. A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate[.] . . . To suffice, the cautionary statements must be ***substantive and tailored to*** the specific future projections" at issue. *Slayton*, 604 F.3d at 772. Statements that "operating results are likely to fluctuate[,]" that Ideanomics "cannot guarantee future results[,]" that Ideanomics "is in the process of transforming],]" and that Ideanomics "is uncertain whether these efforts will prove beneficial" are all boilerplate language which courts in this circuit have rejected as not meaningful. *See Hawaii Structural Ironworkers Pension Trust Fund v. AMC Ent. Holdings, Inc.*, 2019 WL 4601644, at *14 (S.D.N.Y. Sept. 23, 2019) (finding that warning about "execution risks[,]" and "unspecified known . . . risks and certainties," like Ideanomics' warnings about some vague uncertainties, were "too general to constitute meaningful cautionary statements"); *Cherednichenko v. Quarterdeck Corp.*, 1997 WL 809750, at *5 (C.D. Cal. Nov. 26, 1997) (finding that identifying risks regarding "integration of acquisitions," like Ideanomics' warning regarding its "transform[ation,]" "appear[ed] to be merely boilerplate"). Critically,

11

these warnings fail to apprise investors of the risks attendant to SVG/WAG's Q4 2016 performance and Ideanomics' decision to operate its businesses for "research" purposes. *See Salix*, 2016 WL 1629341, at \*11 (finding cautionary language insufficient because it failed to "alert the reasonable investor" to risk of then-existing "inventory build-up at issue").

Lastly, Defendants' statements were made with actual knowledge of the omitted or misrepresented facts and therefore are not protected by the safe harbor. *See* § II.B.1, *infra*.

### 3.  Wu's and Ideanomics' November 2017 Statement That Ideanomics Was "On Track" To Meet Its 2017 Revenue Guidance Was Materially False When Made

Wu and Ideanomics stated on November 13, 2017 that Ideanomics was "***on track to reach its top-line revenue guidance of $300 million***." ¶54.  This statement was made in the following context: (1) Ideanomics had only earned $107 million year-to-date; and (2) the guidance was based largely on the Guarantees. ¶¶41, 55.  This statement was false when made because the Company was not "on track" to meet its guidance.  At that time, it had generated only $107 million in revenues—or approximately 35.6%—of Ideanomics' $300 million guidance, meaning that Ideanomics would have to generate ***$193 million*** in revenues during the remaining 48 days of 2017.  ¶¶54-55.  This was particularly unlikely given that: (1) the Company generated only $4.5 million in 2016 from its legacy video-on-demand business; (2) SVG/WAG were highly unlikely to make up the difference because they generated only $30 million in Q4 2016; and (3) the Company was only operating its crude oil and consumer electronics business for "research purposes" and "not primarily with a view to competitive returns." ¶55.  *See In re Globalstar Sec. Litig.*, 2003 WL 22953163, at \*6-7 (S.D.N.Y. Dec. 5, 2003) (statement that the company was "still on track for $250-300 million in revenue for the year" was actionable where it misrepresented the effect that the delay in its gateway rollouts would have on potential revenues); *Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 480 (E.D.N.Y. 2001)

12

(defendants' representation that the Company's "revenue and earnings growth model is still on track" was actionable where they omitted to disclose that the Company's "basic health" was threatened); *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at \*13 (D.N.J. 2015) (statements that the company was "on track" to meet its projections were actionable where defendants failed to disclose "formidable hurdles" to achieving them).

This statement is not forward-looking because it concerns whether Ideanomics was "on track" to meet its guidance, which could be ascertained when the statement was made. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (finding statement that the company was "on track" to meet its development schedule was not forward-looking); *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 964 (N.D. Cal. 2014) ("on track" statement was "fundamentally a representation of present fact . . ." and therefore fell outside the safe harbor); *Plumbers and Pipefitters Local Union No. 630 Pension Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 485 (S.D.N.Y. 2010) (statement that company was "on track" to commercialize device in New York "were statements of specific present-day fact" and actionable); *In re Secure Computing Corp.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) (statement that company was "on track" to meet expectations were "statements of current business conditions" and "not forward-looking"). Thus, this statement is not protected by the safe harbor or bespeaks caution doctrine. *Vivendi*, 765 F. Supp. 2d at 568.

In any event, even if some aspect of the November 13th "on track" statement is forward-looking, then at best the statement "has both a forward-looking aspect and an aspect that encompasses a representation of present fact[,]" and therefore, the statement is not subject to the safe harbor. *See Salix*, 2016 WL 1629341, at \*9 (The "safe harbor provision does not apply to any allegedly false statement [that] has both a forward-looking aspect and an aspect that

13

encompasses a representation of present fact."); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (finding revenue projection statement "combined with statements of existing fact" regarding the improper accounting of advertising transactions fell outside scope of the safe harbor and bespeaks caution doctrine); *Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, 2019 WL 4674839, at *19 (D. Conn. Sept. 25, 2019) (finding statement regarding "similar profit growth in the future" which omitted "drastic decline in inflated profit" actionable because "[t]he fact that the defendants also made forward-looking statements does not change the fact that their statements about the past were misleading").

### B. Ideanomics' Statement That The Company Made $170 Million In Q4 2017 Crude Oil Revenue Was Materially False When Made

Ideanomics' statement that it "*did*" "$170 million USD in revenue in Q4 2017," ¶57, was necessarily false when made because the Company's Q4 2017 crude oil revenue was later admitted to be only $19,028,003—roughly 11% of the amount stated.  ¶58.  *See In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *2-5 (S.D.N.Y. June 12, 2018) (finding "unaudited" financial statements actionable as false where "revision of net revenue" "was less than 5%"); *In re AIG, Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 528, 530-31 (S.D.N.Y. 2010) (finding statements regarding "unaudited" loss estimates in CDS portfolio actionable).

Defendants argue that the statement is forward-looking because it was described as "preliminarily reviewed" and "unaudited" and, as a result, supposedly protected by the safe harbor and the bespeaks caution doctrine.  Co. MTD at 13.  This statement is not forward-looking, however, as it is a statement of **historical fact** whose "accuracy can be determined at the time it was made."  *Vivendi*, 765 F. Supp. 2d at 569.  When the statement was made, it could be accurately determined whether Ideanomics "*did*" $170 million in crude oil revenue in Q4 2017, a

14

quarter that had already expired. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.2d 784, 801 (9th Cir. 2017) (statement not forward-looking because statement's "emphasis on the past tense indicate[d] Quay was referring to prior events"). Rule 10b-5 requires that when a party voluntarily elects to speak about a certain topic, it has a "duty to be both accurate and complete." *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). Consequently, Ideanomics' decision to voluntarily disclose unaudited numbers is beside the point, as the numbers still needed to be accurate. Furthermore, the language Ideanomics used was past tense and stated the amount of revenue already supposedly generated; such language cannot possibly be forward looking. Therefore, neither the safe harbor nor the bespeaks caution doctrine applies. *See Vivendi*, 765 F. Supp. 2d at 568.[2]

### C. Defendants' Statements That Ideanomics Had Integrated Blockchain Technology Into Ideanomics' Businesses Were Materially False When Made

Beginning May 15, 2018, Defendants began to tout the Company's integration of blockchain and artificial intelligence technology into Ideanomics' crude oil and consumer electronics businesses, with Wu claiming that Ideanomics already "***did***" apply blockchain "***with crude oil***." ¶66. On August 13, 2018, when discussing a product known as "Tradetech, ***which involves the use of blockchain***," Benya claimed that Tradetech was "***a key driver of our current and rapid topline revenue growth***." ¶70. These statements were false when made as no such blockchain integration had taken place. ¶¶65, 77, 79; *see In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 2013 WL 1139408, at *23 (S.D.N.Y. Dec. 12, 2013) (finding actionable "specific statements leading up to the Facebook IPO ensuring 'on-time, on-target and ready-to-launch'

---

[2]    Defendants' reliance on *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 39-40 (S.D.N.Y. 2016), is misplaced because the statement at issue there—that the company "***expected***" its adjusted net income for the quarter "***to be*** in the range of $0.06-0.08"—was ***expressly*** framed in terms of future expectations, whereas the statement here is framed in historical terms ("***did*** " $170 million in Q4 2017 revenue).

technology" when such technology was not ready); *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *15-16 (C.D. Cal. May 8, 2013) (finding actionable statements regarding commitment to apply "webOS on PCs" where company was "just concepting" webOS).

Defendants claim these statements are nonactionable forward-looking statements, arguing, without authority, that Ideanomics' January 2, 2018 press release stating that it was "aiming to become a next generation" blockchain company renders ***all statements <u>subsequently</u> made forward-looking***. Co. MTD at 15. But Defendants' statements clearly refer to historical statements of fact because at the time the statements were made it could be determined whether Ideanomics "***did***" integrate blockchain into its crude oil business, and whether Tradetech's blockchain platform was a "***current***" driver of growth. ¶¶66, 70.[3] Therefore, neither the safe harbor nor the bespeaks caution doctrine applies. *See Vivendi*, 765 F. Supp. 2d at 568.

## II. DEFENDANTS ACTED WITH THE REQUISITE SCIENTER

"The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre or even the most plausible of competing inferences[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). The court's "job is not to scrutinize each allegation in isolation but to assess all of the allegations ***<u>holistically</u>***[,]" *id*. at 324, and determine whether "it is ***at least as likely as not*** that defendants acted with scienter." *Slayton*, 604 F.3d at 775. A plaintiff may satisfy the scienter standard "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v.*

---

[3]    *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375-76 (S.D.N.Y. 2018) is inapposite because the statements deemed forward-looking concerned the amount of gold a "***expected to be produced***" in the Company's gold mine, whereas here the statements concern whether Ideanomics "***did***" integrate blockchain and AI into its businesses, *e.g.*, ¶66.

16

*Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Motive and opportunity are pleaded by stating "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 364 (S.D.N.Y. 2003).  Conscious misbehavior or recklessness arises in two situations.  First, when the defendants had "knowledge of facts or access to information contradicting their public statements" such that they "knew or . . . should have known that they were misrepresenting material facts[.]" *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  Second, when "the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.*

When considered holistically, Plaintiff's allegations and arguments below establish Defendants' scienter.

### A.    Ideanomics' Scienter Results From Respondeat Superior Principles

To plead scienter for a corporation, a plaintiff must show "(1) that someone whose intent could be imputed to the [company] acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015).  Under this standard, "[t]here is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants . . . Furthermore, the individual making an alleged misstatement and the one with scienter do not have to be one and the same." *In re BHP Billiton*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017).  As well, "a plaintiff is not required to identify specifically the individuals at a company who acted with scienter in order to plead scienter with respect to a company[.]" *Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 435 (S.D.N.Y. 2017).  Thus, the scienter

17

of Ideanomics' key employees and executives is to be imputed to the Company. ¶83.[4]

### B. Defendants Acted With Conscious Misbehavior And Recklessness

#### 1. Defendants Acted With Conscious Misbehavior and Recklessness as to the Guarantees, 2017 Revenue Guidance, and "On Track" Statements

The AC is replete with facts showing that Defendants had access to and consciously disregarded the Acquisitions' dismal Q4 2016 results and Ideanomics' operating them for research purposes, which facts: (1) were material to evaluating the significance of the Guarantees; (2) materially undermined the Company's 2017 Revenue Guidance; (3) demonstrated that the 2017 Revenue Guidance lacked a reasonable basis; and (4) demonstrated in November 2017 that the Company was not "on track" to achieve its 2017 Revenue Guidance.

First, because Wu controlled SVG and WAG, he had knowledge of and access to records showing the entities' limited Q4 2016 revenues and unprofitability. ¶86; *Eletrobras*, 245 F. Supp. 3d at 468 (scienter may be inferred when officer obtained prior knowledge from a different corporation). Second, the Acquisitions' Q4 2016 results were known and accessible to Ideanomics, Wu, and Yang because as directors, and founder and CEO, Wu and Yang negotiated the transaction over the course of several months, during which time they conducted—or at a minimum were obligated to conduct—due diligence, and ultimately approved the terms of the Acquisitions. ¶¶85, 86.[5] It is simply not credible that when negotiating and approving the

---

[4] Defendants' group pleading argument falls flat because the AC specifically explains how each of the Individual Defendants possessed scienter. *See, e.g.*, ¶86 (Wu and Yang approved transactions) and ¶96 (Wu, Yang, Benya, and Tovar had access to internal system of computers). To the extent that Individual Defendants are not identified in the scienter allegations, Ideanomics still possesses scienter through its un-named officers and managers. Moreover, the cases cited by Defendants do not support their argument because in *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *28 (S.D.N.Y. Oct. 10, 2018) the court upheld claims against the individual defendants when, like here, the complaint identified how they possessed scienter; and in *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 480 (S.D.N.Y. 2013) the court dismissed on grounds other than group pleading.

[5] In contrast, the cases relied upon by Defendants for their argument that allegations of access are not sufficient—*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) and *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015)—did not contain facts showing direct access.

18

purchase of SVG and WAG, Wu and Yang did not review the companies' financials for the quarter immediately preceding the transaction. *See Salix*, 2016 WL 1629341, at \*15 (inferring knowledge of inventory levels when they were easily determinable during due diligence); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 409–10 (S.D.N.Y. 2010) (finding scienter when due diligence would have revealed red flags).  Third, because Wu controlled SVG and WAG, Ideanomics had a legal duty to adjust its financial statements to reflect the entities' gross loss in Q4 2016.  ¶88.  Wu signed several SEC filings acknowledging this fact, and in so doing, attested that he reviewed these underlying financials pursuant to his obligations under GAAP and ASC Subtopic 805-50.  *See In re Alstom SA*, 406 F. Supp. 2d 433, 459–60 (S.D.N.Y. 2005) ("In order to sign the SEC filing documents, [defendants] had a duty to familiarize themselves with the facts relevant to the core operations of [Alstom].").  Fourth, the addition of WAG, NextGen, and Ocasia crude oil business to WSG to bolster revenues for the purposes of the Guarantees supports the inference that Ideanomics, Wu, and Yang were aware that SVG alone was not sufficiently profitable to meet the Guarantees and 2017 Revenue Guidance.  ¶87.  Fifth, the magnitude of the difference between the Company's actual revenues and its 2017 Revenue Guidance ($125-144 vs. $300 million) indicates that Defendants were aware that the 2017 guidance lacked a reasonable basis particularly given Ideanomics' revenue history from its video-on-demand business, ¶55, and the Acquisitions' Q4 2016 revenues.  Sixth, at a minimum, Defendants consciously and recklessly disregarded that the Company was not "on track" to achieve this guidance in November 2017 because it is simply not "credible" that "defendants [] were somehow surprised by their sudden reversal of fortune."  *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001).  Last, Defendants were plainly aware that they were not primarily operating the Acquisitions to meet the 2017 Revenue Guidance given

19

Ideanomics' admission that it operated the businesses for research purposes and how these intentions had to be known throughout the Company.  ¶79; *see In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 33 (S.D.N.Y. 2004) ("The allegation of scienter is certainly sufficient for defendant Knapp, as he admitted his knowledge" that the company had become cash flow negative).

### 2.   Defendants Acted With Conscious Misbehavior and Recklessness as to the Actual Crude Oil Revenues in Q4 2017

Before stating Ideanomics' crude oil revenues for Q4 2017, Ideanomics claimed to have reviewed the relevant data before touting the $170 million figure.  ¶¶57, 91, 93; *In re KeySpan Corp.*, 2003 WL 21981806, at *16 (E.D.N.Y. July 30, 2003) (inferring scienter when defendant admitted that he received periodic reports).  These revenues were almost entirely derived from a related party and not third parties, meaning that Defendants had ample access to financial data to assess the statement's accuracy.  ¶92.  Indeed, it is not fraud-by-hindsight because Ideanomics could verify the accuracy of its statement at the time the statement was made.  *See* § I.A.2, *supra*; *Freudenberg v. E\*TRADE Fin. Corp.*, 712 F. Supp. 2d 171, 191–92 (S.D.N.Y. 2010) ("[i]t is not 'fraud by hindsight'" where accuracy of statements could be determined at the time such statements were made); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016).  The vast disparity between the Company's **actual $19 million** in revenues and the falsely reported **$170 million revenue** figure is so large that anyone who reviewed the financial data would have discovered that the statement was false.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (the magnitude of "$24 million in special charges during the third and fourth quarters undermines . . . the argument that defendants were unaware of the sharp increase in" returns); *Freudenberg*, 712 F. Supp. 2d at 199 ("[T]he magnitude of write-offs alleged to be the subject of the misstatements supports a strong inference of scienter."); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008)

20

(endorsing collective scienter theory where company scienter can be inferred, for example, where company announces it sold one million SUVs when "actual number was zero").[6]  And if Ideanomics was not aware of the large discrepancy, then it was reckless in speaking about revenues without properly checking them.  *See Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017) (because the defendants spoke "about comScore's revenues" "it is plausible that [they] were aware that the revenues were artificially inflated, or at the very least consciously or recklessly disregarded the evidence that the revenues were overstated.").[7]

### 3.   Defendants Acted with Conscious Misbehavior and Recklessness as to the Implementation of Blockchain into Ideanomics' Businesses

Because blockchain is a large system where transactions are recorded in a database on various computers to promote transparency, such a platform would have been easily accessible on Ideanomics' internal computers.  ¶¶32-33, 95.  All Defendants had access to Ideanomics' internal computers and systems, and thus had access to real-time information indicating that Ideanomics had not integrated blockchain into its crude oil and consumer electronics businesses.  ¶¶32-33, 95; *see City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*19 (S.D.N.Y. Mar. 25, 2013) ("access to real time [inventory and sales] data" supported inference of defendants' awareness "of the severity of the 'inventory crisis'" and its impact on revenue guidance); *see also Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650 (2010) ("[C]ertain

---

[6]      *See also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at \*14 (N.D. Cal. Jan. 4, 2017) (applying theory where VW touted the emissions compliance of all "clean diesel" vehicles when none were in compliance); *In re BP P.L.C. Sec. Litig*., 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012) (applying theory where BP could only recover 15,000 of 491,721 barrels of oil it claimed it could, as the difference was "so far from the truth as to support a finding of reckless indifference").

[7]      Defendants' citation to *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) is not compelling because unlike Defendants' express admission in this case that they had reviewed the financials, in *Glaser* there were no facts indicating that the defendants had knowledge of or access to the omitted financial information. Moreover, the portion of *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) cited by Defendants is discussing loss causation, which Defendants did not challenge here.

21

statements[,]" such as "I am not married[,]" are such that "to show them false is normally to show scienter as well."). Therefore, either Defendants reviewed the transactions in the consumer electronics and crude oil business and saw that blockchain had not been integrated, or they were reckless in speaking about the integration of blockchain without verifying whether it had actually occurred. *See Eletrobras*, 245 F. Supp. 3d at 469 (inferring scienter when defendants were in a position to know "facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor").

At the very least, the SEC's inquiry during the Class Period into Ideanomics' blockchain platform would have put Ideanomics, Wu, and Benya on notice that the system had not yet been integrated into the crude oil and consumer electronics businesses because the Company was required to conduct an investigation which reached the conclusion that blockchain had not been integrated. ¶¶34-35, 96; *see Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 388 (S.D.N.Y. 2011) (SEC letter questioning the company's holdings and valuations "creat[ed] the inference that the Company was aware of regulatory concerns about the valuation[.]"); *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 480 (S.D.N.Y. 2011) (communication of SEC's concerns put defendants on notice of issues).

### C.      Defendants Had The Motive And Opportunity To Commit Fraud

Plaintiffs are not required to plead a financial motive to state a claim. *Tellabs*, 551 U.S. at 325. However, Plaintiff's allegations suffice to establish Defendants' motive and opportunity to mislead the market regarding the Guarantees and 2017 Revenue Guidance, the Company's oil-related revenues, and blockchain integration. "Opportunity is presumed to have been met" given that Defendants are a corporation and its officers. ¶¶21-25; *Teva*, 2019 WL 4674839, at *21. As for motive, first, because Ideanomics' auditors had a "substantial doubt about the Company's ability to continue as a going concern[,]" Ideanomics was motivated to pump up its stock price

22

through misrepresentations in order to conduct five share offerings, reaping more than $60 million in profits in only 15 months.  ¶104.  Allegations that "the executives' careers and the very survival of the company were on the line[,]" like those here, are the types of corporate goals that establish a financial motive.  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) ("the crucial contribution of theater system revenue to IMAX as a going concern" supported an inference of scienter).  Second, during the Class Period, Wu, using Ideanomics as his personal dumping ground, offloaded five of his unprofitable businesses onto Ideanomics in exchange for the Company's inflated stock.  ¶102.[8]  The Company also used its inflated stock to acquire stakes in two additional entities during the Class Period.  ¶103.  Contrary to Defendants' assertions, these acquisitions were connected to specific fraudulent statements, as they were executed weeks after Wu announced that Ideanomics was "on track" to reach revenue of $300 million and caused Ideanomics' stock price to be/remain inflated.  ¶¶54, 103.  It is well established that a strategy to "inflate the price of [] stocks to use as currency to acquire" other companies is sufficient motive to support scienter.  *Teva*, 2019 WL 4674839, at *22; *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 n.6 (2d Cir. 2009).

> **D.  Defendants Had Access To Information Regarding Q4 2016 Revenues And Blockchain Integration Due To Their Importance To The Company**

Numerous courts have found that the importance of an issue to a corporation lends to an inference of executive scienter as to adverse facts regarding that issue.  *See Celestica*, 455 F. App'x at 14 n.3 (endorsing the core operations doctrine as enhancing, if not independently

---

[8]    Defendants' argument that Wu's acquisition of stock negates scienter is improper as there is no information concerning Wu's total personal holdings, and ignores that Wu acquired Ideanomics' shares for his other entities at prices lower than the stock was currently trading, ¶102.  Thus, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) and *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) are inapposite because, in those cases, the stock was acquired by the defendants for personal ownership and the plaintiffs did not allege whether the shares were valued below market prices.

supporting, an inference of scienter); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012). During the Class Period, WSG's consumer electronics and crude oil businesses were Ideanomics' primary sources of revenue. ¶111. The Individual Defendants, as senior level officers, were tasked with overseeing the Company's operations, and their statements during the Class Period indicate that they were heavily involved in developing the consumer electronics and crude oil businesses and the blockchain platform. ¶¶41, 43, 45, 47, 49, 54, 57, 66, 68, 70. Thus, due to the "importance of [these projects] during the relevant period, [the Individual Defendants] should have been aware of" the misrepresented and omitted facts at issue. *Alstom*, 406 F. Supp. 2d at 459–60.

### E. Suspicious Resignations And Concealment Of Defendant Yang's Firing Support An Inference of Scienter

The number of resignations and terminations during a short, 22-month period, are alarming in amount and suspicious in timing, with the following six resignations/terminations taking place: (1) the resignation of CFO Chen; (2) the firing of CEO Yang; (3) the dismissal of Grant Thornton as auditor; (4) the resignation of CFO Wang; (5) the resignation of CRO Benya; and (6) the resignation of CEO Wu. *See* ¶¶59-63, 89, 106-110 (explaining circumstances).[9] Yang's termination is especially suspicious because Ideanomics concealed that fact for months until ultimately admitting it fired Yang. *Emp. Ret. Sys. v. Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (finding that "efforts to conceal" demonstrated "intent to deceive or defraud"). This revolving door of officers and auditors supports the inference that Ideanomics was aware of the problems with revenue and blockchain integration and chose to conceal these facts rather than disclose the true state of affairs at the Company. *See In re Sadia*

---

[9] Defendants' hearsay argument that Grant Thornton later denied that their dismissal resulted from a dispute is based upon improperly submitted extrinsic evidence that cannot be considered at this stage. *See* MTS at 15.

24

*SA Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) (termination of officer and resignations of two other officers supported inference of scienter); *Salix, Ltd.*, 2016 WL 1629341, *15 (resignation of CFO the day of company's revelation supported inference of scienter).[10]

## III.     PLAINTIFF STATES CONTROL PERSON CLAIMS UNDER SECTION 20(a)

Because Plaintiff alleges viable § 10(b) claims, Plaintiff's § 20(a) claims survive. *Kinross Gold*, 957 F. Supp. 2d at 310-11.

## IV.     ALTHOUGH UNNECESSARY, AMENDMENT SHOULD BE PERMITTED

Fed. R. Civ. P. 15(a) permits a party to amend a complaint with the court's permission. "Without doubt, [the Second Circuit] strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) ("The proper time for a plaintiff to move to amend the complaint is when the plaintiff learns from the District Court in what respect the complaint is deficient."). Therefore, should the Court grant the Defendants' MTD, Plaintiff respectfully requests leave to amend, including to amend any fact or argument asserted herein that the Court does not believe was sufficiently alleged in the AC. *See Loreley*, 797 F.3d at 190.

### CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court deny Defendants' motion. Alternatively, Plaintiff requests leave to amend the AC.

Dated: March 2, 2020                         Respectfully submitted,


                                             By: */s/ Richard W. Gonnello*
                                                     Richard W. Gonnello

                                             Richard W. Gonnello
                                             Katherine M. Lenahan

---

[10]     Defendants' citations are not analogous. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) (resignations were to accept another opportunity and for health reasons); *Glaser*, 772 F. Supp. 2d at 598 (resignations had no temporal relation to alleged fraud).

Sherief Morsy
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: rgonnello@faruqilaw.com
        klenahan@faruqilaw.com
        smorsy@faruqilaw.com

*Attorneys for Lead Plaintiff Jaysukh Rudani*

26