# EXHIBIT D

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K/A

(Amendment No.1)

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: **December 31, 2017**

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File No.**001-35561**



# SEVEN STARS CLOUD GROUP, INC.
(Exact name of registrant as specified in its charter)

| **Nevada** | **20-1778374** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**No.4 Drive-in Movie Theater Park,**
**No. 21, Liangmaqiao Road, Chaoyang District, Beijing, China 100125**
(Address of principal executive offices)

**(212) 206-1216**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, par value $0.001 per share** | **Nasdaq Capital Market** |

Securities registered pursuant to Section 12(g) of the Exchange Act:**None.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best

of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act

Large Accelerated Filer ☐                                    Accelerated Filer ☐

Non-Accelerated Filer ☐                                      Smaller reporting company ☒

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

Yes ☐   No ☒

As of June 30, 2017 (the last business day of the registrant's most recently completed second fiscal quarter), the market value of the shares of the registrant's common stock held by non-affiliates (based upon the closing price of shares as reported by Nasdaq) was approximately $63,222,176. Shares of the registrant's common stock held by each executive officer and director and each by each person who owns 10% or more of the outstanding common stock have excluded from the calculation in that such persons may be deemed to be affiliates of the registrant. This determination affiliate status is not necessarily a conclusive determination for other purposes.

There were a total of 68,865,056 shares of the registrant's common stock outstanding as of March 26, 2018.

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

Table of Contents

## RISKS RELATED TO OUR BUSINESS

*Substantial doubt about our ability to continue as a going concern.*

As discussed in Note 3 to the consolidated financial statements included in this report, the Company has incurred significant losses during 2017 and 2016 and has relied on debt and equity financings to fund our operations. As of December 31, 2017, the Company had accumulated deficit of $125.9 million. Management's plans regarding these matters are also described in Note 3 to the consolidated financial statements included in this report.

The Company must continue to rely on proceeds from debt and equity issuances to pay for ongoing operating expenses in order to execute its business plan. On March 28, 2016, the Company completed a common stock financing for $10.0 million. In addition, the Company completed five separate common stock financings as follows: (i) with Seven Star Works Co. Ltd. ("SSW") for $4.0 million on July 19, 2016; (ii) with Harvest Alternative Investment Opportunities SPC ("Harvest") for $4.0 million on August 12, 2016; (iii) with Sun Seven Stars Hong Kong Cultural Development Limited ("SSSHK") for $2.0 million on November 17, 2016; (iv) with certain investors, officers & directors and affiliates in a private placement for $2.0 million on May 19, 2017 and (v) with Hong Kong Guo Yuan Group Capital Holdings Limited for $10 million on October 23, 2017. On March 17, 2018, the Company entered into a subscription agreement (the "Subscription Agreement") with GT Dollar Pte. Ltd. ("GTD") for a private placement of a total amount of $40.0 million. Pursuant to the terms of the Subscription Agreement, the Company (i) will issue and sell to GTD, an aggregate of 13,773,010 shares of the common stock of the Company, par value $0.001 per share (the "Common Stock"), for $1.82 per share, or a total purchase price of $25,066,878.20, and (ii) issue two convertible promissory notes (each a "Note" and together, the "Notes") with a stated principal amount of $10 million and $4,933,121.80, respectively. GTD shall pay $30 million of the purchase price on or prior to March 31, 2018, in connection with the issuance of the 13,773,010 shares of Common Stock and the $4,933,121.80 Note, and the remaining $10 million on or prior to April 30, 2018, in connection with the issuance of the $10 million Note. The Subscription Agreement contains customary representations, warranties and covenants and a 9 month lock-up period for GTD from the date of the Subscription Agreement. The Notes bear interest at the rate of 0.56% per annum and matures December 31, 2019. In the event of default, the Notes will become immediately due and payable. Until receipt of necessary shareholder approvals for the transactions contemplated by these agreements, the Notes note may not be converted, to the extent that such conversion would result in GTD and its affiliates beneficially owning more than 19.9% of the Company's outstanding shares of Common Stock. Once the necessary shareholder approval is received, the unpaid principal and interest on the Notes will automatically convert into shares of Common Stock at a conversion rate of $1.82.

Although the Company may attempt to raise funds by issuing debt or equity instruments, however additional financing may not be available to the Company on terms acceptable to the Company or at all or such resources may not be received in a timely manner.

These conditions raise substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements have been prepared assuming that the Company will continue as a going concern and, accordingly, do not include any adjustments that might result from the outcome of this uncertainty. If we are in fact unable to continue as a going concern, our shareholders may lose their entire investment in our Company.

*The Company is in the process of transforming its business model and this transformation may not be successful.*

The Company is in the process of transforming its business model to become a next generation Artificial-Intelligent (AI) & blockchain-powered, fintech company. In connection with this transformation, the Company is in the process of considerable changes, which attempted to assemble a new management team, reconfigure the business structure, and expand the Company's mission and business lines. It is uncertain whether these efforts will prove beneficial or whether we will be able to develop the necessary business models, infrastructure and systems to support the business. This includes having or hiring the right talent to execute our business strategy. Market acceptance of new product and service offerings will be dependent in part on our ability to include functionality and usability that address customer requirements, and optimally price our products and services to meet customer demand and cover our costs.

Any failure to implement this plan in accordance with our expectations will have a material adverse effect on our financial results. Even if the anticipated benefits and savings are realized in part, there may be consequences, internal control issues, or business impacts that were not expected. Additionally, as a result of our restructuring efforts in connection with our business transformation plan, we may experience a loss of continuity, loss of accumulated knowledge or loss of efficiency during transitional periods. Reorganization and restructuring can require a significant amount of management and other employees' time and focus, which may divert attention from operating activities and growing our business. If we fail to achieve some or all of the expected benefits of these activities, it could have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows.

*Our operating results are likely to fluctuate significantly and may differ from market expectations.*

Our annual and quarterly operating results have varied significantly in the past, and may vary significantly in the future, due to a number of factors which could have an adverse impact on our business. Our revenue may fluctuate as we expect a disproportionate amount of our revenues generated from Wecast Services quarter over quarter due to the customers' seasonal demand, as normally holiday demand would increase our revenue. Furthermore, as launch dates of our new products will might not be the same as what we planned, we expect the financial performance might fluctuate significantly depending on timing, quantity and outcome of such product launches.

*The transformation of our business will put added pressure on our management and operational infrastructure, impeding our ability to meet any potential increased demand for our services and possibly hurting our future operating results.*

Our business plan is to significantly grow our operations to meet anticipated growth in demand for the services that we offer, and by the introduction of new goods or services. Growth in our businesses will place a significant strain on our personnel, management, financial systems and other resources. The evolution of our business also presents numerous risks and challenges, including:

. our ability to successfully and rapidly expand sales to potential new distributors in response to potentially increasing demand;
. the costs associated with such growth, which are difficult to quantify, but could be significant; and
. rapid technological change.

15

Table of Contents

To accommodate any such growth and compete effectively, we will need to obtain additional funding to improve information systems, procedures and controls and expand, train, motivate and manage our employees, and such funding may not be available in sufficient quantities, if at all. If we are not able to manage these activities and implement these strategies successfully to expand to meet any increased demand, our operating results could suffer.

### *Our supply chain business might not be successful as we expected.*

Our current and future supply chain business operations are also impacted by the policies and regulations of the PRC government. Central government, provincial and local authorities and agencies regulate many aspects of Chinese industries, including but not limited to provision of (i) supply chain solutions, financial services, retail services and operation of high technology businesses; (ii) security laws and regulations; (iii) foreign exchange; (iv) taxes, duties and fees; and (v) customs. Failure to comply with relevant laws and regulations in our operations may result in various penalties and affect our business, operations, prospects and financial condition. There is no assurance that the laws and regulations of relevant government agencies will not change and no assurance that additional or more stringent laws or regulations will not be imposed. Moreover, compliance with such laws or regulations may require us to incur capital expenditures or other obligations or liabilities.

The emergence of "New Retail" (seamless integration of online and offline retail offering a consumer-centric, omni-channel and global shopping experience through digitization and just-in-time delivery) and transformation of the logistics and supply chain industry affect the demand for our supply chain services and our business opportunities. Our future supply chain business and growth are significantly affected by the emergence of New Retail, the continued global development of e-commerce, particularly in China, and the demand for integrated supply chain solutions. If New Retail, the e-commerce industry in China and the demand for integrated supply chain solutions fail to develop as we expect, our supply chain business and growth could be harmed. In addition, macroeconomic and other factors that reduce demand for supply chain services globally or in China could also have a material adverse impact on our future supply chain business

### *In order to comply with PRC regulatory requirements, we operate our legacy YOD businesses through companies with which we have contractual relationships. By virtue of these contractual relationships, we control the economic interests and have the power to direct the activities of these entities, and are therefore determined to be the primary beneficiary of these entities, but we do not have any equity ownership interest in these entities. If the PRC government determines that our contractual agreements with these entities are not in compliance with applicable regulations, our business in the PRC could be materially adversely affected.*

We do not have direct or indirect equity ownership of our VIEs, which collectively operate all of our legacy YOD businesses in China, but instead have entered into contractual arrangements with our VIEs and each of its individual legal shareholder(s) pursuant to which we received an economic interest in, and have the power to direct the activities of the VIEs, in a manner substantially similar to a controlling equity interest. Although we believe that our business operations are in compliance with the current laws in China, we cannot be sure that the PRC government would view our operating arrangements to be in compliance with PRC regulations that may be adopted in the future. If we are determined not to be in compliance, the PRC government could levy fines, revoke our business and operating licenses, require us to restrict or discontinue our operations, restrict our right to collect revenues, require us to restructure our business, corporate structure or operations, impose additional conditions or requirements with which we may not be able to comply, impose restrictions on our business operations or on our customers, or take other regulatory or enforcement actions against us that could be harmful to our business. As a result, our legacy YOD business in the PRC could be materially adversely affected.

### *We rely on contractual arrangements with our VIEs for our operations, which may not be as effective for providing control over these entities as direct ownership.*

Our legacy YOD operations and financial results are dependent on our VIEs in which we have no equity ownership interest and must rely on contractual arrangements to control and operate the businesses of our VIEs. These contractual arrangements may not be as effective for providing control over the VIEs as direct ownership. For example, the VIEs may be unwilling or unable to perform its contractual obligations under our commercial agreements. Consequently, we may not be able to conduct our operations in the manner currently planned. In addition, the VIEs may seek to renew their agreements on terms that are disadvantageous to us. Although we have entered into a series of agreements that provide us with the ability to control the VIEs, we may not succeed in enforcing our rights under them insofar as our contractual rights and legal remedies under PRC law are inadequate. In addition, if we are unable to renew these agreements on favorable terms when these agreements expire or to enter into similar agreements with other parties, our legacy YOD business may not be able to operate or expand, and our operating expenses may significantly increase.

### *Our arrangements with our VIEs and its respective shareholders may be subject to a transfer pricing adjustment by the PRC tax authorities which could have an adverse effect on our income and expenses.*

We could face material and adverse tax consequences if the PRC tax authorities determine that our contracts with our VIEs and their respective shareholders were not entered into based on arm's length negotiations. Although our contractual arrangements are similar to those of other companies conducting similar operations in China, if the PRC tax authorities determine that these contracts were not entered into on an arm's length basis, they may adjust our income and expenses for PRC tax purposes in the form of a transfer pricing adjustment. Such an adjustment may require that we pay additional PRC taxes plus applicable penalties and interest, if any.

### *If we do not obtain shareholder approval of certain potential common stock issuances to BT Capital Global Limited, or BT Capital, a promissory note held by BT Capital will be due, and we may not have the resources to repay such note.*

Under the rules of the NASDAQ Capital Market, we generally may not issue more than 4.99% of our outstanding shares in connection with an acquisition where a related party has an interest in the target, unless we obtain shareholder approval. On January 30, 2017, we entered into an Securities Purchase Agreement (the "Securities Purchase Agreement") with BT Capital for the purchase by us of all of the outstanding capital stock of Sun Video Group Hong Kong Limited ("SVG"), an affiliate of the Company's chairman Bruno Wu, for an aggregate purchase price of (i) $800,000; and (ii) a convertible promissory note (the "SVG Note") with the principal and interest thereon convertible into shares of the Company's common stock at a conversion rate of $1.50 per share. BT has guaranteed that SVG will achieve certain financial goals within 12 months of the closing. The SVG Note has a stated principal amount of $50 million, bears interest at the rate of 0.56% per annum and matures on December 31, 2017. In the event of default, the SVG Note will become immediately due and payable, subject to certain limitations set forth in the Securities Purchase Agreement. Effective on December 31, 2017, the Company and BT entered into Amendment No. 1 to the Note pursuant to which the maturity date of the Note, which was December 31, 2017, is now extended to December 31, 2018. All other terms and conditions of the transaction remain the same.

Under the terms of the Securities Purchase Agreement, until receipt of necessary Company's shareholder approvals, the SVG Note is not convertible into shares of Company common stock.

Although we will put this proposal to our shareholders for their approval, no assurances can be given that we will obtain such shareholder approval. If we fail to obtain such shareholder approval by December 31, 2018 (unless such maturity date for the SVG Note is extended), BT Capital may require us to satisfy all of our obligations under the SVG Note, including the payment in full of all principal and interest, and may pursue other legal or equitable remedies against us. Our ability to make such cash payments will depend on available cash resources at that time, and there can be no assurance that we will have the cash necessary to make such payments. Early payment of the SVG Note could therefore have a significantly adverse effect on our liquidity and financial condition.

16