K8J5rudA                    telephonic argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JAYSUKH RUDANI, *et al.*,

                Plaintiffs,              New York, N.Y.

          v.                             19 Civ. 6741 (GBD)

IDEANOMICS, INC., *et al.*,

                Defendants.

------------------------------x

                                         August 19, 2020
                                         11:00 a.m.

Before:

                    HON. GEORGE B. DANIELS,

                                         District Judge


                         APPEARANCES


FARUQI & FARUQI, LLP
     Attorneys for Plaintiffs
BY:  RICHARD W. GONNELLO

VENABLE LLP
     Attorneys for Defendants Ideanomics, Benya, Wu, and Yang
BY:  GEORGE KOSTOLAMPROS
          -and-
QUINN EMANUEL URQUHART & SULLIVAN, LLP
BY:  XOCHITL S. STROHBEHN

ARENT FOX, LLP
     Attorneys for Defendant Tovar
BY:  HUNTER T. CARTER


                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

(Case called)

THE COURT:  Good morning.  Who wants to be heard first.  I guess I will hear from the group defendants first. Mr. Kostolampros, if you can hear us?  I can see you.  Can you hear me?  I can't hear you.  Still can't hear you.  Nope.

MR. KOSTOLAMPROS:  Can you hear me now?  George Kostolampros on behalf of the company and defendants Bruno Wu, Bing Yang, and Robert Benya.

Your Honor, we have moved to dismiss the complaint. We believe that the complaint does not meet the strict standards under the PSLRA to make a claim.  I will be handling the motion to dismiss argument and my colleague Xochitl Strohbehn, who is also on the video conference, will be handling the opposition to plaintiff's motion to strike.

Your Honor, I am prepared to go through our full argument unless there is something in particular based on our papers that you would like me to focus on.

THE COURT:  Well, I think I would like you, both sides, to focus on, as they say, what the factual allegations are in the complaint.  My reading in the papers is that you are focused on basically two factual allegations or several -- fewer factual allegations than the plaintiff is focused on in their brief.  And I have the complaint and I haven't matched every statement that's alleged in the complaint with every statement that's alleged in the brief.  So, basically you argue

K8J5rudA                          telephonic argument

that there are very limited statements that they say that should be relied upon and are sufficient and they say that they have certain statements that are not forward-thinking statements but statements about the current condition of the company that remain and that those statements, they allege, are false.

So, I would like you to concentrate on what you say are the insufficient allegations and address, if you can, the additional statement that they try to rely upon in their complaint to base their claim.

MR. KOSTOLAMPROS:  Sure, your Honor.

The way that we read complaint -- and I think the plaintiffs do too as well as they set forth in their opposition -- is there is three categories of alleged statements.  The first category is the 2017 revenue guidance. Plaintiffs claim that those were false.  We allege that those were forward-looking statements accompanied by meaningful cautionary language.

Now, the plaintiffs highlight the February 1, 2017 press release and in that press release the company announced the closing of its acquisition of the SVGDL -- Sun Video Group -- and within that press release the company issued company-wide guidance of $280 million in top line revenue for the year and the plaintiffs allege that that was false.  Now, we allege that that included, that was a forward-looking

K8J5rudA                      telephonic argument

statement with meaningful cautionary language.  If you look at the press release the press release, it sets forth that the safe harbor statement states that there were forward-looking statements, that forward-looking statements that may prove to be incorrect and the actual results could differ materially.

THE COURT:  Can you concentrate on what exactly, the exact language that was used and where that language was used?  My recollection is that they say that you said you had $280 million in revenue and you didn't have $280 million in revenue.

MR. KOSTOLAMPROS:  No, and the company didn't say that it had $280 million in revenue.

THE COURT:  That why I need to concentrate on exactly how it was said and whether or not it was a forward-thinking statement or whether it was reasonably a statement proveable or non-provable statement of the current condition of the company.

MR. KOSTOLAMPROS:  Sure, your Honor.

THE COURT:  Should we concentrate on that language in the complaint or should we concentrate on that language in the press release?

MR. KOSTOLAMPROS:  Well, if you look at the press release, your Honor --

THE COURT:  And I am sorry, you have to tell me which exhibit that I am looking at.

MR. KOSTOLAMPROS:  Sure, your Honor.  Hold on one

K8J5rudA                         telephonic argument

second, let me get that as well.  It is Exhibit 7 in our original motion papers, your Honor.

THE COURT:  Exhibit 7?  Okay.  I have pulled that up.  Go ahead.

So, the essence of what was stated that they say was incorrect was what?

MR. KOSTOLAMPROS:  They state, your Honor, that they point out that the company stated that it was issuing company-wide 2017 guidance of $280 million in top line revenue.  Now remember, this statement is issued on February 1st, 2017 so this is a forward-looking statement.

THE COURT:  Well, wait a minute.  Don't go past that so quickly.

MR. KOSTOLAMPROS:  Sure.

THE COURT:  Why does that necessarily make it a forward-looking statement?

MR. KOSTOLAMPROS:  Because it is a statement regarding future events.  It is a statement about future revenues.  It is not about revenues at the current date.

THE COURT:  Well, then give me, characterize for me what you say was being represented about either the current state of the company or the future?

MR. KOSTOLAMPROS:  There was nothing being stated about the current revenues of the company.  What was being stated was based on the SVG deal and other contemplated

K8J5rudA                        telephonic argument

acquisitions being currently vetted, that the company foresaw that potentially -- that it was issuing guidance that potentially the revenues could be $280 million.  This is a standard forward-looking statement.  Plaintiffs acknowledge that revenue guidance is a forward-looking statement.  What they try to do here is they claim, and they argue, that there was a revenue guarantee made by SVG, the company being acquired.  As part of the acquisition agreement --

THE COURT:  I have Exhibit 7 in front of me.

MR. KOSTOLAMPROS:  Sure.

THE COURT:  Go to the language so I can highlight the language in the Exhibit.

MR. KOSTOLAMPROS:  Sure, your Honor.  It is on the page that, if you look at it, it is the fifth paragraph.

THE COURT:  And the language is what?

MR. KOSTOLAMPROS:  What they say is that SVG deal provides Wecast --

THE COURT:  I'm sorry.  Where are you?  I'm trying to follow you.

MR. KOSTOLAMPROS:  Hold on.  I am looking at --

THE COURT:  What paragraph?

MR. KOSTOLAMPROS:  It is the paragraph -- hold on one second, your Honor -- it starts with CEO Bing Yang.

THE COURT:  All right.  So, quote me the language at issue.

K8J5rudA                          telephonic argument

MR. KOSTOLAMPROS:  Sure.  Hold on, your Honor.

The language at issue is later in the paragraph and it states:  The SVG deal provides Wecast Network with a tremendous opportunity to innovate and disrupt certain global supply chains.  This deal, along with other M&A currently being vetted will provide the foundation for Wecast Network's goal towards becoming a next generation global brand and content licensing and IP sales company driven by AI and Big Data.

And this is the key language, your Honor, this last sentence:  Based on all of this, today Wecast Network is confident in issuing company-wide 2017 guidance of $280 million in top-line revenue.

That's for the full 2017.  The company hadn't had revenues of $280 million at that point in time.  It couldn't have because it was for the full --

THE COURT:  What is it about the current state of the company that gives one confidence that there is going to be $280 million in revenue?

MR. KOSTOLAMPROS:  It is the acquisition of SVG and currently contemplated and being vetted acquisitions that the company was contemplating at that point in time.  And there was another acquisition that occurred the very next day as well as August of 2017 with the joint venture partnership with Ocasia Holdings.

What plaintiffs focus on, your Honor, to say that

there is a current statement here is the revenue guarantee that was made by the company that was being acquired, SVG.  Now, all the company did here -- being Ideanomics -- is that it set forth what the terms of the acquisition agreement were.  One of those terms was that the company, SVG, was guaranteeing certain revenue of $250 million and the company also disclosed that there was a contingency here.  If SVG didn't meet that guarantee, SVG was afforded certain compensation and consideration that it was to receive.

All of this is disclosed.  There is no misstatement here.

THE COURT:  That's in the paragraph, two paragraphs above what we just read?

MR. KOSTOLAMPROS:  Yes, your Honor.  Yes.

THE COURT:  As previously mentioned paragraph?

MR. KOSTOLAMPROS:  Yes, your Honor.

And if you go further down in the press release, your Honor, it is the safe harbor statement.  The safe harbor statement makes clear that the press release contains forward-looking statements and that these statements could materially change.

THE COURT:  A general safe harbor statement isn't a get-out-of-jail-free card, as they say, for every statement that you make about the current condition of the company.

MR. KOSTOLAMPROS:  Agreed, your Honor.  That's

correct. And we are not disputing that. Look. The company set forth that this is a forward-looking statement. This is not controversial. A company's revenue guidance is exactly what the PSLRA defines as a forward-looking statement. So, the risk factors are set forth in the safe harbor statement and the safe harbor statement also references the company's 10k which has a multitude of risk factors including the company is transforming, that there is no guarantee that it will meet its expectations. Look. There are a number of risk factors listed in the 10k as well. So, what plaintiffs try to do here is to basically make a current statement, manufacture a current statement as a guarantee.

Look. The guarantee is a term of the underlying contract, the acquisition agreement. It is not any guarantee by the company, being Ideanomics, that SVG would meet its goals. The expectation was that it would meet its goal but there was also a contingency in case SVG didn't meet its goals. And that's ultimately what happened, your Honor.

THE COURT: All right. And the company-wide 2017 guidance of $280 million in revenue is what was projected to be that revenue when SVG met its guarantee of $250 million?

MR. KOSTOLAMPROS: That was part of it, your Honor. If you look at the press release the press release says, look, it is not only SVG but it is also currently being vetted M&A transactions. So, the company was issuing its guidance based

on what it understood it had in the works as well.  It wasn't just SVG but there was other transactions which ultimately came to fruition.  One was the WAG transaction which occurred, the wide angle limited transaction which occurred the very next day, and the other was in August 2017 when the company entered into a joint venture partnership with Ocasia Holdings.

THE COURT:  Okay.

MR. KOSTOLAMPROS:  And look.  Plaintiffs go on to try to, assuming the statement is a forward-looking statement, then in order to get over the higher standard of scienter for a forward-looking statement plaintiffs try to -- that would be actual, they would have to show actual knowledge -- plaintiffs make the argument that it was unreasonable for the company to rely on the SVG revenue guidance.  And the plaintiffs make the argument that that's the only thing, essentially, that the company relied on to issue its guidance but it is clearly not.  The February 1, 2017 statement makes clear that the company was relying on SVG as well as other currently being vetted transactions.  And then they point to a disclosure in the company's 10k relating to SVG's revenue for fourth quarter 2016, this is the quarter right before the acquisition by Ideanomics.  First of all, plaintiffs got it incorrect.  They say $30 million for one quarter.  If you extrapolate that, that basically comes to $120 million.  How can you come up with $280 million?  Well, first of all, the $30 million was only

over a portion of the fourth quarter, really from November 10, 2016 to December 31, 2016.  And if you extrapolate that then that comes out to over $200 million for the year but that, again, it gets back to the guidance wasn't only based only upon the SVG deal, it was based upon these other contemplated actions.

So, your Honor, our position is again, this is a forward-looking statement, there is no basis to allege that this is an actionable statement, there was meaningful cautionary language, and ultimately plaintiffs can't satisfy the standard under the PSLRA.

Plaintiffs also point to some statements being made about the consumer electronics business and crude oil business being for research purposes only.  And they highlight a disclosure made in December 2018 where the company stated that.  But, recall, the company stated this in December 2018 that its crude oil and consumer electronics business was only being operated for research purposes.  That has nothing to do with the company's thinking as of February 1, 2017 or the statements prior to February 1, 2017.

So, again, we don't think that, based on what the plaintiffs have alleged here, it is simply not enough to allege that the company statements were misstated and incorrect at the time they were stated being throughout 2017.  So, that's the first category of misstatements that plaintiffs allege.  Those

K8J5rudA                            telephonic argument

misstatements that plaintiffs allege relate to revenue guidance for 2017.

Now, the second category of misstatements that the plaintiffs assert is based on a January 16, 2018 press release, and in that January 16, 2018 press release, your Honor, the company announced certain products with its crude oil trading business but also stated that its crude oil supply finance and management business did a preliminarily reviewed but still unaudited $170 million in revenue for Q4 2017.  Again, this is primarily out of the Ocasia joint venture.  And this is in January of 2017 the company puts out a release stating that, look, we have done a preliminary review but still unaudited $170 million in revenue.  So, there again there is safe harbor statement.  A little over a month later --

Sorry, your Honor, I can't hear you.  I still can't hear you, your Honor.  Can you hear me?  Your Honor?  We can't hear.

MS. STROHBEHN:  I can't hear you.

THE COURT:  Can you hear me?  For some reason I was muted.  I was trying to get the exhibit number from you.

MR. KOSTOLAMPROS:  Sure, your Honor.  Hold on one minute.

THE COURT:  So that I can have it.

MR. KOSTOLAMPROS:  It is Exhibit 16.

THE COURT:  16.  Point me to the language you say is

K8J5rudA                          telephonic argument

at issue.  I remember it in the brief.

MR. KOSTOLAMPROS:  Hold on one second, your Honor.  It is the second paragraph, your Honor.

THE COURT:  Okay.  Quote that too.

MR. KOSTOLAMPROS:  Let me open that up myself, your Honor.  I have it right here on my computer.

So, it is the second paragraph -- actually, your Honor, in the third paragraph and it begins:  In addition to above, it is worth noting that SSC's crude oil supply chain finance and management business alone -- and then there is a link -- did a preliminarily reviewed but still unaudited, $170 million USD in revenue in Q4 2017.

THE COURT:  Okay.

MR. KOSTOLAMPROS:  So, your Honor, plaintiffs claim that this is a statement of current fact --

THE COURT:  Well, in one sense it is a statement of current fact.  The fact is that you say that a current preliminary review would indicate that you have already accomplished $170 million in revenue in the fourth quarter 2017.

MR. KOSTOLAMPROS:  You are right, your Honor.

THE COURT:  Is that accurate or inaccurate?

MR. KOSTOLAMPROS:  Your Honor, that is accurate at that time.  The issue is is that is that a forward-looking statement because it is language that is qualified.  It says it

K8J5rudA                          telephonic argument

is preliminarily unaudited.

THE COURT:  Yes, but what about it being preliminary makes it a forward statement?  The statement is that you did a preliminary review, you have already done a preliminary review, and that preliminary review indicated that you have $170 million in revenue for the fourth quarter.  Now, it may turn out that a more extensive review might indicate something different but the real question is not whether or not that number is the final and accurate number.  The question is whether or not you had, in fact did a preliminary review and, in fact, that preliminary review gave you a reasonable basis to conclude that you had $170 million in revenue in the fourth quarter.

MR. KOSTOLAMPROS:  That's exactly right, your Honor. There is no allegation in the complaint that sets forth that the company had any information thinking that, showing it that that wasn't an accurate statement at the time.  Now, what happens later is the numbers do get audited and they change.

THE COURT:  Right.

MR. KOSTOLAMPROS:  Things that aren't set forth now and go beyond the complaint, can't get into that, but at the end of the day they did change and we believe, your Honor, that this is an issue that was directly addressed by Judge Engelmayer in another matter, very similar, we say it is basically on all fours here.  That's the *Lopez v. Ctpartners*

K8J5rudA                          telephonic argument

case, your Honor.  It is 173 F.Supp. 3D 12.  This is a 2016 case.  There, Ctpartners issued a press release and gave earnings guidance that substantially changed a week later.  The company qualified that earning guidance as saying it was preliminary.  Judge Engelmayer found that the preliminary results were a prediction based on incomplete or provisional information.  That's exactly what it is here.  And, I would go further, your Honor --

THE COURT:  Well, wait a minute.  I don't know if I can just use Judge Engelmayer's case for guidance here because the question really is what kind of preliminary review are you relying upon?  I mean, that seems to be critical, if the preliminary review is just a bunch of estimates about the future that's what one thing.  If the preliminary review is that you stating that you went, saw how much, took a quick look about how much money you had in the bank, saw that it was $170 million and was trying to represent that in fact you have $170 million in the bank because you did that preliminary review, obviously if it turns out you never went to the bank and looked it up then it doesn't make a difference whether or not it is a preliminary review or not.  The question is did you do a preliminary review that gave you a reasonable basis to make that statement.  Why isn't that --

MR. KOSTOLAMPROS:  Your Honor, what I would say is that this is a motion to dismiss stage where it is plaintiffs'

responsibility and burden to make an allegation that passes muster under the PSLRA.

THE COURT:  Right.

MR. KOSTOLAMPROS:  It can't simply be, look, you got it wrong, you must not have been reasonable.

THE COURT:  Right.

MR. KOSTOLAMPROS:  That's not enough and that's what they're saying here.  If you go back to the cases that plaintiffs rely on primarily, many of these cases, if not all of them, have much more facts in them alleged.  For instance, many of these cases have confidential witnesses or documents that show that defendants had before them facts that contradicted their statements.

THE COURT:  Right.

MR. KOSTOLAMPROS:  We have none of that here.

THE COURT:  Can you point me to the paragraph in the complaint that corresponds to this allegation?  Do you have that?

MR. KOSTOLAMPROS:  Sure, your Honor.  Hold on one second.

THE COURT:  Because I don't disagree with what you are saying in the abstract and I am not sure that they can disagree with you.  The question is if they alleged a materially false statement, if they allege that you made a representation about how you came up with this number and the representation you

made about how you came up with this number was false.

MR. KOSTOLAMPROS:  Right.  Your Honor, I think if you go to paragraph 6 where it talks about the second category, and they basically just pull from the press release that the company stated that it had done $170 million.  So, that's one of the allegations in the complaint.

THE COURT:  Okay.

MR. KOSTOLAMPROS:  I am going now to another one on paragraph 57, it states, again, what is stated in the underlying document.

THE COURT:  I'm sorry.  57?

MR. KOSTOLAMPROS:  57 and 58.  Then in 58, The statement made by Ideanomics was false when made because the company's revenue from crude oil for the fourth quarter was ultimately recognized at $19 million.  Now, again, that's just false by hindsight, at the end of the day fault by hindsight allegations because the number has changed and plaintiffs tried to make an argument and their scienter point is, look, the magnitude of the change shows that something must have been wrong there.  But, that's not enough under Second Circuit case law and other Circuits' case law.  Magnitude of loss standing alone does not get you past the PSLRA standard and this is what we have here, your Honor.  There is no allegations that the company had something before it that made it know or should have known as of the date that it issued that statement on

K8J5rudA                           telephonic argument

January 2018 that its preliminary and unaudited number

statement was incorrect.

THE COURT:  Okay, but clearly that if the company puts

out a revenue number, even if it is unaudited and even if it is

only based on a preliminary review, I don't know that I can buy

the argument that you didn't put out that number for any other

reason other than to make investors believe that that was the

state of affairs.  And then, if it was so preliminary that it

was unreliable, then it shouldn't have been put out.  You put

it out because you knew that investors would use that in the

midst of information to make a decision about the investment.

MR. KOSTOLAMPROS:  Your Honor, I would counter with

that that the number was put out and it was qualified, that we

are putting investors on notice that this was subject to

change.  Again, I go back to Judge Engelmayer's decision which

is on point here that, look, preliminary numbers are a

prediction and if it is a prediction and it is a

forward-looking statement, the plaintiffs have to go one step

further in showing falsity.  They have to show actual

knowledge.  And, again, I go back to what's -- what is

strikingly deficient in this complaint is that there are no

confidential witnesses, there is no document that they point

to.  Again, they try to point to the SVG guarantee but, again,

that's part of the acquisition.  That's the acquisition

agreement that also has a contingency if the revenues weren't

K8J5rudA                        telephonic argument

made.  So, again, we go back to that there is nothing showing that there is actual knowledge on the part of the defendants here or even the lower standard but still a high strict standard of showing consciousness of behavior or recklessness.

THE COURT:  I guess it begs the question, and I will have to inquire of them, but it begs the question as to it may not be determined as to how is it that one can do a reasonable preliminary review and come up with $170 million and that the actual number is really less than 20.

MR. KOSTOLAMPROS:  Look, your Honor.  How that could happen is your auditors come in and say, look, risk of loss hadn't passed because certain administrative steps weren't taken in order to finalize regulatory steps in the acquisition and the auditor comes back and says, look, you can only recognize as revenue -- this is an accounting issue --

THE COURT:  Are you giving me this answer in the abstract or are you giving me this answer as to what actually happened.

MR. KOSTOLAMPROS:  It is in the abstract because I can't get into what actually happened.

THE COURT:  Right.

MR. KOSTOLAMPROS:  That's one possibility, is that the auditors come back and say, look, even though there was $170 million of gross revenue, you, company, can't use it because you didn't have risk of loss.  What you can recognize

is net revenue. So, that's one possibility. So, what plaintiffs don't show here or offer any allegation of, I should say, is anything to get over some sort of explanation that is not nefarious, not fraudulent in any way. What we have here is fraud by hindsight allegations here.

THE COURT: All right.

MR. KOSTOLAMPROS: Okay, your Honor?

THE COURT: Yes.

MR. KOSTOLAMPROS: I will move on to the third category of misstatements. Here, again we think plaintiffs try to argue and state that the company made certain statements stating that it actually had integrated blockchain technology into its business. When we look at those statements, your Honor, and these are two statements, one by Bruno Wu on May 15, 2018 -- and I will get you the exhibit numbers in a minute -- and the second one is statement made by Robert Benya, the chief revenue officer, on August 13, 2018. Now, when you look at these statements themselves we don't think they speak to what the plaintiffs state. We don't believe it says that they had integrated the blockchain technology at this point and, frankly, for the August 13th, 2018 statement, defendant Federico Tovar, later in the very same earning calls basically says, look, we intend to transition our business into higher margin and blockchain-driven business but nothing has happened yet. And, your Honor, one needs to look at the company's

K8J5rudA                          telephonic argument

filings at this time.  The company's filings are clear that the company was aiming to become a next generation artificial intelligence blockchain powered fintech company.  There is safe harbor statements in there, risk factors saying, look, we may meet our goal and be able to become this, essentially.  We think this is clearly, number one, a forward-looking statement and, frankly, we don't think that the plaintiffs, what they say we said actually we said.

THE COURT:  Okay.

MR. KOSTOLAMPROS:  We never did say that it is an integrated blockchain.  And look --

THE COURT:  Point me again to the language at issue.

MR. KOSTOLAMPROS:  Sure, your Honor.  Let me get that again.

So, the August 13th statement is at Exhibit 19.

THE COURT:  And what paragraph?

MR. KOSTOLAMPROS:  Hold on, your Honor?  I have to get it in front of me myself.  It is on paragraph -- it is page 3 of 6 and it is the fifth paragraph that begins with, Our gross profit for three months ended June 30th, 2018.

Are you there, your Honor?  Do you see that?

THE COURT:  Yes.  Is that supposed to be Tovar's statement?

MR. KOSTOLAMPROS:  Yes, that's Tovar's statement where he says, This increase in margin is primarily due to our

K8J5rudA                          telephonic argument

outstanding supply chain business which we intend to transition.

So, that makes clear that the company was intending to transition. If you go back to page 2 of 6, this is what plaintiffs rely on and, I apologize, I should have gone there first.

THE COURT: Yes. The fifth?

MR. KOSTOLAMPROS: The fifth paragraph begins with, For product two, consumer digital assets...

So, plaintiffs take the last sentence, Product four is TradeTech which involves the use of blockchain, active ledger, and index profits to ramp up margins significantly in our supplier chain finance service business which is the key driver of our current and rapid top line revenue growth.

What Mr. Benya was referring to as a key driver of our current rapid and top-line revenue growth was the supplier chain finance service business which is the Ocasia crude oil trading business. It is not that the key driver was TradeTech at that point. That's where I think the plaintiffs have conflated these issues. They take the statement as saying that the company integrated blockchain but it had not at this point. What it was is that it was ultimately intending to integrate TradeTech with its supplier chain finance service business.

THE COURT: Well, what is --

MR. KOSTOLAMPROS: Go ahead, your Honor.

THE COURT:  What does it mean that TradeTech involves the use of blockchain?

MR. KOSTOLAMPROS:  That was a product that the company was developing and it involved the use of blockchain.

THE COURT:  Did it in fact involve the use of blockchain?

MR. KOSTOLAMPROS:  Yes.  Blockchain, and what blockchain is, as I understand it to be, is this active ledger that people can get into and it can't be -- it is all sorts of security around that.  But, that is what the company was developing and ultimately it wanted to integrate that into this crude oil trading business that would create efficiencies for trading crude oil.

THE COURT:  I am trying to understand which part of this is supposed to be the statement at issue.

MR. KOSTOLAMPROS:  The statement is the whole statement, the last sentence, and plaintiffs take it to mean that --

THE COURT:  What fact is supposed to be at issue?

MR. KOSTOLAMPROS:  Sure.  Sure.  What plaintiffs take at issue is that the product TradeTech was the key driver of current and rapid top-line growth.  That's not correct.  What this says is that supplier chain finance service business was the key driver of current and rapid top-line growth.  Again, we think that plaintiffs are here trying to manufacture a

K8J5rudA                      telephonic argument

statement, a current statement, and what is clear is throughout the company's filings, your Honor, is that the company always said, look, we are intending and we are aiming to become this, not that we are.  And that is highlighted about by Mr. Tovar's statement that I read earlier just from the next page where he says, look, we intend to transition into a higher margin and blockchain-driven trade business.

THE COURT:  Where are you?

MR. KOSTOLAMPROS:  Page 3 of 6, your Honor.

THE COURT:  Which paragraph?

MR. KOSTOLAMPROS:  Under the Federico Tovar, the third paragraph that begins with:  Our gross profit.

THE COURT:  Right.  Which line?

MR. KOSTOLAMPROS:  The third sentence in there which begins:  This increase, the increase in margin, is primarily due to our outstanding supply chain management business. Again, that refers to the consumer electronics and crude oil business.  And he goes on to say, which we intend to transition into our high-margin and blockchain-driven TradeTech business. There is nothing here that says, look, we have transitions. This is now transitioning.  Again, this is forward-looking saying what we are going do in the future.

THE COURT:  Okay.

MR. KOSTOLAMPROS:  That's the three statements, your Honor, that I think generally and I guess plaintiffs agree on

K8J5rudA                         telephonic argument

this, in their amended complaint they set forth three categories of statements; again, the revenue guidance, the statement regarding the preliminary revenues for the fourth quarter of 2017, and then what plaintiffs claim are the company's padding that it actually integrated.

Your Honor, I am happy to get into the scienter part of this as well in our argument at this point unless you want me to pause at this point.

THE COURT:  Why don't you pause at this point because let me go to them and let me see how they are further articulating the scienter and then you can respond.

MR. KOSTOLAMPROS:  Sure.

THE COURT:  So, why don't I hear from Mr. Gonnello.

MR. GONNELLO:  Yes, your Honor.

I guess it makes sense first to deal with the statements about the acquisitions, the guarantees, the guidance and the company's statement in mid–November of 2017 that it was on track to meet the guidance that they previously issued.

THE COURT:  So, where are you?

MR. GONNELLO:  I am in my complaint in paragraph 41.

THE COURT:  41.

MR. GONNELLO:  We tried to bold and emphasize the language that was particularly concerning to us in terms of we thought it was actionable.  I guess with respect to paragraph 41, you will see the block quote.

THE COURT:  Yes.

MR. GONNELLO:  As previously mentioned, and as part of the original deal, SVG guaranteed it would achieve certain revenue and profitability milestones within 12 months of closing the transaction.

THE COURT:  Okay.

MR. GONNELLO:  Paragraph goes on to state, As part of the negotiation process, that revenue milestone has been increased to --

THE COURT:  Slow down for the court reporter.

MR. GONNELLO:  I will slow down.  I apologize.

I will start that sentence again.  As part of the negotiation process, that revenue milestone has been increased to $250 million up from $200 million and the gross profit milestone has been established at $15 million.

THE COURT:  Okay.

MR. GONNELLO:  So these statements are all present statements of fact.

THE COURT:  Wait a minute.  Which part are present statements of fact?  Milestone doesn't necessarily mean that they've reached that.

MR. GONNELLO:  Correct.

THE COURT:  So that's not a present -- it doesn't say that they have $200 million.  They say that the revenue milestone, which is the projection, is projected to be

$250 million.

MR. GONNELLO:  So, I view milestone as referring to the first sentence above where they talk about SVG guaranteeing the milestone so it is really a guarantee that they would generate $250 million in revenue.

THE COURT:  Right.  SVG guarantee.

MR. GONNELLO:  Yes.

THE COURT:  Okay.

MR. GONNELLO:  And those revenue numbers, the guarantees were incorporated into the company's revenue estimates.  So, the company estimates it is going to make $280 million.

THE COURT:  Right.

MR. GONNELLO:  And here we have a $250 million guarantee.

THE COURT:  Right.

MR. GONNELLO:  Here the company is largely basing its estimate on the contractual terms that they describe, the existing contractual terms which are present statements of listing historical fact.

THE COURT:  What is a present statement existing in fact other than the guarantee by SVG?

MR. GONNELLO:  That's it.  The guarantees -- the revenue guarantees and the profitability guarantees are existing statements of fact because they are statements of the

K8J5rudA                          telephonic argument

presently existing contractual terms.

THE COURT:  Okay.  But you are not saying that their statement that SVG guaranteed the milestone.  You are not saying that that is a false statement.

MR. GONNELLO:  I am saying it is a misleading statement.

THE COURT:  Well, isn't it correct that SVG entered into an agreement in which they said they would guarantee the milestone and, if not, then there were certain penalties that were going to be imposed?

MR. GONNELLO:  Yes.  It is absolutely correct.  However, it is misleading because investors would not be able to value the true value of these acquisitions without knowing that these companies historically were not able to generate the kinds of revenues and profits that the company was indicating that they would.

THE COURT:  Okay, but the statement that you are relying upon says that SVG guaranteed it would achieve certain revenue and profitability milestones within 12 months of closing the transaction.  If SVG fails to meet the guarantee, then SVG would forfeit that to the company, the WCST promissory sorry common stock it received on a pro rata basis.

So, what is it about that statement that is either false or misleading?  I am not sure I understand the false or misleading.

MR. GONNELLO:  I will get to the facts in a second.

There are omitted facts that make these statements misleading because a reasonable investor would read this language and think that when these guarantees are being incorporated into the company's estimates --

THE COURT:  Right.

MR. GONNELLO:  -- that there would be a reasonable expectation that these revenue guarantees and profitability guarantees would come to fruition, otherwise why else describe it or why else tout it but to make investors think that these guarantees were not pie in the sky numbers and that they had some reasonable basis for offering them.

THE COURT:  But except that they basically say that there is a guarantee, what they expect if the guarantee is met, and what they expect if the guarantee is not met.  Right?

MR. GONNELLO:  That's true, but it is clear --

THE COURT:  What is the additional information that they had at the time that you say they should have disclosed?  You are talking about -- here you are not talking about a material misstatement, you are talking about a material omission.

MR. GONNELLO:  Correct, your Honor.

THE COURT:  What do you say that they should have said?

MR. GONNELLO:  What we believe was improperly omitted

K8J5rudA                      telephonic argument

were the historical revenue figures and profitability figures

for SVG and subsequently WAG, the two acquisitions for the

quarter immediately preceding the acquisition, namely quarter 4

2016, because in quarter 42016 the companies generated

$30 million in revenue and they were made profitable.

            THE COURT:  And a loss of $475,000.

            MR. GONNELLO:  Correct.

            THE COURT:  So you say, I think that's pretty much

your paragraph 42.

            MR. GONNELLO:  Yes.

            THE COURT:  So you say that they had, with regard to

this statement, you say that they omitted that information and

that they had an affirmative obligation to provide that

information in conjunction with this statement?

            MR. GONNELLO:  Yes, your Honor.

            THE COURT:  All right.

            MR. GONNELLO:  Similarly, there were a number of

statements throughout the class period -- and we can go to some

of these -- but, generally speaking, the company and some of

the defendants issued guidance.  It started at $280 million for

the revenues for 2017.  That $280 million estimate was

ultimately increased to $300 million --

            THE COURT:  Right.

            MR. GONNELLO:  -- 2017 revenues, and we have alleged

that there were two important omissions, two important

K8J5rudA                         telephonic argument

historical facts which omissions are not subject to the safe harbor.

THE COURT:  So you are talking about omissions now again, not affirmative misstatements.

MR. GONNELLO:  Correct, your Honor.  Correct.

THE COURT:  What do you say was omitted and was omitted in conjunction with what misleading statement?

MR. GONNELLO:  So, for instance, if you go to paragraph 43?

THE COURT:  Okay.

MR. GONNELLO:  There is a press release quoting defendant Yang --

THE COURT:  Right.

MR. GONNELLO:  -- which is based on all of this, today Ideanomics is confident in issuing company-wide 2017 guidance of $280 million top-line revenue.

THE COURT:  Right.

MR. GONNELLO:  In paragraph 44 we allege what was omitted and we think there are two important sets of facts that were omitted, namely, the historical revenue and profitability figures for the two acquisitions -- SVG and WAG -- and we also say it was important material fact that the company failed to disclose to investors that it was only operating its businesses or consumer electronics business after it was acquired -- or started the joint venture, their oil joint venture -- they are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K8J5rudA                         telephonic argument

operating them for research purposes and not primarily with a view to competitive returns.  So, in other words, they didn't tell investors that, oh, we are not running these businesses serving the basis of our estimate primarily for profit, we are running them primarily for research.

THE COURT:  What do you say that that means, though? I mean, technically at that point in time they weren't running it for profit because they weren't making a profit.  I don't know -- I mean, I'm not quite sure what a reasonable investor is supposed interpret as research purposes as opposed to primarily with a view to competitive return.  That doesn't tell me whether or not they are in fact going to engage in that activity, nor does it tell me whether or not that activity is going to be a money winner, maker, or money loser.

MR. GONNELLO:  In the context of the fact that these businesses served as the primary basis for the $280 million to $300 million revenue estimate, I think it is highly material in light of that context that an investor would know they're putting research goals ahead of profits.

THE COURT:  Remind me where that language comes from.

MR. GONNELLO:  The language, well, we cite it in paragraph 44 and a number of other --

THE COURT:  Does that language come out of a document?

MR. GONNELLO:  Yes, it does; it comes out of the third 2017 annual report.  So, I believe what happened is that the

SEC made certain inquiries of the company regarding their disclosures and in response to those inquiries the company amended its annual report for 2017.

THE COURT:  Right.

MR. GONNELLO:  So, this is an important point because the company doesn't admit this until 2018.  So, when counsel previously was discussing that these statements were made in 2018, well, that's true, but they were about the events in 2017.  That's, by definition, the 2017 annual report that describes the events during 2017.

THE COURT:  Well, that's what I am trying to understand.  I am trying to understand what you say they were researching.  I'm not sure I understand -- let's put it this way.  Why isn't this a statement saying, look, currently we are operating the consumer electronics business to see if it is going to be something worth pursuing and currently we are not primarily operating that business with a view to a competitive return.  Why would that be a misleading -- I mean, is that not a possible interpretation and why would that be a misleading statement?

MR. GONNELLO:  I may have misunderstood so correct me if I did, please.

So, the things that we identified were the revenue guidance statements which incorporated the companies at issue that they were running for research purposes as being the

primary basis for the $280 million estimate and $300 million estimate.  So, within their, incorporated and vetted within the guidance, is information relating about the two companies that are going to serve as the primary generator of revenues.

THE COURT:  Well, that's what I am trying to look at, I am trying to find it in the document itself because I don't -- I want to see particularly what context these statements were made, which document is this coming from.  Can you tell me the exhibit and page number?

MR. GONNELLO:  Unfortunately I only know the complaint paragraphs, I didn't -- give our arguments I didn't focus on the exhibits in part because some of them aren't even documents that we cited in our complaint.

THE COURT:  Right, but you don't give me the whole sentence.

MR. GONNELLO:  Well, I apologize, your Honor.  They're in the complaint, I believe they're in the scienter section.

THE COURT:  B says the company was only operating its consumer electronics business for "research purposes" and "not primarily with a view to competitive returns."  I don't know what that statement is and in what context that complete statement was made.

MR. GONNELLO:  I can certainly get the full document for you maybe.  I believe it's the third --

THE COURT:  You have laid it out this way in support

K8J5rudA                          telephonic argument

of your claim, in support of your argument, but I don't know --

I am sure their argument in response is going to be, well, you

have to look at the whole thing and that's not what we meant.

MR. GONNELLO:  Well, we quoted it to save space.

THE COURT:  I understand that.

MR. GONNELLO:  I believe it is contained in the 2017

annual report 10k as amended, so I think it is the third annual

report for 2017 filed on December 14 of 2018.

THE COURT:  And what page is that on?

MR. GONNELLO:  That is actually in the table of

defined terms, iv for definition of third 2017 10k.

THE COURT:  I don't need the whole document, I am just

trying to focus in on the language that you have listed.

MR. GONNELLO:  I understand.  I think I can actually

pull it up.  It will make it easier.

THE COURT:  You say it is the 10k?

MR. GONNELLO:  Third amended 10k.

THE COURT:  Do we have an exhibit number?

MS. STROHBEHN:  And you think it is the 10k December

14?

THE COURT:  Is that what we are looking at?

MR. GONNELLO:  Exhibit 14, Xochitl?

MS. STROHBEHN:  No, I am asking you, Mr. Gonnello,

December 14?

MR. GONNELLO:  Yes; December 14, 2018.

THE COURT:  Do you know which exhibit that is?

MS. STROHBEHN:  Yes.  It is Exhibit 20 by one set of excerpts, and then the second set of excerpts are attached to defendant's reply papers and that would be at Exhibit E.

THE COURT:  Let's continue.  I will just pull it up.

So you are saying that -- I am just trying to understand what it is that you say is why what the reasonable interpretation is or what they're saying; and two, what you say the real contrary facts were.

MR. GONNELLO:  So, I believe I was actually able to find the language in Mr. Tovar's exhibits.  It was an April 1, 2020 supplemental decoration that he filed in support of his motion to dismiss, ECF no. 68-1, and the statements are on page 12 of the SEC filings and ECF page 15 of 15.

THE COURT:  Okay.

MR. GONNELLO:  And it is at the very top of that page, it is highlighted, blocked off in red and it says:  While we generate revenues from our crude oil and consumer electronics business, we engage in this business largely for research purposes to support our development of fintech solutions for this space and not primarily with a view to competitive returns.

THE COURT:  And you say that's inconsistent with what?

MR. GONNELLO:  That's inconsistent with basing your revenue estimates for the year almost entirely on the revenues

K8J5rudA                              telephonic argument

generated by these companies given that you are operating those companies for research purposes and not primarily for profit, and a reasonable investor ought to know that your research is going to come ahead of your desire to generate revenues because, ultimately, the revenue miss was very large.

THE COURT:  So you are saying it is inconsistent with the estimated company-wide 2017 estimate of $280 million?

MR. GONNELLO:  Yes, your Honor.  Because if you are running the business for research purposes and putting the research interests ahead of generating revenues and profits, you are far less likely to reach your revenue goals if that's the case.

THE COURT:  Well, I mean, I'm not sure factually what it consists of.  I mean, there is some logic to it but it doesn't necessarily follow that simply because it is for research purposes and it is not primarily with a view to competitive return, that doesn't tell me whether it is reasonable or unreasonable to expect $280 million on the fact that they have a $250 million guarantee.

MR. GONNELLO:  So that's where the other omission comes into play, together, because these are companies being run for research purposes and don't have historical track record of generating the kind of revenues and profits that investors would take.

THE COURT:  All right.

K8J5rudA                         telephonic argument

MR. GONNELLO:  So, that's the revenue guarantees that were made.

THE COURT:  Okay, so other than that being the reasonable inference, is there any evidence, any facts that you have alleged that either directly or circumstantially proves that fact?

MR. GONNELLO:  Well, in paragraph 75 we allege that on the day after the period the company announced that it was divesting itself of these businesses.

THE COURT:  Right.

MR. GONNELLO:  So they were obviously being run for research purposes.

THE COURT:  Okay.  That's true.  That's what they say they were run for, for research purposes, but what is one supposed to infer from the fact that they divested other than they didn't make the money that they thought they were going to make.

MR. GONNELLO:  That's part of it.

THE COURT:  Or they decided that they were no longer going to pursue that area of business.

MR. GONNELLO:  Well, they also talked about how these were the businesses that were generating large amounts of revenues and that if you look at --

THE COURT:  Where does it say that?

MR. GONNELLO:  Primary revenues, paragraph 111.  We

cite the company's amended 10k, I guess the second 10k they filed on August 28, 2018 for the proposition that WSG's consumer electronics business and its crude oil business were Ideanomics' primary source of revenues.

THE COURT:  Just a second.  Okay.  From the annual report?

MR. GONNELLO:  Yes.

THE COURT:  Okay, so the consumer electronics and crude oil businesses were their primary source of revenue.  You say that that's true, right?

MR. GONNELLO:  Yes, sir.

THE COURT:  And so that puts a lie to what?

MR. GONNELLO:  Well, it demonstrates that if your primary source of revenues are companies that you are not running with a primary aim to generating revenues, that when you are providing people with revenue estimates that are primarily based on those businesses you ought to tell them that these businesses are subject to a different set of parameters than any reasonable investor would expect because a reasonable investor is expecting them to be run to generate revenues to hit their guidance and hit the profitability, not that they're going to be running these things for experimental purposes; that they never disclosed that during the class period, mind you.  That was only disclosed after SEC made an inquiry to the company about a number of different matters including

K8J5rudA                            telephonic argument

blockchain.

THE COURT:  But you are comparing that to the statement that the company was only operating its consumer electronics business for research purposes, right?

MR. GONNELLO:  Yes.

THE COURT:  But that doesn't say anything about the crude oil business.

MR. GONNELLO:  Well, the crude oil business --

THE COURT:  And then generated $20 million in the fourth quarter, right?

MR. GONNELLO:  There are revenue estimates that occurred after -- I believe there are revenue estimates that occurred after that joint venture started because the joint venture didn't exist at the outset of the class period and there is nothing in the record that indicates that the joint venture was being contemplated by the parties at the time the class period began.

THE COURT:  I know, but why is the fact that Ideanomics' consumer electronics and crude oil business was its primary source of business, why is that inconsistent with the fact that the consumer electronics business was for research purposes at that time?

MR. GONNELLO:  It is not so much inconsistent as it explains why the facts that we have alleged were omitted are material.  So, it explains why an investor would want to know

K8J5rudA                              telephonic argument

that the businesses that are the primary basis of your revenue

estimates are being run in a way different than what an

investor would expect.

THE COURT:  But that's not true with regard to the

crude oil business, if I am following you.

MR. GONNELLO:  I am going to go back to -- we may be

ships passing in the night so I want to make sure that I am

answering your question.

So, if you go back to the 2017 annual report that's in

Mr. Tovar's supplemental declaration it says:  While we

generate revenues from our crude oil and consumer electronic

business, we engage in this business largely for research

purposes to support our development of fintech solutions etc.,

etc.  So, both of these businesses were being run for research

purposes.

THE COURT:  Okay.  That's not what it says in

paragraph 44.

MR. GONNELLO:  And I think that's because in paragraph

44 --

THE COURT:  That's why I say it is, more important,

point me directly to the context in which the full statement is

made because you made no reference, when you quote that

language, you make no reference to the oil business.

MR. GONNELLO:  I understand, your Honor.

THE COURT:  You just simply say that they said that

about the consumer electronics business.

MR. GONNELLO:  Because the oil business did not exist at that time.

THE COURT:  Okay.

MR. GONNELLO:  The oil business was a joint venture.

THE COURT:  So I am not quite sure -- what, again, you are not talking about a material misstatement.  You are saying that they should have given more information about the revenue being generated by these two companies.

MR. GONNELLO:  Correct, your Honor.

THE COURT:  What is it that you say should have been disclosed with regard to the crude oil business?

MR. GONNELLO:  Well, the crude oil business doesn't come until later.

THE COURT:  And when it comes, it generates almost $20 million of profit.

MR. GONNELLO:  Yes.

THE COURT:  I don't follow what you say is misleading about the crude oil business.

MR. GONNELLO:  With respect to the statement in 44 I would say nothing.

THE COURT:  What about 111?

MR. GONNELLO:  So, 111 is not a false statement but I think it might be helpful if we go to paragraph 54 because that is later in time.  I guess the crude oil business is not part

of this analysis but here they are in November of 2017 --

THE COURT:  Where are you?

MR. GONNELLO:  Paragraph 54.

THE COURT:  54, all right.

MR. GONNELLO:  So they have now a $300 million estimate at this point.

THE COURT:  Okay.

MR. GONNELLO:  And they have only made $107 million in revenues at that point.

THE COURT:  Okay.

MR. GONNELLO:  So they have to generate, in the remaining 48 days of the year, they have to generate $193 million in order to hit the guidance.

THE COURT:  So you are saying that they should have disclosed that they were only, of the $300 million goal they were only -- they only generated $107 million of that and so therefore it was not accurate to say that they were on track to meet $300 million and they should have known that if they had to make up $200 million in that remaining period that it was unreasonable to say that they were on track to make 300.

MR. GONNELLO:  Yes, your Honor; that they had no basis to say that in light of the historical performance of the subsidiaries and in light of the revenues from their legacy company, they previously had a video-on-demand company that had only generated about 4 million, 4.5 million the prior year, and

the subsidiaries that served that they were touting at the beginning of the class period, you have seen the revenue numbers and the fact that they were unprofitable. And to say they were on track at that point as if nothing is wrong it is not credible. There is simply no basis for that. And, at the very least, investors should have been able to evaluate the risks they were facing if the facts we have identified in paragraph 55 were disclosed.

THE COURT: Okay. I understand.

What are the other, either material misstatements or material omissions that you want me to concentrate on?

MR. GONNELLO: Well, with respect to the guidance there are basically instances where the company iterates its guidance so it is sort of repetitive but in paragraphs 47 and paragraphs 49 you will see that there is some further guidance. These are basically analogous to what we have already talked about and so the same analysis would apply.

THE COURT: Those are the same facts.

MR. GONNELLO: Yes, your Honor.

THE COURT: Just that they repeated them at those times.

MR. GONNELLO: Correct. Correct.

THE COURT: Okay.

MR. GONNELLO: So, if it is okay with the Court, we can talk a little bit about the crude oil?

THE COURT:  Yes.

MR. GONNELLO:  So, there are a number of things, a number of points I wanted to make in response to what defense counsel said.

First, with respect to the Lopez case, and maybe it will be helpful if you go to paragraph 57, that's the statement that we are talking about, paragraph 57 of the complaint.  The language they used, and we tried to bold it and emphasize it in certain ways at the end of the paragraph is they said they did a preliminarily reviewed but still unaudited $170 million U.S. dollars in revenue in Q4 '17.  So, the Lopez case is the case by Judge Engelmayer.  The company or the defendants in that case, they talked about what their expected revenue was.  They used the word expected.  Here, in a press release so this was carefully drafted, it was approved by the Board, by the officers, they said they did $170 million U.S. dollars in revenue.  That's past tense, it is not a forward-looking statement.  So, the Lopez case, I think, is wholly inapposite.

And it is also worth noting for the statement that the ultimate revenues that were booked were approximately $19 million and virtually all of those revenues were from related parties.  So, they had virtually no revenue or reduced, single-digit percentage from non-parties in the crude oil business.  So, the notion that they had a difficult time calculating their revenue such that when they checked their

bank accounts and they thought that it said $170 million and it really only had $19 million at the end is not particularly credible and our motion to dismiss where the reasonable inferences are to be drawn in favor of the plaintiff, I would think that the statement is, in my mind false, because they had the revenue numbers were inaccurate or, at the very least misleading, because the numbers were so far off.  And, as far as I'm aware, your Honor, the company never subsequently booked this missing $150 million in revenues in a different quarter.  So I don't know what happened to it but as far as I know it never existed and never appears.

THE COURT:  Okay.  All right.  I understand that argument.

MR. GONNELLO:  So, with respect to the next category of statements we have the blockchain statements, and for a little bit of context I think it is worth going to paragraph 64 and I guess the quote from Defendant Wu doesn't start until the top of page 23, but this statement was made --

THE COURT:  I'm sorry.  Say that again.  You were breaking up.

MR. GONNELLO:  Sorry.

This statement was made by the company and the company's CEO in a press release on December 22nd of 2017, and Defendant Wu says:  Ideanomics is a next generation artificial intelligence and blockchain powered essence financial

K8J5rudA                         telephonic argument

technology company, and then it goes on further, a little bit further down, focusing on blockchain for a moment, I want to be very clear and concise on how blockchain is powering Seven Stars' Cloud business model.  Seven Stars Cloud is basically a prior name of the company.  It says:  In this case of Ideanomics we are applying blockchain and artificial intelligence, etc., etc.  So, they are giving investors the impression that blockchain is already incorporated into the company's business models and we have alleged subsequent statements that we believe are false.  And if you go to paragraph 66, which is further down the page and there is ultimately a lengthy block quote and it starts out:  The second revenue driver will be the legacy to what we have put in because we, for the entire year of 2017, our model, I mean, we really took over the management in May but the entire year's model has been Phase I which is supply chain.  So, he is saying that blockchain is the business.  And if you go, I guess you go to the next page, you can read all of this obviously -- I am trying to save time -- if you go to the top of page 24 and if you go to the last few sentences that begin with, So we are now... So, we are now in the middle of transforming, we did with the crude oil.  What we did with the crude oil is going to greatly increase the margin of the Ocasia subsidiary and we are about ready, in the next couple of quarters, to do the same thing with electronic vertical.

So, a reasonable investor would take from this sentence, this statement by Mr. Wu, that blockchain was already incorporated into the crude oil business and that was false. And we know that was false because after the SEC made that inquiry, the company ultimately admitted that blockchain had not been integrated into the crude oil business. And, we allege it, but we also give more details in paragraph 79.

In paragraph 79 there again appears this third 2017 10k and, mind you, this is an amended 10k. So, they're correcting their prior misstatement by definition and doing so at the behest of the SEC inquiry. And it says, quote, oil trading business does not currently integrate blockchain or AI biggest logistics solutions. Which in our view directly contradicts Mr. Wu's prior statements about what the company did in crude oil.

THE COURT: Okay.

MR. GONNELLO: So there were a couple of other statements with respect to blockchain which were discussed previously. When we discussed the TradeTech products, I guess paragraph 70.

So, in the context of Mr. Wu telling everyone that this year is focused on blockchaining and the actual statements that were made which defendants don't dispute that the statement was made, they just disagree and dispute how that statement should be interpreted which we think is improper

under Rule 26, it says product 4 is trade K, which involves use of blockchain, active ledger, and index products to ramp up margins significantly in our supplier chain finance services business which is a key driver of our current and rapid top-line growth.

THE COURT:  Well, they argue that they are saying that that supply chain finance services business is driving it, not specifically the TradeTech is driving it.

MR. GONNELLO:  I understand they're arguing that.  On a 12(b)(6) motion, all reasonable inferences are to be drawn in favor of the non-moving party.

THE COURT:  Why is yours a more reasonable inference than theirs?

MR. GONNELLO:  Well, it doesn't -- I don't know that it needs to be more reasonable.

THE COURT:  Is it a reasonable inference at all?

MR. GONNELLO:  Just from the plain language because --

THE COURT:  Is there something that is consistent with this statement some place else, the interpretation that you want to give to the statement?

MR. GONNELLO:  Yes.  I think the statement by Mr. Wu, which we just discussed, the entire year's model has been phase 1 which is blockchain which is a supply chain.  In the context

K8J5rudA                          telephonic argument

of that statement and the context of the statement about what we did with the crude oil is going to greatly increase the margin of Ocasia's own subsidiary and, mind you, to be clear, the crude oil business, it is the crude oil trading business so they're trading crude oil.  I don't know whether it is futures, I don't know the full detail but TradeTech, presumably, relates to commodities trading and oil trading.

THE COURT:  What do you say is the false statement?

MR. GONNELLO:  So the false statement, I guess we can start with Mr. Wu's statement on paragraph 24 -- sorry, on page 24, paragraph 66, indicating that blockchain was already intergraded into the crude oil business because he said we did with the crude oil, what we did with the crude oil is going to greatly increase the margin of Ocasia's subsidiary.  And they went and corrected that at the behest of the SEC in December of 2018.

THE COURT:  Okay.  What else about that statement on 25?

MR. GONNELLO:  I just think from the statement, a reasonable investor would think that blockchain had been integrated into the company's businesses and it had not, in my view for context purposes, given the way blockchain works, anyone who has access to the system can see whether it is working or not.  So, if you look, for instance, in paragraph 32 of our complaint, on the top of page 10 there is a block quote

and as part of that block quote their sense -- you are welcome to read it or whichever is easier, but the sentence in the middle, it says the blockchain database isn't stored in any single location meaning the records it keeps are truly public and easily verifiable.  So, anybody who is involved with the company's blockchain system is going to be able to tell easily, he says it is even verifiable, whether or not blockchain has in fact been incorporated.  Either this was in the context of the anticipation of the complaint but the SEC was out there warning its investors because a number of unscrupulous companies, who had nothing to do with blockchain, were just taking the buzzword blockchain, throwing it into their press releases, in some cases their names, and the stock price skyrocketed, it would triple in value.  So, that's part of the analysis, the context that I think is appropriate, and I also think it is appropriate to consider that the SEC made inquiries about the company's blockchain business.

THE COURT:  All right.

MR. GONNELLO:  In response to those inquiries the company fessed up.  I apologize but my laptop -- (inaudible).

THE COURT:  So you are saying any statement intending to indicate to the public that they were already involved with blockchain technology was false?

MR. GONNELLO:  Correct, your Honor.

THE COURT:  Okay.  Go ahead.

MR. GONNELLO:  In terms of falsity.  I think I would rest on the relevant points but I am happy to talk about anything else that the Court is interested in.

THE COURT:  Well, I want to, if we can finish up in the next half hour, 45 minutes, I want to talk about Mr. Tovar but maybe I should speak to Mr. Carter first.

MR. CARTER:  Your Honor, this is Hunter Carter.  Can you hear me?

THE COURT:  Yes, I can hear you, but I can't see you.

MR. CARTER:  I'm not sure I understand why.  We tried to reboot the computer and reload the program and enter again.  There seems to be some barrier on getting my very ugly face in front of you today.

THE COURT:  I know what you look like.

MR. CARTER:  Your Honor, thank you for the opportunity.  I represent Federico Tovar; hunter Carter from Arent Fox.  There is only one allegation about Mr. Tovar, he really should not be a defendant in this case.  He signed the second quarter 2018 10Q.  He signed several other documents as well but of all of those statements and all of those documents the only ones that they're attributing to him and saying is false is one from the second quarter 2018 10Q.  Now, I think you have already been shown where that is in the exhibits and you had it in front of you before and the allegation in the complaint is based upon a statement found at page 33 of that

10Q.  It's buried in the middle of a bullet deep in the 10Q and it's very carefully cherry-picked to make it look like it might be false but it is not.  And the statement is:  As part of our blockchain and AI focus strategy, we are currently focused on consumer electronics and the crude oil trading business and supply chain management with the intent to migrate this onto the blockchain with AI capabilities.  And the plaintiffs allege that statement it false, it has no intent to manage, to migrate this onto the blockchain, and the basis of the allegation that it is false is the 10k -- the amended -- pardon me 2017 10k which you have also had put before you by prior counsel, excerpts of the relevant portion of which are in my supplemental declaration which is ECF docket 58-1.

Before we get to the 10k, your Honor, the express clear reference and reliance upon both the 10Q and the 10k are exactly why your Honor is correct to refer to those documents and to understand the reference "cherry-picked statements" in their broader context.  So, if I could first take you to the 10Q that you were shown, you have to get pretty deep into it to get to the relevant portion so I am going to direct you first to page 30 -- I don't know if you have that --

THE COURT:  I don't, unless you can give me an exhibit number.

MR. CARTER:  Maybe one of the other counsel could tell me, we were just referring to it a moment ago.

K8J5rudA                          telephonic argument

MR. GONNELLO:  Which document are you looking for?

MR. CARTER:  Second quarter 10Q in 2018.

MS. STROHBEHN:  It is Exhibit 18.  Excerpts at Exhibit 18.

THE COURT:  What page are you looking at Mr. Carter.

MR. CARTER:  Your Honor, I am also looking to my -- well, the answer to your question is page 30.

THE COURT:  Page 30?  Let me just print that out.

MR. CARTER:  That's the page number at the bottom of the 10Q, not the page number of the pdf.

THE COURT:  Okay.  You can Go ahead.

MR. CARTER:  So, your Honor, the argument that we have submitted in our papers is simple and straightforward, it is that the statement about intent to migrate to the blockchain is a forward-looking statement and it is not false.  And it is certainly not paid made with adequate scienter, there is no adequate allegation of scienter.  Let me take you through those three arguments.

Forward-looking statement, if you are looking at page 30 you will see there is a cautionary note in the 10Q about a forward-looking statement and it talks about language --

THE COURT:  Mr. Carter, could you get closer to the microphone?  I want to make sure the court reporter can hear you.

MR. CARTER:  Absolutely.  Is this any this better?

THE COURT:  That's good.

MR. CARTER:  The statement there is a cautionary note, it is the bold heading, cautionary note regarding forward-looking statements and it says the following section has either historical or forward-looking statements, statements that talk about may, will, affect, anticipate, estimate, believe, continue, or other similar words.  We, in our motion to dismiss, reference the PSLRA and the cases to discuss, then discuss where company plans or intent clearly fall within the safe harbor and there is language clearly asserting that that is what is coming up in the next section.  And so, just to headlines down from there will be the word "over" and the very next sentence says:  Seven Stars Cloud is aiming to become a next generation artificial intelligence -- AI -- and blockchain-powered fintech company.  That's the basic message of this 10Q, is that they're aiming to become that kind of company.

I am going to scroll you down now to where the allegation is contained on page 33.

THE COURT:  Yes.

MR. CARTER:  On page 33, the heading in the middle of the page is:  Principal factors affecting our financial performance.  This is where the company, signed by Mr. Tovar, tells the investors that their operating results are primarily affected by various factors.

K8J5rudA                        telephonic argument

THE COURT:  Right.

MR. CARTER:  The plaintiffs skip over the first bullet point but the Court shouldn't.  It says our ability to transform our business and to meet internal or external expectations of future performance.  That's the first subject.  And it says we are aiming to become a next generation artificial intelligence -- AI -- and blockchain-powered fintech company, and that sentence will be familiar to you because I just read it from page 2 at the top under Overview.  That it is emphasized tells you much about what you need to know much about what this 10Q is actually disclosing or representing to shareholders.  Further into that paragraph of the next sentence you find a line over near the far right in the third line it says SSC -- and that's the company's initials -- hopes to provide -- hopes to provide -- asset owners and holders a seamless method and platform for digital assets, securitization, and trading, importantly.  They go on further in the next sentence after that says:  In connection with this transformation, the company is in the process of considerable changes which include an attempt to assemble a new management team reconfiguring the business structure and expanding the company's mission and business line.  It is uncertain whether these efforts will prove beneficial or whether we will be able to develop the necessary business models.

I am almost done with this document, your Honor.  Go

to the next bullet point, that's where the cherry-picked

language from the middle of the paragraph underlies the only

allegation against my client can be found but before you get

there you have to read where it says:  Our current electronic

and crude oil products and services compete in

highly-competitive global markets characterized by aggressive

price competition and resulting downward pressure on gross

margin.  Frequent introduction of new products, short product

lifestyles, involving industry standards, continual improvement

and product price performance characteristics, rapid adoption

of technological and product advancement by competitors and

price sensitivity on the part of the consumers.  Then you get

to the sentence that says:  As part of our blockchain and AI

focus strategy, we are currently focused on consumer

electronics and the crude oil trading business and supply chain

management with the intent to migrate this onto the blockchain

with AI capability.  The sentence continues:  As such, the

company is co-developing the underlying technology platform, it

is being developed, with an aim to become a smart supply chain

management platform.

          I am not going to keep reading this lengthy document.

We have excerpted from this paragraph and highlighted.  The

point here is that, in context, it is abundantly clear that

this is all forward-looking about company business plans and

intent.

K8J5rudA                      telephonic argument

In the next document is my supplemental declaration in support of the motion to dismiss which has the relevant pages excerpted and highlighted for you from the form 10k and that's ECF document 68-1 and I would like to, if I may, direct you to page 4 of 15 at the top where the ECF file number is.

MR. GONNELLO:  I apologize.  What document is this?

MR. CARTER:  This is document 68-1, you mentioned it earlier a minute ago, Rick; my supplemental declaration of April 1, 2020.

THE COURT:  What page?

MR. CARTER:  6 of 17 in the printed document at the top, it will be page 4 of 15.

THE COURT:  Okay.

MR. CARTER:  That's the ECF page number.

THE COURT:  Okay.

MR. CARTER:  So, what this document tells you when you look at it is not what plaintiffs allege which is that the plaintiff's 10Q statements about intent to migrate are false. What it tells you is it is exactly consistent, there is no, you can't reasonably infer falsity from this document because it repeats, to very great extent, the intent to migrate concept.

THE COURT:  I am on the wrong page.  What page are you on?

MR. CARTER:  I am referring to the ECF page number at the upper right of the page, page 4 of 15.

THE COURT:  I don't have that.  What is the bottom page?

MR. CARTER:  Page 1.  Tell you what, let's make it familiar, we have already looked, your Honor, at page 12.  Why don't you go there so I can orient you to the document.  The page number at the bottom of 12, 12 of the 10k letter.

THE COURT:  Just a second.  I don't have a page 12.  Let me make sure I have the right document.  I have it.

MR. CARTER:  So let me go back to where you were to orient you, if I may, but I appreciate your patience with this platform and my trying to lead you through what you need to see.

So, this is where the statement that plaintiffs rely upon is contained, that while we generate revenues from our crude oil and consumer electronics business, we engage in this business largely for research purposes to support our development of fintech solutions for this space and not primarily with a view to competitive returns.

Now, as to Mr. Tovar, because each defendant has to be looked at differently, but as to Mr. Tovar, plaintiffs rely on that statement to say that his statement in the 10Q about the intent to migrate was a false statement of present fact as opposed to a declaration of future intent of the company.  We already showed you how its cautionary language about forward-looking statements is located right there, next to it

K8J5rudA                       telephonic argument

and how it is located in the section about risk factors. So, what I want to do here is just briefly show you in this 10k document how that statement that I just read to you is sort of cherry-picked out of context. So, if you go to page 1 --

THE COURT: Yes.

MR. CARTER: -- the very second paragraph that this document contains begins at, Starting in early 2017, while continuing to support our YOD -- that's a video called you-on-demand service -- we began transitioning our business model to become a next generation financial technology company with the intention of offering customized products and services based on best in class blockchain artificial intelligence and other technology. Let's pause for a second to appreciate that that's the same thing that was said in the 10Q with the intention to migrate. So, how can you rely on this 10k which says the same thing to say that the 10Q is false? And that's really the theme that you are going to see from my other references in this document. In the interest of time I won't read you all of them but in that same paragraph you see phrases like, We are building a network, We believe have significant potential to recognize benefits. The next paragraph starts out: Our core business strategy is to promote the use, development, and advancement of blockchain and AI based technologies. It says, two lines down, we believe that the technologies being developed in our ecosystem can decustomize

and leverage, etc., etc.  All of this is statement of belief or expectation or plan about migrating those businesses to the blockchain.  When you see these documents in context -- and I also refer to the following paragraph which in the exhibit we submitted to the Court is highlighted using phrases like planning and testing phase, the following paragraph being developed, the following paragraph would be under statements and so on; where you get to the logistics management and financing section on page 3 you see a statement entirely consistent with the 10k does not support an inference whatsoever of falsity.  And it says to support the development of blockchain and AI-based technologies -- sorry, this is the second paragraph on page 3 of the 10k, Exhibit 68-1, it says: To support the development of blockchain and AI-based technologies for the logistics management and financing industries, we entered the commodity trading business.

Why did they enter the commodities trading business? To support the development of blockchain and AI technologies.

So, there is no support from this 10k for the inference of falsity when you look at the language in that paragraph.  And what we do in the next paragraph, your Honor and this is what you just cautioned us about in terms of time when I direct to you that highlighted paragraph and the next one about the crude oil treatment business and when it can commence and the next paragraph about the consumer digital

products and then the financial services product, the paragraph after that, these all talk about the transition to a AI and blockchain.  When you get to page 5, which begins, Mr. Tovar specifically mentioned the first sentence under the management team heading says:  To support our transition to the next generation AI and blockchain enabled company we have hired the following folks.  And then when you get to -- so that gets us back to where we started with this document.

Now I am going to move briefly to scienter in the interest of time.  It is clear in our papers, the only allegations in the complaint about a financial motive to get a transaction done were two transactions that happened before Mr. Tovar became a part of the company.  He was hired, was only about six months to go in the class period and so he had no motive owing to those two transactions.  There is no allegation of what his stock interests were or how, in any fashion, the statements in the 10Q should be presumed, under the high standards (inaudible) litigation format to meet the concrete evidence of fraudulent intent or fraudulent knowledge standards.  On the contrary, I think we have demonstrated the one allegation of a statement against him concerns a forward-looking statement about the intent to migrate and it is, in context, described as a forward-looking statement accompanied by other forward-looking statements, and that the one document saying that it is false is actually fully

K8J5rudA                          telephonic argument

consistent with it and supports no inference of falsity whatsoever.

THE COURT:  Okay.  Can I go back to Mr. Gonnello?

MR. GONNELLO:  Yes, your Honor.

MR. CARTER:  Yes, sir.  Thank you, unless you have no further questions of me.

THE COURT:  Thank you.

Mr. Gonnello?

MR. GONNELLO:  Yes.  I will keep this brief.

With respect to Mr. Tovar's statement about what the company and their intent was, I believe a person's intent is a statement of present historical fact, it's what they intend to do at the moment they make the statement so it is not a forward-looking statement, it is a statement of what they actually intended to do.  It is not saying we will do this, it is saying it was the intent to migrate and, from my point of view and from plaintiff's point of view, when you read that sentence a reasonable investor would assume that the consumer electronics business and the crude oil trading business are important parts of the company that are important parts of the company going forward, but when you review the statements that they change and alter in the 10k after the class period that these businesses were just being run largely for research purposes, they're essentially guinea pigs so they are kind of trial runs in these companies to see if they can come up with a

product that would work in other areas and that is borne out because the day after the class period they announced that they were divesting these businesses.

So, the actual intent was different and what they led investors to believe based on the context of Mr. Wu's statement that blockchain had already been integrated into the crude oil business.

THE COURT:  Except that the problem I am having is that you are trying to rope in Mr. Tovar based on his late entry into this company based on one statement that he has made in the 10k and it is sort of you have done just now I think what you have done in the papers, is that in support of that you jump back and forth with regard to other defendants.  But that doesn't tell me anything about Mr. Tovar, that why one should assume that Mr. Tovar is a full participant in a conspiracy that you say primarily was engaged in long before he got there.

MR. GONNELLO:  So, with respect to Mr. Tovar, the one fact that makes him unique is that he was brought into the company as CFO based, in part, on his expertise in blockchain.

THE COURT:  Yes.

MR. GONNELLO:  So, he is a person who is truly going to understand the blockchain issues, he is going to understand whether it is integrated, whether it is not integrated.  He is going to understand far more than the average person and he is

K8J5rudA                          telephonic argument

tasked with doing so in his capacity as CFO.

THE COURT:  That's sort of a false argument because on the one hand you can't say he is brought in because of his expertise in blockchain but that he had absolutely no intention of engaging in any future business when you buy the blockchain.

MR. GONNELLO:  No.

THE COURT:  That's not inconsistent?

MR. GONNELLO:  That's not our argument precisely.  Our argument is that they were trying to find blockchain businesses but they were dishonest about the businesses they describe as currently having integrated blockchain.

THE COURT:  So what was Tovar dishonest about?

MR. GONNELLO:  Tovar was dishonest with respect to the statement about the company's intent -- let me find that.

THE COURT:  So you say independently that one statement by Mr. Tovar is sufficient to make him liable along with everybody else?

MR. GONNELLO:  One statement can be enough, your Honor, if it is a materially misrepresented fact or omission, even a single statement is sufficient to establish a claim.

THE COURT:  So, what was the material statement?  I also have a problem with the nature of the statement.  The statement, why is this -- why would any reasonable investor rely on the statement Mr. Tovar made to make investment in this company or make a purchase or sale with regard to this company?

Why is what he said a material misrepresentation?

MR. GONNELLO:  I understand your question, your Honor, so I am going to address paragraph 68 which is where the statement is located.

THE COURT:  Okay.

MR. GONNELLO:  So, it says, As part of our blockchain and AI focused strategy we are currently focused on consumer electronics and the crude oil trading business.  It's supply chain management with the intent to migrate this on the blockchain with AI capabilities.

THE COURT:  Okay.

MR. GONNELLO:  So that statement, my interpretation of it -- the plaintiff's interpretation of it I should say -- is that the blockchain technology that they've already put into place in their consumer electronics business --

THE COURT:  Well, he hasn't said that they put this into place.

MR. GONNELLO:  Well, Mr. Wu does.

THE COURT:  But you want to somehow transfer Mr. Wu's mental state into Mr. Tovar.  I mean, you have to tell me why Mr. Tovar, whatever it is that Mr. Tovar has consciously engaged in this being test.  You simply say, well, Mr. Wu said it six months before he got there and he should have known about it when he got there is not a particularly compelling argument.

K8J5rudA                         telephonic argument

MR. GONNELLO:  In the context of the prior statements made by other defendant, to be clear --

THE COURT:  Okay.

MR. GONNELLO:  -- a reasonable investor would view Mr. Tovar's statements as being consistent with and supporting the statements made by the other defendants.

THE COURT:  Why would a reasonable investor interpret the statement to mean anything more than what it says?

MR. GONNELLO:  I'm not sure I disagree with that, that proposition.

THE COURT:  What is it that you say that it says that is false?

MR. GONNELLO:  So, what is false or misleading, depending on how equitably you want to parse it --

THE COURT:  I am asking you.  Is it false or misleading?

MR. GONNELLO:  I think it could be either.

THE COURT:  So what part of it is false and what part of it is misleading.

MR. GONNELLO:  When they say we are currently focusing on consumer electronics and crude oil trading business and supply chain management that statement, in light of what the company and other defendants have previously said was false, because it is listed in paragraph 69 subparagraph A, blockchain had not been integrated into the crude oil/consumer electronics

K8J5rudA                          telephonic argument

business.

THE COURT:  It doesn't say it is integrated.  It doesn't say it is currently integrated, it says they're currently focused.

MR. GONNELLO:  You are correct, if you construe it in a way that doesn't encompass the integration of the products then I would say the statement is misleading for the same reason because it puts the issue of whether the consumer electronics business and the crude oil trading business are actually focused on blockchain in which I view, in light of the prior statements as meaning that is part of their business, it is actively part of their business in generating revenues.

THE COURT:  Well, I am just not sure what -- I am not sure, other than your requesting an inference against Mr. Tovar, I'm not sure what it is in this paragraph that would lead one to believe that Mr. Tovar was trying to make a false statement and mislead investors when he made this statement.

MR. GONNELLO:  I understand.

THE COURT:  You say they brought them in because of his expertise with regard to blockchain.  There is no reasonable inference that if that's why he was brought in here that somehow he is aware that he is making a false statement simply because you accuse the others before he got involved to be engaged in false statement and this is a little different than the statements made by the others where you say that they

K8J5rudA                          telephonic argument

say they make stronger statements, one about the financial

condition of the company; and two, about the current activities

of the company.  You are saying that by this statement alone,

if this is all that you can prove -- if this is all you can

prove with regard to Mr. Tovar, this is sufficient for a trial

fact to conclude that Mr. Tovar made this statement, it was

either false, misleading, or he omitted something else that he

consciously knew and should have said and that he did it with

the intent to defraud investors.  That's quite a leap on this

one sentence.

          MR. GONNELLO:  I understand your Honor's point.  This

is not as clear a statement or misrepresentation as Mr. Wu's

and I realize the Court may have different view of it than the

plaintiffs do.

          THE COURT:  I am just trying to understand, trying to

make sure I am not missing anything.  Is there anything, any

evidence related to Mr. Tovar prior to August 13th of 2018 or

after August 18 of 2018 that indicates his personal involvement

that would support your theory of liability?

          MR. GONNELLO:  I'm not aware of anything currently

other than what is in the complaint.

          THE COURT:  So, what else am I supposed to assume that

is going to support your claim against Mr. Tovar?

          MR. GONNELLO:  There are a number of documents,

correspondence between the SEC and the company about blockchain

K8J5rudA                         telephonic argument

and statements that were made and asking the company to clarify and change things, so I can't sit here and tell you at this moment that I would be able to put specific sentences in that Mr. Tovar said but after hearing your Honor's point I would certainly look to do that.

THE COURT:  Let me ask you this.  Is it the correct understanding that even with regard to this statement in the, I guess it is the 10k, with regard to this statement you are not necessarily saying that you, Mr. Tovar, wrote this statement?

MR. GONNELLO:  He signed it.

THE COURT:  No, I understand that part.

So, your theory is everybody who signed it, that that is evidence that they were aware that this statement in there was false but you are not claiming he was the author or generated this particular statement?

MR. GONNELLO:  So, in terms of speaker liability under the Supreme Court's decision in *Janus*, I believe that anyone who signs a document is the speaker of the statement.

THE COURT:  I understand that.  I understand that.  But, obviously, your theory, particularly with regard to scienter is -- your theory would be stronger if he made this statement personally, here or someplace else.  You are not saying you have any basis to allege that his liability is based on anything other than the fact that he was one of the people who signed this document in which this statement was in that

K8J5rudA                          telephonic argument

document.  So, that's what you are relying upon in terms of his involvement, his personal involvement.

MR. GONNELLO:  Yes, your Honor.

THE COURT:  Okay.  All right.

And you say that, I guess my last question on this is that is there something else that you have alleged or even possibly can allege that is evidence of additional evidence of his role or liability with regard to these claims?

MR. GONNELLO:  At the moment, no.  After hearing your points I would go back through and look at the SEC correspondence and see if there is anything else.

THE COURT:  All right.  At this point you haven't alleged anything else and you don't know whether or not you could at this point if I thought that that was a determinative issue.

MR. GONNELLO:  Correct, your Honor.

THE COURT:  All right.  Thank you.

I guess, as they say, the last one seems to be short shrift.  Ms. Strohbehn, is there anything you wanted to add at this point?

MS. STROHBEHN:  No, your Honor.  Not at this time.

Are there any questions for us on the motion to strike that you have?

THE COURT:  Not really.  I have looked at, and my law clerk as looked at the references, particularly there were some

K8J5rudA                          telephonic argument

with regard to Mr. Tovar and then there were a lot more with regard to the other defendant.  It seems to me that most, if not -- I don't remember, there is one document that I --

MS. STROHBEHN:  Exhibit 9.

THE COURT:  Yes.  Exhibit 9 is really the only one that struck me as not being incorporated by reference with regard to what is obviously within the knowledge of both sides and I'm not quite sure, I haven't had a chance to look at them more carefully.

Exhibit 9 is what?  Remind me which one.

MS. STROHBEHN:  It is the 2015 10k that was provided in connection with giving fuller context under Federal Rule of Evidence 201(c)(1) you can take judicial notice of that just for the fact of the disclosure.

THE COURT:  I'm not sure.  Remind me what was the purpose for which it was submitted?  Because it clearly didn't seem to be determinative.

MS. STROHBEHN:  We asked or we are seeking judicial notice of that exhibit with respect to the overall safe harbors and the description of the safe harbors throughout the various SEC filings.

THE COURT:  But how is your argument any different whether or not you had that document or you don't have that document?

MS. STROHBEHN:  I think our argument is equally strong

K8J5rudA                        telephonic argument

without that document.

THE COURT:  How many annual and quarterly reports do we have?

MS. STROHBEHN:  More than five, I estimate.

THE COURT:  With regard to the issue you submitted them for they all pretty much say exactly the same thing?

MS. STROHBEHN:  I think there is modification.  To put a finer point on it there is some modification to tailor it.

THE COURT:  I am trying to figure out whether that Exhibit 9 adds something that you think is critical that I need to spend a lot of time thinking about.

MS. STROHBEHN:  I don't think so, your Honor.  And to the extent that would result in a conversion or -- discovery wouldn't be necessary to consider it.

THE COURT:  Mr. Gonnello?

MR. GONNELLO:  I am happy to stand on my papers, your Honor.  Time is short for you.

THE COURT:  I assume you don't disagree that the documents, to the extent that you have, that documents are relied upon in drafting the complaint or there could be some particularly cited in the complaint, that there is really no real basis to strike those documents.

MR. GONNELLO:  So, it depends on the purpose.  For incorporation by reference, if the document contains a false statement that we have alleged --

K8J5rudA                        telephonic argument

THE COURT:  Right.

MR. GONNELLO:  -- it is appropriate for the Court to look at the statement and surrounding language to see whether or not it is false or misleading.

THE COURT:  Right.

MR. GONNELLO:  That is the issue.  If it is being offered for hearsay purposes then we have an issue.

THE COURT:  I'm not sure you have identified any document that was being offered for hearsay purposes.

MR. GONNELLO:  I do think we did.

THE COURT:  I will look at it.  I will look at it a little bit more carefully but my recollection, as I say, I don't think it's determinative of the issues that have been raised before the Court but I will look specifically in that regard.  Okay?

Is there anything else that we need to address before we adjourn?  I'm going to try to get back to you in the next 60 days, 45 days at the most, hopefully, to resolve this.  I know, I believe we have Mr.  -- my understanding is that a couple of other cases are coming in similar or related and I think we already have a date for those.  I am going to put this down for that same date and I will see whether or not those cases should be related and/or consolidated if we go forward with this case.

MR. GONNELLO:  Thank you, your Honor.

THE COURT:  Let me look up that date and I will give

K8J5rudA                          telephonic argument

it to you -- November 10th, I am being told.  I think we have three cases that we set down for that day so we will set this down for that same day but I will get back to you before then and we will see where we are with regard to this case.

MR. KOSTOLAMPROS:  Your Honor, if I may?  This is George Kostolampros again.

Yes, we are aware of that date.  We didn't get into the scienter arguments but obviously we have those in our brief.

THE COURT:  Yes.

MR. KOSTOLAMPROS:  And one other point I would be remiss not bringing up is you mentioned it with Mr. Tovar but as with the other individual defendants, we think that there is lacking in scienter as to each one.

THE COURT:  Yes.

MR. KOSTOLAMPROS:  The time periods do not overlap for each of these individual defendants.  So, for instance, Mr. Yang was not there at the time of the statements regarding the blockchain.  And, Mr. Benya was not there initially in the February 1st, February 2nd, 2017 statements regarding revenue guidance.

Again, just pointing that out for your Honor and, again, thank you, your Honor, for the time, and addressing our arguments.

THE COURT:  I thank all of you.  This has been

K8J5rudA                        telephonic argument

helpful.  I want to get the transcript, though, because this has been helpful.

o0o