**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JAYSUKH RUDANI, *individually and on behalf of all* :
*others similarly situated,* :
                                                   :
                          Plaintiff,               :
                                                   :
            -against-                              :
                                                   :
IDEANOMICS, INC., *f/k/a Seven Stars Cloud Group,* :
*Inc. f/k/a Wecast Network, Inc.*, BING YANG,      :
FEDERICO TOVAR, ROBERT BENYA, and ZHENG            :
WU, *a/k/a Bruno Wu,*                              :
                                                   :
                          Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 2 5 2020

MEMORANDUM DECISION
AND ORDER

19 Civ. 6741 (GBD)

GEORGE B. DANIELS, United States District Judge:

Lead Plaintiff Jaysukh Rudani brings this putative class action for securities fraud against

Defendants Ideanomics, Inc. ("Ideanomics" or "Company"), Bing Yang, Federico Tovar, Robert

Benya, and Zheng Wu, also known as Bruno Wu. (*See* Am. Securities Class Action Compl. ("Am.

Compl."), ECF No. 41.) Defendants Ideanomics, Yang, Benya, and Wu move to dismiss

Plaintiff's amended complaint for failure to state a claim pursuant to Rules 12(b)(6) and 9(b) of

the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4(b). (Not. of Mot., ECF No. 51.) Separately, Defendant Tovar also

moves to dismiss Plaintiff's amended complaint. (Def. Federico Tovar's Not. of Mot. to Dismiss

Am. Securities Class Action Compl., ECF No. 48.) Plaintiff, in turn, moves to strike portions of

Defendants' motions to dismiss. (Pl.'s Not. of Mot. to Strike the Extrinsic Evidence and Related

Arguments that Defs. Ideanomics, Inc., Bruno Wu, Bing Yang, and Robert Benya Submitted with

their Mot. to Dismiss, ECF No. 54; Pl.'s Not. of Mot. to Strike the Extrinsic Evidence and Related

Arguments that Federico Tovar Submitted with his Mot. to Dismiss, ECF No. 58.) Plaintiff's

motions to strike are DENIED.[1]  Defendant Tovar's motion to dismiss is GRANTED.  Defendant

Benya's motion to dismiss Count I of the amended complaint against him is GRANTED.

## I.   FACTUAL BACKGROUND [2]

Ideanomics is a publicly traded company that has undergone a flurry of changes over the

last few years, both in name and lines of business.[3]  Plaintiff alleges that between February 1, 2017

and November 13, 2018 (the "Class Period"), Defendants made a series of fraudulent

misrepresentations and omissions related to three distinct aspects of Ideanomics' businesses:

(1) Ideanomics' acquisitions of Sun Video Group HK Limited ("SVG") and Wide Angle Group

Limited ("WAG") and subsequent 2017 Company-wide revenue guidance, (2) revenues from

Ideanomics' crude oil business in the fourth quarter of 2017, and (3) the integration of blockchain

and artificial intelligence technology into Ideanomics' consumer electronics and crude oil

businesses.  (Am. Compl. ¶ 144.)

---

[1] Plaintiff challenges all of the exhibits accompanying Defendants' motions to dismiss, arguing that they are extrinsic evidence that cannot be considered by the Court at this stage.  "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'"  *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).  Here, the challenged exhibits include SEC filings, earnings call transcripts, and press releases, all but one of which were cited and quoted in Plaintiff's amended complaint.  Further, the lone document that was not cited in the amended complaint is an SEC filing (2015 10-K).  Courts are permitted to consider legally required public disclosure documents filed with the SEC on a motion to dismiss.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Moreover, Plaintiff's motion to strike is improper.  None of the rules cited by Plaintiff confer authority on a party to move to strike portions of an opposing party's motion to dismiss.  The only rule that contemplates a motion brought by a party, Rule 12(f), provides that a court "may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f) (emphasis added).  Rule 12(f) does not apply to motions to dismiss.

[2] The following facts are taken from Plaintiff's amended complaint.  Because this Court is considering a Rule 12(b)(6) motion, this Court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[3] The Company is referred to as Ideanomics, Wecast, and the Company interchangeably throughout this decision.

### A. Acquisition of SVG and WAG

On February 1, 2017, the Company acquired supply chain company SVG from BT Capital Global Limited ("BT Capital"), a private equity fund controlled by Defendant Bruno Wu, who at the time was, and still is, the Company's Chairman. (*Id.* ¶ 36.) The Company purchased SVG for $800,000 in cash and a promissory note of $50 million with principal and interest automatically convertible into Ideanomics shares at $1.50 per share. (*Id.*) The Company announced the deal in a press release ("February 2017 Press Release"), in which it also rebranded SVG as the "Wecast Services Group." (*Id.*) The newly acquired subsidiary would primarily engage in consumer electronics and smart supply chain management operations, and later in crude oil trading. (*Id.*) As part of the SVG purchase agreement, BT Capital guaranteed that SVG, along with its subsidiaries and any new businesses, would receive $250 million in audited revenue and $15 million in audited gross profits within a year. (*Id.* ¶ 37.) If SVG failed to meet these numbers, BT Capital was required to forfeit back the Ideanomics shares BT Capital received on a pro-rata basis (the "SVG Performance Guarantee"). (*Id.*)

On February 2, 2017, the Company acquired 55% of industrial/trade media and commerce company WAG from BT Capital (together with the acquisition of SVG, the "February 2017 Acquisitions"). (*Id.* ¶ 38.) The sole consideration was the Company's agreement to count WAG's revenues and profits towards the SVG Performance Guarantee. (*Id.*) The Company also announced this transaction via press release. (*Id.*)

Unbeknownst to investors, in the quarter preceding the February 2017 Acquisitions, SVG and WAG were unprofitable businesses with revenues well below the SVG Performance Guarantee. (*Id.* ¶ 39.) Collectively, SVG and WAG obtained $30 million in revenue while incurring a loss of $475,046 in Q4 2016. (*Id.*)

3

In announcing the SVG deal in the February 2017 Press Release, the Company included the following statements regarding the SVG Performance Guarantee:

> [A]s part of the original deal, SVG guaranteed it would achieve certain revenue and profitability milestones within 12 months of closing the transaction. If SVG fails to meet the guarantee, then SVG would forfeit back to the Company the [Ideanomics] promissory note / common stock it received, on a prorata basis. As part of the negotiation process, that revenue milestone has been increased to $250 million (up from $200 million) and the gross profit milestone has been established at $15 million.

(*Id.* ¶ 41.)   Defendant Bing Yang, then Company CEO, added, "Based on all of this, today [Ideanomics] is confident in issuing Company-wide 2017 guidance of $280 million top-line revenue." (*Id.* ¶ 43.)   Subsequently, during an earnings call on March 31, 2017, Wu, Ideanomics' Chairman, announced:

> I'm pleased to note the company today is raising its full-year revenue guidance from $280 million to $300 million based on recent visibility of and internal projections for 2017. This projection is based currently on the Wecast Service Group, which, as a reminder, is a new operational and branding for the recently purchased Sun Video Group.

(*Id.* ¶ 47.)   Yang echoed Wu's statement on the same call.   (*Id.*)   During a later earnings call on May 15, 2017, Wu reiterated the Company's "full-year top-line revenue guidance of $300 million." (*Id.* ¶ 49.)   Further, a November 13, 2017 Company press release quoted Wu as stating that the Company was "still on track to reach [its] top line revenue guidance of $300 million USD as projected by the Company in early 2017." (*Id.* ¶ 54.)

## B. Q4 2017 Crude Oil Revenue

In August 2017, the Company announced a joint venture partnership deal with Ocasia Group Holdings ("Ocasia"), a company that was engaged in, among other things, the trading of crude oil. (*Id.* ¶ 30.)   Subsequently, in or around October 2017, the Company began trading in crude oil. (*Id.* ¶¶ 52–53.)   A few months later, on January 16, 2018, Ideanomics issued a press release ("January 2018 Press Release") regarding its crude oil business and provided a

4

"preliminary and unaudited update on Q4 2017 revenues." (*Id.* ¶ 57.) Specifically, the Company noted that its "crude oil supply chain finance and management business alone (specifically from its JV with Ocasia . . . ), did a preliminarily reviewed, but still unaudited, $170 million USD in revenue in Q4 2017." (*Id.* ¶ 57.)

**C. Ideanomics' 2017 Revenue Announcement and Stock Impact**

On February 23, 2018, Ideanomics issued a press release ("February 2018 Press Release"), announcing that it would only achieve $125–$144 million in revenue for the year 2017. (*Id.* ¶ 62.) This figure was significantly less than the $300 million revenue guidance the Company had announced throughout the year and the $170 million in preliminarily reviewed, but unaudited, crude oil revenue announced a month earlier. (*Id.*) Wu explained that "[u]nanticipated personnel issues that led to internal communication and internal administrative oversights that materialized during the Company's 2017 fiscal year, resulted in what is anticipated to be 2017 revenue that is below prior and recent guidance expectations." (*Id.*) Additionally, Wu identified actions taken to "cure the causes of these deficiencies," including dismissing Yang—who had left the Company in October 2017 in what was previously described as a resignation—and hiring Defendant Robert Benya as President, Chief Revenue Officer, and a Company Director. (*Id.* ¶¶ 7, 62.)

On this news, Ideanomics' stock price dropped 39.3%. (*Id.* ¶ 63.) On August 28, 2018, pre-market open, Ideanomics filed an amended Annual Report for the year 2017 that revealed that the Company's crude oil revenue for the year consisted of only $18,973,054 from related parties. (*Id.* ¶ 72.) On this news, Ideanomics' stock price dropped 18.2%. (*Id.* ¶ 73.)

Plaintiff contends that Defendants' statements regarding the 2017 revenue guidance and failure to disclose SVG and WAG's Q4 2016 revenue and losses constitute material misrepresentations or omissions. Additionally, Plaintiff alleges that Ideanomics' statements

regarding crude oil revenues in the January 2018 Press Release were fraudulent misrepresentations.

### D. Blockchain Integration

As early as December 2017, Ideanomics began describing itself as a "next-generation Artificial Intelligence and Blockchain-Powered Financial Technology Company." (*Id.* ¶ 64.) In the simplest of terms, "blockchain" is a decentralized, immutable record of data managed by a cluster of computers, rather than a single entity. (*Id.* ¶ 32.) Blockchain's decentralized nature provides a number of benefits that have led several public companies to incorporate blockchain technology into their business practices, including: (1) greater transparency; (2) increased transaction efficiency; (3) better security; and (4) increased traceability. (*Id.* ¶¶ 33–34.) Plaintiff alleges that companies who have incorporated blockchain into their names or business models have seen a more than threefold increase in their average share prices. (*Id.* ¶ 34.)

Plaintiff alleges that Defendants sought to capitalize on the perceived benefits of blockchain to Ideanomics' stock price. (*Id.* ¶ 65.) Specifically, Plaintiff claims that Defendants began to misrepresent to investors that the Company had integrated blockchain into its crude oil business, with a view to incorporate it into the consumer electronics business, when in reality, the Company had not integrated blockchain into its business and was operating the crude oil and consumer electronics businesses for research purposes, instead of competitive returns. (*Id.*)

Plaintiff cites a number of statements made by Defendants that he alleges support his claims. On a May 15, 2018 earnings call, Wu discussed applying "four layers" of blockchain technology onto the Company's consumer electronics and crude oil trading businesses, the latter of which he claimed was already completed. (*Id.* ¶ 66.)

> [T]he supply chain business provides a foundation for us to add four layers of
> pyramid on top of that, which is the digital settlement based on blockchain which

is the digital wallets that based blockchain for buyers and sellers which is the digital asset trading place whereas we can capture a transaction fee over all the blockchain-based transactional activities in that particular industry. And on top of that pyramid is the indexing and future derivative computation using super artificial Intelligence and dynamic ontology technology. So we are now in the middle of transforming—we did with the crude oil. What we did with the crude oil is going to greatly increase the margin of Ocasia subsidiary and we are about ready to in the next couple of quarters do the same thing with electronic vertical.

(Id.)  On August 13, 2018, Ideanomics filed its Form 10-Q for the second quarter of 2018, which was signed by Defendant Federico Tovar, as the CFO of the Company.  (Id. ¶ 68.)  The 10-Q stated, "As part of our blockchain and AI focused strategy, we are currently focused on consumer electronics and the crude oil trading business in supply chain management with the intent to migrate this on to the blockchain with AI capabilities." (Id.)  On the same day, Ideanomics held an earnings call with investors. (Id. ¶ 70.)  During the call, Benya—President, CRO, and a Director of the Company—described the Company's core products.  He explained that one such product, TradeTech, "involves the use of blockchain, active ledger, and index products to ramp up margin significantly in our supplier chain finance services business, which is a key driver of our current and rapid top line revenue growth." (Id.)

On November 14, 2018, Ideanomics issued a press release explaining that it was divesting from its oil trading and consumer electronics businesses. (Id. ¶ 75.)  On this news, Ideanomics stock price dropped 48.8%. (Id. ¶ 76.)  Additionally, after market close, the Company filed its Form 10-Q for the third quarter of 2018, in which it revealed that its "commodities trading business does not currently integrate blockchain or AI based logistics solutions." (Id. ¶ 77.)  A month later, on December 14, 2018, Ideanomics filed a second amended 2017 Annual Report that explained that its crude oil and consumer electronics businesses were operated "largely for research purposes to support [its] development of fintech solutions for this space, and not primarily with a view to competitive returns." (Id. ¶ 79.)

\* \* \*

Based upon the above alleged misrepresentations, Plaintiff asserts a claim for securities fraud against all Defendants under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and its implementing regulation, Rule 10b-5, 17 C.F.R. § 240, 10b-5. (Am. Compl. ¶¶ 142–52.) Plaintiff also asserts a claim against Wu, Yang, Tovar, and Benya for control person liability under § 20(a) of the Exchange Act. (*Id.* ¶¶ 153–58.)

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at \*3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

8

Additionally, "[t]o withstand a Rule 12(b)(6) motion on securities fraud claims, a plaintiff must satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the [PSLRA]." *GE Invs. v. Gen. Elec. Co.*, 447 F. App'x 229, 230 (2d Cir. 2011). To satisfy Rule 9(b), the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

### III.   PLAINTIFF STATES A CLAIM FOR SECURITIES FRAUD AS TO IDEANOMICS, WU, AND YANG

To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Charney v. Wilkov*, 734 F. App'x 6, 9 (2d Cir. 2018) (quoting *Stoneridge Inv. Partners LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008)). Here, Defendants argue that Plaintiff has failed to state such a claim because he has not alleged actionable misrepresentations or scienter under the PSLRA.

#### A.  Misrepresentations

As discussed above, Plaintiff contends that Defendants made misrepresentations concerning Ideanomics' revenue guidance for 2017. On February 1, 2017, in announcing the Company's acquisition of SVG, including the SVG Performance Guarantee, Yang declared that, "[b]ased on all of this, today [Ideanomics] is confident in issuing Company-wide 2017 guidance of $280 million top-line revenue." (Am. Compl. ¶ 43.) Two months later, in an earnings call, Wu increased the Company's projection, stating that the Company was "raising its full-year revenue guidance from $280 million to $300 million based on recent visibility of and internal projections

for 2017." (*Id.* ¶ 47.)  Specifically, Wu explained that the guidance was based on the Wecast Services Group (i.e., SVG).  (*Id.*)  Wu reiterated this $300 million guidance figure during an earnings call in May.  (*Id.* ¶ 49.)  Finally, in November, Wu stated that the Company was "on track to reach its top-line revenue guidance of $300 million."  (*Id.* ¶ 54.)

Plaintiff alleges that Defendants' statements were false and misleading because Defendants lacked a reasonable basis for these statements and were aware of undisclosed facts tending to seriously undermine the accuracy of the statements.  Plaintiff argues that "by omitting that SVG and WAG were unprofitable businesses that collectively lost $475,000 and only generated $30 million in revenues" in the fourth quarter of 2016, investors were "misled as to the likelihood Ideanomics would meet its estimates."  (Mem. of Law in Opp'n to Defs. Ideanomics, Inc., Bruno Wu, Bing Yang, and Robert Benya's Mot. to Dismiss the Am. Compl. ("MTD Opp'n"), ECF No. 57, at 10.)  Plaintiff further contends that such statements were misleading because Ideanomics was only operating its consumer electronics business for research purposes, rather than to achieve competitive returns, as later disclosed in the Company's second amended 2017 Annual Report. (*Id.*)  Plainly, such facts, if known to a reasonable investor, would likely influence his view of the Company's revenue guidance and his decision as to whether to purchase or sell Ideanomics' securities.

Defendants argue that such statements are protected by the PSLRA safe harbor for forward-looking statements.  The safe harbor provides that "a defendant is not liable if [1] the forward-looking statement is identified and accompanied by meaningful cautionary language *or* [2] is immaterial *or* [3] the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (citation omitted); *see also* 15 U.S.C. § 78u-5(c).  Revenue projections are certainly forward-looking

statements.  Defendants, however, cannot, at this stage of the proceedings, avail themselves of the safe harbor.  Plaintiff alleges that Defendants omitted material information, namely SVG and WAG's operating history and the intended purpose of such business lines.  Courts in this circuit have consistently held that material omissions are not protected by the PSLRA safe harbor.  *See, e.g., Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001); *In re Salix Pharm., Ltd.*, No. 14 Civ. 8925 (KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016).

Having determined that at least some of Defendants' statements regarding Ideanomics' revenue guidance for 2017 are actionable, it is unnecessary at this point to consider whether Defendants' other alleged misstatements, including those regarding Ideanomics' crude oil revenues and integration of blockchain, are independently actionable.

### B. Scienter

Under the PSLRA, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "Under Section 10(b) and Rule 10b-5, the required state of mind is 'scienter,' or an intent 'to deceive, manipulate, or defraud.'" *First N.Y. Sec. LLC v. United Rentals Inc.*, 391 F. App'x 71, 73 (2d Cir. 2010) (quoting *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). "The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 556 (2d Cir. 2018) (quoting *ECA v. JP Morgan Chase Co.*, 533 F.3d 187, 198 (2d Cir. 2009)).  Under the "conscious misbehavior or recklessness" prong, to qualify as "strong," the inference of scienter from the facts alleged "must be more than merely plausible or reasonable—it must be cogent and

at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *ECA*, 553 F.3d at 199 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000)).

Plaintiff establishes a strong inference of scienter with respect to Ideanomics, Wu, and Yang, specifically their knowledge of SVG and WAG's revenue and unprofitability during the fourth quarter of 2016. At the time of the February 2017 Acquisitions, Wu had a controlling interest in the seller of SVG and WAG—BT Capital. (Am. Compl. ¶ 86.) Through his ownership interest, Wu had access to records showing the entities' limited revenues and unprofitability. (*Id.*) Further, prior to completing the transaction, the Company was obligated to conduct due diligence and secure board approval. (*Id.* ¶ 85.) Through the diligence process, Yang, who signed the SVG purchase agreement as CEO of Ideanomics, and Wu, who approved the acquisition as Chairman of Ideanomics' Board, had access to data showing SVG and WAG's collective revenues and profitability. (*Id.* ¶ 86.) The financial status of SVG and WAG was therefore easily determinable prior to Ideanomics completing the acquisitions and issuing its 2017 revenue guidance. (*Id.*) Moreover, because Wu had a controlling interest in SVG and WAG prior to their acquisition by Ideanomics, the Company, Wu, and Yang had a duty to monitor SVG and WAG's financial records and retrospectively adjust Ideanomics' financial statements to reflect SVG and WAG's gross loss. (*Id.* ¶ 88.)

To be sure, Plaintiff "must do more than allege that the [individual defendants] had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions" to establish scienter. *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015). The information at issue, however, was critical to the February 2017 Acquisitions. The very consideration for purchasing SVG and WAG was contingent on the entities' future revenue and profits. Where, as here, the transaction was negotiated over a number of months and the revenue projections of the acquired assets are so integral to the terms of the deal, it is reasonable to conclude that Wu and Yang knew or should have known of SVG and WAG's financial data from the fourth quarter of 2016. Further, Wu and Yang's intent may be imputed to Ideanomics, due to their senior positions within the Company. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017) ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.")

## IV.   PLAINTIFF DOES NOT STATE A CLAIM FOR SECURITIES FRAUD AS TO BENYA

Plaintiff's claims regarding alleged misstatements by Benya are limited to his comments regarding the use of blockchain in Ideanomics' products, during an earnings call on August 13, 2018. (Am. Compl. ¶ 70.) The parties dispute whether Benya's statement is an actionable misrepresentation. This Court need not decide this question, because Plaintiff has not, in any event, adequately pled scienter as to Benya. Plaintiff argues that he has pled scienter because Benya "had access to Ideanomics' internal computers and systems, and thus had access to real-time information indicating that Ideanomics had not integrated blockchain into its crude oil and consumer electronics businesses." (MTD Opp'n at 21; *see* Am. Compl. ¶ 95.) Such allegations amount to nothing more than speculation and are plainly lacking under the PSLRA. There is quite

a leap between Benya having a computer login and having access to information about the data mechanisms and records underlying the Company's products.   Moreover, Plaintiff does not identify any specific information or document that would have indicated to Benya that blockchain was not integrated into the consumer electronics and crude oil businesses.

Plaintiff, alternatively, argues that the "SEC inquiry during the Class Period into Ideanomics' blockchain platform" would have put Benya on notice, "because the Company was required to conduct an investigation which reached the conclusion that blockchain had not been integrated." (MTD Opp'n at 22.)  Simply put, Plaintiff's amended complaint does not reflect an SEC inquiry and ordered investigation of Ideanomics' blockchain platform.  Plaintiff alleges that on December 14, 2018, Ideanomics amended its 2017 Annual Report in response to SEC comments, and added a sentence revealing that its "crude oil trading business does not currently integrate blockchain- or AI-based logistics solutions." (Am. Compl. ¶¶ 79, 96.)  Plaintiff contrasts this statement with the Company's first 2017 Annual Report, which made reference to the Company's "Venus blockchain based platform." (*Id.* ¶ 96.)  Plaintiff, then, cites a statement by the Chairman of the SEC from January 23, 2018 indicating that the "SEC is looking at disclosures of public companies that shift their business models to capitalize on the perceived promise of distributed ledger technology and whether the disclosures comply with the securities laws." (*Id.* ¶¶ 35, 96.)  From these facts, Plaintiff makes the conclusory allegation that the SEC conducted an inquiry of the Company during the Class Period, "which undoubtedly related to the Company's statements regarding the integration of blockchain in light of what Defendants edited" in their Annual Report. (*Id.* ¶ 96.)

Plaintiff also contends that due to the importance of blockchain integration to the Company, the individual defendants should have been aware of the misrepresented and omitted

facts at issue.   However, "that an allegedly fraudulent statement concerned 'core operations,'
standing alone, is insufficient to support strong circumstantial evidence of scienter."   *Glaser v.
The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011).   The "core operations" doctrine only
"bolsters the strength of the inference of scienter when plaintiffs have already adequately alleged
facts indicating that defendants might have known their statements were false."   *Id.*   On these
allegations, Plaintiff has not established a strong inference of scienter.

Finally, Plaintiff makes general allegations regarding motive and opportunity, none of
which are sufficient as to Benya.   Specifically, Plaintiff alleges that all Defendants were motivated
to artificially inflate Ideanomics' stock price to acquire companies using Ideanomics stock and
raise capital to avoid insolvency.[4]   (Am. Compl. ¶¶ 103–04.)   However, all of the capital raises
and all but one of the acquisitions identified in Plaintiff's amended complaint occurred *before*
Benya's alleged misrepresentation.   Moreover, Plaintiff makes no allegations specifically
connecting the transactions and the alleged misconduct.   Without such a link to strengthen the
inference of an intent to defraud, Plaintiff's allegations are reduced to a general desire to increase
the stock price.   Such generalized motivations are insufficient for scienter because they are
universal to every company.   *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y.
2008) ("Any corporation would be motivated to make a profit, [or] to avoid bankruptcy . . . . These
allegations do not support an inference of scienter.")

---

[4] Plaintiff premises Ideanomics' risk of insolvency on a statement from the Company's independent
auditor in its 2017 Annual Report raising "substantial doubt about the Company's ability to continue as a
going concern." (Am. Compl. ¶ 104.) Such a statement, alone, is insufficient to conclude that at the time
of Benya's alleged misrepresentation, the Company was in danger of collapse.

## V.   PLAINTIFF DOES NOT STATE A CLAIM FOR SECURITIES FRAUD OR CONTROL PERSON LIABILITY AS TO TOVAR

Plaintiff's amended complaint contains just one purportedly false statement by Tovar. Specifically, Plaintiff attributes a statement to Tovar in the Company's SEC filing for the second quarter of 2018.  The filing, which was signed by Tovar as the CFO of the Company, states in relevant part: "As part of our blockchain and AI focused strategy, we are currently focused on consumer electronics and the crude oil trading business in supply chain management with the intent to migrate this on to the blockchain with AI capabilities."  (Am. Compl. ¶ 68.)  Tovar's statement is a protected forward-looking statement under the PSLRA safe harbor.  The PSLRA defines a "forward-looking statement" as, *inter alia*, "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer."  15 U.S.C. § 78u-5(i)(1)(B).  By its plain terms, Tovar's statement falls squarely within this definition.  The statement indicates a future "intent to migrate" certain businesses to the blockchain.  This statement was also accompanied by meaningful cautionary disclosures and risk factors.  (*See* Dec. of Hunter T. Carter, Ex. 1 (Q2 2018 Form 10-Q), ECF No. 50-1, at 30, 33.) Accordingly, Tovar's statement cannot give rise to liability.

Plaintiff's amended complaint also cannot sustain a Section 20(a) claim for control person liability against Tovar.  Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person" directly liable under the Exchange Act. 15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns*, 493 F.3d at 108.  "[A] determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a

16

defendant's particular culpability." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). Tovar joined Ideanomics as Chief Financial Officer in June 2018. (Am. Compl. ¶ 24.) The only alleged fraudulent statement that occurred after Tovar joined the Company, other than his own, is Benya's comment regarding blockchain on the August 13, 2018 earnings call. However, Plaintiff's amended complaint contains no allegation to support the inference that Tovar exercised control over Benya. Indeed, Benya's title, alone—President, Chief Revenue Officer, and Company Director—belies any notion of Tovar controlling him. Moreover, since Plaintiff has failed to state a claim for securities fraud against Benya, Plaintiff's claim for control person liability against Tovar also fails. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 739 F. App'x 679, 685 (2d Cir. 2018) (noting that the "elements of a § 20(a) claim" include "a primary violation [of the securities laws] by the controlled person").

## VI.   CONCLUSION

Plaintiff's motions to strike, (ECF No. 54 and 58), are DENIED. Defendant Tovar's motion to dismiss, (ECF No. 48), is GRANTED. Defendant Benya's motion to dismiss, (ECF No. 51), is GRANTED, to the extent that Count I of Plaintiff's amended complaint as to Benya is dismissed. The Clerk of Court is directed to close the motion accordingly.

Dated: New York, New York
       September 25, 2020

                                          SO ORDERED.

                                         *George B. Daniels*

                                        GEORGE B. DANIELS
                                        United States District Judge